RECEIVED

JUN 2 6 2008 *aew*
JUN 26 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

FILED

JUN 2 6 2008 *aew*
Jun 26. 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel.
    Jose Vidaurri #R15606

_____
(Full name and prison number)
(Include name under which convicted)

PETITIONER

    vs.

    Terry L. McCann
_____
(Warden, Superintendent, or authorized
person having custody of petitioner)

RESPONDENT, and

**(Fill in the following blank only if judgment
attacked imposes a sentence to commence
in the future)**

ATTORNEY GENERAL OF THE STATE OF

_____
(State where judgment entered)

)
)
)
)
)
)
)
)
)  CASE
)  NO:_____
)    (Supplied by Clerk of this Court)
)
)
)  **08CV3665**
)  **JUDGE PALLMEYER**
)  **MAGISTRATE JUDGE DENLOW**
)
)
)
)
)
)  Case Number of State Court Conviction:
)
)    00 CR 8905(03)
)  _____
)

### PETITION FOR WRIT OF HABEAS CORPUS – PERSON IN STATE CUSTODY

1.  Name and location of court where conviction entered:  **Circuit Court of Cook County;**

_____

2.  Date of judgment of conviction:  **July 10,2002.**

3.  Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

    **First-Degree murder and Attempt First-Degree murder.**

_____

4.  Sentence(s) imposed: **35 yrs. and 10 yrs. to be served consecutively.**

5.  What was your plea? (Check one)    (A)  Not guilty    (X)
                                  (B)  Guilty        ( )
                                  (C)  Nolo contendere  ( )

    If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

_____

Revised: 7/20/05

**PART I – TRIAL AND DIRECT REVIEW**

1. Kind of trial: (Check one):        Jury (☒)                Judge only ( )

2. Did you testify at trial?        YES ( )            NO        (☒)

3. Did you appeal from the conviction or the sentence imposed? YES (☒)   NO ( )

    (A)  If you appealed, give the

        (1)  Name of court:    Illinois Appellate Court—1st Dist.

        (2)  Result:    Affirmed conviction and sentence.

        (3)  Date of ruling:    April 26,2004

        (4)  Issues raised:    Deprived of a fair trial when the Trial Court

        failed to empanel a fair and impartial jury by not asking the

        jury any questions regarding gang bias. Also, Trial counsel(cont.)

    (B)  If you did not appeal, explain briefly why not:

    _____

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES ( x )        NO ( )

    (A)  If yes, give the

        (1)  Result:    Denied

        (2)  Date of ruling:    _____

        (3)  Issues raised:    In affirming Jose Vidaurri's conviction,the Appellate

        Court,relying soley on People v. Williams,295 Ill.App.3d 456,

        692 N.E.2d 723(!stDist.1998),an Appellate Court decision that (cont.)

    (B)  If no, why not:    _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*?  Yes ( )  No (☒)

    If yes, give (A) date of petition: _____ (B) date *certiorari* was denied: _____

2

**3.** **(A)** **(4) Issues raised:**(Cont.) was ineffective for failing to en-
sure that the panel of jurors consisted of Impartial jurors
by not insisting that Trial Judge ask or by herself asking
whether they had any bias toward members of gangs as required
by Illinois Supreme Court Rule 431(b) And People v. Strain.

**4.** **(A)** **(3) Issues raised:**(Cont.) predated the Illinois Supreme Court
ruling in People V. Strain, held that the circuit court had
no sua sponte duty to question the venire about whether they
harbored any gang bias. The **Williams** Court held that the
circuit court's general inquiries of the venire were suffic-
ient, **295 Ill.App.3d at 466.** The Illinois Supreme Court has
now recognized, however, that anyone can harbor negative gang
bias, and that it is not sufficient to simply make general
inquiries, or just ask jurors whether they had family mem-
bers affiliated with street gangs, to uncover such biases.
**Strain,194 Ill.2d at 480.** In **People v. Strain,194 Ill.2d**
**467,481,742 N.E.2d 315(2000),** the Illinois Supreme Court
held that the trial court committed reversible error when
it refused defense counsel's request to probe the venire re-
garding potential gang bias. Underpinning this court's hold-
ing was it's recognition that because gangs are "regarded
with considerable disfavor", gang-related evidence can im-
pact a juror's ability to be impartial. To protect the
defendant's right to a fair trial, the **Strain** Court held
that it is the circuit court's fundamental "Obligation to
conduct **voir dire** in a manner to assure the selection of an
impartial panel of jurors, free from bias and prejudice."
**Strain,194 Ill.2d at 479-81.** Indeed, in light of the circuit
court's preeminent duty pursuant to Illinois Supreme Court
Rules 234 and 431, to assure selection of a fair and impat-
ial jury, leave to appeal was filed to determine whether

this Court's holding in **People v. Strain** should be extended
to require a **sua sponte** duty upon a circuit court to quest-
ion the venire whether they harbor any gang bias where gang-
related evidence permeates every aspect of the defendant's
trial as was the case here.

## PART II – COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

   YES ( x )   NO ( )

   With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

   A. Name of court: Circuit Court of Cook County.

   B. Date of filing: March 10, 2005

   C. Issues raised: (1) Cumulatively applied as one body, trial counsel's actions denied Mr. Vidaurri a fair trial: (a) Denied his Right to effective assistance of counsel by his trial counsel's failure (cont.

   D. Did you receive an evidentiary hearing on your petition?     YES ( )   NO ( x )

   E. What was the court's ruling?     Denied

   F. Date of court's ruling: May 11, 2005.

   G. Did you appeal from the ruling on your petition?     YES ( X )   NO ( )

   H. (a)   If yes, (1) what was the result?     Affirmed

             (2) date of decision:     November 6, 2006.

      (b)   If no, explain briefly why not:

   I. Did you appeal, or seek leave to appeal this decision to the highest state court?

   YES ( X )   NO ( )

      (a)   If yes, (1) what was the result?     Denied

             (2) date of decision:

      (b)   If no, explain briefly why not:

Revised: 7/20/05

## PART II-COLLATERAL PROCEEDINGS

**1.** **(C.)** **Issues raised:**(cont.) to file a motion to suppress the videotaped statement;**(B)** Trial counsel's failure to investigate and prepare law & evidence for pre-trial motion;**(C)**(a) Trial counsel failed to timely object to the prejudicial admission of improper remarks made by state witness,Det.Garcia,and,(b) failure to timely object to the prejudicial admission of a gun and ammunition that were not connected to this crime;**(D)** Denied his right to testify where his affidavit avers that defense counsel refused to allow him to testify, threatened him,and made him promises of acquittal to induce him to waive his right;**(E)** Trial counsel's failure to object to prosecutorial misconduct in their use of perjured testimony by state witness,David Niera, and assistant state's attorney,Brian Holmes in closing arguments;**(F)** Trial counsel's remarks during closing argument conceded guilt and prejudiced Mr.Vidaurri resulting in a CHANDLER violation. **(2)** Petitioner re-states arguments (!)(A) through (1)(F) and asserted ineffective assistance of counsel on direct appeal where said issues are applied, and direct appeal counsel expressing biasness towards petitioner. **(3)** Evidence not available to petitioner or trial court during sentencing that would have supported petitioner's rehabilitative potential.

3a.

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?     YES ( )        NO (**X**)

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1.    Nature of proceeding    _____

        2.    Date petition filed    _____

        3.    Ruling on the petition    _____

        4.    Date of ruling    _____

        5.    If you appealed, what was the ruling on appeal?    _____

        6.    Date of ruling on appeal    _____

        7.    If there was a further appeal, what was the ruling ?    _____

        8.    Date of ruling on appeal    _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?     YES ( )    NO (**X**)

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition? If so, state

      (1) Ruling: _____

      (2)  Date: _____

4. With respect to this conviction or sentence, are there legal proceedings pending in any court, other than this petition?     YES ( )        NO (**X**)

    If yes, explain: _____

_____

Revised: 7/20/05

**PART III-PETITIONER CLAIMS**

1

 **(A) Ground one:** <u>**Denial of effective assistance of counsel/**</u>
<u>**Conviction obtained by use of coerced confession**</u>

Mr.Vidaurri made the claims to his trial counsel that the only
reason there was a confession, was because he was induced to do
so by a violation of his rights nad torture. Upon being being
placed into an interrogation room, Mr.Vidaurri made it known to
the detective that he did not want to speak to him. In fact that
he wanted an attorney, but Mr.Vidaurri was repeatedly ignored.
Mr.Vidaurri gave an alibi for the night in question. Mr.Vidaurri
was handcuffed to a wall, and left there all night until the next
day. During the course of this night, Mr.Vidaurri tried to lay
across some chairs that were against the wall in which he was
handcuffed to. While asleep, several people entered the room and
yanked Mr.Vidaurri off of said chairs. Mr.Vidaurri's hand is still
handcuffed to the wall, while an officer squeezes him by the back
of the neck, forcing his head down towards the ground. Everytime
Mr.Vidaurri tried to pick his head up to see faces, he was squeezed
harder and smacked repeatedly on the back of his head. When this
ended, the chairs were gone from the interrogation room. Mr.
Vidaurri was forced to stand for hours while handcuffed to the
wall, and when he would squat down to try and rest, he was dealing
with the pain of his body weight pulling on his arm cuffed to the
wall. Everytime Mr.Vidaurri did manage to dose off, he was yanked
awake everytime and not allowed to rest at all. The next day when
questioned again, Mr.Vidaurri again requested an attorney. He was
even slapped by Detective Garcia for his request. Eventually,
Mr.Vidaurri was threatened that his cousin Erica would be arrested
and her child taken away from her, if Mr.Vidaurri did not co-
operate. Mr.Vidaurri told him what happened, but Det.Garcia
already had his own ready made version of events. A.S.A. Blakey
was called in and Mr.Vidaurri was promised that he might be able
to go home, and a word on his behalf, should he take their
version of events. However, threatened about his cousin again,

5.

should he not agree. Mr.Vidaurri, afraid for his family, had no
choice but to take their version of events and document them.
Mr.Vidaurri was then coached by Det.Garcia and A.S.A. Blakey,
before documenting anything. Mr.Vidaurri told his trial attorney
that the statement was attained through a violation of his rights
torture, threats and coercion. Trial attorney never once challenged
the voluntariness of Mr.Vidaurri's statement. Mr.Vidaurri's
strongest defense was to seek suppression of the statement, the
evidence in this case was very closely balanced. Absent the video
taped statement, which Mr.Vidaurri argues should have been
suppressed, there was no direct evidence fo his accountability
for the shooting. The state's priciple witnesses, David Niera and
William Solis testified that in the van before the shooting, no
one displayed a gun or discussed shooting anyone. (TR P56-P57,
P60,P99-P100). They testified that they did not see Mr.Vidaurri
with a gun, never saw Mr.Vidaurri give anyone a gun, and never
heard any discussion or indication that Mr.Vidaurri knew that
anybody had any guns. (TR P46,P56,P91,P100). They also testified
they never once heard Mr.Vidaurri tell anyone to shoot at the
car. (TR P57,P100). Thus, a jury could reasonably have inferred
that Mr.Vidaurri did not have the knowledge or intent to promote
or facilitate the crime.

**(B) Ground two: <u>Denial of effective assistance of counsel/Trial
counsel's failure to investigate and prepare law
& evidence for pre-trial motion.</u>**

Trial counsel filed a Motion to Quash Arrest and Suppress Evidence
challenging a "Third Party Consent." A Mr. Ivan Beltran allegedly
signed a third part consent to search the apartment at 2138 N.
Lawndale, but when the detectives tried to gain entry to the home,
Mr.Beltran's daughter, Vanessa Beltran, denied these detectives
entry unless they had a warrant. The door to the home was broken,
and Mr.Vidaurri was arrested without a warrant. Trial counsel

challenged the third part consent of Ivan Beltran, by placing
Vanessa Beltran on the stand. Had trial counsel did any investi-
gation and prepared law and evidence, trial counsel would have
known that this was a losing motion. As the State presented,
**People v. Simpson,Illinois Supreme Court,March 21,1996, cited 172
Ill.2d,117,665 N.E.2d,1228.** "Consent to enter may be obtained
from the defendant or a third party who possesses common authority
over the premises." This is the law throughout the state of
Illinois. Trial counsel had no knowledge of this, and it is clear
from the record.

> **Trial counsel:** Judge, I think we have an interesting situation
> which is not one that I'm personally familiar with as regards
> to the case law, and I would like an opportunity to brief your
> Honor where one person gives consent and another does not.
> **(TR D69).**

The Simpson case goes on to state, that consent to enter a re-
sidence by a person to be arrested or some other person with
significant interest validates a warrantless arrest.
The state also stated to the judge, that the officers did gain..
entry to the home with consent voluntarily given to them from
Ivan Beltran and they effectuated the arrest. Trial counsel did
no investigation into the voluntariness or authenticity of
Mr.Beltran's alleged signature consent. It was the signature of
Mr.Beltran that validated the warrantless arrest of Mr.Vidaurri,
yet counsel never subpeonaed Mr.Ivan Beltran. It was because of
the alleged signature of Mr.Beltran, that said motion was denied.

> **Trial Court:** Based upon the evidence that I heard that
> Mr.Beltran was able to give a valid consent to the police
> officer to enter the premises to effect the arrest of
> Mr.Vidaurri. Based on that, the motion to suppress is
> denied.

Furthermore, in **New York v. Harris,495 U.S. 14,18-21,109 L.Ed.2d
13,21-22,110 S.Ct.1640,1643-45(1990)**(Held that even an arrest
made during a warrantless nonconsensual entry of a home does not

7.

invalidate a defendant's subsequent voluntary statement outside
the home, so long as the authorities has probable cause to arrest
the suspect); **See also People v. Segoviano,189 Ill.2d 228,244
(2000).** Those cases hold that even though there was a good argu-
ment that the police's entry into the home where I was arrested
might have been illegal, even though it was'nt, that is not a
basis for suppression of a statement.  Trial counsel clearly
failed to investigate and prepare law and evidence for the pre-
trial motion.

**(C) Ground Three: <u>Denial of effective assistance of Counsel/(a)
Trial counsel failed to timely object to the
prejudicial admission of improper remarks;(b)
Failure to timely object to the prejudicial
admission of a gun and ammunition that were
not connected to this crime.</u>**

**(a)** During the direct examination by A.S.A. of detective Adrian
Garcia, Det.Garcia made a comment that he advised Mr.Vidaurri
that there were approximately six witnesses that had placed him
in the van the night of the homicide.**(TR P183).** This resulting
that it was improperly before the jury that six people said that
Mr.Vidaurri was in the van, as there was a motion for a severance.
The state's attorney only presented two witnesses at trial, that
testified Mr.Vidaurri was in said van the night of the shooting.
Following a lengthy direct examination by the state, it was not
until trial counsel was to cross-examine Det.Garcia that counsel
chose to object to Det.Garcia's prejudicial remark. **(TR P195).**
Trial counsel did not object to these remarks in front of the
jury, but asked for a side-bar. **(TR P194).** It was then that
counsel informed the Judge about being improperly before the
jury that six people said that Mr.Vidaurri was in the van the
night of the shooting, and counsel asked that it be stricken
from the record and that the state. not be allowed to argue it.
**(TR P195-P196).**

8.

Trial Judge realizes and questions counsel on her error:

    **Trial Judge:** "Why did'nt you make an objection at that time."

    **Trial counsel:** <u>'Because it slipped right past me, Judge.</u>
                 <u>That's what I'm telling you."</u>
                 **(TR P196)**

Trial counsel was suppose to make a timely objection in front of
the jury, so that the jury would know that such remarks were wrong
and improperly before them and should be ignored, because there
were not six witnesses at trial stating this. Trial counsel's
failure to do so, resulted in it improperly being before the jury.
Upon counsel's untimely objection to such prejudicial remarks,
counsel stated the following:

    **Trial Counsel:** "I'm not asking your honor to go back over
    it and tell the jury to ignore it. I'm asking your honor
     to strike it from the record and prohibit the state from
    arguing it." **(TR P196)**.

On top of counsel's excuse that her failure to make an untimely
objection was because "it slipped right past her head", counsel
does'nt ask the judge to do what is suppose to be done. Counsel
should have rectified her mistake, by asking the judge to go
back over it and tell the jury to ignore such improper remarks.
However, counsel does not do so. Therefore this highly pre-
judicial remark was before the jury, without any clarification
at all. Trial counsel's excuse that "it slipped right past her",
after the judge acknowledged there was error, clearly shows
that counsel was not effective. Although it was ruled that there
was no evidence that identification was made, and the state was
not going to argue it. It was still before the jury improperly
and highly prejudicially, that there were in fact six witnesses
that identified Mr.Vidaurri.

**(b)** Detective Climack testified that he repeatedly interviewed
Onyx Santana, who was not alleged to be present during the
shooting.**(TR P167,P35-P37)**. Climack testifed that after inter-

viewing Santana and Santana's girlfriend, he went to a certain
address on January 12,2000(about three days after the shooting)
and recovered a nine millimeter handgun and magazine clip.(TR
P167-P168). No evidence whatsoever was adduced at trial connect-
ing the gun to the crime at issue. Nevertheless, the gun and
clip were admitted into evidence and displayed to the jury.(TR
P167-P168,Q5). The day after Detective Climack testified, defense
counsel belatedly moved to deny admission of the gun and clip in
to evidence on the basis that there was no evidence connecting the
gun to the crime.(TR Q5). The trial court overruled the objection
as untimely, noting, "There was no objection during the course of
the trial." (TR Q6). The gun and magazine clip were inflammatory,
prejudicial evidence that had no relevance to this trial. As
Mr.Vidaurri's petition alleges, trial counsel was ineffective for
failing to timely object to their admission, and appellate
counsel was ineffective for failing to raise this issue on direct
appeal. (C.26,39-43). The prosecution did not establish any
connection between the gun admitted at trial and displayed before
the jury, and the gun used in the shooting. Noone testified that
the gun found had been used during the shooting or even that it
resembled one of the guns used. Thus, a timely relevance objection
should have resulted in the court denying the gun and clip's
admission into evidence. Nevertheless, the court properly denied
defense counsel's belated objection to the gun because it was not
timely made.(TR Q5). Thus counsel's unreasonable representation
in failing to make a timely objection to the gun and clip, per-
mitted the evidence admission. Moreover, counsel's delay in
objecting to the evidence was clearly not trial strategy, as she
admitted on record that her failure to make a timely objection
was "an oversight" rather than intentional strategy.(TR Q5).
Here, the inflammatory nature of the irrelevant nine millimeter
handgun and magazine clip was highly prejudicial.

**(D) Ground Four:** <u>Denial of effective assistance of counsel/Denied</u>
<u>his right to testify in that trial counsel re-</u>
<u>fused to allow him to testify,threatened him,</u>
<u>and made him promises to induce him to waive his</u>
<u>right.</u>

Petition stated the claim clearly: "Petitioner's trial counsel re-
fused to allow him to take the stand, during attorney visit. Pet-
itioner expressed his desire to take the stand, trial counsel
ignored this position by petitioner ." **(C.30).** Moreover, Mr.
Vidaurri's affidavit clearly states that an additional, contem-
poraneous attempt to testify was amde on the last day of the trial
before the defense rested.**(C.67).** Mr.Vidaurri's affidavit recounts
that when he told his attorneys that he intended to testify,
counsel told him he was "crazy" and that she would have him
"thrown out of the court room if he tried to testify."**(C.65-66).**
According to the affidavit, counsel told Mr.Vidaurri that he
would forgo his appeal rights if he testified.**(C.66).** Mr.Vidaurri
also alleges that the waiver of his rights were induced by
several misapprehensions of legal signifigance of the waiver.
Mr.Vidaurri alleges he waived his rights because counsel promised
him, that due to an instructional error, he would be acquitted of
one or both charges if he proceeded without testifying.**(C.67).**
Significantly, the record does not rebutt Mr.Vidaurri's claims.
Although the court did indeed ask Mr.Vidaurri if he was fore-
going his right to testify, the court <u>never</u> questioned whether
any threats or promises induced the decision.**(TR Q4).** Here,
Mr.Vidaurri's allegations show that he relied on several mis-
apprehensions in waiving his rights, including his beliefs that
waiver was necessary to preserve his right to appeal, that his
lawyer could have him "thrown out of the courtroom" if he tried
to testify, and that if he relinguished his right to testify,
he would be acquited on a technicality. Mr.Vidaurri's allegations
arised from conversations he had before trial and at the last
day of trial, before the defense rested, with his attorneys, in

which noone else was present but him and his attorneys. The
appellate court's contention is also burdensome because
apparently it would impose a burden on Mr.Vidaurri to attach an
affidavit from trial counsel confessing to their ineffective
assistance, and even specifying it's exact nature. No authority
can be cited for such a burden, orcourse, because there is none.
Because Mr.Vidaurri alleges that the waiver of his rights were
based on a misrepresentation by his trial counsel, "the only
affidavit that petitioner could possibly have furnished, other
than his own sworn statement, would have been that of his
attorney who allegedly made the misrepresentation to him. The
difficulty or impossibility of obtaining such an affidavit is
self-apparent."

**(E) Ground Five:** <u>Denial of effective assistance of counsel/</u>
<u>Failure to object to prosecutorial misconduct</u>
<u>in their use of perjured testimony by state</u>
<u>witness David Niera, and Assistant state's</u>
<u>attorney Brian Holmes.</u>

In this case at bar, petitioner avers, that the A.S.A. Mark
Gerhardt, wrote things in the statement of state witness David
Niera, that David Niera never told A.S.A. Gerhardt. At Co-
defendant's (Alvaro Vera) trial, Mr.Niera was questioned about
his written statement contradicting his testimony at Mr.Vera's
trial.

> **Q:THEN WHAT HAPPENED?**
>
> **DN:Then when he stuck his hand out the window at the
> same time Bam-Bam was reaching to open the door....**
>
> **Q:Who opened the door?**
>
> **DN:Bam-Bam.**
>
> **(Alvaro Vera's TR D250).**

It is established by Mr.Niera that <u>Bam-Bam</u> opened the van door
right before the shooting, it is then that Mr.Niera is asked
if he remembered his written statement.

Q:Do you remember in your written statement you said that
   **Porky** pulled the door open?

DN:I seen Bam-Bam, I know.

(Alvaro Vera's TR D251).

Mr.Niera is then showed his written statement, and he himself
realizes that his written statement states that **Porky** not **Bam-Bam** opened the sliding door before the shooting began. When
asked if he said what was on his written statement, he says that
the state's attorney wrote that and not him.

Q:Did you in your statement say David states **Porky** pulled
   open the sliding door on the right and stuck his right
   hand out with a gun? Did you say that?

DN:They wrote it down.

Q:Did you write that?

DN:I did'nt actually write it, but they wrote it and I
   signed it.

Q:Someone wrote it for you?

DN:Yes, the state's attorney.

(Alvaro Vera's TR D251-D252).

It is well established here that after Mr.Niera testified with
conviction when challenged about who opened the van door, that it
was **Bam-Bam** that he saw with his own eyes. It is also well
established that the written statement was written by the state's
attorney, and the written statement written by the state's
attorney contradicted Mr.Niera's conviction of what he knows he
saw. Several months later, state witness David Niera knowingly and
willingly changed his conviction/testimony to match that of the
same written statement that contradicted his testimony at Mr.Vera
trial. On July 9,2002, David Niera testified at the trial of
Mr.Vidaurri.

Q:Okay. What happened as the van caught up to the car?

DN:I seen Juan Ocon with a handgun. He was pointing it out
   the window and then at the same time **Porky** opened the
   van door and they started shooting.

(Vidaurri's TR P45).

State witness David Niera's willingness to change his testimony,
his conviction of what he claimed he know he saw that **Bam-Bam**
opened the van door, at the trial of Alvaro vera, to match the
same written statement that contradicted his conviction and
testimony, that **Porky** opened the van door at Mr.Vidaurri's
trial is questionable. It amounts to perjury. One could only
try to imagine what would cause Mr.Niera to go against his
conviction, from one trial to another. Had trial counsel did a
pretrial investigation, especially into the testimony of the
priciple witness David Niera at the trial of Alvaro Vera, whose
trial was 3 months prior to Mr.Vidaurri's trial. Counsel would
have known of this, and would have objected to this perjured
testimony. Mr.Vidaurri avers that A.S.A. Brian Holmes and Romano
DiBenedetto tried the same case twice prior to Mr.Vidaurri's
trial, Mr.Niera is one of the state's own priciple witnesses.
Both of the assistant state's attorneys were present at the
trial of Mr. Alvaro Vera, and knew of the contradiction between
David Niera's convictions and the written statement that contrad-
icted Mr.Niera's testimony in which he defended with conviction.

During the closing arguments, the A.S.A. Brian Holmes committed
perjury, when he himself knowingly and willingly misinformed the
jury about certain facts of the case.

> BH:Look at his actions afterwards. **He takes the guns from**
> **the shooters, hides them in the van, parks the van and**
> **leaves. (TR Q54).**

Prosecuting attorneys, Brian Holmes and Romano Di Benedetto again
both tried the same case twice prior to Mr.Vidaurri's trial. They
both had knowledge of this case in detail, including their state
witnesses' statements and testimonies. During the trial of co-
defendant Alvaro Vera, state witness William Solis was questioned
by one of Brian Holmes or Romano Di Benedetto about what happened
to the weapons after the shooting.

Q:What happened next?

WS:We made a right in the alley and parked in the other
   alley and parked the van in a parking lot.

Q:Did you see what Alvaro did with his gun?

WS:I believe he put the gun in the back seat of the van.

Q:We're talking about Alvaro Vera, so we're clear?

WS:Yes

Q:Did you see what Juan Ocon did with his gun?

WS:I believe he gave it to Porky.

Q:Did you see what Porky did with that second gun?

WS:Placed it in the same spot as the first one.

(Alvaro Vera's TR D178-D179).

As shown through the trial transcript of Alvaro Vera, Mr.Holmes
and Mr.Benedetto knew who it was that took those weapons and where
they placed them. They even put emphasis on Alvaro Vera for
clarity, yet Mr.Holmes still chose to knowingly and willingly
lied to the jury of Mr.Vidaurri's trial. Trial counsel was
ineffective in that she did not object to this prosecutorial mis-
conduct, and correct the wrong that severly prejudiced the
petitioner.

(F) Ground Six: <u>Denial of effective assistance of counsel/trial
               counsel's remarks during closing arguments
               conceeded guilt when petitioner plead not
               guilty.</u>

Trial counsel presented no witnesses on Mr.Vidaurri's behalf, and
Mr.Vidaurri himself did not testify. During Closing arguments,
trial counsel conceeded that Mr.Vidaurri drove the van to get the
shooters to where they were going to shoot. Trial counsel then
said that Bam-Bam opening the door, getting out and shooting, is
exactly the same action as Mr.Vidaurri's actions.

   <u>Trial counsel</u>: Apparently driving the van to get the
   shooters to where they were going to shoot is accountability
   but opening the door, get out and shoot as Bam-Bam did,
   that's not accountability. <u>Exactly the same action</u>....

   (TR Q41).

It is clear from the context of the trial transcript, that
counsel was being sarcastic in a way. However, the comparison
that Mr.Vidaurri's actions were the same of a man who opened
the door and shot conceeded guilt. Trial counsel's argument was
that Mr.Vidaurri was accountable, but so was Bam-Bam, so why
was'nt he on trial also. Even if counsel would have convinced
the jury that Bam-Bam should be on trial and was guilty, by the
statement that Mr.Vidaurri's actions and Bam-Bam's actions were
the same, the jury was still instructed to find the defendant
guilty of murder on accountability, and had no choice but to
find Mr.Vidaurri guilty of murder and attempted-murder.

Grounds one through six Cumulatively applied as one body, trial
counsel's actions resulted in denial of Mr.Vidaurri's right to
effective assistance of counsel. This denying him a fair trial.

**(G) Ground Seven:** <u>**Denial of effective assistance of counsel/
Petitioner restates arguments one through
six and asserts ineffective assistance of
counsel on direct appeal where said issues
are applied, and direct appeal counsel
expressed biasness toward petitioner.**</u>

When petitioner spoke with his appellate counsel, Yasaman
Hannah Navai, about challenging the evidence used to convict
Mr.Vidaurri, appellate counsel expressed biasness toward the
petitioner. "You were a gangmember, doing a drive by shooting.
I would hope you take your responsibility." Appellate counsel
also used the most damaging testimony at trial, in her state-
ment of facts which showed petitioner in a very prejudicial
light. Appellate counsel stated in "Brief and argument", and
"Leave to Appeal" statement of facts, "at this point, Mr.
Vidaurri caught up to the Mercury and drove the van along side
the Mercury's driver side, <u>eventually hitting the Mercury with
the van</u>." Appellate counsel used **(TR P44)**, the testimony of

**16.**

David Niera to prove this, but ignored the overwhelming test-
imony of William Solis(TR P92);Nicholas Mobley(TR P111-P112);
Delbert Guy(TR P140); and William Peppers(TR P153). All state
witnesses. These four testimonies all refuted the testimony
of David Niera(TR P44), which appellate defender used to prove
her statement of facts. Appellate counsel raised the issue of
ineffective assistance of counsel in the direct appeal: **"Jose
Vidaurri was deprived of a fair trial when trial court failed
to empanel a fair and impartial jury by not asking the jury any
questions regarding gang bias. Also, trial counsel was in-
effective for failing to ensure that the panel of jurors con-
sisted of impartial jurors by not insisting that trial judge
ask or by herself asking whether they had any bias towards
members of gangs as required by Illinois Supreme Court Rule
431(b) and People V. Strain."** However Appellate counsel knowing
the case law, was well aware that raising an ineffective claim
would have to meet the two-prong test in Strickland v. Washington.
The record shows that trial counsel was ineffective for failing
to ensure that panel of jurors consisted of impartial jurors,
therefore meeting prong (1) of the Strickland test. However,
failure to challenge the evidence used to convict Mr.Vidaurri,
would render claim frivolous in that it would not meet the second
prong of the Strickland test. Appellate counsel ignored the re-
quest of Mr.Vidaurri to challenge the evidence used to convict
him. Mr.Vidaurri's direct appeal was denied, and it stated in the
beginning: "Following a jury trial, defendant Jose Vidaurri, was
convicted of First degree murder and attempted first degree
murder, then sentenced to consecutive, respective terms of 35
and 10 years' imprisonment. Defendant does not challenge the
sufficiency of the evidence to sustain his conviction...."

17.

**Relief Requested:** That Mr.Vidaurri's conviction for both first degree murder and first degree attempted murder be overturned, and reversed and remanded for a new trial to be given the opportunity to have effective assistance of counsel and a fair trial. Any other relief that this court may see fit.

(C) Ground three ___ __Refer to page 8__ _____ _____
    Supporting facts:

_____

_____

_____

_____

_____

_____

_____

(D) Ground four __Refer to page 11.__ _____
    Supporting facts:

_____

_____

_____

_____

_____

_____

_____

2. Have all grounds raised in this petition been presented to the highest court having jurisdiction?

   YES (**X**)   NO ( )

3. If you answered **"NO"** to question (2), state briefly what grounds were not so presented and why not:

_____

_____

Revised: 7/20/05

## PART IV – REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing _____

(B) At arraignment and plea _____

(C) At trial _Martha Fitzsimmons and Wendy schilling_____

(D) At sentencing _Martha Fitzsimmons_____

(E) On appeal _Yasaman Hannah Navai_____

(F) In any post-conviction procceding _Debra Loevy-Reyes_____

(G) Other (state): _____

## PART V – FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )  NO ( **x** )

Name and location of the court which imposed the sentence: _____

Date and length of sentence to be served in the future _____

    WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _____          _____
                    (Date)                                   Signature of attorney (if any)


                                        **I declare under penalty of perjury that the foregoing is true and correct.**

                                        _Jose Vidaurri_____
                                        (Signature of petitioner)

                                        _R15606_____
                                        (I.D. Number)

                                        _P.O.Box 112  Joliet,IL.60434_
                                        (Address)


                                    20.

Revised: 7/20/05

1      Q      Juan told Jose and Jose Vidaurri followed

2   Juan's instructions?

3      A      Yeah.  I guess.

4      Q      He received those instructions numerous

5   times.

6          Correct?

7      A      I don't know a lot, but I know he was telling

8   him.

9      Q      How many times was he told, the defendant

10  told to keep driving, keep following the car?

11     A      A couple times.  I know that, I'm not saying

12  20, 30 times, but he was telling him.

13     Q      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14  ▓▓▓▓▓

15     A      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓m.  ▓▓▓

16  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

       Q      Y▓▓▓▓▓▓ saw Jose with a gun that ▓▓▓▓▓?

       A      ▓▓▓▓

       Q      Y▓▓ never saw Jose ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓that
       ▓▓▓▓▓▓

       A      ▓▓▓▓

       Q      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓hat
       ▓▓▓▓▓▓

       A      N▓▓

                                  ▓▓▓ & there's ▓▓▓▓▓▓▓▓

Q ~~(redacted)~~

~~(redacted)~~

A ~~(redacted)~~

Q ~~(redacted)~~

~~(redacted)~~

A ~~(redacted)~~

7    Q    You indicated that a few days after the

8  shooting you went down to Area 4?

9    A    They came and got me, yes.

10    Q    So they came and picked you up?

11    A    Right.

12    Q    What time of the morning did they pick you

13  up?

14    A    About three o'clock, four o'clock in the

15  morning.

16    Q    Did anybody accompany you to the police

17  station?

18    A    Yes.

19    Q    Who went with you?

20    A    The detectives came and got me.  But I went

21  by myself.

22    Q    After the shooting on January 9th you didn't

23  tell anybody about the shooting, did you?

24    A    The next day I did.

D-39

1          Isn't that true?

2     A    As far as?

3     Q    This case?

4     A    No.

      Q    ~~[redacted]~~

      ~~[redacted]~~

      ~~[redacted]~~

      ~~[redacted]~~

      A    ~~[redacted]~~

10    Q    ~~[redacted]~~

11    A    ~~[redacted]~~

12    Q    ~~[redacted]~~  An~~[redacted]~~

13    ~~[redacted]~~

14    A    ~~[redacted]~~

15    Q    I have nothing further, your Honor.

16    MS. FITZSIMMONS:   Just a minute.

17    MS. SCHILLING:   Nothing further, your Honor.

18    MR. HOLMES:   Just one question, Judge.

19              RE-DIRECT EXAMINATION

20                    BY

21               MR. HOLMES

22    Q    Who did you tell the next day about the

23    shooting?

24    A    Onyx Santana.

1  A  Yep.

2  Q  Is that a yes?

3  A  Yes.

4  Q  Were you smoking your pot in a pipe or by a

5 joint?

6  A  By a joint.

7  Q  How many joints did you have before you got

8 into the van?

9  A  Probably one, maybe two.

10  Q  When you got into the van did you begin

11 smoking more pot?

12  A  No.

13  Q  Did you begin to drink in that van?

14  A  Yes.

  Q  ████████████████████████████████████ got
████████████████████████████ party ████ your friends.
██████████████

  A  ████

  Q  Wh██████████████████████████████████ you didn't
████████████████████████████████████████████████████████
██████████████████████████

  A  ████

  Q  ████████████████████████████████████████████████
████████████████████████████████████████████████?



```
        A    ████

        Q    ████████████████████████████████████
████████████████████████████████████████████

did you?

        A    ████

        Q    ████████████████████████████████████
did you?

        A    ████

        Q    ████████████████████████████████████
that night, did you?

        A    ████

        Q    ████████████████████████████████████
████████████████████████ night, did you?

        A    ████

        Q    ████████████████████████████████████
████████████████████ chase car, did you?

        A    ████

        Q    ████████████████████████████████████
████████████████ that car?

        A    No response.

        Q    Did you?

        A    ██████████████

22      Q    You testified here today that you told Mr.

23   Vidaurri to stop chasing the car.

24           Is that your testimony?
```

1    Q    ~~[redacted]~~

2    A    ~~[redacted]~~

3    Q    ~~[redacted]~~,

4    ~~[redacted]~~

5    A    ~~[redacted]~~

6    Q    That sliding door, was that on the driver's

7    side or passenger side?

8    A    Passenger.

9    Q    It was closest to you?

10   A    Well, I was in the back, so yeah, you could

11   see.

12   Q    You were on the back passenger side?

13   A    Right.

14   Q    Before, during or after Juan Ocon and Alvaro

15   Vera were firing at the car did you hear any noises,

16   any sounds coming from the car?

17   A    From our car or from --

18   Q    From that red car?

19   A    No.  I didn't hear nothing.

20   Q    Did you see the occupants of that red car

21   with any weapons?

22   A    No.

23   Q    Did they throw anything at the van?

24   A    Nothing.

1   already, Pelon already had his out.

2      MS. FITZSIMMONS:  Objection to what he guesses.

3      THE COURT:  Overruled.

4     A   And shot a couple times.

5     MR. HOLMES:  Q  Who shot a couple times first?

6     A   I can't tell who shot first, but I know Pelon

7   and Porky.

8     Q   Juan Ocon and Pelon shot?

9     A   Yes.

10    Q   And Porky shot?

11    A   Yes.

12    Q   [redacted]

13    A   [redacted]

      Q   [redacted]

      A   [redacted]

16    Q   Were you saying anything to Jose Vidaurri

17  while the whole chase was going on?

18    A   Just, I was just yelling to the front, you

19  know, just forget about it since the car was kind of

20  further away from us.

21    Q   You were telling him to stop?

22    A   Yes.

23    Q   How many times?  If you know, how many times

24  did Juan Ocon fire his gun?

*[handwritten note on line 18-19: Never said it to grand jury and its not in his statement]*

1    THE COURT:  People's 1 is received into evidence.

2    MS. FITZSIMMONS: ~~██████████████████~~

~~██████████████████████████████████████~~

~~██████████████████████████████████████~~

~~██████████████████████████████████████~~

~~██████████████████████████████████████~~

~~██████████~~.  And I'd like to be able to

give your Honor some case law on that issue.

9    THE COURT:  I'll give you some time to do that.

10   When did we set the other matter for, Mr. Holmes.

11   MR. HOLMES:  September 5th, Judge.

12   MS. FITZSIMMONS:  That's a bad week for me.

13   THE COURT:  Well, I was suggesting sometime like

14   before that, the week of August 27th.

15   MS. FITZSIMMONS:  Those two weeks, the last week

16   of August and the first week of September are bad

17   weeks for me because of child care issues, Judge.

18   THE COURT:  How about August the 10th?

19   MR. HOLMES:  August 10th would be perfect.

20   MS. FITZSIMMONS:  Judge, that's soon for me

21   because of other matters -- the jury -- not the jury,

22   because of other matters that I have; I'm not going to

23   have time to do it then.  Your Honor is going to be

24   gone from when to when?

1    obtained from the defendant or a third party who

2    possesses common authority over the premises.

3    That's Mr. Beltran in this case clearly.

4                    Common authority exists when there

5    are mutual uses for the property by persons

6    generally having joint access or control for most

7    purposes.  Clearly that's here.  The officers had

8    consent from him.

9                    Case goes on to state that consent

10   to enter a residence by a person to be arrested or

11   some other person with significant interest

12   validates a warrantless arrest. ✳

13                    That's what we are asking for the

14   court to find today.  That's what the evidence

15   suggested at the motion.  We ask for you to deny

16   the motion.

                     THE COURT:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

                     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23                   MS. FITZSIMMONS:  Judge, co-defendants

24   are up September 5th, but I am not able to be here

E-6

that that be stricken from the record and that the

State not be allowed to argue it.

THE COURT:  ~~Why didn't you make any objection at~~

~~the time?~~

MS. FITZSIMMONS:  ~~Because it slipped right past~~

~~my mind.    That's why I'm asking you.~~

~~Now I'm asking your Honor to go back and I~~

~~would like to request to, of a ruling point for~~

~~strikes it from the record and prohibit the State~~

~~from arguing it.~~

11  THE COURT:  Well, that, your request is taken

12  under advisement and I'll rule prior to closing

13  argument.

14  MS. FITZSIMMONS:  Okay.  Okay.

15  That's what I asked to come back here for.

16  THE COURT:  Okay.

17                    (Whereupon, the following

18                     proceedings were had in open

19                     Court)

20              CROSS EXAMINATION

21                    BY

22              MS. FITZSIMMONS

23  Q    People's 18, this is about roughly 15 minutes

24  long.

1       A      Yes.

2       Q      ~~And after you spoke with Onyx Santana for the~~

3    ~~fourth time, where did you go~~?

4       MS. FITZSIMMONS:  Objection to this line of

5    inquiry, your Honor.

6       THE COURT:  Objection overruled.

7       MR. HOLMES:   Q   ~~Where did you go~~?

8       A      ~~We went to, we interviewed his girlfriend,~~

9    ~~Onyx's girlfriend~~.

10      Q      ~~After interviewing the girlfriend, where did~~

11   ~~you go~~?

12      A      ~~We went to a location on Gray Road, that's where~~

13   ~~we were~~.

14      MS. FITZSIMMONS:  Objection to where they were, to

15   what they were doing there.

16      THE COURT:   Q   ~~Was that where you went~~?

17      A      ~~Yes~~.

18      THE COURT:  That was the question.  He answered

19   the question.

20           Ask him another question if you wish.

21      MR. HOLMES:   Q   ~~Did you recover anything there~~?

22      A      ~~Yes~~.

23      Q      ~~What did you recover~~?

24      A      ~~A nine millimeter handgun~~.

1       Q    What member, was he a member of any gang?

2       A    Yeah.  He was a Latin Jiver.

3       Q    Now you used the name Jose Vidaurri.  Do you

4  see Mr. Vidaurri in court today?

5       A    Yes.

6       Q    Could you please point to him and describe

7  something that he's wearing?

8       A    He's got a white shirt with glasses.

9       Q    For the record, Judge, an in court

10  identification of the defendant, Jose Vidaurri.

11     THE COURT:  The record will so indicate.

12     MR. HOLMES:  Q    When you met up with these

13  friends of yours, did you go with them or did you stay

14  on the street?

15       A    We went with them.

16       Q    So you left William's car.

17       A    Right.  We parked it and we jumped in with

18  them.

19       Q    What kind of car did they have?

20       A    They were in a van.

21       Q    And what kind of van was it?

22       A    Conversion van.

23       Q    [illegible]?

24       A    [illegible].



```
 1      Q    Who was sitting in the front seat passenger?

 2      A    Juan Ocon.

 3      Q    And the next row of seats, is that a bench or

 4   are those captain's chairs?

 5      A    They're captain's chairs.

 6      Q    Who was sitting right behind Jose Vidaurri?

 7      A    Marvin.

 8      Q    That's Francisco Rodriguez?

 9      A    Yes.

10      Q    Who was sitting behind Juan Ocon?

11      A    Ben Pienaro.

12      Q    Benjamin Pienaro?

13      A    Right.

14      Q    The last row of seats was a captain's chair

15   another chair?

16      A    Bench.

17      Q    Who was sitting on the far driver's side of

18   that bench?

19      A    Denise.

20      Q    Adriana Vera?

21      A    Right.

22      Q    Who was seated in the middle?

23      A    Liddiard.

24      Q    Where were you seated?
```

1    A    On one end, passenger side on the end.

2    Q    As of January 8th of 2000 how long had you

3    known Jose Vidaurri?

4    A    I've known him since grammar school.

5    Q    How many years would that have been?

6    A    Six, seven years.

7    Q    How many years did you know Juan Ocon?

8    A    Maybe a year or two.   I'm not sure.

9    Q    What about Francisco Rodriguez?   How many

10   years did you know him?

11   A    Not that long.   Either about like a year or

12   two.

13   Q    And Benjamin Pienero, how long had you known

14   him?

15   A    About the same.

16   Q    Alvaro Vera, how long had you known him?

17   A    Maybe like a week or two.

18   Q    Do you know who owned that van the defendant

19   was driving and you got in?

20   A    Machin.

21   Q    Francisco Rodriguez?

22   A    Right.

23   Q    Do you know why he wasn't driving the van?

24   A    I think he was drinking.   So --

1      Q     Just so we're clear, this would be January

2   12th at approximately 5 p.m.

3          Is that correct?

4      A     It might have been later than that if I'm not

5   mistaken.

6      Q     Evening hours of the 12th?

7      A     Yes.   Yes.

8      Q     ~~Showing you what's been marked as Peoples'~~

9   ~~Exhibits 16 (A) and 16 (B) for identification, do you~~

10  ~~recognize what those items are~~?

11     A     ~~Yes~~.

12     Q     ~~What is 16 (A)~~?

13     A     ~~That's the handgun gun that I recovered from the~~

14  ~~car at 172 E. 95th Street~~.

15     Q     ~~And 16 (B)~~?

16     A     ~~Those are the magazine that I recovered from the~~ ~~gun~~.

17     Q     Are those in the same or substantially the

18  same condition as when you recovered them?

19     A     Yes.

20     Q     Detective, after recovering that gun,

21  directing your attention to Thursday the 13th of

22  January did you have a fifth conversation with Onyx

23  Santana at that time?

24     A     Yes.

1          Q     You watched the entire videotaped statement.

2          Correct?

3          A     That is correct.

4          Q     The videotaped statement you watched upstairs

5     today, does it accurately depict what happened during

6     the actual videotaped statement of the defendant?

7          A     That is correct.

8          Q     I'd tender the witness.

9          THE COURT:  You may inquire.

      MS. FITZSIMMONS:  Judge, before I begin examining

this witness, may I be heard at the side-bar with the

Court Reporter?

      THE COURT:  We'll go into chambers.

            Ladies and Gentlemen, while we're there,

please don't discuss the case while we're gone.

            We'll be right back.

                        (Whereupon the following

                         proceedings were had in the

                         court's chambers out of the

                         presence and hearing of the jury)

      THE COURT:  What?

      MS. FITZSIMMONS:  Off the record, Judge.

```
1
2                    (Whereupon, there was colloquy
3                     had between the Court and Counsel
4                     with no official record being
5                     made, after which the following
6                     proceedings were had)
```

MS. FITZSIMMONS:  Judge, on the record.

You know, I objected a lot to what the State did which was go through each individual person Ocon, Neira, Santana, etc. to establish this chain of custody that they talked to all of these people and as a result of all of their conversations they got information about Jose.

At the time that Mr. Di Benedetto asked the detective what I thought was a rather innocuous question and the response that he gave, I did not respond to at the time.

The response was I told Mr. Vidaurri that six people put him in the van which is a short cut way of doing what I had been objecting to and I didn't respond to it immediately.

It's improperly before this jury that six people said that he was in the van.

There's a motion for a severance.  I'd ask

1       Q    Now when you, when you met with the defendant

2    at this time were you alone or were you with anybody?

3       A    This time again I was with my partner,

4    Detective Patrick Fanuken.

5       Q    When you met with the defendant did you

6    advise him of anything at that point?

7       A    Once again I advised him of his Miranda

8    Warnings.

9       Q    Did you do it in the same fashion you

10   demonstrated for the jury?

11      A    Yes, I did.

12      Q    After advising him of his Miranda Warnings at

13   this time was the defendant still willing to speak to

14   you?

15      A    Yes, he was.

16      Q    At the outset of that conversation did you

17   tell the defendant anything?

18      A    Yes, I did.

19      Q    What did you tell the defendant?

20      A    I had advised him there were approximately

21   six witnesses that had placed him in the van the night

22   of the homicide.

23      Q    And when you told the defendant that did he

24   respond?

did was he said we, although he did not identify who

that was, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓Number 16A ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ gun

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

i▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓.

      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓, and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

21          THE COURT:  Did you want to say anything?

22          MR. HOLMES:  It sounds to me, Judge, that she's

23     arguing the weight that should be given the

24     evidentiary value of the gun, the admissibility of the

1   gun.  It's clear the detective identified that's the

2   gun, "I recovered it such and such a place."

*KNOWING*
*USE OF*
*PERJURED*
*TESTIMONY*

    The Court's aware the State's position is

    this was not a shooter, he never had a gun, no one

    ever identified him with a gun.  It's not going to

    come out in argument.  It was just one of the items

*FALSE*
*EVIDONA*

    that the detective recovred in the course of his

    investigation which I think is certainly proper for

    the jury.

10  MS. FITZSIMMONS:  For the record, Judge, I'm not

11  arguing the weight of it.  I'm arguing the actual

12  admissibility of it because there is nothing to link

13  it to this case other than the fact that this

14  particular detective recovered it on this particular

15  day.

    THE COURT:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  ▓▓▓▓▓▓▓▓▓▓▓▓

    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  It's for

18  the jury to determine whether or not any weight to be

19  given to to the testimony that they've heard.

20      With regard to the other issue that was --

21  the Court said I would take under advisement, the

22  issue with regard to a statement that was told to the

23  defendant during the course of the investigation but

24  also during the course of this questioning by the

1    going to testify in the case in his own behalf.  Is he

2    going to testify?

3         MS. FITZSIMMONS:  He is not, your Honor.

4         THE COURT:  ~~Mr. Vidaurri, I just want to advise~~

5    ~~you that your attorney, I'm sure, told you that~~

6    ~~things that you have a right to testify, you also have~~

7    ~~a right not to testify, but that's your decision.  Do~~

8    ~~you understand that?~~

9         A.   ~~Yes, sir.~~

10        THE COURT:  ~~And have you decided that you don't~~

11   ~~want to testify today?~~

12        A.   ~~Yes, sir.~~

13        THE COURT:  Okay.

         MS. FITZSIMMONS:  Your Honor, in reviewing the

     evidence yesterday it occurred to me that Mr. Vidaurri

     should really seek to strike the gun and the clip.  I

     think the numbers are --

              The evidence before you regarding the gun is

     this:  The gun is People's 16A and the clip is

     People's 16B.  Detective Climack, C-l-i-m-a-c-k,

     testified that he spoke to a string of people.  There

     is a motion pending regarding that -- some of that

     testimony.  The last one in the string I believe is

     Onyx, O-n-y-x, Santana and that the next thing that he

                              Q-4

1    Q.    So they were going faster than the red car?

2    A.    Right, right.

3    Q.    And it continued moving at a faster rate of

4  speed, and you see Juan put his hand out the window?

5    A.    When we got up to them, yes.

       Q.    ~~████████████~~?

       A.    ~~████████████████████████████~~

~~████████████████████████████████████~~

~~████████████████████████████~~ed

~~████████████████████████████████████~~

~~████████████████████████████~~.

       Q.    ~~████████████~~?

       A.    ~~████~~.

14    Q.    Do you remember giving your handwritten

15  statement in this case?

16    A.    When we went to the police station, yes.

17    Q.    Do you remember that?

18    A.    Yes.

19    Q.    Have you read it lately?

20    A.    Yes.

21    Q.    When was the last time you read it?

22    A.    Not too long ago.

23    Q.    How long is not too long ago?

24    A.    A little while ago.

1      Q.    How long is that?

2      A.    Two or three hours.

~~      Q.    Do you remember in your written statement you~~

~~      made that Porky pulled the door open?~~

~~      A.    I don't, Bam-Bam, I know~~

6      Q.    Sir, the question is do you remember reading

7    in your handwritten statement that you said Porky pulled

8    the door open?

9      A.    I'm not really sure, sir.  I know I read it,

10   but I haven't really got down to --

~~      Q.    Take a look what we're going to consider

     People's -- excuse me, Defendant Vera's No. 2 for

     Identification.

             If you would be kind enough, turn to the first

     page.  I want to make sure that is your statement.

       A.    Yes.

       Q.    Okay.

             Would you be kind enough to go to the page, I

     think it would be Page 3, and I'll point to you the

     appropriate location.

       A.    I see right here.

       Q.    Did you in your statement say David said~~

~~     Porky pulled open the sliding door on the right and~~

~~     stuck his right hand out with a gun.  Did you say that?~~

A.    ~~They were in a room.~~

Q.    ~~Did you write that?~~

A.    ~~I didn't actually write it, but they wrote it and I signed it.~~

Q.    ~~Someone wrote it for you?~~

A.    ~~Yes, the State's Attorney.~~

7    Q.    So which one was it?  Was it Bam-Bam opened

8    the door or was it Porky opened the door?

9    A.    Well, it was like when the first couple of

10   shots came, I like, I didn't know what to do.  I kind

11   of, I got scared.

12          And then at the same time they were getting

13   up, and I figured Bam-Bam had got up because he moved

14   out of his place, and he got up, and Porky went to the

15   door, and by that time the door was already opened, I

16   figured Bam-Bam had did it.

17          So --

18   Q.    So you hear the gunshots, right?

19   A.    Yes.

20   Q.    You were frightened, right?

21   A.    Yes, very frightened.

22   Q.    You started ducking?

23   A.    Not ducking, but I was just waiting to see

24   what was going to happen.  I was like --

1      Q    You say the van bumped.  What did the van

2  bump?

3      A    The car.

4      Q    What side of the car was the van on when it

5  drove down Jackson?

6      A    The van was on, we were on their driver's

7  side and they were on our passenger side.

8      Q    Is your passenger side to their driver's

9  side?

10      A    Right.

11      Q    And at some point while driving down Jackson,

12  both those vehicles collided?

13      A    Hit, yeah.

14      Q    [redacted]

15  [redacted]

16      A    [redacted]

17  [redacted]

18  [redacted]

19      Q    [redacted] opened the door.  [redacted]?

20      A    [redacted] and

21  [redacted]

22      Q    When you say they both started shooting, who

23  are you talking about specifically?

24      A    Juan Ocon and Porky.

1    Gangster network, a nation, do hereby give my gun to

2    Juan Ocon to kill someone.

3        MS. FITZSIMMONS:  Objection.

4        THE COURT:  Overruled.

5    ██████ ███████

6        You don't need that.  The best indication of

7    knowledge and intent of someone is their actions,

8    either before, during, or after the crime.

9        The last statement on the video when he tells

10   you people, he tells the Judge, the last statement.

11   Remember?  Jack Blakey is not controlling him.  He

12   says hey, hey, can I say something else.  Jack Blakey,

13   sure, go ahead, it's your statement.  Even though I

14   know I'm going to jail, even though I know I'm going

15   to jail, he knows, he knows he's guilty, even though I

16   know I'm going to jail, I'm doing this to cooperate,

17   to show the Judge I'm cooperating.  These are the

18   little truth detectors.

     ██████████████████████████████████████████████████

     ██████████████████████████████████████████████████

     ██████████████████████████████████████████████████

22       Alvaro Vera, the 16-year-old --

23       MS. FITZSIMMONS:  Objection to the 16-year-old,

24   your Honor.

1            MR. WALSH:  Objection as to the form of that

2    question.

3            THE COURT:  Overruled.

4            ~~MR. HOLMES:  You can answer~~.

5            THE WITNESS:  From both of them.

6        Q.    After Juan Ocon and Alvaro Vera fired their

7    guns, what happened?

8        A.    All of a sudden I felt the car hit the van,

9    and I guess it veered off the side of the road, and we

10    kept on heading down Jackson.

11        Q.    How far did that van go down Jackson?

12        A.    Approximately two blocks maybe.

         Q.    ~~What happened next?~~

         A.    ~~We made a right in the alley and parked in~~
    ~~the other alley and parked the van in a parking lot.~~

         Q.    ~~Did you see what Alvaro Vera did with the~~
    ~~gun?~~

         A.    ~~I seen -- I believe he put the gun in the~~
    ~~back seat of the van.~~

         Q.    ~~Were talking about Alvaro Vera, correct --~~
    ~~other?~~

         A.    ~~Yes.~~

         Q.    ~~Did you see what Juan Ocon did with his gun?~~

         A.    ~~I believe he gave it to Darby.~~

Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓

A. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

4    Q.    Prior to the shooting, did you see anyone in

5    the van with a gun?

6    A.    No, I did not.

7    Q.    Did anyone in the van indicate that they had

8    a gun?

9    A.    Nope.

10    Q.    After the van parked, did you get out of the

11    van?

12    A.    Yes, we did.

13    Q.    When you say "we," who are you talking about?

14    A.    Individuals in the van.

15    Q.    Did you go somewhere?

16    A.    Yes, I did.

17    Q.    Where did you go?

18    A.    I went walking through UIC campus.

19    Q.    Who were you with?

20    A.    I was with David Neira, and then about maybe

21    a couple of seconds later Porky caught up with us.

22    Q.    And where did you guys go?

23    A.    Try to catch a train on the, by the train

24    station, but I guess it was closed at the time, so we

1    was the time element.  Mr. DiBenedetto said think

2    about that brief segment.  Well, think about it.

3    Think about it honestly and fairly.

4          Mr. DiBenedetto been attaches significance to

5    the fact that Mr. Vidaurri drove away from the

6    shooting.  Where did he drive?  According to

7    everybody, he drove within spitting distance of the

8    shooting and he bailed out of the van.

9          Mr. DiBenedetto tells you, and I'm sure Mr.

10   Holmes will also tell you, you have to infer Mr.

11   Vidaurri's intentions from his actions.  Why did he

12   have a gun?  Well, he told you on the tape why he had

13   a gun.  He had a gun for his ownself protection.  He

14   handed the gun to Mr. Ocon.  He never asked Mr. Ocon

15   to kill anyone, he never asked Mr. Vera to kill

16   anyone, he didn't open the door so Mr. Vera could get

17   out and shoot someone the way that Benjamin Pienero

18   did.

[redacted text]

Q-41

1    what street, but he kept going after them.   That's

2    when we were taking all the red lights.

3        Q    Going down Ashland?

4        A    Right.

5        Q    Did the van, strike that.

6             Did the van eventually turn off of Ashland?

7        A    Yes.

8        Q    Do you recall what street it turned onto?

9        A    Jackson.

10       Q    Did the van turn also onto Jackson?

11       A    Yes.

12       Q    D̶ ̶S̶o̶n̶g̶ ̶w̶h̶a̶t̶ ̶h̶a̶p̶p̶e̶n̶e̶d̶ ̶w̶h̶e̶n̶ ̶t̶h̶e̶ ̶v̶a̶n̶ ̶t̶u̶r̶n̶e̶d̶

13       ̶o̶n̶t̶o̶ ̶J̶a̶c̶k̶s̶o̶n̶.̶ ̶W̶h̶i̶l̶e̶ ̶y̶o̶u̶ ̶w̶e̶r̶e̶ ̶i̶n̶?̶

14       A    W̶e̶ ̶m̶a̶d̶e̶ ̶a̶ ̶l̶e̶f̶t̶ ̶t̶u̶r̶n̶ ̶J̶a̶c̶k̶s̶o̶n̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶g̶u̶y̶s̶ ̶t̶u̶r̶n̶e̶d̶

15       d̶o̶w̶n̶ ̶J̶a̶m̶e̶s̶.̶ ̶ ̶T̶h̶e̶y̶ ̶c̶a̶u̶g̶h̶t̶ ̶u̶p̶

16       MS. FITZSIMMONS:  Objection to what he guesses.

17       THE COURT:  Overruled.

18       A    T̶h̶e̶ ̶v̶a̶n̶ ̶c̶a̶u̶g̶h̶t̶ ̶u̶p̶,̶ ̶a̶n̶d̶ ̶t̶h̶e̶ ̶g̶u̶y̶s̶ ̶s̶t̶o̶p̶p̶e̶d̶

19       ̶t̶h̶e̶r̶e̶'̶s̶ ̶w̶h̶e̶n̶ ̶t̶h̶e̶ ̶g̶u̶y̶s̶  I don't know what the guys were

20       doing.  I̶ ̶d̶o̶n̶'̶t̶ ̶k̶n̶o̶w̶ ̶i̶f̶ ̶t̶h̶e̶y̶ ̶w̶e̶r̶e̶ ̶s̶c̶a̶r̶e̶d̶ or whatever.

21       MS. FITZSIMMONS:  Objection.

22       THE COURT:  Sustained.

23            Strike the last comment please.

24       MR. HOLMES:  Let's slow down.

1    A    Probably six, seven times.

2    Q    How many times did Vera fire his gun?

3    A    Most likely the same.

4    Q    Where was the van in relationship to the car

5    when Ocon and Vera fired the gun?

6    A    Left side of the car.

7    Q    Would that be the passenger side of the van

8    was up against what side of the car?

9    A    The right side.  The left side.

10    Q    Driver's side or passenger side of the car?

11    A    Driver's side.

12    Q    So we're clear, the passenger side of the van

13    was up against the driver's side of the car?

14    A    Yes.

15    Q    ~~After the shots were fired at the car did you~~

16    ~~see what the car do?~~

17    A    ~~All I know is I felt like a bump.~~  ~~I guess~~

18    ~~they caught the car to veered off the road.~~

19    MS. FITZSIMMONS:  Objection to he guesses.

20    THE COURT:  Overruled.

21    MR. HOLMES:  Q  Go on?

22    A    ~~The car bumped up and it veered off to the~~

23    ~~right side of the road.~~

24    Q    Where did the van go?

1    van was gaining on us.

2         Q    Did the van eventually catch up to your car?

3         A    Yes it did actually.

4         Q    Did it pull up on a certain side of your car?

5         A    Pulled up on the driver's side.

6         Q    What side of the van would have been on the

7    driver's side of your car?

8         A    Passenger side of the van would have been on

9    the driver's side of our car.

10        Q    ~~What happened as the van pulled alongside~~

11    ~~your car?~~

12        A    ~~Well, actually before it actually got to our~~

13    ~~car they start firing shots at our car.~~

14        Q    ~~As they were catching up to your car they~~

15    ~~started firing?~~

16        A    E~~xactly~~.

17        Q    ~~Could you tell which side of the van that the~~

18    ~~gunfire was coming from in the van?~~

19        A    ~~Passenger side of the van.~~

20        Q    ~~Could you see the faces of the persons firing~~

21    ~~the shots out of the van?~~

22        A    ~~No I couldn~~'t.

23        Q    ~~As the van caught up and passed you did it~~

24    ~~continue firing?~~

1    A    ~~Yes it did?~~

2    Q    Approximately how many shots were fired at

3    your car?

4    A    I wasn't exactly counting, but I'd say over

5    10 shots were fired.

6    Q    After the van passed your car what happened

7    inside your car?

8    A    Well, at the time that the shooting occurred,

9    you know, I realized at first the windows were being

10   shot out.  Then I was shot in my leg and my foot.

11        I realized that Dauntrez was shot.

12   Q    How did you realize Dauntrez was shot?

13   A    He began bobbing and weaving, you know.  He

14   didn't exactly say he was hit, but he was moaning like

15   calling for his mother and whatnot and he took his

16   attention off driving.

17        He was just bobbing side to side.

18   Q    ~~What happened with your red car immediately~~

19   ~~after firing the shots?~~

20   A    ~~Well, there wasn't any control of the~~

21   ~~vehicle.  So it kind of bounced off a couple parked~~

22   ~~cars.~~  And William who was in the front passenger

23   seat, he took control of the vehicle and we kind of

24   just slowed down to a stop.

1    Q    What happened when the van caught up to your

2    car?

3    A    They approached us from our driver's side and

4    I just remember shots being fired.

5    Q    Do you recall what side of their van, the

6    driver's side or the passenger side was next to the

7    driver's side of your car?

8    A    Their passenger side.

9    Q    You're in the back seat furthest away from

10   the van.

11        Correct?

12   A    Right.

13   Q    Were you able to see who was firing the guns?

14   A    No.

15   Q    I'd ask you to take a look at this gentleman

16   here in the white shirt.  Did you ever see him that

17   night?

18   A    Not to identify him.

19   Q    Okay.  How many shots came from the van

20   towards your car?

21   A    I couldn't be exact.  There were numerous

22   shots.

23   Q    Could you tell how many people were firing?

24   A    No.

1      Which side of your car would the van have
2  been?
3      A    The driver's side.
4      Q    So the driver's side and oncoming traffic?
5      A    Yes.
6      Q    What happened next?
7      A    They began shooting.
8      Q    When you say they, are you talking about the
9  van?
10     A    The van.
11     Q    Could you see who was shooting?
12     A    No, I didn't.
13     Q    You could tell it was coming from the van or
14 no?
15     A    Yes.
16     Q    Was the car hit?
17     A    At the time I didn't really notice it because
18 of everything that was happening.  But when I did get
19 out of the van after you know, everything came to a
20 halt, I did notice we'd just gotten hit.
21     Q    You just said when you got out of the van.
22 Do you mean when you got out of the car?
23     A    Yes.
24     Q    When the shots started firing what did you