*MHN*

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED** 

AUG 2 6 2008
8-26-2008
**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. JOSE VIDAURRI, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 08 C 3665 |
| TERRY L. McCANN, Warden, Stateville Correctional Center, | ) ) ) ) | The Honorable Rebecca R. Pallmeyer, |
| Respondent. | ) | Judge Presiding. |

## TO THE CLERK OF THE UNITED STATES DISTRICT COURT

The following Exhibits A through G to respondent's Motion To Dismiss

Petition For Writ Of Habeas Corpus As Time-Barred are hereby filed in this Court:

Exhibit A:   Rule 23 Order, *People v. Vidaurri*, No. 1-02-3718 (Ill. App. 2004);

Exhibit B:   Rule 23 Order, *People v. Vidaurri*, No. 1-05-2051 (Ill. App. 2006);

Exhibit C:   PLA, *People v. Vidaurri*, No. 98536;

Exhibit D:   Order Denying PLA, *People v. Vidaurri*, No. 98536;

Exhibit E:   Postconviction Petition, No. 00 CR 8905(03);

Exhibit F:   PLA, *People v. Vidaurri*, No. 104198; and

Exhibit G:   Order Denying PLA, *People v. Vidaurri*, No. 104198.

August 26, 2008

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

By:

MICHAEL R. BLANKENHEIM, Bar # 6289072
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-8826
FAX: (312) 814-2253
EMAIL: mblankenheim@atg.state.il.us

-2-

✓ NOTICE
The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same. ✓

FIRST DIVISION
April 26, 2004

No. 1-02-3718

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, ) | Appeal from the |
| ) | Circuit Court of |
| Plaintiff-Appellee, ) | Cook County. |
| ) | |
| v. ) | No. 00 CR 8905 |
| ) | |
| JOSE VIDAURRI, ) | Honorable |
| ) | Joseph G. Kazmierski, Jr., |
| Defendant-Appellant. ) | Judge Presiding. |

O R D E R

Following a jury trial, defendant Jose Vidaurri was
convicted of first degree murder and attempted first degree
murder, then sentenced to consecutive, respective terms of 35 and
10 years' imprisonment. Defendant does not challenge the
sufficiency of the evidence to sustain his conviction, but
contends that the trial court committed reversible error in
failing to <u>sua sponte</u> question the venire as to whether
defendant's gang affiliation would affect their ability to be
fair. He also contends that he was denied his right to the
effective assistance of trial counsel, who failed to question the
venire as to any bias against gangs.

Defendant's convictions arose from his involvement in the
fatal shooting of Dauntrez Snowden and the attempted murder of
Nicholas Mobley. The incident took place shortly after midnight

1-02-3718

on January 9, 2000, in Chicago.

 Prior to individual <u>voir dire</u> examination, the trial court
advised the collective venire that defendant is presumed
innocent, that such presumption remains with him throughout trial
and is not overcome unless the State proves defendant's guilt
beyond a reasonable doubt.  The court further admonished the
venire that the burden of proof remains with the State throughout
trial and that defendant is not required to prove his innocence
or to present any evidence in his own behalf.  The court then
asked the prospective jurors whether they had ever been an
accused, a complainant, or a witness in a criminal case.  When
answered affirmatively, the court questioned the prospective
juror further about the attendant circumstances.

 At the close of <u>voir dire</u>, the court asked the venire about
their ability to be fair and then allowed the parties to pose any
supplemental questions.  Defendant asked one prospective juror
about a pending civil lawsuit and another about her husband's
duties as a suburban police officer.  As a result of <u>voir dire</u>,
defense counsel struck five prospective jurors for cause and
objected to seating a juror who lived six miles from the crime
scene.  The trial court excused one prospective juror who
indicated that her friend was the victim of a drive-by shooting.

 The case proceeded to trial where evidence was introduced
that on January 8, 2000, Dauntrez Snowden, William Peppers,

- 2 -

1-02-3718

Delbert Guy, and Nicholas Mobley were celebrating Peppers'
impending departure for college the next day.  Snowden was
driving his maroon Mercury Mystique that night and Peppers was in
the front passenger seat.  Guy and Mobley were in the back seat.

That same night, defendant, Francisco Rodriguez, David
Niera, Juan Ocon,[1] Benjamin Pienero, William Solis, and Alvaro
Vera[2] were joyriding in Rodriguez's van.  The occupants of this
van were members of the Satan Disciples street gang, save for
Ocon who was a member of the Latin Jivers street gang.

About 12:15 a.m., defendant pulled up beside Snowden's car
near Erie and Paulina.  Ocon and Pienero flashed gang signs
toward the car, but, purportedly, no one responded.  During the
high speed chase that ensued, defendant drove alongside Snowden's
car while Ocon and Vera fired multiple shots.  Mobley was shot in
the left leg and right foot.  Snowden was fatally shot in the
stomach.

Subsequently, defendant gave a videotaped statement
regarding his involvement in the shootings.  The State rested its
case and defendant did not present any evidence.  A jury found

---

[1]Ocon was also convicted of first degree murder and
attempted murder.  That judgment was affirmed in a separate
appeal.  People v. Ocon, No. 1-02-1567 (2003)(unpublished order
under Supreme Court Rule 23).

[2]Vera was convicted of attempted murder for his involvement
in the shootings.  That judgment was affirmed in a separate
appeal.  People v. Vera, No. 1-02-2046 (2004)(unpublished order
under Supreme Court Rule 23).

1-02-3718

defendant guilty of the first degree murder of Snowden and the
attempted murder of Mobley.  This appeal followed.

Citing <u>People v. Zehr</u>, 103 Ill. 2d 472 (1984), defendant
argues that the trial court committed reversible error by failing
to question the venire about gang bias.  In <u>Zehr</u>, our supreme
court articulated the basic guarantees of which the venire must
be informed during <u>voir dire</u>.  The supreme court held that the
venire must be informed that a defendant is presumed innocent,
that he is not required to present any evidence in his own
behalf, that he must be proven guilty beyond a reasonable doubt,
and that his failure to testify cannot be held against him.
<u>Zehr</u>, 103 Ill. 2d at 477.  The supreme court concluded that the
refusal to ask these questions upon defendant's request was
reversible error.  <u>Zehr</u>, 103 Ill. 2d at 477.  The supreme court
reasoned that if a juror has a bias against any of these basic
guarantees, an instruction given at the end of the trial would
have little benefit.  <u>Zehr</u>, 103 Ill. 2d at 477.

Defendant contends that under the reasoning set forth in
<u>Zehr</u>, the trial court has a duty to make inquiries <u>sua sponte</u>
regarding gang bias and cites <u>People v. Strain</u>, 194 Ill. 2d 467
(2000), in support of his argument.  In <u>Strain</u>, our supreme court
held that when testimony about gang affiliation and gang-related
activity is to be an indispensable part of defendant's trial,
defendant must be allowed an opportunity to question the venire

- 4 -

1-02-3718

about gang bias.  <u>Strain</u>, 194 Ill. 2d at 477.  Defendant
acknowledges that <u>Strain</u> did not directly address whether the
trial court had a duty to make inquiries <u>sua</u> <u>sponte</u> on gang bias;
nonetheless, he asks this court to hold that such a duty exists
under <u>Strain</u>.  We decline to do so.

  We initially agree with the State that defendant has waived
this issue by failing to ask the trial court to question the
venire regarding potential gang bias and by failing to raise a
contemporaneous objection during the questioning of the
prospective jurors.  <u>People v. Enoch</u>, 127 Ill. 2d 176, 190
(1988); <u>People v. Thomas</u>, 186 Ill. App. 3d 782, 799-800 (1989).
We also find for the following reasons that the purported error
does not fall within the plain error exception to the waiver
rule.  134 Ill. 2d R. 615(a).

  In <u>People v. Williams</u>, 295 Ill. App. 3d 456, 466 (1998),
this court explicitly held that, where, as here, neither party
tendered supplemental <u>voir</u> <u>dire</u> questions to the trial court
regarding this issue, and defendant failed to object during <u>voir</u>
<u>dire</u> or raise the issue in a posttrial motion, the trial court
had no duty to make inquires <u>sua</u> <u>sponte</u> regarding gang bias.
<u>Williams</u>, 295 Ill. App. 3d at 466.  In reaching that conclusion,
this court noted that the trial court had advised the parties of
its procedures for conducting <u>voir</u> <u>dire</u> and then posed general
questions to the venire regarding fundamental principles of law,

- 5 -

1-02-3718

burden of proof, and their ability to render a fair and impartial
verdict.  The court also asked whether any venire member had been
the victim of a crime and when answered affirmatively, the court
probed the nature of the crimes and whether the experiences would
affect their ability to be fair.  The same is true in this case
and we discern no reason to depart from our holding in <u>Williams</u>
to impose an additional duty on the trial court.

Defendant next contends that he was denied his right to
effective assistance of counsel because his attorney failed to
request that the venire be questioned about potential gang bias
or to ask these questions herself when the court provided counsel
an opportunity to inquire.

In <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 2d 674,
104 S. Ct. 2052 (1984), the United States Supreme Court set forth
a two-prong test to determine whether a defendant has been denied
effective assistance of counsel: first, defendant must show that
counsel's representation fell below an objective standard of
reasonableness, and, second, that the deficient performance
prejudiced the defense.  <u>Strickland</u>, 466 U.S. at 687, 80 L. Ed.
2d at 693, 104 S. Ct. at 2064.  It is not sufficient for
defendant to show that the alleged errors of counsel may have had
some effect on the trial; rather, the burden is on defendant to
prove that but for trial counsel's unprofessional conduct, the
outcome of the proceeding would probably have been different.

1-02-3718

People v. Wiley, 165 Ill. 2d 259, 285 (1995).  In reviewing trial
counsel's performance, the entire record must be taken into
consideration and counsel's actions reviewed from the
circumstances confronting counsel at the time the questioned
conduct occurred.  Wiley, 165 Ill. 2d at 285.  A claim of
ineffectiveness arising from a matter of defense strategy will
not support a claim of ineffectiveness.  Williams, 295 Ill. App.
3d at 469.

    Defendant asserts that an attorney's failure to tender
supplemental voir dire questions can support a claim of
ineffectiveness.  However, our supreme court, in People v. Lear,
175 Ill. 2d 262, 270 (1997), held that this issue is a matter of
trial strategy and virtually unchallengeable.  Under the
circumstances revealed in this record, we cannot say that
counsel's conduct was not tactical or a matter of jury selection
strategy.  See People v. Metcalfe, 202 Ill. 2d 544, 562 (2002).

    The record shows that during voir dire, defense counsel
excused five prospective jurors, and also objected to seating the
juror who lived six miles from the crime scene.  See Metcalfe,
202 Ill. 2d at 562.  The record also shows that the gang evidence
introduced at trial was limited to explaining motive and no
litany of witnesses discussing gang rivalry or gang territory was
presented.  It was thus plausible for counsel to reasonably
conclude that probing into gang bias would have served to unduly

- 7 -

1-02-3718

emphasize the gang issue with no good result to defendant.
People v. Furdge, 332 Ill. App. 3d 1019, 1027 (2002).
Accordingly, we find that counsel's alleged omission in this
regard fell within the broad range of defense tactics that will
not support a claim of ineffective assistance of counsel.
Williams, 295 Ill. App. 3d at 469.  Moreover, even if we assumed
that counsel's action was objectively unreasonable, defendant
cannot meet the prejudice prong of the Strickland test given the
substantial evidence proving his guilt of the charged offenses
beyond a reasonable doubt.  Metcalfe, 202 Ill. 2d at 562.

   We therefore affirm the judgment of the circuit court of
Cook County.

   Affirmed.

   McBRIDE, J., with O'MALLEY, P.J., and McNULTY, J., concurring.

NOTICE

The text of this order may be changed or corrected prior to the time for filing of a Petition for Rehearing or the disposition of the same.

FIRST DIVISION
November 6, 2006

No. 1-05-2051

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the Circuit Court of Cook County |
| Respondent-Appellee, | ) | |
| v. | ) | 00 CR 8905(03) |
| JOSE VIDAURRI, | ) | |
| Petitioner-Appellant. | ) | Honorable Joseph G. Kazmierski, Judge Presiding |

## O R D E R

In July 2002, a jury convicted petitioner, Jose Vidaurri, in the first-degree murder of Dauntrez Snowden and the attempt first-degree murder of Nicholas Mobley. The trial court sentenced petitioner to 35 years for the first-degree murder and 10 years for the attempt first-degree murder, to be served consecutively. On direct appeal, this court affirmed defendant's convictions and sentence. See People v. Vidaurri, No. 1-02-3718 (April 26, 2004) (unpublished order pursuant to Supreme Court Rule 23).

In March 2005, petitioner filed his *pro se* postconviction petition alleging that he was denied effective assistance of trial counsel by (1) his trial counsel's threats and promises to induce petitioner to waive his right to testify; (2) his trial counsel's failure to file a motion to suppress

1-05-2051

petitioner's videotape statement; (3) his trial counsel's failure to make a timely objection to the
admission of a gun and ammunition clip as evidence, and that his appellate counsel was ineffective
for failing to raise these claims on direct appeal.

The evidence presented at trial established that on the evening of January 8, 2000,
Dauntrez Snowden went out with his friends Nicholas Mobley, William Peppers and Delbert Guy.
The men were in a maroon compact car. Snowden was driving while Peppers was in the
passenger seat, Mobley was sitting in the back seat on the driver's side and Guy was seated in the
back seat behind the passenger. The men had gone out to celebrate Peppers' departure for
college the next day.

Petitioner was driving around with his girlfriend when he saw his friends in a brown van.
He exited his car and got into the van. Petitioner got into the driver's seat. There were several
passengers in the van, including Juan Ocon, Alvero Vera, William Solis, Benjamin Pienero,
Francisco Rodriguez and David Niera. Ocon was in the passenger seat and Rodriguez and
Pienero were in the middle row captain's chairs while Solis, Vera and Niera were seated on the
back bench. The van belonged to Rodriguez.

When petitioner got into the van, he had a loaded .9 millimeter gun with him. He passed
the gun to Ocon in the passenger seat.

At approximately 12:15 a.m. on January 9, 2000, petitioner was driving the van eastbound
on Erie towards Ashland when they saw the victims' maroon car. Petitioner pulled up on the left
side of Snowden's car. Ocon rolled down the window and Pienero stepped onto the running
board along the side of the van and both men "represented" or flashed gang signs to the men in

2

1-05-2051

the car. The men in the car did not respond. Mobley told Snowden to drive away because he feared they would be robbed.

Snowden sped eastbound and turned right to head southbound on Ashland. Petitioner followed after the men. Mobley told Snowden there was a police station at Racine and Monroe, but Snowden was driving too fast to turn onto Monroe. Instead, they turned left onto Jackson. Snowden told Peppers to use a cell phone to call the police. Snowden slowed the car to look for the cell phone. At that time, petitioner caught up to the car.

Petitioner pulled to the left of the car. Ocon fired several shots from the passenger window and Vera opened the sliding door of the van and also fired several shots at the maroon car. Petitioner kept driving and drove to an alley where he left the van. He abandoned the gun in the van.

Mobley stated that he was shot in his left leg and right foot. Snowden was also shot and began to lose control of the car. Once the car stopped, Snowden fell out of the car and called for his mother. Chicago police officers saw the victims' car roll through a red light and come to a stop. The officers called paramedics to the scene. Mobley and Snowden were transported to Cook County Hospital for treatment. Mobley was treated and recovered, but Snowden suffered a gun shot to his abdomen and died at the hospital on January 9, 2000.

Detective John Climack of Area 4 violent crimes unit of the Chicago police department was assigned to investigate Snowden's death. On January 10, 2000, Mobley and Guy came to the police station to create a composite of the van and the individual standing on the running board of the van. The composites were distributed to tactical officers. That evening an officer saw a van

3

1-05-2051

matching the description and curbed the vehicle. It was transported to Area 4 and later identified

by Mobley and Guy as the van involved in the shooting.

Detective Climack interviewed several of the individuals involved in the shooting and from

those interviews, he notified officers to search for petitioner. Petitioner was arrested at his

girlfriend's home on January 13, 2000. Petitioner was advised of his <u>Miranda</u> rights and agreed to

speak with Detective Adrian Garcia. Initially, petitioner denied any knowledge of the shooting

and gave an alibi. Detective Garcia followed up on petitioner's alibi. The next day, Detective

Garcia told petitioner that several witnesses placed him in the van on the night of the murder.

Petitioner agreed to give a statement. Later, Assistant State's Attorney John Blakey came and

spoke with petitioner. Petitioner agreed to make a videotaped statement discussing his

involvement in the murder of Snowden. In the videotaped statement, petitioner admitted to

giving a gun to Ocon and driving the van in pursuit of the maroon car.

At trial, the State admitted a .9 millimeter gun during Detective Climack's testimony.

Detective Climack stated that he was directed to an address during his investigation and at that

address he recovered the gun. At that time, no objection was raised by petitioner's trial counsel.

The next day, petitioner's attorney belatedly objected to the gun's admission, arguing that the gun

was never identified as the gun petitioner gave to Ocon. The trial court overruled the objection,

noting it was not made during the course of the trial.

After the State rested, the defense rested. The trial court admonished petitioner about his

right to testify and if he was waiving his right. Petitioner stated that he was. Following

deliberations, the jury found petitioner guilty of the first-degree murder of Snowden and the

4

1-05-2051

attempt first-degree murder of Mobley. At the sentencing hearing, the trial court sentenced petitioner to consecutive terms of 35 years for the first-degree murder and 10 years for the attempt first-degree murder.

On direct appeal, this court found that the trial court had no *sua sponte* duty to question the venire regarding gang bias nor was petitioner's trial counsel ineffective for failing to question the venire about gang bias.

In March 2005, petitioner filed his *pro se* postconviction petition alleging ineffective assistance of trial and appellate counsel. In May 2005, the trial court dismissed petitioner's postconviction petition as frivolous and patently without merit. This appeal followed.

On appeal, petitioner argues that the trial court erred in dismissing his *pro se* postconviction petition as frivolous and patently without merit because he stated the gist of a constitutional claim and this court should remand his petition to the trial court for further proceedings.

The Illinois Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1 through 122-8 (West 2000)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. 725 ILCS 5/122-1(a) (West 2000); People v. Coleman, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations which occurred at the original trial. Coleman, 183 Ill. 2d at 380. A proceeding brought under the Post-Conviction Act is not an appeal of a defendant's underlying judgment, rather it is a collateral attack on the judgment. People v. Evans, 186 Ill. 2d 83, 89

5

1-05-2051

(1999). The purpose of a postconviction proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. People v. Barrow, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered waived. Barrow, 195 Ill. 2d at 519. However, the doctrine of waiver is relaxed where the alleged waiver stems from the incompetence of appellate counsel. People v. Harris, 206 Ill. 2d 1, 33 (2002). The standard of review for dismissal of a postconviction petition is *de novo*. Coleman, 183 Ill. 2d at 389.

At the dismissal stage of a postconviction proceeding, the trial court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity that would necessitate relief under the Act. People v. Coleman, 183 Ill. 2d 366, 380 (1998). In order to avoid dismissal under section 122-2.1(a)(2), a *pro se* petitioner merely needs to present the gist of a constitutional claim that would provide relief under the Act. People v. Porter, 122 Ill. 2d 64, 74 (1988). Under section 122-2.1(a)(2), the trial court is to dismiss a petition within 90 days of its filing if the court determines that it is "frivolous" or "patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2000). A postconviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the gist of a constitutional claim. People v. Edwards, 197 Ill. 2d 239, 244 (2001). The "gist" standard is a low threshold. Edwards, 197 Ill. 2d at 244. To set forth the "gist" of a constitutional claim, the postconviction petition need only present a limited amount of detail and hence need not set forth the claim in its entirety. Further, the petition need not include

6

1-05-2051

legal arguments or citations to legal authority. <u>Edwards</u>, 197 Ill. 2d at 244. *Pro se* petitioners are

not required to present a full and complete pleading. See <u>Edwards</u>, 197 Ill. 2d at 244 (rejecting

use of the "sufficient facts" test to determine whether a *pro se* petitioner has properly pled a

constitutional claim). If the court determines that the petition is either frivolous or patently

without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122-2.1(a)(2)

(West 2002).

Accordingly, the question for us to consider is whether petitioner has alleged the gist of a

constitutional claim in his petition. Petitioner raised several grounds for ineffective assistance of

trial counsel. Petitioner also claimed ineffective assistance of his appellate counsel for not raising

the ineffectiveness of his trial counsel on the alleged grounds on direct appeal.

First, petitioner argues that he was induced to waive his right to testify by his trial

counsel's threats and false promises. In his petition, petitioner claims that his trial counsel

threatened to have him removed from the courtroom if he testified, told him he would waive his

appeal rights if he testified, and that due to an error in the jury instructions, he would be acquitted

if he did not testify and the case went to the jury right away.

A defendant's right to testify at trial is a fundamental constitutional right, as is his or her

right to choose not to testify. <u>People v. Madej</u>, 177 Ill. 2d 116, 145-46 (1997), see <u>Rock v.</u>

<u>Arkansas</u>, 483 U.S. 44, 97 L. Ed. 2d 37, 107 S. Ct. 2704 (1987). It is now generally recognized

that the decision whether to testify ultimately rests with the defendant. <u>Madej</u>, 177 Ill. 2d at 146.

Therefore, it is not one of those matters which is considered a strategic or tactical decision best

left to trial counsel. <u>Madej</u>, 177 Ill. 2d at 146. Consequently, even though counsel's decision

7

1-05-2051

requiring defendant to testify in this case may be explained in terms of trial strategy, it cannot be

justified on those grounds. Only the defendant may waive his right to testify. <u>Madej</u>, 177 Ill. 2d at

146.

       As petitioner notes, none of the alleged threats or promises made by his trial counsel are

contained in the record. However, the transcript of petitioner's trial includes the following

colloquy:

> "THE COURT: Mr. Vidaurri, I just want to advise you that
>
> your attorney, I'm sure, told you the same thing, that you have a
>
> right to testify, you also have a right not to testify, but that's your
>
> decision. Do you understand that?
>
> PETITIONER: Yes, sir.
>
> THE COURT: Is it your decision that you don't want to
>
> testify today?
>
> PETITIONER: Yes, sir."

       It is well-established that this court will uphold the dismissal of a postconviction petition

when the record from the original trial proceedings contradicts the defendant's allegations. <u>People</u>

<u>v. Rogers</u>, 197 Ill. 2d 216, 222 (2001). Here, petitioner contends that he did not voluntarily

waive his right to testify at trial. He attempts to distinguish the trial court's admonishments to

petitioner by asserting that the trial court never asked whether any threats or promises induced the

decision, and accordingly, the record does not contradict petitioner's allegations in his petition.

       We disagree. As the Illinois Supreme Court stated in <u>People v. Thompkins</u>, 161 Ill. 2d

8

1-05-2051

148, 177-78 (1994), quoting People v. Brown, 54 Ill. 2d 21, 24 (1973):

> " 'By hypothesis, in every case in which the issue is raised,
> the lawyer's advice will in retrospect appear to the defendant to
> have been bad advice, and he will stand to gain if he can succeed in
> establishing that he did not testify because his lawyer refused to
> permit him to do so. Neither in the post-conviction petition in this
> case, with its reference to conversations which took place between
> the defendant and his attorney well in advance of the beginning of
> the trial, nor in the supporting affidavit, is there any statement that
> the defendant, when the time came for him to testify, told his
> lawyer that he wanted to do so despite advice to the contrary. In
> the absence of a contemporaneous assertion by the defendant of his
> right to testify, the trial judge properly denied an evidentiary
> hearing.' "

In the instant case, petitioner's allegations are contradicted by the record. He stated that he was waiving his right to testify and gave no indication to the trial court that his trial attorney improperly induced him to waive his right to testify. Moreover, the trial court was not obligated to ask petitioner if anyone threatened him in his decision. See People v. Smith, 176 Ill. 2d 217, 234 (1997). Consequently, we find that petitioner has failed to state the gist of a constitutional claim that he was prohibited from testifying at trial.

Next, petitioner raises two allegations of ineffective assistance of trial and appellate

9

1-05-2051

counsel. Petitioner claims that his trial counsel was ineffective for failing to file a motion to

suppress his videotaped statement and for failing to make a timely objection to the admission of

the gun and clip. Likewise, petitioner contends that his appellate counsel was ineffective for

failing to present these issues on direct appeal.

Initially, the State responds that these issues should be barred on review as *res judicata*

because this court already considered the effectiveness of petitioner's trial counsel on direct

appeal. The State cites People v. Albanese, 125 Ill. 2d 100, 105 (1988), to support its argument

that when a reviewing court has already considered the issue on direct appeal, the reviewing court

will not consider different allegations in an effort to relitigate previously decided issues. We

question the State's reliance on Albanese. In that case, the supreme court declined to consider a

claim of ineffectiveness when that "very issue" was previously considered; however, it did review

claims of ineffective assistance that were raised for the first time in the postconviction petition.

Albanese, 125 Ill. 2d at 105-06.

In the instant case, the only allegation of ineffective assistance of counsel raised on direct

appeal was whether petitioner's trial counsel was ineffective for failing to question the venire as to

a bias regarding gang affiliation. This court held that petitioner's trial counsel was not ineffective

on that specific claim. The claims of ineffective assistance of counsel raised in petitioner's

postconviction petition are different and do not reallege the claim previously decided on direct

appeal. *Res judicata* bars consideration of issues that were raised and decided on direct appeal

(Barrow, 195 Ill. 2d at 519), but the issues presented were not raised on direct appeal. We

decline to adopt the State's argument that any allegation of ineffective assistance raised on appeal

10

1-05-2051

bars as *res judicata* other claims brought in a postconviction petition. Because this court found that petitioner's trial counsel was not ineffective as to one issue, such as failure to question the venire on gang bias, it does not follow that such a finding applies to other allegations of ineffective assistance. Therefore, we find that petitioner's claims of ineffective assistance of counsel are not barred as *res judicata*.

Claims of ineffective assistance of trial and appellate counsel are resolved under the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct 2052 (1984). In <u>Strickland</u>, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under <u>Strickland</u>, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. <u>Strickland</u>, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. To demonstrate performance deficiency, a defendant must establish that counsel's performance was below an objective standard of reasonableness. <u>People v. Edwards</u>, 195 Ill. 2d 142, 163 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Based on the first-stage procedural posture of this case, the relevant question is whether petitioner's *pro se* postconviction petition set forth the gist of a constitutional claim of ineffective assistance of both trial and appellate counsel.

1-05-2051

Petitioner contends that his trial counsel was ineffective for failing to file a motion to suppress his videotaped statement. Petitioner alleges in his petition that he was coerced by the police to give the statement through physical abuse and harassment. The State responds that the decision not to file a motion to suppress was trial strategy because the videotaped statement showed that petitioner voluntarily agreed to give the statement and was read his <u>Miranda</u> rights during the interview. Moreover, as the State points out, petitioner's trial counsel filed a motion to quash arrest and suppress evidence, including the statement.

In order to prove ineffective assistance of counsel, defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. <u>People v. Giles</u>, 209 Ill. App. 3d 265, 269 (1991). The question of whether to file a motion to suppress evidence is traditionally considered a matter of trial strategy, and to prevail on a claim that trial counsel is ineffective by failing to file a motion to suppress, defendant must show that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed. <u>People v. Rodriguez</u>, 312 Ill. App. 3d 920, 925 (2000). Neither mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent. <u>People v. Young</u>, 341 Ill. App. 3d 379, 383 (2003). A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. <u>People v. Simmons</u>, 342 Ill. App. 3d 185, 191 (2003). Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance. <u>People v. Kelley</u>, 304 Ill. App. 3d 628, 636 (1999).

Here, petitioner cannot show that his trial counsel's decision to file a motion to quash

12

1-05-2051

arrest and suppress evidence rather than a motion to suppress evidence was not trial strategy. His

trial counsel sought to challenge petitioner's arrest at his girlfriend's house by arguing that

petitioner lived at the house. Trial counsel aimed to have the arrest quashed and all subsequent

evidence, including the videotaped statement, suppressed. Petitioner contends that his trial

attorney should have sought to suppress the videotaped statement based on his allegations of

coercion against the police department. However, the videotaped statement refutes petitioner's

claims of coercion and the involuntary nature of the statement. During the videotaped interview,

petitioner sits at a table with his hands crossed and calmly answers questions. He does not

hesitate or give any indication that he was speaking against his will. ASA Blakey read petitioner

his _Miranda_ rights and asked petitioner if he has voluntarily agreed to give the statement.

Significantly, at the conclusion of the statement, petitioner asked to make an additional statement

on his own and stated that he wanted the judge to know that he was willing to cooperate with the

investigation.

We find that petitioner cannot show that his trial counsel's failure to file a motion to

suppress his videotaped statement constituted ineffective assistance of counsel. His attorney

chose as a matter of trial strategy to attack petitioner's arrest. Additionally, the videotaped

statement does not support petitioner's allegations of coercion and in fact, it shows petitioner to

be cooperative, calm and forthcoming with his answers. Petitioner cannot show that the trial

court would have granted a motion to suppress his videotaped statement. For these reasons,

petitioner's claim of ineffective assistance must fail.

Next, petitioner alleged that his trial counsel was ineffective for failing to timely object to

13

1-05-2051

the admission of the gun and clip at trial because the gun was irrelevant and prejudicial, and that

his appellate counsel was ineffective for failing to raise the issue on direct appeal. Specifically,

petitioner contends that the evidence at trial did not establish that the gun recovered by Detective

Climack was the same gun petitioner handed to Ocon. Petitioner's trial counsel made a belated

objection on these grounds the day after the gun was admitted, which the trial court overruled.

This claim of ineffective assistance of trial counsel was not raised on direct appeal and, therefore,

petitioner contends that his appellate counsel was ineffective for failing to present it.

The general rule is that weapons are admissible if connected to both the defendant and the

crime. People v. Babiarz, 271 Ill. App. 3d 153, 159 (1995).

At trial, Detective Climack testified that he received information from an individual named

Onyx Santana or Santana's girlfriend about a gun. Santana was not alleged to have been in the

van on the night of the homicide, but Santana was told about the events by David Niera, who was

present. On the information from Santana or his girlfriend, Detective Climack went to 1727 West

Erie and recovered a .9 millimeter gun. Later, the State introduced petitioner's videotaped

statement, and in the statement, petitioner admitted to having a loaded .9 millimeter gun that day

which he gave to Ocon and later abandoned in the van. No other testimony was presented

regarding the similarity or identification of the recovered .9 millimeter to the .9 millimeter used by

Ocon.

Although the record does not indicate when the gun was actually admitted into evidence,

petitioner's counsel objected to its introduction just before the jury instruction conference.

Petitioner's counsel stated to the trial court that after "reviewing the evidence yesterday it

14

1-05-2051

occurred to me that Mr. Vidaurri should really seek to strike the gun and the clip." Defense

counsel argued that the gun was not identified by petitioner, it was not identified as the gun used,

and it was not identified as similar to the gun used in homicide by Mobley, Peppers, or Guy.

Petitioner's trial counsel concluded her objection by stating that she had not objected the day

before "through an oversight" but was now objecting to its admissibility because the gun was not

properly connected to this offense. The trial court overruled the objection, stating that the weight

to be given to the gun was for the jury to decide.

Petitioner's postconviction petition alleged that this failure to properly object was

ineffective. However, incompetency is not established by mere failure to object to inadmissible

evidence. People v. Murphy, 72 Ill. 2d 421, 438 (1978). Moreover, petitioner's attorney,

although perhaps untimely in not immediately objecting to the gun's admission, clearly objected

the following day to its admission because it had no connection to the shootings. Based upon this

singular oversight, we cannot conclude petitioner's attorney was ineffective.

Further, even if we were to conclude that petitioner's attorney was ineffective for not

objecting promptly (which we do not so hold), petitioner's claim cannot satisfy the prejudice

prong under Strickland. Contrary to petitioner's assertion, the evidence at trial was not closely

balanced. Two witnesses testified that they were in the van on the night in question and that

petitioner was the driver of the van. They stated that petitioner responded to Ocon's

encouragement to follow the maroon car. They said that petitioner tailed the car from Erie onto

Ashland and then onto Jackson. Petitioner pulled the van to the left of the car while Ocon and

Vera fired several shots at the car. The three surviving victims' testimony corroborated that

1-05-2051

testimony. Moreover, in his videotaped statement, petitioner admitted to driving the van,

following the car, and giving a loaded gun to Ocon. Based upon the overwhelming evidence

presented against the petitioner, the result of the proceeding would not have been different absent

the admission of the gun and the clip.

Based on the foregoing reasons, we affirm the decision of the circuit court of Cook

County.

Affirmed.

McBRIDE, P.J., with CAHILL and GARCIA, JJ., concurring.

16

No.

**IN THE**

**SUPREME COURT OF ILLINOIS**

---

| | |
|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) Petition for Leave to Appeal from the |
| | ) Appellate Court of Illinois, First District, |
| Respondent-Appellee, | ) No. 02-3718 |
| | ) |
| | ) There heard on Appeal from the Circuit |
| -vs- | ) Court of Cook County, Illinois, |
| | ) No. 00 CR 8905 (03). |
| | ) |
| **JOSE VIDAURRI,** | ) Honorable |
| | ) Joseph G. Kazmierski, |
| Petitioner-Appellant. | ) Judge Presiding. |

---

**PETITION FOR LEAVE TO APPEAL**

---

MICHAEL J. PELLETIER
Deputy Defender

YASAMAN HANNAH NAVAI
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

EXHIBIT C

No.

IN THE

SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Petition for Leave to Appeal from the |
| | ) | Appellate Court of Illinois, First District, |
| Respondent-Appellee, | ) | No. 02-3718 |
| | ) | |
| | ) | There heard on Appeal from the Circuit |
| -vs- | ) | Court of Cook County, Illinois, |
| | ) | No. 00 CR 8905 (03). |
| | ) | |
| JOSE VIDAURRI, | ) | Honorable |
| | ) | Joseph G. Kazmierski, |
| Petitioner-Appellant. | ) | Judge Presiding. |

**PETITION FOR LEAVE TO APPEAL**

**PRAYER FOR LEAVE TO APPEAL**

Jose Vidaurri, petitioner-appellant, hereby petitions this Court for leave to appeal,

pursuant to Supreme Court Rules 315 and 612, from the judgment of the Appellate Court, First

District, affirming his conviction for first degree murder and attempt first degree murder and his

sentence of consecutive terms of 35 years and 10 years imprisonment.

## PROCEEDINGS BELOW

The Appellate Court affirmed Jose Vidaurri's conviction on April 26, 2004. On April 27, 2004, Mr. Vidaurri filed an affidavit of intent to file a petition for leave to appeal. No petition for rehearing was filed. A copy of the appellate court's judgment and the affidavit of intent are appended to this petition.

## COMPELLING REASONS FOR GRANTING REVIEW

In *People v. Strain*, 194 Ill.2d 467, 481, 742 N.E.2d 315 (2000), this Court held that the trial court committed reversible error when it refused defense counsel's request to probe the venire regarding potential gang bias. Underpinning this Court's holding was its recognition that because gangs are "regarded with considerable disfavor," gang-related evidence can impact a juror's ability to be impartial. To protect the defendant's right to a fair trial, the *Strain* Court held that it is the circuit court's fundamental "obligation to conduct *voir dire* in a manner to assure the selection of an impartial panel of jurors, free from bias and prejudice." *Strain*, 194 Ill.2d at 479-81.

In affirming Jose Vidaurri's conviction, the Appellate Court, relying solely on *People v. Williams*, 295 Ill. App.3d 456, 692 N.E.2d 723 (1st Dist. 1998), an Appellate Court decision that predated this Court's ruling in *People v. Strain*, held that the circuit court had no *sua sponte* duty to question the venire about whether they harbored any gang bias. The *Williams* Court held that the circuit court's general inquiries of the venire were sufficient. 295 Ill. App.3d at 466. This Court has now recognized, however, that anyone can harbor negative gang bias, and that it is not sufficient to simply make general inquiries, or just ask jurors whether they had family members affiliated with street gangs, to uncover such biases. *Strain*, 194 Ill.2d at 480. Therefore, consideration of this issue does not begin and end with the *Williams* analysis.

Indeed, in light of the circuit court's preeminent duty pursuant to Illinois Supreme Court Rules 234 and 431, to assure the selection of a fair and impartial jury, leave to appeal should be granted to determine whether this Court's holding in *People v. Strain* should be extended to require a *sua sponte* duty upon a circuit court to question the venire whether they harbor any

-3-

gang bias where gang-related evidence permeates every aspect of the defendant's trial as was the case here.

## STATEMENT OF FACTS

On July 10, 2002, a jury convicted Jose Vidaurri of the first-degree murder of Dauntrez Snowden and the attempt first-degree murder of Nicholas Mobley. 720 ILCS 5/9-1 (A)(1) (West 2002) and 720 ILCS 5/8-4 (720ILCS 5-91A(1))(West 2002);(C. Supp.2 10; R.V. Q91). The Court subsequently sentenced Mr. Vidaurri on September 12, 2002, to serve consecutive terms of 35 years for the first-degree murder conviction and 10 years for the attempt first-degree murder conviction in the Illinois Department of Corrections. (C. Supp.2 10; R. V. S18).

During *voir dire*, the trial court inquired into whether the prospective jurors had ever been involved in criminal prosecutions or had ever been the victim of a crime. (R. II. 018). Several jurors indicated that they had been victims of various crimes or had served as jurors in criminal prosecutions. (R. II. 018, 23, 27, 29, 32, 36, 41, 42, 45, 59, 65). Juror Katherine Szanowski, who was eventually empaneled, testified that she had been involved in a drive-by shooting. (RII. O29). Empaneled juror Tim Runyon had a cousin that had been murdered. (RII. O32). Empaneled jurors Roseann Plasencia and Suzanne Stanton testified that they had been witnesses in a murder and stabbing case, respectively. (RI.. O22, O38) Neither the judge nor defense counsel asked any of the prospective jurors if the crimes were gang-related or whether they had any bias against gangs.

In opening arguments, the State characterized the murder of Dauntrez Snowden and attempt murder of Nicholas Mobley as gang-related. In so doing, the Assistant State's Attorney made several references to the fact that Mr. Vidaurri was a member of the Satan Disciples gang. (R. III. P11,13-14, 17). Further, the State indicated that Mr. Vidaurri and his friends chased Mr. Snowden, thinking he and his friends were rival gang members. (R. III. P14).

-5-

At trial the State showed that on the evening of January 8, 2000, Mr. Vidaurri was driving a van in which the following people were occupants: Francisco Rodriquez, David Niera, Juan "Pelon" Ocon, Benjamin "Bam Bam" Pinero, Rocky Salazar, William Solis and Alvaro "Porky" Vera. (People's Ex. 18). According to Mr. Vidaurri and David Niera, everyone in the van was a member of the Satan Disciples gang except for Mr. Ocon, who was in the Latin Jiver gang. (People's Ex. 18, R. III. P34-5). At approximately 12:15 a.m. on January 9, 2000, the individuals in the van saw a maroon four-door vehicle near the intersection of Erie and Paulina. (R. III. P39, P85; People's Ex. 18).

Inside the maroon vehicle, a Mercury Mystique, were Dauntrez Snowden, the driver of the vehicle, and his passengers. Dauntrez Snowden drove while William Peppers sat in the front passenger seat, Nicholas Mobley sat in the back behind Mr. Snowden, and Delbert Guy sat behind William Peppers. (R. III. P149). The men were lost when William Peppers noticed the van being driven by Vidaurri pull alongside of them. (R. III. P149-150). At that point the van door pulled open and an individual flashed hand signals at them. (R. III. P41, 86,108, 137,150; People's Ex. 18). Neither Mr. Mobley, Mr. Peppers, nor Mr. Guy claimed any gang affiliation. (R. III. P108, P138, P150). None of the men in the Mercury flashed any symbols back at the van. (R. III. P109, P138, P150). Jose Vidaurri and the rest of the individuals in the van chased the Mercury until they caught up to the vehicle. Juan Ocon and Alvero Vero then opened fire on the occupants of the Mercury.

On January 14, 2000, the police arrested Mr. Vidaurri and brought him to Area 4 where he made a videotaped statement which was admitted at trial. (People's Exhibit 18). In his statement, Mr. Vidaurri stated that he and the rest of the individuals in the van believed the individuals in Mr. Snowden's vehicle might be members of a gang, so Mr. Ocon flashed gang

-6-

symbols at them. (People's Ex. 18). The absence of any response by the individuals in the

Mercury was perceived to be a sign of disrespect. (People's Ex. 18, R. III. P41-2). Therefore

Mr. Vidaurri followed the Mercury. (People's Ex. 18; R. III. P89, P42). Mr. Vidaurri caught up

to the Mercury and drove the van alongside the Mercury's driver side, eventually hitting the

Mercury with the van. (People's Ex. 18; R. III. P44). Ocon began shooting from his window

while Vera began shooting from the back of the van. (People's Ex. 18; R. III. P45; P91)

Dauntrez Snowden was shot once in his upper left abdomen while Nicholas Mobley was shot

twice, once in the left leg and another time in the right foot. (R III. P68-9, P114). Dauntrez

Snowden died as a result of the gunshot wound. (R. III. P74)

The State opened its closing argument by replaying Mr. Vidaurri's videotaped statement

and then began in the following manner:

> In that brief segment right there [Mr. Vidaurri's videotaped
> statement], the defendant (indicating) tells you in own words how
> he and his hinchmen [sic], Juan Ocon and Alvera Vera, forged
> their final links of their quest that night to rid what they believe
> was there [sic] territory of anybody that didn't belong in their street
> gang....
> Why did this occur? Because that's the world of the
> defendant, that is the world of the Satan Disciples when they get
> together and they patrol their killing field....
> And if you dare have the audacity to enter their killing field
> and you don't respond with the right gang symbol right away, the
> price you pay is with your life. And if a few innocent people die in
> the process, well, that's simply the price you pay in the Satan
> Disciple world....I told you that in that in the Satan Disciple world
> they [Mr. Vidaurri and co-defendants] may call that [the murder of
> Dauntrez Snowden and attempted murder of Nicholas Mobley] the
> price you pay for not knowing their gang symbols. (R. IV. Q23-
> 24).

Mr. Vidaurri was subsequently found guilty of both first-degree murder and attempt first-degree

murder. (R. V. Q 91). The court sentenced Mr. Vidaurri to serve consecutive terms of 35 years

for first degree murder and 10 years for attempt murder. (R.V. S3, S18).

In an unpublished order, the Appellate Court upheld Mr. Vidaurri's conviction and held that the trial court did not have a *sua sponte* duty to question jurors regarding their potential gang bias. *People v. Vidaurri*, No. 1-02-3718 (Rule 23 order, April 26, 2004). A timely affidavit of intent was filed on April 27, 2004. This petition now follows.

**ARGUMENT**

**LEAVE TO APPEAL SHOULD BE GRANTED TO DETERMINE WHETHER THIS COURT'S HOLDING IN *PEOPLE V. STRAIN* SHOULD BE EXTENDED TO REQUIRE A CIRCUIT COURT TO *SUA SPONTE* QUESTION THE VENIRE ABOUT ANY POTENTIAL GANG BIAS WHERE GANG-RELATED EVIDENCE PERMEATES EVERY ASPECT OF THE DEFENDANT'S TRIAL.**

In *People v. Strain*, 194 Ill.2d 467, 481, 742 N.E.2d 315 (2000), this Court held that the trial court committed reversible error when it refused defense counsel's request to probe the venire regarding potential gang bias. Underpinning this Court's holding was its recognition of the extremely prejudicial effect that gang evidence can have upon a juror's ability to be impartial, particularly since gangs are "regarded with considerable disfavor." *Strain*, 194 Ill.2d at 479-80. *Strain* left open the question posed here: whether a circuit court has a *sua sponte* duty to question the venire about gang bias absent a request from defense counsel, where the circuit court is aware that gang-related testimony will permeate every aspect of the defendant's trial.

Recently, the First District Appellate Court, in *People v. Gardner*, No 1-03-1619, __Ill. App.3d__, __N.E.2d__, 2004 Ill. App. LEXIS 476, at *22-3 (1st Dist. May 11, 2004), held that "the *Strain* decision did not impose a specific request as a condition precedent for a gang bias question." In *Gardner*, the Appellate Court refused to impose a duty upon the trial court to question the venire about gang bias because it held that the trial court had expressly afforded defense counsel an opportunity to ask questions and counsel failed to take advantage of that opportunity. 2004 Ill. App. LEXIS at *16-7. The *Gardner* Court refused to impose such a duty because the record before that court, in light of defense counsel's actions, raised the possibility

-9-

that counsel had consciously chosen not to question jurors on the subject. While the *Gardner* Court thus refused to hold that the circuit court had a *sua sponte* duty in that case, however, it clearly contemplated that such a requirement may be needed to ensure a defendant's fundamental right to a fair and impartial jury. 2004 Ill. App. LEXIS 476, at *22 ("There may be circumstances where in the absence of an apparent waiver by defense counsel, *the trial court must at least offer to pose a gang bias question to prospective jurors*")(emphasis added).

Mr. Vidaurri's case best exemplifies when a trial must offer to pose a gang bias question. In this case the trial judge asked no gang-related questions of the venire and offered defense counsel no opportunity to ask such questions and defense counsel failed to broach the subject at all, asking no gang-related questions of the jurors and requesting no gang-related questions by the court. Because gang-related evidence permeated Mr. Vidaurri's entire trial, however the absence of any inquiry on this subject raises serious questions as to whether the jury empaneled to hear Mr. Vidaurri's case was fair and impartial.

In affirming Jose Vidaurri's conviction, the Appellate Court, relying solely on *People v. Williams*, 295 Ill. App.3d 456, 692 N.E.2d 723 (1ˢᵗ Dist. 1998), a decision that predated this Court's ruling in *People v. Strain*, held that the circuit court had no *sua sponte* duty to question the venire about whether they harbored any gang bias. The *Williams* decision was premised upon that Appellate Court's holding that the circuit court's general questioning of the venire was sufficient to uncover any potential gang bias. 295 Ill. App.3d at 466. This Court's holding in *Strain*, that because anyone could harbor negative gang bias it is not sufficient to simply make general inquiries, or just ask jurors whether they had family members affiliated with street gangs, to uncover such biases, severely undermines the rationale in *Williams*. *Strain*, 194 Ill.2d at 480. Therefore, consideration of this issue does not begin and end with the *Williams* analysis.

-10-

Moreover, a *sua sponte* duty was greatly necessitated in Mr. Vidaurri's case. Even when the circuit court became aware that venire members were victims of violent crimes, it failed to determine the nature of the crime. For example, after empaneled juror Katherine Szanowski disclosed that she had been involved in a drive-by shooting, the only follow-up question asked of her was whether anyone had been killed. (R. II. O29). Remarkably, given the nature of the offense and its similarity to the offense Mr. Vidaurri was convicted of committing, the trial court never asked Szanowski if the offense was gang-related. The court also asked no follow-up questions of empaneled juror Tim Runyon, who testified that his cousin had been murdered. (RII. O32). Because there was overwhelming gang-related evidence in the trial testimony, in Mr. Vidaurri's videotaped statement and in both the State's opening and closing arguments, the circuit court's failure to *sua sponte* question the venire about gang bias undermined any assurance that the jury empaneled was free of any such bias.

While *Strain* does not specifically create a *sua sponte* duty upon the circuit court to ask such questions where defense counsel fails to do so, Illinois Supreme Court Rule 431, by mandating that "the Court shall conduct *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate," suggests such a duty. Further, the questions posed by the circuit court in the instant case, pursuant to *Strain's* rationale, did not create a reasonable assurance that gang bias would be uncovered. As such, the circuit court "thwarted the selection of an impartial jury." *See People v. Metcalfe*, 202 Ill.2d 544, 559, 782 N.E.2d 263 (2002) (a circuit court abuses its discretion, if its conduct during *voir dire* thwarts the selection of a fair and impartial jury). To prevent the possibility that a circuit court's failure to *sua sponte* question the venire about gang bias will result in the empaneling of a partial jury, in direct contravention of the circuit court's duty pursuant to Illinois Supreme Court Rules 234 and 431, this Court

-11-

should grant Mr. Vidaurri leave to appeal to delineate those circumstances in which a *sua sponte* duty may be imposed.

**CONCLUSION**

Jose Vidaurri, petitioner-appellant, respectfully requests that this Court grant leave to appeal.

Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender

YASAMAN HANNAH NAVAI
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

-13-

**APPENDIX**

NOTICE
The text of this order may be
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same. *Navai*

FIRST DIVISION
April 26, 2004

No. 1-02-3718

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,) | Appeal from the |
| ) | Circuit Court of |
| Plaintiff-Appellee, ) | Cook County. |
| ) | |
| v. ) | No. 00 CR 8905 |
| ) | |
| JOSE VIDAURRI, ) | Honorable |
| ) | Joseph G. Kazmierski, Jr., |
| Defendant-Appellant. ) | Judge Presiding. |

O R D E R

Following a jury trial, defendant Jose Vidaurri was convicted of first degree murder and attempted first degree murder, then sentenced to consecutive, respective terms of 35 and 10 years' imprisonment. Defendant does not challenge the sufficiency of the evidence to sustain his conviction, but contends that the trial court committed reversible error in failing to sua sponte question the venire as to whether defendant's gang affiliation would affect their ability to be fair. He also contends that he was denied his right to the effective assistance of trial counsel, who failed to question the venire as to any bias against gangs.

Defendant's convictions arose from his involvement in the fatal shooting of Dauntrez Snowden and the attempted murder of Nicholas Mobley. The incident took place shortly after midnight

1-02-3718

Delbert Guy, and Nicholas Mobley were celebrating Peppers'
impending departure for college the next day.  Snowden was
driving his maroon Mercury Mystique that night and Peppers was in
the front passenger seat.  Guy and Mobley were in the back seat.

That same night, defendant, Francisco Rodriguez, David
Niera, Juan Ocon,[1] Benjamin Pienero, William Solis, and Alvaro
Vera[2] were joyriding in Rodriguez's van.  The occupants of this
van were members of the Satan Disciples street gang, save for
Ocon who was a member of the Latin Jivers street gang.

About 12:15 a.m., defendant pulled up beside Snowden's car
near Erie and Paulina.  Ocon and Pienero flashed gang signs
toward the car, but, purportedly, no one responded.  During the
high speed chase that ensued, defendant drove alongside Snowden's
car while Ocon and Vera fired multiple shots.  Mobley was shot in
the left leg and right foot.  Snowden was fatally shot in the
stomach.

Subsequently, defendant gave a videotaped statement
regarding his involvement in the shootings.  The State rested its
case and defendant did not present any evidence.  A jury found

---

[1]Ocon was also convicted of first degree murder and
attempted murder.  That judgment was affirmed in a separate
appeal.  People v. Ocon, No. 1-02-1567 (2003)(unpublished order
under Supreme Court Rule 23).

[2]Vera was convicted of attempted murder for his involvement
in the shootings.  That judgment was affirmed in a separate
appeal.  People v. Vera, No. 1-02-2046 (2004)(unpublished order
under Supreme Court Rule 23).

1-02-3718

about gang bias.  <u>Strain</u>, 194 Ill. 2d at 477.  Defendant
acknowledges that <u>Strain</u> did not directly address whether the
trial court had a duty to make inquiries <u>sua sponte</u> on gang bias;
nonetheless, he asks this court to hold that such a duty exists
under <u>Strain</u>.  We decline to do so.

We initially agree with the State that defendant has waived
this issue by failing to ask the trial court to question the
venire regarding potential gang bias and by failing to raise a
contemporaneous objection during the questioning of the
prospective jurors.  <u>People v. Enoch</u>, 127 Ill. 2d 176, 190
(1988); <u>People v. Thomas</u>, 186 Ill. App. 3d 782, 799-800 (1989).
We also find for the following reasons that the purported error
does not fall within the plain error exception to the waiver
rule.  134 Ill. 2d R. 615(a).

In <u>People v. Williams</u>, 295 Ill. App. 3d 456, 466 (1998),
this court explicitly held that, where, as here, neither party
tendered supplemental <u>voir dire</u> questions to the trial court
regarding this issue, and defendant failed to object during <u>voir
dire</u> or raise the issue in a posttrial motion, the trial court
had no duty to make inquires <u>sua sponte</u> regarding gang bias.
<u>Williams</u>, 295 Ill. App. 3d at 466.  In reaching that conclusion,
this court noted that the trial court had advised the parties of
its procedures for conducting <u>voir dire</u> and then posed general
questions to the venire regarding fundamental principles of law,

- 5 -

1-02-3718

People v. Wiley, 165 Ill. 2d 259, 285 (1995). In reviewing trial
counsel's performance, the entire record must be taken into
consideration and counsel's actions reviewed from the
circumstances confronting counsel at the time the questioned
conduct occurred. Wiley, 165 Ill. 2d at 285. A claim of
ineffectiveness arising from a matter of defense strategy will
not support a claim of ineffectiveness. Williams, 295 Ill. App.
3d at 469.

Defendant asserts that an attorney's failure to tender
supplemental voir dire questions can support a claim of
ineffectiveness. However, our supreme court, in People v. Lear,
175 Ill. 2d 262, 270 (1997), held that this issue is a matter of
trial strategy and virtually unchallengeable. Under the
circumstances revealed in this record, we cannot say that
counsel's conduct was not tactical or a matter of jury selection
strategy. See People v. Metcalfe, 202 Ill. 2d 544, 562 (2002).

The record shows that during voir dire, defense counsel
excused five prospective jurors, and also objected to seating the
juror who lived six miles from the crime scene. See Metcalfe,
202 Ill. 2d at 562. The record also shows that the gang evidence
introduced at trial was limited to explaining motive and no
litany of witnesses discussing gang rivalry or gang territory was
presented. It was thus plausible for counsel to reasonably
conclude that probing into gang bias would have served to unduly

No. 1-02-3718

FILED APPELLATE COURT
1ST DIST.

2004 APR 28 AM 10: 16

STEVEN M. RAVID
CLERK OF COURT

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| -vs- | ) | No. 00 CR 8905 (03). |
| JOSE VIDAURRI, | ) | Honorable Joseph G. Kazmierski, |
| Defendant-Appellant. | ) | Judge Presiding. |

## PROOF OF SERVICE

TO:  Richard A. Devine              Mr. Jose Vidaurri
     Cook County State's Attorney   Register No. R-15606
     300 Daley Center               Stateville Correctional Center
     Chicago, Illinois  60602       P.O. Box 112
                                    Joliet, IL 60434

You are hereby notified that on April 27, 2004, we filed the original and one copy of the attached Affidavit of Intent to File Petition for Leave to Appeal in the office of the Clerk of the above Court, a copy of which is hereby served on you.

YASAMAN HANNAH NAVAI
Assistant Appellate Defender

STATE OF ILLINOIS  )
                   ) SS
COUNTY OF COOK     )

The undersigned, being first duly sworn on oath, deposes and says that he personally delivered the required number of copies of the attached Affidavit to the Clerk of the above Court and to the State's Attorney of Cook County on April 27, 2004.

_____
CLERK

SUBSCRIBED AND SWORN TO BEFORE ME
on April 27, 2004.

_____
NOTARY PUBLIC

Official Seal
Dora Eason
Notary Public State of Illinois
My Commission Expires 04/26/06

No. 1-02-3718

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County, Illinois. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 00 CR 8905 (03). |
| | ) | |
| JOSE VIDAURRI, | ) | Honorable Joseph G. Kazmierski, Judge Presiding. |
| | ) | |
| Defendant-Appellant. | ) | |

## AFFIDAVIT OF INTENT TO FILE PETITION FOR LEAVE TO APPEAL

Yasaman Hannah Navai, Assistant Appellate Defender, states on oath:

1.     On April 26, 2004, this Court affirmed the judgment of the circuit court.  No

petition for rehearing was filed.

2.     On behalf of appellant, I intend to file a petition for leave to appeal within 35 days

of this Court's decision as provided for in Supreme Court Rule 315(b).

Respectfully submitted,

YASAMAN HANNAH NAVAI
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois  60601
(312) 814-5472

COUNSEL FOR DEFENDANT-APPELLANT

SUBSCRIBED AND SWORN TO BEFORE ME
on April 27, 2004

NOTARY PUBLIC

Official Seal
Dora Elacor
Notary Public State of Illinois
My Commission Expires 08/06

Case 1:08-cv-03085   Document 16   Filed 08/26/2008   Page 48 of 95

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

98536

October 6, 2004


Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601


No.  98536 - People State of Illinois, respondent, v. Jose
             Vidaurri, petitioner.  Leave to appeal, Appellate
             Court, First District.


    The Supreme Court today DENIED the petition for leave to

appeal in the above entitled cause.


    The mandate of this Court will issue to the Appellate Court

on October 28, 2004.


EXHIBIT D



**RECEIVED**

IN THE

MAR 0 9 2005

CIRCUIT COURT OF COOK COUNTY

CLERK OF THE CIRCUIT COURT
CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )
                                 )

Respondent, **FILED** )

                MAR 1 0 2005 )

    -Vs- )

          DOROTHY BROWN )
      CLERK OF CIRCUIT COURT )

JOSE VIDAURRI, )

Petitioner. )

P.C. No._____

Honorable

Joseph G. Kazmierski JR.
Judge Presiding.

---

## PROOF/CERTIFICATE OF SERVICE

TO: Clerk of the Circuit Court of Cook County Original &(3)-copys

2650 South California

Chicago, Illinos. 60608

PLEASE TAKE NOTICE! that on March 3rd ,2005. I have placed the
PETITION for POST-CONVICTION Relief & Motion for in forma pauperis
and to appoint counsel, with affidavit, and exhibits attached.
in the institutional mail at Stateville Prison, properly addressed
to the party above. For mailing through the United States Postal
Service:

Date: March 3, 2005.

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declares, under
the penalty of perjury, that I am the named party in the above action, and
the information contained herein, is true to the best of my knowledge.

/s Jose Vidaurri.

Jose Vidaurri#R-15606
P.O. Box-112/Joliet, Illinois. 60434

**EXHIBIT E**

IN THE

CIRCUIT COURT OF COOK COUNTY

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, ) | |
| Respondent, ) | P.C.No. _____ |
| ) | |
| -vs- ) | Honorable |
| ) | Joseph G. Kazmierski JR. |
| Jose Vidaurri ) | Judge Presiding |
| Petitioner, ) | |

## MOTION TO PROCEED IN FORMA PAUPERIS
### AND TO APPOINT COUNSEL

Petitioner Jose Vidaurri comes before the Court and respact-
fully requests that he be permitted to file the attached Petition
for Post-Conviction Relief _in forma pauperis_ and to have an attor
ney appointed to represent him in this proceeding.

In support of this request, Petitioner states:

1. That he is presently incarcerated in Stateville Corr. Ctr.

2. That he without any income or assets with which to pay for
the cost of this litigation or to procure counsel.

Wherefore, Petitioner prays that he be granted leave to file an
to proceed _in forma pauperis_ in the above-captioned Petition
for Post-conviction Relief and to have counsel appointed to re
present him in this proceeding.

_Jose Vidaurri_
Petitioner

I swear that the facts stated in this Motion are true and correct
in substance and in fact.

_Jose Vidaurri_
Petitioner

SUBSCRIBED AND SWORN TO ME BEFORE ME
this 23rd day of February , 2005
_Crystal L. Mason_
NOTARY PUBLIC

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

IN THE

CIRCUIT COURT OF COOK COUNTY

PEOPLE OF THE STATE OF ILLINOIS, )
                                 )
        Respondent,              )          P.C.No._____
                                 )
                                 )
-VS-                             )
                                 )          Honorable
                                 )          Joseph G. Kazmierski JR.,
JOSE VIDAURRI,                   )
                                 )          Judge Presiding.
        Petitioner.              )
                                 )

## PETITION FOR POST-CONVICTION RELIEF

Pursuant to 725 ILCS 5/122-1 et seq.(West 2000),Petitioner Jose

Vidaurri comes before the court and asks that the judgment in Cook

county Indictment No.00CR0890503 be vacated.

In support of this request Petitioner states:

1. On September 12,2002 Petitioner was sentenced by Joseph G. Kaz-

mierski Jr. following a jury trial for the offense of First Degree

Murder and Attempt First Degree Murder in indictment No.00CR0890503

2.Notice of Appeal filed by Petitioner on September 25,2002. The

appeal was docketed in the Illinois Appellate Court as Number 1-

02-3718,and was affirmed on April 26,2004.

3.Petition for Leave to Appeal was denied on October 6,2004(SUPRE-

ME COURT No.98536).

4.Petitioner's SIXTH AMENDMENT right under the Constitution of the

United States and the State Of Illinois,were substantially denied

in that he was denied effective assistance of counsel at each

level of legal criminal proceedings.

(1)

5. Petitioner's SIXTH AMENDMENT right under the Constitution of the United States and the State Of Illinois ,were substantially denied in that he was denied effective assistance of counsel in the Direct Appeal process,as well as the leave to appeal process.

6.Newly Discovered Evidence regarding brain development that would have yielded different results at sentencing had it been available to the court.

7.Evidence not available to the court at sentencing,that would have supported Petitioner's rehabilitative potential,Illinois constitution requires that every sentence take into account the objective of rehabilitating the offender to useful citizenship. Ill Const.,art. I,sec. 11.

8.Petitioner is without any income or assets with which to procure counsel,petitioner therefore desires that counsel be appointed to represent him in his proceedings.

### ISSUE # I

**PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASS-ISTANCE OF COUNSEL AT EACH LEVEL OF REPRESENTATION.**

Petitioner's trial counsel,was ineffective at pre-trial,trial and post-trial.When counsel failed to challenge the voluntariness of petitioner's involuntary coerced video confession.Attorney,Martha Fitzsimmons,came to speak with this petitioner about his case,and advised petitioner that if he was going to take a guilty plea to let her know.If they were to fight case,it will be to the end.The second time,Ms.Fitzsimmons,came to speak with petitioner,she presented petitioner with the video statement.

(2)

She asked petitioner questions about the interrogation,and also,

the arrest.At this particular point,petitioner explained to coun-

sel,about the police misconduct,relating to how they treated him,

from when they took petitioner from a Ms.Beltran's home.Also how

he was treated while in custody of the police.Petitioner told co-

unsel about being threatened,coerced,and tortured by police dur-

ing the time he was in custody.Also,petitioner told counsel about

being coached,as what to say and do during Video taped confession

by,Det.Garcia and Assist. States Attorney Jack Blakey.Counsel's

reply to petitioner was,she would not be challenging the video

confession,because the Judge would deny the motion and the state

would then know the trial strategy.Counsel instead insited on a

Motion To Quash Arrest And Suppress Evidence.Counsel never list-

ened to this petitioner,about his allegations of how he was

treated by police while in their custody.As to him being coerced

and coached into making the video statement.Consider,People V.

Shatner, 174 Ill.2d 133, 673 N.E.2d 258,220 Ill.Dec.346.Our Sup-

reme Court of Illinois held;at footnote[1][2],A defendant alleg-

ing a violation of his SIXTH AMENDMENT right to effective assist-

ance of counsel must generally meet the tqo-pronged test establ-

ished by the United States Supreme Court in Strickland V. washing

ton,446 U.S. 668,80 L.Ed.2d 674,104 S.Ct.2052(1984),and recognized

by this court in People V. Albanse,104 Ill.2d 504,85 Ill.Dec.441,

473 N.E.2d 1246(1984).Under Strickland,the defendant(1) must show

that his counsel's performance fell below the objective standard

of reasonableness and(2) must demonstrate that there is a reason-

able probability that,but for counsel's unprofessional errors,

the result of the proceeding would have been different. In the
case at bar, petitioner submits that appointed counsel, has not
only flunked the two-prong analysis of the Strickland test, she
also flunked the analysis announced by the United States Supreme
Court in Glover V. United States, 531 U.S.121 S.Ct.696(2001).
petitioner has been severly prejudiced by counsel's failure to
challenge the voluntariness of this petitioner's video confession
Consider, Sims V. Georgia, 385 U.S.538,87 S.Ct.639,17 L.Ed.2d 593,
where our United States supreme Court held, although the Judge need
not make a formal finding of facts or write an opinion, his con-
clusion that the confession is voluntary must appear from the re-
cord with unmistakable clarity." It is submitted that "but-for coun
sel's incompetence and ineffectivenss, this petitioner has been
severely prejudiced, by her not challenging the voluntariness of
the video confession, which deprived petitioner a review of the
events which caused petitioner to make such confession. Determining
the voluntariness of a defendant's custodial statement, courts must
consider the "Totality of the Circumstances", including factors
such as defendant's age, intelligence, background, experience, mental
capacity, education and physical condition at the time of question
ing. As well as the legality and the duration of the actual quest-
ioning of the defendant. Additionally, the court must consider any
physical or mental abuse of defendant, including any possible
threat or promises. People V. Nicholas, Case No.1-02-0828(July 9, 2004)
1st Dist. Appellate Court. Petitioner's court appionted counsel
ignored his allegations of his video confession being involuntary.
Petitioner

4.

Petitioner avers he was taken to the 13th District police depart-
ment parking lot,where he sat handcuffed for 30 to 40 minutes in
custody of Det.Michelle Rubino. Approx.(8) police came to the car
during this period of time,looking inside the car,and pointing at
the petitioner.Given his age of 19yrs old,naturally he became
afraid and nervous.From the 13th dist. police station,petitioner
was taken to the area 4 police station and placed in a interrog-
ation room,hancuffed to a steel ring secured on to a wall.Shortly
after,Det.Garcia entered the interrogationroom alone,he pulled up
a chair and asked petitioner if he knew why he was there.Petition
replied that he did not.Det.Garcia then informed petitioner that
he was implacated in a crime.Petitioner was asked for a alibi for
date in question,and petitioner gave his cousin.Petitioner then
told Det.Garcia that he wanted a phonecall,and that he did not
want to talk to him anymore,he wanted a lawyer.Det.Garcia respond-
ed to petitioners request,by informing petitioner that he would
be back in the morning to speak to this petitioner. Det.Garcia
then left the room.No Miranda Warnings were ever read to this
petitioner during this 20 to 30 minute interrogation.Petitioners
request for a phonecall and attorney went ignored."Consider,
Edwards V. Arizona,451 U.S.477,101 S.Ct.1880,68 L.Ed.2d 378(1981)
"Petitioner who requested counsel before questioning one day,and
the next day was questioned by police without the benefit of
counsel,and whose confession was ultimately used against him
at trial,was found to have had his rights under the the FIFTH
and FOURTEENTH AMENDMENTS violated."Det.Garcia took the position

5.

that despite this petitioner's assertion of his FIFTH and FOUR-
TEENTH AMENDMENT Privileges,he subsequently intiated further
contact with this petitioner. Petitioner's court appionted attor-
ney knew all of this information,yet chose to ignore it all.

[INTERROGATION ENVIROMENT]

In this interrogationroom,there were (3) chairs that were lined
up against the wall this petitioner was hand-cuffed to.This petit-
ioner used these chairs to lay across on his left side of his body
so that the weight of his body would not pull on his arm that was
hand-cuffed and secured to the wall by his wrist.During the night
while this petitioner was asleep,3 or 4 detectives entered the
interrogationroom.Petitioner was yanked off the chairs,and felt a
sharp pain in his right wrist from being yanked off the chairs
while he was handcuffed to the wall.When this petitioner tried to
raise his head up to see who these police were,his head was
forced back down.When petitioner attempted to raise his head,he
was smacked on the back of the head and told to keep his head
down.In this particular position,all that petitioner could see
were multiple set(s) of feet.When they left the room petitioner
noticed that the chairs were now gone.So with no chairs in this
room,and handcuffed to the wall,petitioner was forced to stand
for a long period of time.When petitioner got tired,he was forced
to sit down painfully due to his body weight pulling on his wrist
that was secured to the wall.Several times within the night when
petitioner would fall asleep from exhaustion,he would be smacked
and yanked awake by these unknown police officers.On January 14,
2000,petitioner was awakened by Det.Garcia and an unknown Detect-

6.

ive,who brought to chairs in with them.Det.Garcia was asked by
this petitioner,about his request for a lawyer and a phonecall.

Petitioner was slapped across the face by Det.Garcia,and told that
he does not need a lawyer.Petitioner again asked Det.Garcia for a
attorney ,and informed him that he did not want to talk to him.
However Det.Garcia kept saying that petitioner did not need a law-
yer,and that he knew petitioner was the driver of said crime.
Petitioner avers,for more of this unlawful conduct please **See**
**(Affidavite of this petitioner).**Consider,<u>People V. Gilliam</u>,172
Ill.2d 484,500(1996)."For the propositionthat no single factor is
dispositive and the test of voluntariness is whether the defendant
made the statement Freely,Voluntarily and without compulsion or
induement of any sort,or whether the [defendant's] will was over-
come at the time he or she confessed".Again the petitioner's court
appionted counsel knew these facts,yet chose to ignore them.The
Assistant States Attorney will be intentionally ignoring <u>Mabry V.</u>
<u>Johnson</u>,467 U.S. 504,508(1984).Refering to"competent counsel".
The A.D.A. will further argue that this petitioner received effect-
ive assistance of counsel under the gise of <u>Strickland</u> Supra,at
446 U.S..Further Citing the Illinois Supreme Court's holding in
<u>People V. Fair</u>,193 Ill.2d 256,250 Ill.Dec.248,738 N.E.2d 500,507
(Ill.2000) or the Seventh Circuit's holding in <u>United States V.</u>
<u>Olson</u>,846 F.2d 1103,1107-1108 (7th Cir.1998).In <u>Strickland</u>,the
court required defendant to prove the prejudice prong of the two-
part analysis,and requires the defendant to demonstrate that any
alleged error,even if proven,must also result in prejudice in
order for the defendant to prevail on his alleged errors.In

7.

Glover,the court emphatically held,that any additional period of incarceration that is the result of the error,may satisfy the prejudice prong required by Strickland.

Under the voluntariness test,the Supreme Court undertook a continuing re-evaluation on the facts of each case on how much pressure on the suspect was permissible.The rule required examination of the "Totality of Circumstances" surrounding each confession. Haynes V. Wash.,(1963) The factors deemed most important were:(1) Physical abuse,Lee V. Miss.,(1948);(2)Threats,Payne V. Ark.,(1958) (3)Extensive questioning,Turner V. pa.,(1949);(4)Incommunicado detention,Davis V. N.C.,(1966);(5)Denial of right to counsel,Fay V. Noia,(1963);and(6) The characteristics and status of suspect, such as his lack of education,Colmbe V. Conn.(1961) Emmotional in stability,Spano V. N.Y., Youth,Gallegos V. Colo.,(1962),or sickness,Jackson V. Denno,(1964). Given the fact that the trial counsel waived this petitioner's due process and equel protection of these rights by not affording him the "Voluntariness Test" to see whether his claims of being assaulted,threatened,coerced and coached into making the video confession,petitioner's counsel was ineffective.Consider,Bliss V. Lockhart,891 F.2d 1335 (8th Cir. 1989)"Trial counsel's failure to investigate,preserve evidence,and present petitioner's claim of coercion or duress".In this case at bar,this petitioner was deprived of any"adequate and effective" presentation of these claims by his trial counsel.

[TRIAL COUNSEL"S FAILURE TO INVESTIGATE AND PREPARE LAW AND
EVIDENCE].

Petitioner's Trial Court appionted attorney ignored his claims of
police misconduct,which produced the involuntary video confession.
Counsel then challenged the issue of thid party consent,via,motion
to quash arrest,and suppress evidence.Counsel only subpeonaed a
Miss Vanessa Beltran,who was not the party who allegedlly signed
the third party consent form. Mr.Ivan Beltran was the person who
allegedlly,signed the third party consent to search form.Yet the
petitioner's trial counsel,never thought to subpeona this man.
Even after petioiner informed counsel that Mr.Ivan Beltran only
signed consent to seaech form,after he was caught smoking cocain
in location's garage.Subsequently,Mr.Ivan Beltran was threatened
by police,that if he did not sign said form,he would be arrested
for allegedly smoking cocain.Trial counsel never interviewed Mr.
Ivan Beltran,or investigated such information. Mr.Ivan Beltran
was never presented,to testify at Motion to Quash Arrest Hearing.
Petitioner  avers during this hearing aforementioned,trial counsel
failed both prongs of Strickland. Counsel had no case law prepared
for this motion,due to her not researching the issue of third par-
ty consent or any other issue for that matter.See(D-69 Lines 2-8)
Counsel,Ms. Fitzsimmons: Judge,I think we have an interesting
situation which is not one that I'm personally familiar with as
regards to the case law,and I would like an opportunity to brief
your honor where one person gives consent and another does not.
And I'd like to be able to give your honor some case law on that
issue. A continueance was set for August 23,2001.See(E-3 Lines

15-16).Counsel Fitzsimmons: I don't have any case law to submit.
Trial Counsel's representation fell below the objective standard
of reasonableness,counsel did not research any case law pertain-
ing to third-party consent.Had counsel done so,she would have
known that Mr.Ivan Beltran allegedly signing a consent to search
form was basis for a third-party consent.Therefore counsel would
have known to investigate,interview,and subpeona Mr.Ivan Beltran,
instead of his daughter,Ms.Vanessa Beltran to challenge the auth-
entiscity and voluntariness of the consent of Mr.Beltran on the
consent to search form. Motion To Quash Arrest And Suppress Evid-
ence,was denied due to the alleged signature of Mr.Beltran.See(E-
6 Lines 17-22). Trial counsel never interviewed or investigated
whether or not,Mr.Ivan Beltran,did indeed sign the consent to
search form voluntarily,or ever had knowledge of his alleged sign-
ature being on it.Despite being told countless times by this pet-
itioner and Ms.Beltran,as to the circumstances surrounding his
alleged signature upon the consent to search form. The Supreme
Court cautioned in Strickland,that "a Court deciding an actual in-
effective claim,must judge the reasonableness of counsel's chall-
enged conduct on the facts of the particular case,viewed as of the
time of counsel's conduct".Strickland Supra,at 104 S.Ct.2066.Once
again,petitioner avers,his trial counsel has flunked the prongs of
the Strickland test.
[TRIAL COUNSEL'S FAILURE TO PROTECT PETITIONER'S SIXTH AMENDMENT
RIGHT TO THE CONFRONTATION CLAUSE IN REFERENCE TO MR.IVAN BELTRAN
[CRAWFORD VIOLATION]
On January 13,2000,Officer Michelle Rubino of the 13th District,
assigned to the tactical unit#136-charlie.Entered a house at the

10.

2100 block of north Lawndale(2138 N. Lawndale),basement apartment
at approximately 9:50 or 10:00pm. Before entering the aforemention-
ed house ,this detective claims to have encountered Mr.Ivan Beltran
who allegedly stated to this police officer,that he was the renter
of the apartment in question. This Officer testified at the Motion
to Quash arrest and Suppress Evidence,that she informed Mr.Ivan
Beltran that she was there to bring this petitioner in for quest-
ioning.See(D-59 Line 12- D-61 line 10). Subsequently this police
officer allegedly obtained a third party consent,with two other
police officer's signatures upon it.An officer Tally,and officer
Schultz. They then entered this address by force,and took this
petitioner into custody. Our United States Supreme Court in Craw-
ford V. Washington,held " testimonial hearsay" cannot be introduced
at a defendant's trial if the defendant did not have aprior oppor-
tunity to cross-examine the person making the statement.In Crawfo-
rd,a defendant was tried for attempted murder. The police had
taken a tape recorded statement from defendant's wife,in which she
related comments the defendant made to her,which conflicted with
the account the defendant later testified to at trial.Sylvia was
unavailable for trial because she claimed the Marital privilege,
by which a spouse can refuse to testify against the other spouse.
However the prosecution was permitted to introduce Sylvia's
statement to the police on the basis of a rule which allows a
hearsay statement from an unavailable witness,to be introduced in
evidence if it is found to be trustworthy by the judge.The defend-
ant was convicted. The Supreme Court reversed the conviction on
the grounds that the admission of Sylvia's statement violated the
SIXTH AMENDMENT. Under-taking an exhaustive historical analysis,

11.

the Supreme Court found that the confrontation clause of the SIXTH
AMENDMENT was intended to prohibit "testimonial hearsay" from be-
ing admitted unless (a) the witness was unavailable for trial and
(b) the defendant had a prior opportunity to cross-examine the
witness.Applying these historical principles as a guide,this peti-
tioner contends that the trial court was in error for allowing Mr
Ivan Beltran's third-party consent to search be allowed at petit-
ioner's Motion to Quash arrest and suppress evidence hearing. Mr.
Beltran's third-party consent to search is testimonial,because it
was a formal statement to a government officer,and thus something
the declarant(Mr.Beltran) could also reasonably be used in court.
Furthermore,this petitioner never had an opportunity to challenge
the authenticity of declarant's (Mr.Ivan Beltran) signature,nor
was this petitioner given a prior opportunity to examine Mr.Beltran
whether if he did sign such document,if it was under his own free
will.Petitioner contends (a) or (b) part of the test under the
analysis found in the confrontation clause of the SIXTH AMENDMENT
has not been satisfied in reference to Mr.Ivan Beltran.He was
never brought before the court during Motion to Quash Arrest,and
it was his signature that caused petitioner's Motion to be denied
Therefore the consent to search form should have been inadmissible
and never allowed as evidence. crawford V. Washington,124 S.Ct.
1354 (2004).

**[TRIAL COUNSEL'S FAILURE TO CHALLENGE THE DELAY OF PROBABLE CAUSE
HEARING,PREJUDICED PETITIONER]**

Consider,Gerstien V. Pugh,420 U.S.103 (1975),the United States
Supreme Court has made it clear that there is a Constitutional
right to have an opportunity to appear before a judge,in a timely

12.

manner after arrest,for a fair and reliable determination of prob-
able cause,and that failure to provide such an opportunity to a
defendant renders continued detention a violation of the FOURTH
AMENDMENT right to be free from unreasonable restraint. The single
most important fact regarding the issue of voluntariness is that
it's clear from the trial transcript,that the police and/or the
prosecutor's office at some point made a decision that petitioner
would not be produced before a magistrate for a probable cause
hearing,in anything like the normal amount of time. Which is
usually within 48-hrs. of arrest.Petitioner had been placed under
warrantless arrest at Ms.Vanessa Beltran's home.After being placed
into custody,petitioner was not produced before a court for a
probable cause hearing for several days.Importantly,it was during
this unusaully long delay that this involuntary video statement
was produced. The 1st District Appellate Court particularly point-
ed to People V. Gilliam,172 Ill.2d 484,500(1996),"For the propos-
ition that no single factor is dispositive and that the test of
voluntariness is whether the defendant made the statement "freely
voluntarily, and without compulsion or inducement of any sort,
whether the defendant's will was overcome at the time he or she
confessed".Petitioner was 19yrs. old at time of arrest.See(Exhibit
Gur). The evidence is clear from the trial transcript,that long
before the involuntary video confession,this petitioner was in
custody.Consider,U.S. V. Mitchell,966 F.2d 92 (2nd Cir. 1992).
"The test used in determining whether a defendant was in custody
is an objective one .It asks whether a reasonable person in the
defendant's position would have understood himself to be subjected
to restraints comparable to those associated with a formal arrest.

This inquiry focuses upon the presence or absence of affirmative
indications that the defendant was not free to leave.Custodial
arrest is said to convey to the suspect a message that he has no
choice but to submit to the (interrogation) officer's will and to
confess".Having been placed in the interrogationroom at the area
4 police station for several days on end and being subjected to
repeated smacks,and threats.Which effectively amounted to torture
by these unnamed police officers.Including Det.Garcia. Petitioner
avers there had been no effort to arrange even the most basic
arrangement,for him to be given a place to sleep.petitioner was
left handcuffed to wall and slept on chairs until they were re-
moved intentionally by the police.There was no bench,nor table in
the room which he was being held. The Gerstein rule has been co-
dified in Illinois as 725 ILCS 5/109-1(a)(west)(1998).Consider,
Riverside V. Mclaughlin,500 U.S. 44,Our United States Supreme
Court held,"For the proposition that the promptness requirement
of Gerstein requires probable cause determination by a neutral
Magistrate within 48 hrs. of "warrentless arrest".Indeed the
Mclaughlin Court stated that delays for the purpose of gathering
addittional evidence to justify the arrest were not acceptable
violated the spirit of Gerstein". Our United States Supreme Court
did note that Illinois cases have held that even where a delay of
more than 48hrs. occurs,the,state may still prevail in a claim of
voluntariness as to a statement if it can show that the delay was
due to a bona fide emergency or other extraordinary circumstances
(e.g.,People V. Willis,344 Ill.App.3d 868 (2003),but the same case
instructs that the proper remedy for a violation of the Mclaughlin

14.

and Gerstein rule is the suppression of any statement made after
the point of a Constitutional violation.Petitioner avers,trial
counsel wholly failed to subject the delay for a probable cause
hearing to a meaningful adversarial testing.Trial counsel once
again flunks application of the Strickland test.

[TRIAL COUNSEL'S FAILURE TO PREPARE LAW AND EVIDENCE FOR TRIAL]
Consider,House V. Balkcom,725 F.2d 608 (11th Cir.1984),"A pretrial
investigation in a criminal case,provides the basic foundation,on
which most defense rests and is a critical stage of the lawyer's
performance".Petitioner contends trial counsel also errored in
that she did not object to People's exhibit#16-A (Gun) and #16-B
(clip),being allowed into evidence.Counsel did not object during
Det.Climack's testimony,but the next day,which counsel claims was
due to an oversight. See(Q-4 Line14 - Q-5 Line20).The objection
was overruled,because counsel failed to timely make this particular
objection during trial.See(Q-6 Lines16-17).Once again counsel has
flunked a prong of Strickland.This inaction by trial counsel lead
to this petitioner being prejudiced before the jury,by this gun and
clip being improperly submitted in front in front of the jury.
When there was no evidence factual,or probable,linking this
particular gun to the crime.Petitioner bases this claim upon
People V. Chandler,129 Ill.2d 233,135 Ill.Dec.543 N.E.2d 1290(1989)
Subsequently during this untimely objection without the jury pre-
sent,counsel argued," gun was not identified by Mr.vidaurri as the
he used,nor was it identified as the gun,nor was it identified as
even similar to the gun that was used by the surviving victims,
Mr.Mobley,Mr.Peppers,or Mr.Guy.There is no competent evidence to
which links that gun to this incident other than the fact that it

was recovered in the course of this investigation.For that reason
I would ask that the court not allow that to be admitted into
evidence,although I did not object to it yesterday through an
oversight,and that the court additionally prohibit the state from
arguing to the jury that this is,in fact thegun that was used.See
(Q-5 lines 6-20). Consider,Harris by and through Ramseyer V. Wood
64 F.3d 1432(9th Cir.1995),"Trial counsel's failure to investigate
and prepare for trial ammounted to ineffective assistance".During
this stage of this petitioner's trial,if trial counsel would have
conducted a pretrial investigation.Counsel would have known about
the state's intention to submit this prejudical gun before the
jury.Had counsel been prepared for trial,she would have objected
to this prejudicial evidence in front of jury at the time it was
being presented. Prosecutor Mr.Holmes argued,"It sounds to me
judge,that she is arguing the weight that should be given the
evidentiary value of the gun,the admissibility of the gun.It's
clear the detective identified thats the gun, I recovered it such
and such place.The courts aware the state's position is that this
was not a shooter,he never had a gun,noone ever identified him
with a gun.Its not going to come out in arguement.It was just one
of the items that the detective recovered in the course of his
investigation which I think is certainly proper for the jury.See
(Q-5 Line 21- Q-6 Line 9). Petitioner contends that prosecutor Mr,
Holmes knew that the state's position was that this petitioner was
not a shooter in this crime,never had a gun and was never identi-
fied by the three surviving victims to have had any gun.Therefore
the prosecutor knowingly abused the judicial process by his act of

16.

bad faith,by submitting this weapon before the jury,to effectively
prejudiced this petitioner. Petitioner's counsel's failure to ob-
ject in a timely manner,also severly prejudiced this petitioner.
For more ineffective behavior as such.See(P-194 Line 10 - P-196
Line 10).Again counsel failed to make timely objection,and petit-
ioner was severly prejudiced in front of jury.

[CHANDLER VIOLATION]

Goodwin V. Balkcom,684 F.2d 794 (11th Cir. 1982),"Trial counsel's
lack of pretrial investigation,which deprived defendant of potent-
ial defense,constituted ineffective assistance of counsel".Petit-
ioner relying on People V. Chandler,129 Ill.2d 233,135 Ill.Dec
543, 543 N.E.2d 1290 (1987). Chandler's trial counsel's performance
fell below an objective standard of reasonableness.Chandler was
charged with murder,residential burglary,and arson.After his arrest
he made a statement,introduced at trial,which he admitted tobreak-
ing into victim's home,but stated that it was his co-defendant
who stabbed the victim.Chandler's trial counsel presented no witn-
esses on his behalf,and Chandler himself did not testify.During
closing arguments,defense counsel conceeded,that Chandler had
entered the victim's house,but argued that he did not stab the
victim. Our Supreme Court of Illinois held,that defense counsel's
performance in Chandler amounted to ineffective assistance of
counsel.Our Supreme Court of Illinois,reasoned that,even if
counsel had succeeded in persuading the jury that defendant did
not kill the victim,the jury was still instructed to find the de-
fendant guilty of murder on accountability,and had no choice but
to find the defendant guilty of murder,residential burglary,and

arson." In the instant case,just as in <u>Chandler</u>,trial counsel did not vigorously challenge the prosecutor's claim that this petition-er paticipated in said crime.Petioner's Trial counsel did not pre-sent any witnesses on his behalf,including this petitioner,even though this petitioner expressed his willingness to do so. Just like <u>Chandler</u>,petitioner's counsel at closing argument argued that petitioner was accountable.See(Q-41 Line 19- Q-42 Line 3).**Trial counsel Martha Fitzsimmons:Apparently driving the van to get the shooters to where they were going to shoot is accountability,but opening the door,get out and shoot as Bam Bam did,that's not accountability.Exactly the same action. Driving the car for under three minutes,opening the door. Something that took a second or two.But Bam Bam is not accountable.Mr.Vidaurri is accountable.He's accountable because he drove the van.** Petitioner's Trial counsel's defense was that petitioner is guilty,but someone else is to but is not on trial.Trial counsel could have listened to petitioner's claim of police misconduct,interviewed witnesses that would have refuted video statement as well as state witnesses.All due to counsel's failure conduct a pretrial investigation,which deprived petitioner of apotential defense.Consider,<u>Goodwin V. Balkcom</u>,684 F.2d 794 (11th Cir. 1982)"Trial counsel's lack of pretrial invest-igation,whick deprived defendant of potential defense,constituted ineffective assistance of counsel".Also consider,<u>Lord V. Wood</u>,184 F.3d 1083 (9th Cir. 1999),"Counsel's failure to investigate evidence,which demonstrated his clients factual innocence,under-mines the confidence in the verdict and constitutes ineffective assistance of counsel".

18.

[TRIAL COUNSEL FAILED TO INTERVIEW SEVERAL PROSECUTION WITNESSES]

Our Supreme Court of Illinois held in,People V. Shatner,174 Ill.2

133,673 N.E.2d 258,220 Ill.Dec.346,at footnote [5]."The Court's

finding of ineffective assistance did not rest exclusively on

Chandler's counsel alleged failure to develope a theory of innoc-

ence.Rather the Chandler court furhter observed that the defense

counsel's performance was deficient because he failed to cross-

examine others in an extremely conclusive manner,and called no

witnesses to testify,including the defendant,even though counsel

had asserted that defendant would do so during opening arguement"

In this case at bar,trial counsel failed to subpoena Mr.Onyx Sant-

ana,whom·det.Climack claims to have interviewed during his test-

imony at Petitioner's trial.As a result of this alleged interview

Det.Climack claims that a gun was produced,which the prosecutor

submitted before the jury.Petitioner's trial counsel refused to

allow him to take the stand,during attorney visit.Petitioner ex-

pressed his desire to take the stand,trial counsel ignored this

position by this petitioner.On the first day of trial before pick-

ing the jury,petitioner talked to his counsel in the lock-up and

conveyed to her his desire to have the state witnesses,that were

in the car during this crime taking place.Mr.Nicholas Mobley,Mr.

Delburt Guy,and Mr.William Peppers about whether or not they were

wearing hats on said night.Their testimony would have refuted the

involuntary video confession,yet counsel refused.Trial counsel's

performance in this area was defecient as well,because not only

did she not interview or cross-examine the aforementioned in this

manner.Counsel refused to subpoena and examine Officer Michelle

Rubino about the circumstances in which her and petitioner met

19.

prior to arrest,which could have also refuted some of the involunt-
ary video confession.Consider,Wade V. Armontrout,798 f.2d 304 (8th
Cir. 1986),"Trial counsel's failure to conduct a pretrial invest-
igation,failed to interview prosecution's witnesses,constituted
ineffective assistance of counsel and required an evidentiary hear-
ing". Petitioner told trial counsel about the misconduct of the
police,about being smacked,being denied his right to counsel during
questioning.Also being coerced,and coached into saying things,in
the making of the involuntary video confession.Yet Det.Garcia or
Assistant States Attorney Jack Blakey were not questioned in this
manner.Petitioner also expressed to trial counsel that testimony
of the state witnesses contradicts some of what was said in the
involuntary video confession,and if he was allowed to take the
stand,he could present the real facts of how he was treated by the
police,and the real facts about the crime before the jury.
[counsel's failure to object prosecutor's use of perjurded test-
imony,resulting in severely prejudicing petitioner]
In United States V. Agurs,427 U.S. 97,96 S.Ct.2392,49 L.Ed.342
(1976),"the court distinguished a situation where the prosecution
knowing use of perjured testimony or,equivalently,the prosecutor's
knowing failure to disclose that testimony used to convict the de-
fendant was false.The court noted the well-established rule that
"a conviction obtained by knowing use of perjured testimony is
fundamentally unfair,and must be set aside if there is any reason-
able likelihood that the false testimony could have affected the
judgement of the jury".Although this rule is stated in terms that
treat the knowing use of perjured testimony as error subjected to

20.

harmless error review,it may as easily be stated as a materialali+y
standard under which the fact that testimony that is perjured is
considered material unless,failure to disclose it would be harm-
less beyond a reasonable doubt. The court in Agurs justified this
standard of materiality on the ground that the knowing use of per-
jured testimony involves prosecutorial misconduct and,more import-
antly,involves "a corruption of the truth seeking process".In this
case at bar,petitioner avers,that the assistant States Attorney
Mark Gerhardt,knowingly committed perjury in that while he was
writing state witness David Neira's written statement.Assistant
States Attorney Mark Gerhardt,knowingly wrote things in David
Neira's statement that David never told this Assist. States Atto-
rney.Mark Gerhardt never informed State witness David Neira,that
he was going to do so either. At petitioner's two co-defendant's
trials,State witness David Neira is questioned about his written
statement stating that he saw Porky(Alvaro Vera),pull open the
van door,when he has been testifying in court that Bam Bam did so.
**See(D-250 Line 6 – Line 13)of codefendant's trial transcript.See**
**also(D-251 Line 3 -Line 5)of co-defendant's trial transcript.**
**Defense Attorney: Do you remember in your written statement you**
**said that porky pulled the door open? State Witness,David Neira:**
**I seen Bam-Bam,I know.** State witness,David Neira states with con-
viction,regardless of what his written statement says,he saw Bam-
Bam,and he knows. He is then shown his written statement for
identification.When shown and asked if he said those things,he
states that the states attorney wrote the statement,and he just
signed it.**Defense Attorney:would you be kind enough to go to the**

21.

page,I think it would be page 3,and I'll point out to you the app-
ropriate location. State Witness,David Neira:I see right here.
Defense Attorney:did you in your statement say,David states porky
pulled open sliding door on the right and stuck his right hand out
with a gun? Did you say that? State Witness,David Neira:They
wrote it down. Defense Attorney:Did you write that? State Witness
David Neira:I didn't actually write it,but they wrote it and I
signed it. Defense Attorney:Someone wrote it for you? State witn-
ess,David Neira:Yes,the states attorney.See(d-251 Line 11-24;
D-252 Line 1-6)of co-defendant's trial transcript.Assistant State'
Attorney,Mark Gerhardt,Knowingly wrote things in David Neira's
written statement ,that David Neira didn't even know about,in bad
faith. The only thing or person in total record of case,that
claims Porky (Alvaro Vera),opened said door is the written state-
ment wrote by assistant states attorney,Mark Gerhardt,which is
claimed to be the statement David Neira gave,but his testimony was
clearly inconsistant.State prosecutor's knowledge of this is shown
by the two prior trials of petitioner's co-defendants. Two trials
that prosecuting attorneys,Brian Holmes and Romano DI Benedetto,
tried prior to petitioner's trial. Consider,U.S. V. Lorefice,192
F.3d 647 (7th Cir. 1999),"Misconduct by investigating law enforce-
ment agents is indistinguishable from misconduct by prosecuting
attorneys".Petitioner avers that State Witness,David Neira,Changed
from his conviction of what he saw with his own eyes,and testified
to at co-defendants trials.That Bam-Bam opened said van door,to

22.

what Assistant States Attorney,Mark Gerhardt wrote in written
statement at petitioner's trial.Compare(**D-250 Lines 7-24;D-251;
D-252 Lines 1-16**)of co-defendant's transcript.And(**P-45 Lines 14-
21**)of petitioner's trial transcript. State witness David Neira's
willingness to change his testimony,to match state Attorney Mark
Gerhardt's story,clearly shows that David Neira willingly committ-
ed perjury to help the prosecution. Making State witness David
Neira's testimony untrust-worthy,as well as written statement
claimed to be that of David Neira. Petitioner avers that Brian
Holmes and Romano Di Benedetto knowingly allowed and used this
perjured testimony,and deliberately suppressed evidence from jury
that would have impeached and refuted David Neira's testimony at
petitioner's trial. In <u>Mooney V. Holohan</u>,294 U.S. 103,55 S.Ct. 34
79 L.Ed 791 (1935),"the court established the rule that the know-
ing use by a state prosecutor of perjured testimony to obtain a
conviction and the deliberate suppression of evidence that  would
have impeached and refuted the testimony constitutes a denial of
due process.The court reasoned that a deliberate deception of
court and jury by the presentation of testimony known to be perj-
ured,is inconsistent with the rudimentary demands of justice".
Petitioner avers that that prosecuting attorneys,Brian Holmes and
Romano Di Benedetto further violated the rule established in
<u>Mooney V. Holohan</u>. State Witness,David Neira,testified at petit-
ioner's trial,that co-defendant,Juan Ocon,told petitioner specif-
ically,"Go  get em, Go get em".While said van is driving to pull
up to said car.See(**P-43 Lines 12-20**)of petitioner's trial trans.

23.

In state witness David Neira's testimony at petitioner's co-defen-
dant's prior trials,the words "Go get em" never came out of David
Neira's mouth. From examination of petitioner's co-defendant's
trial transcripts,David Neira Never mentioned Juan Ocon Saying
anything to petitioner. Not when examined by prosecutors or defense
attorneys. **See(D-223 Lines 6-16)of co-defendant's trial trans.**
Petitioner suggests that David Neira's alleged written statement
be examined as well. William Solis,another state witness,was
seated right next to David Neira in said van on said night.
William Solis was specifically asked by prosecuting attorneys
about what Juan Ocon might have said to petitioner in co-defendan**t's**
trial. **States attorney:what was Juan Ocon doing during the first
part of the chase? State witness,William Solis:Just sitting on
the front seat,like,just sitting there,just--I don't know.I guess
just sitting. States Attorney:was he saying anything to Jose
Vidaurri? States witness,William Solis:Not at the time. See(D-172
Lines 17-24;D-173;D-174 Lines 1-16)of co-defendants trial trans.**
William Solis testimony clearly contradicts David Neira's testimony
at petitioner's trial,that Juan Ocon,told petitioner,"Go get em".
A statement that was never made anywhere else in the record,except
at petitioner;s trial.William Solis is asked again. **State attorney
what was Juan Ocon Saying?;William Solis:kind of like,I don't
know,encouraging him to keep up with the van.See(D-174 Lines 11-1
of co-defendant's trial trans.** William Solis was asked 3 times,
**See(D-173 Lines 16-19)of co-defendant's trial trans.**About what was
said between Juan Ocon and Petitioner. When something is finally
said to petitioner,it is not"Go get em". The court re-affirmed the

24.

principle in <u>Mooney V. Holohan</u> in broader terms,in <u>Plyle V. Kansas</u>
317 U.S. 213,63 S.Ct. 177,87 L.Ed. 214 (1942),"where it held that
allegations that the prosecutor had deliberately suppressed evid-
ence favorable to the accused,and had knowingly used perjured
testimony,were sufficient to charge a due process violation". The
court re-affirmed this principle in <u>Napue V. Illinois</u>,360 U.S. 26
79 S.Ct. 1173,3 L.Ed.2d 1217 (1959).In <u>Napue</u>"the principle witness
for the prosecution falsely testified that he had been promised no
consideration for his testimony.The court held that knowing use
of false testimony to obtain a conviction ,violates due process
regardless of whether the prosecutor solicited the false testimony
or merely allowed it to go uncorrected when it appeared,the court
explained that the principle that a state may not knowingly use
false testimony to obtain a conviction-even false testimony that
goes only to the credibility of the - is implicit in any concept
of  ordered liberty. Finally the court held that it was not bound
 by the state court's dtermination that the false testimony could
not in any reasonable likelihood have affected the judgement of
the jury. The court conducted it's own independent examination of
the record and concluded that the false testimony,may have had an
effect on the outcome of the trial.Accordingly,the court reversed
the judgement of the conviction". Petitioner avers that prosecutors
Brian Holmes and Romano Di Benedetto,continued to allow David Neira
to commit perjury. David Neira testified at petitioner's trial,
that **petitioner represented gang signs and even gestured signs**
**for the jury,which the record reflected.See(P-39 Lines 8-12;P-40**

Lines 12-24;P-41;P-42 Lines 1-9)of petitioner's trial transcript.
States Attorneys Brian Holmes and Romano Di Benedetto,knew from
the state's own witness,William Solis,his written statement,and
testimony at two previous trials.That William Solis was sitting
right next to David Neira in said van on the night of shooting.
At petitioner's co-defendant's trials,William Solis is asked who
was it that was gesturing gang signs to car.See(D-170 Lines 14-24
D-171;D-172 Lines 1-4)of co-defendant's trial transcript. In fact
William Solis even singles out petitioner as not gesturing any
gang signs, State's Attorney:When you throw it up it means that
you are the gang you're with?; William Solis:Yes ;State's Attorney:
And throwing down is showing disrespect?; William Solis:Yes ;
State's Attorney:Who was doing this? ;William Solis: I believe
Jose -- or not Jose.Juan and Bam-Bam. See(D-171 Lines 7-14)of
petitioner's co-defendant's trial transcript. See also(P-85 Lines
7-24;P-86;P-87;P-88 Lines 1-5)of petitioner's trial transcript.
See also ,Affidavit of Alvaro Vera. The testimony of William Solis
at both trials,and affidavit of Alvaro Vera clearly contradict the
state witness David Neira's testimony.Proving that yet again David
Neira,comitted perjury. Petitioner avers that prosecuting attorney's
Brian Holmes and Romano Di Benedetto,violated the rule established
by the court in Mooney V. Holohan. "That the knowing use by a
state prosecutor of perjured testimony to obtain conviction and
and deliberate supression of evidence that would have impeached
and refuted the testimony constitutes a denial of due process. And
that deliberate deception of court and jury by the presentation of
testimony known to be perjured,is inconsistent with the rudimentary

demands of justice". Petitioner further avers that such perjured
testimony as,"Go get em",and perjured testimony that petitioner
was gesturing gang signs to car.Definitely had an effect on the
outcome of the trial,since petitioner was tried under the account-
ability theory. Petitioner also avers that not only did the state
allow perjured testimony to go unchecked,but prosecuting attorney
Brian Holmes also knowingly and willingly committed perjury him-
self in closing arguements. **States Attorney,Brian Holmes: Look at
his actions afterwards.He takes the guns from the shooter,hides
them in the van,parks the van and leaves.See(Q-54 Lines 19-21)of
petitioner's trial transcripts.**Prosecuting attorneys,Brian Holmes
and Romano Di Benedetto,tried petitioner's co-defendants in two
seperate trials prior to petitioner's.They had knowledge of this
case in detail,including their state witnesse's statements.They
knew their witnesse's testimonies front and back,but clearly
allowed perjured testimony in petitioner's trial to go unchecked
and corrected in bad faith. **State's Attorney:What happened next?
William Solis:We made aright in the alley and parked in the other
alley and parked the van in a parking lot.;State's Attorney:Did
you see what Alvaro did with his gun?;William solis:I believe he
put the gun in the back seat of the van;States Attorney:we're
talking about Alvaro Vera,so we're clear?;WilliamSolis:Yes;
States Attorney:Did you see what Juan ocon did with his gun?;
William Solis:I believe he gave it to porky. See(D178 Lines 13-
24)of co-defendantstrial transcript.**Perjury was used to severely

27.

prejudice the jury against petitioner in accountability trial. See(D-178 Lines 13-24;D-179 Lines 1-3)of co-defendant's trial trans. Trial counsel was extremely ineffective for allowing this perjured testimony to go unchecked and uncorrected,resulting in a due process violation. Consider,U.S.V. Doe,125 F.3d 1249 (9th Cir 1997).1)District court may dismss information based on outrageous government conduct if conduct amounts to due process violation.2) If outrageous government conduct does not rise to level of due process violation,court may none-the-less dismiss information under its supervisory powers. The court found in U S V. Lorefice, 192 F.3d 647 (7th Cir.1999),that "mis-conduct by investigating law enforcement agents is indistinguishable from misconduct by prosecuting attorneys". The court also found in U.S. V. Nyhuis,211 F.3d 1340 (11th Cir. 2000),that law enforcement techniques that are shocking to the universal sense of justice mandated by the due process clause violated the constitution.

## ISSUE # II

## PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL DURING THE APPEAL PROCESS.

On December 5th,2003,the State Appellate Defender was appointed to represent Jose Vidaurri on his appeal.See(Exhibit Appellate A) The assistant state appellate defender,Ms.Yasaman Hannah Navai, never saw Jose Vidaurri in person. Petitioner (appellant),wrote to this appellate defender many times.See(Exhibit Appellate B). In these letters,petitioner (appellant),explained over and over again about the being threatened,coerced and coached into making the involuntary video statement.Petitioner sent her issues that he wants raised,challenging the video and cases to go with it.

Petitioner spoke to Yasaman Hannah Navai on the phone about these
issues,and how petitioner's trial counsel refused to raise these
issues at any level of criminal court proceedings. Appellate Def-
ender Yasaman Hannah Navai,replied,"You were a gangmember,doing
a driveby shooting.I would hope you take your responsibility".This
Appellate defender,by such statement,clearly showed her prejudice
against petitioner from the beginning.See(**Affidavit of Jose Vidaurri**
**pg 12)**. Petitioner further avers that just like his trial counsel
appellate defender refused and failed to challenge the evidence
used to convict him. Because of appellate defender's failure to
raise ineffective assistance on petitioner's trial counsel,for
failure to challenge involuntary video statement,perjured testi-
mony,sufficiency of the evidence that convicted this petitioner.
Also,trial counsel's failure to do any pretrial investigation.
Petitioner (appellate),was severly prejudiced in the direct appeal
process,just as he was prejudiced in his trial process for failure
to challenge the evidence,by his trial counsel. Appellate counsel
also misstated many facts,that could have been used to further
prejudice petitioner (appellate),in direct appeal. Appellate
defender stated in "Brief and argument",and "Leave to appeal
statement of facts,"**at this point,Mr.Vidaurri caught up to the**
**Mercury** and drove the van alongside the Mercury's **driver side,**
**eventually hitting the Mercury with the van.**(People's Ex.18;III.
**P-44).Juan Ocon began shooting from window".**(People's Ex.18;RIII.
P-45). Appellate defender used (P-44),the testimony of David Neiro.
See(**exhibit appellate C)**,to prove this,but clearly overlooked the
testimony of William Solis (P-92);Nicholas Mobley (P-111&P-112);

29.

Delbert Guy (P-140);William Peppers (P-153). Which all refute the
testimony of David Neira (P-44),which appellate defender used to
prove her statement of facts. Appellate defender used many things
in her statement of facts,that petitioner (appellate) told her
could be refuted with trial transcript upon closer review. None
the less,petitioner was ignored by his appellate defender,as he
was ignored by his trial counsel. Appellate defender raised the
issue that,**"Jose Vidaurri was deprived of a fair trial when the
Trial court failed to Empanel a Fair and Impartial Jury by not
asking the Jury any Questions regarding gang bias.Also,Trial
counsel was ineffective for failing to ensure that the panel of
Jurors consisted of Impartial Jurors By not Insisting that trial
Judge ask or By herself asking whether they had any Bias Towards
members of Gangs as required by Illinois Supreme Court Rule 431(b
and People V.Strain."** See(exhibit appellate D). However Appellate
defender knowing the case law,was well aware that raising an in-
effective claim would have to meet the (2) prong test in Strick-
land V. Washington. The record shows that trial counsel was in-
effective for failing to ensure that panel of jurors consisted of
Impartial Jurors. Therefore meeting prong(1) of the Strickland
test. However failure to challenge the evidence used to convict
petitioner,would render claim claim frivolous in that it would
not meet the second prong of the Stickland test. Appellate defender
ignored petitioner's claim of police misconduct,coercion and in-
effective assistance of trial counsel,regardless of all that pet-
itioner (appellate) informed her of on these issues.**See(affidavit
of Jose Vidaurri pg.12 ).** Petitioner's leave to appeal was denied

It is stated in the beginning,"**Following a jury trial,defendant
Jose Vidaurri,was convicted of first degree murder and attempted
first degree murder,then sentenced to consecutive,respective
terms of 35 and 10 years' imprisonment.Defendant does not challenge
the sufficiency of the evidence to sustain his conviction,....**"
See(exhibit appellate E). By failure to challenge the evidence
used to convict the petitioner (appellate),claim did not meet the
second prong of Strickland. Therefore the ineffective assistance
counsel claim was denied,for this reason petitioner avers that
Appellate defender was ineffective. Appellate defender,Yasaman
Hannah Navai,informed petitioner that he should raise such claims
of involuntary video statement on post-conviction. Appellate
defender also filed petitioner's leave to appeal,but only filed
the first issue that,"**Petitioner was deprived of a fair trial
when the trial court failed to empanel a fair and impartial jury
by not asking the jury any questions regarding Gang bias**".Appell-
ate defender informed petitioner(appellant),that leave to appeal
might be denied also because evidence is sufficient to sustain
conviction either way.**See(affidavit of Jose Vidaurri pg. 13 )**.
Therefore appellate defender knew that failure to challenge the
sufficiency of evidence,would lead to negative results in direct
and leave to appeal process and ignored petitioner's claims in
bad faith. Petitioner avers that appellate defender was herself
biased against him,and was ineffective in that she did not chall-
enge petitioner's trial counsel's actions in ignoring petitioner's
claims of police assault,coercion and being coached into making
involuntary video confession. As well as trial counsel's failure

to do any pre-trial investigation,investigate andpresent evidence
regarding petitioner's claims,therefore denying petitioner comp-
lete and fair review of these issues once again.

### ISSUE # III

**NEWLY DISCOVERED EVIDENCE REGARDING BRAIN DEVELOPMENT WOULD HAVE**
**YIELDED DIFFERENT RESULTS AT SENTENCING,HAD IT BEEN AVAILABLE TO**
**TO THE COURT.**

At the time of the offense,Petitioner was only 19 years old.Durin
sentencing, trial counsel,Ms.Fitzsimmons,failed to present any
evidence that Petitioner's age could have influenced his invole-
ment in the offense and should be taken into consideration as a
mitigating factor.Significant scientific evidence has been publis
ed in recent years detailing the juvenile brain,specifically
analyzing it in terms of impulse control,and consideration of con
sequences.In light of this evidence,petitioner's sentence should
be vacated and remanded for a new sentencing hearing.
The Petitioner's young age is an important mitigating factor.
People V. Steffens,131 Ill.App.3d 141(1st District 1985).Petition
was only 18 years old at the time of offense,and had only one
prior conviction.The combination of factors of youth and lack of
a criminal record warrants a sentence reduction.**Steffens**,131 Ill.
App.3d at 153.
Ms.Fitzsimmons did not even make an arguement that this evidence
should be linked to Mr.Vidaurri's rehabilitative potential.The
words **rehabilitative potential** never even came out Ms.Fitzsimmons

32.

mouth,not one time even thogh a letter was submitted from a priso

outreach personel commenting on petitioner's rehabilitative pot-

ential. The words **rehabilitative potential** were not spoken one

time by anybody at all,at petitioner's sentencing hearing.Petitio

er's sentence does not reflect consideration of his rehabilitativ

potential. The Illinois Constitution requires that **every sentence**

take into account the objective of rehabilitating the offender to

useful citizenship. Ill. Const.,art.I,sec.11;**Steffens**,131 Ill.App

3d at 151.

**[Recent Studies on Brain Development Prove that Brain Development
is Not Complete Until Young Adulthood (Age 20 to 22)**

In recent years,many new studies have arisen regarding brain dev-

elopment. These studies continue to shed light on the adolescent

brain and its growth to maturity. Along with everything else in

the body,the brain changes significantly during adolescence.Recen

studies suggest that the adolescent brain is far less developed

than previously imagined. The expert opinion of Dr.Ruben Gur shed

light on the development of the adolescent brain. It is his opini

that the "human brain is not fully mature before reaching adultho

and that furthermore the brain regions that are the most importan

for regulating impulse control,planning,consideration of conseque

ces,abstract reasoning,and most probably moral judgment,are the

very regions that mature last." **See(Exhibit Gur)**. The largest par

of the brain is known as the frontal lobe. One area of the fronta

lobe,known as the prefrontal cortex,controls the most advanced

functions.It allows us to prioritize thoughts,imagine,think in th

abstract,anticipate consequences,plan,and control impulses. It is

this region of the brain that undergoes by far the most change
during adolescence. One method utilized to measure brain develop-
ment is called Magnetic Resonance Imaging(MRI). MRI tests scan
the brain and provide three-dimensional images of the brain,allow
ing scientists to map development.Through this technique,scientis
discovered that during adolescence the brain overproduces gray
matter,or the brain tissue responsible for thinking.After this
period of overproduction,the brain undergoes a "pruning" phase,
where this gray matter is discarded. The theory is that by prunin
the gray matter in some areas,overall growht is stimulated. The
pruning process is accompanied by myelination,a process by which
the brain's white matter refines and makes the brain's operation
more efficient. **See(Exhibit Gur)**. It is these processes which
scientists have been mapping in their experiments.Though there
have been numerous studies utilizing both MRI and other technique
there has been a convergence of the evidence that the pace and
severity of these changes shows that the brain is still developin
through adolescence,and continues doing so until young adulthood
(age 20 to 22).**See(Exhibit Gur)**. If the brain has not reached ful
development before adulthood,it is unreasonable to expect the
individual to act with mature thought processes.The evidence show
that adolescents do not have the same ability to make rational
decisions,and to prevent impulse behavior. Exhibit Gur sheds an
enormous amount of light directly onto petitioner's situation.
His conclusions are as follows: The results have rather profound-

34.

implications for understanding behavioral development.The cortica
regions that are last to mature,particularly those in prefrontal
areas,are involved in behavioral facets germane to many aspects
of criminal culpability.Perhaps most relevant is the involvment
of these brain regions in control of aggression and other impulse
the process of planning for long-range goals,organization of seq-
uential behavior,consideration of alternatives and consequences,
the process of abstraction and mental flexibility,and aspects of
memory including "working memory." More recent evidence indicates
the frontal lobes in processing aspects of morality and moral
judgment.If the neural substrates of these behaviors have not
reached maturity before adulthood,it is unreasonable to expect th
behaviors themselves to reflect mature thought processes.The brai
scan techniques have demonstrated conclusively that the phenomena
observed by mental health professionals in persons under 18 that
would render them less morally blameworthy for offenses have a
scientific grounding in neural substrates.The evidence now is
strong that the brain does not cease to mature until the early 20
in those relevant parts that govern impulsivity,judgment,planning
for the future,foresight of consequences,and other characteristic
that make people morally culpable.Therefore,a presumption arises
that someone <u>under 20</u> should be considered to have an underdev-
eloped brain. This Petitioner was 19 years old at time of offense
because the age of the petitioner reflects Gur's principles.Gur's
principles can be directly applied to petitioner's case.See(exhibi
Gur).

38.

**[EVIDENCE NOT AVAILABLE TO PETITIONER OR COURT AT SENTENCING THAT WOULD HAVE SUPPORTED PETITIONER'S REHABILITATIVE POTENTIAL]**

The Illinois Constitution requires that every sentence take into account the objective of Rehabilitating the offender to useful Citizenship. Ill. Const.,art.I,Sec.11;Steffens,131 Ill.App 3d at 151.

In 2000 this petitioner was incarcerated at the cook county Dept. of Corr.,awaiting trial on said offense. During this time of in-carceration,petitioner took every opportunity available to him to better and rehabilitate himself. This petitioner attended the Consuella B. York Altenative H.S. for two Qtrs.,and received A's B's.**See(Exhibit School #1).** While petitioner was attending CBY Alternative H.S. during the day,this petitioner was also attending the CBY evening H.S. at night.**See(Exhibit School #2 and Exhibit School #3).** In this evening school,petitioner also received A's and B's. While petitioner was attending these classes,he was advised that he would not be able to receive enough credits on-time to earn his High School Diploma. Petitioner then started attending GED classes in which he successfully completed,and earned his GED. This was presented at sentencing,but proof of it was not available.**See(Exhibit GED #1 and GED #2).** In 2001 after petitioner earned his GED,he then signed up for a life learning dorm program Div.10 of the CCDOC. In this program petitioner was a student of the OUTREACH CHRISTIAN SCHOOL,and earned many certificates of education in academics and religion.**SEE(Exhibit LL #1 through #8).** Petitioner graduated from the Div.10 Life

Learning Dorm Program on May 29,2002. **See(Exhibit LL #9)**. These
exhibits were not available to this petitioner at sentencing,
therefore were not available to the courts. Petitioner was sent-
enced to 35 yrs. at 100pecent and 10 yrs. at 85 percent,to be
served consecutively. Which means with petitioner's 5 yrs. and 1
month served already,he will have to wait $18\frac{1}{2}$ yrs. to be eligible
for a medium security prison. With time petitioner has been sent-
enced to,he is only eligible for a maximum security prison. In
these maximum security prisons,petitioner is not in a rehabilitat-
ive environment in that he spends 21 hrs. a day on average in a
cell. Petitioner is not afforded opportunity to gain employment,
and the only educational programs available are GED classes and
barber college. Petitioner can not attend GED classes in that he
has his GED already,and is unable to attend the barber college
because open spots go to those with lesser time. Therefore there
is no programs or tools available for petitioner to further re-
habilitate himself. Medium Security Prisons have ample opportunity
to gain employment ,as well as earn college degrees and trades.
However in order to be eligible for such medium security prison,
offender's sentence must have 20yrs. or less left to serve.
Petitioner avers that all of the exhibits presented now,as well
as presented at sentencing show that petitioner has very excellent
rehabilitative potential. It is also very important to consider
that petitioner was convicted on a accountability theory,and did
not he himself kill or attempt to kill anyone. For these reasons

petitioner asks that his sentence be reduced to reflect his rehab-
ilitative potential that he may be eligible for a medium security
prison,and he may be placed in a rehabilitative environment.


## CONCLUSION

A pretrial investigation in a criminal case,provides the basic
foundation,on which most defense rests and is a critical stage of
the lawyer's performance. Petitioner's trial counsel did not con-
duct any pretrial investigation,which deprived petitioner of
potential defense. Counsel did not investigate and prepare for
pretrial motion or trial. Counsel failed to investigate evidence,
when petitioner informed her that he was assaulted,threatened,
coreced,and coached into making involuntary video confession by
polive detectives and Assistsant States Attorney. Counsel failed
to present any evidence on behalf of petitioner, No witnesses
were called even though there were some that would have been
available to refute video confession. Counsel did not cross-examine
others in an extremely conclusive manner. Counsel failed to object
to highly prejudical things being admitted before the jury,in a
timely manner resulting in petitioner being prejudiced in front
of jury during jury trial. Counsel did not challenge involuntary
video confession with pretrial motion or at trial. Counsel's
failure to conduct pretrial investigation,led to her failure to
object to the state's use of perjured testimony and the state
themselves committing perjury,knowingly deceiving the jury and

court. Petitioner was denied fair review of all his claims,that
would have yielded a different outcome at trial should they have
been investigated and presented by Ms.Fitzsimmons. Petitioner
avers that he has shown his counsel's performance fell below the
objective standard of reasonableness,and has demonstrated that
there is areasonable probability that but for counsel's unprofessional
 errors,the result of the proceeding would have been different.
Therefore meeting the two prong test of <u>Strickland</u>. Petitioner
respectfully asks that this Honarable Court Rule that this Trial
Counsel was ineffective during all of petitioner's criminal
proceedings,and reverse the judgment in this case. That he be given
fair review of his claims,or with evidence presented in this
petition,supress involuntary video confession in that his Miranda
Rights under the FIFTH and SIXTH AMENDMENT were violated by police,
That petitioner be afforded a new trial without involuntary conf-
ession,without State witnesse David Neira's Perjured testimony,an
without Assistant States Attorney's Brian Holmes and Romano Di
Benedetto tring new trial,in that they allowed perjured testimony
to go unchecked and they themselves committed perjury in bad faith
to obtain conviction. Petitioner also respectfully requests that
Appellate counsel Yasaman Hannah Navai be ruled to have been to be
ineffective,in that she also refused to investigate petitioner's
claims of assualt,being threatened,coerced and coached into
making involuntary video confession and herself challenging the
effectivness of petitioner's trial counsel. For her prejudice

39.

against this petitioner,which denied petitioner fair review of
his claims against the evidence used to convict him. Which ultimately
led to his direct appeal and Leave to appeal being denied.Also
that he be granted a re-sentencing pursuant to Newly Discovered
evidence regarding Brain Development,as well as evidence that was
not available during sentencing.

### PRAYER FOR RELIEF

Petitioner prays that this Honorable Court grant him a reversal
of Judgment in full in this case;or reverse and remand for new
trial without involuntary video confession,perjured testimony
of David Neira and State's Attorney;or grant him a resentencing
that reflects his rehabilitative potential.And any other relief
the Court deems just and proper....

*Jose Vidaurri*

Jose Vidaurri,
Petitioner

I swear that the facts stated in this petition are true and correct
in substance and in fact.

*Jose Vidaurri*

Jose Vidaurri,
Petitioner

SUBSCRIBED AND SWORN TO BEFORE ME
this 23rd day of February ,2005

*Crystal L. Mason*

NOTARY PUBLIC

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

40.

## EXHIBITS

**PETITION:**

Affidavit of Jose Vidaurri (13 pages)

D-69 Lines 2-8

E-3 Lines 15-16

E-6 Lines 17-22

D-59 Line 12 through D-61 Line 10

Exhibit Gur (19 pages)

Q-4 Line 14 through Q-5 Line 20

Q-6 Lines 16-17

Q-5 Lines 6-20

Q-5 Line 21 through Q-6 Line 9

P-194 Line 10 through P-196 Line 10

Q-41 Line 19 through Q-42 Line 3

D-250 Lines 6-13 of co-defendant's trial transcript

D-251 Lines 3-5 of co-defendant's trial transcript

D-251 Lines 11-24 of co-defendant's trial transcript

D-252 Lines 1-6 of co-defendant's trial transcript

D-250 Lines 7-24 of co-defendant's trial transcript

D-251 of co-defendant's trial transcript

D-252 Lines 1-16 of co-defendant's trial transcript

P-45 Lines 14-21 of petitioner's trial transcript

P-43 Lines 12-20

D-223 Lines 6-16 of co-defendant's trial transcript

D-172 Lines 17-24 of co-defendant's trial transcript

D-173 of co-defendant's trial transcript

D-174 Lines 1-16 of co-defendant's trial transcript

D-174 Lines 11-16 of co-defendant's trial transcript

D-173 Lines 16-19 of co-defendant's trial transcript

P-39 Lines 8-12

P-40 Lines 12-24  through P-41

P-42 Lines 1-9

D-170 Lines 14-24 of co-defendant's trial transcript

D-171 of co-defendant's trial transcript

D-172 Lines 1-4 of co-defendant's trial transcript

D-171 Lines 7-14 of co-defendant's trial transcript

P-85 Lines 7-24

P-86

P-87

P-88 Lines 1-5

Affidavit of Alvaro Vera

Q-54 Lines 19-21 of Petitioner's trial trans. closing arguement

D-178 Lines 13-24 of co-defendant's trial transcript

D=179 Lines 1-3 of co-defendant's trial transcript

Exhibit Appellate A

Exhibit Appellate B

Affidavit of Jose Vidaurri (13 pages)

Exhibit Appellate C

Exhibit Appellate D

Exhibit Appellate E

Exhibit School #1

Exhibit School #2

Exhibit School #3

Exhibit GED #1

Exhibit GED #2

Exhibit LL #1

Exhibit LL #2

Exhibit LL #3

Exhibit LL #4

Exhibit LL #5

Exhibit LL #6

Exhibit LL #7

Exhibit LL #8

Exhibit LL #9

**Affidavit of Jose Vidaurri:**

P-258 Lines 11-22

P-264 Lines 2-5

P-222 Lines 12 through P-223 Line 1

P-249 Line 13 through P-250 Line 20

P-255 Lines 21-24

P-256 Lines 10-12

P-256 Lines 19-20

P-56 Lines 17-24

P-91 Lines 14-15

P-100 Lines 2-13

Q-6 Lines 3-9

P-86 Lines 7-12

P-55 Lines 10-18

P-57 Lines 1-6

P-60 Lines 5-9

P-99 Line 15 through P-100 Line 1

P-100 Lines 11-21

D-67 Line 9 through D-68 Line 14

P-191 Lines 14-23

Q-3 Lines 1-10

O-50 Lines 2-11

WILL COUNTY.                           **AFFIDAVIT**

I Jose Vidarrui#R-15606, depose and say the following:

1) On Thursday January 13, 2000, at about 8:30pm, I was taken
by force at 2138 N. Lawndale, at the time was my girl friend's
house. (Vanessa Beltran). The chain lock on the door was cut
by Chicago, police officers with bolt cutters, they forced their
way in the apartment with guns drawn regardless of how many
times they were told they could not enter without a warrant,
by vanessa beltran. Detectives, pushed their way past vanessa
Beltran, and rushed towards me with their guns drawn.

2) I, became confused & afraid for my life, that I would be
shot, should I resist. I raised my hands in the air in plain
view, so that they can clearly, see I did not have weapons.
I, was grabbed by an Officer Michelle Rubino, and I, was hand-
cuffed, immediately. I, was told that I was going in for questioning,
I was never given a, choice or asked if I wanted to go. I was
never read my rights, in any way, shape or form. My winter coat
was placed on my back, I was told by officer Rubino, to cover
the hand cuffs from Ivan Beltran, so as not to cause alarm.

3) From 2138 N. Lawndale I was taken to 13th district police
department, and left sitting in the back of an unmarked car
hand cuffed in the parking lot of the 13th district police department.
officer Rubino, informed me, that they were not sure if I was
the person, they were looking for? while I was in the car,
about 8 detective's were all talking in the parking lot. I didn't

(1)

File Date:    _8-26-2008_

Case No:    _08CV 3665_

ATTACHMENT # _____

EXHIBIT    _E -continued_____

TAB (DESCRIPTION)

_____

I became very sacred & nervous, because it was very dark & gloomy
in this parking lot. I didn't know what they were gonna do to
or with me, we spent about 30 to 45 min. in the 13th district
parking lot, from the 13th district station, I was taken to
area 4 police station.

4) I, was placed in an interrogation room, and I was hand cuffed
to a ring in the wall by my right wrist. Shortly after, A detective
Garcia, entered the interrogation room by himself. Det. Garcia,
pulled up a chair, and he asked me if I knew why I was there.
I told det. Garcia, that I did not. Det. Garcia, told me that
I was implicated in a crime, and that if I had anything I wanted
to tell him. Det. Garcia, then told me about a shooting that
occured on January 9, 2000, and asked me again, if I had anything
to say to him. I told Det. Garcia, that I was at home with my
Mother, Aunt, & Cousin. I gave him the address to my home, and
I told Det. Garcia, that I wanted a phone call, and that I want
an attorney. Det. Garcia stated that he will be back in the
morning to speak to me, and walked out of the interrogation
room . No rights were ever read to me, during the 20 to 30 min.
conversation by Det. Garcia, my request for an attorney and
phone call was ignored.

5) In this interrogation room, there were (3) chairs that were
lined up against the wall that I was hand-cuffed to. I used
these chairs to lay across on my left side, so that the weight
of my body would not pull on my arm that was hand-cuffed to
the wall by my wrist. During the night while I was asleep, 3
Or 4, detective's entered the interrogation room. I was yanked
off! the chairs, and I felt the sharp pain of my right wrist,

being yanked against the hand-cuff, that held it to the wall.
When I went to look up! my head was pushed, down. A voice yelled
at me, told me to keep my head down. When I tryed to raise my
head again, I was smacked on the back of the head several times
and told to keep my head down. All I was able to see were sets
of feet, when they left the room I noticed the chairs, that
were in the room were gone. With no chairs I was forced to stand
for a long time, when I got too, tired I was forced to sit down.
In doing so, I experienced extreme discomfort & pain, because
my body weight was pulling on my right arm & wrist, that was
hand-cuffed to the wall. I began experiencing hot flashes, I
felt like I was gonna burst into flames. I felt nauseous, also,
like my eyeballs & head wanted to explode. I dosed off several
times that night from exhaustion, and every time that I did
I was yanked and smacked awake, this happened all night.
6) Sometime the next day of January 14, 2000, I was awakened
by Det, Garcia, he brought two chairs, with him an another unknown
Detective. This unknown det. was neither or introduced himself,
he never spoke. Just stood at the end of the interrogation room.
Det. Garcia, began to tell me a story about a shooting, he told
me that he knew that I was the driver and not a shooter. I told
Det. Garcia, that I had nothing to say to him, and that I wanted
a lawyer and phone call, but Det. Garcia, smacked, me repeatedly
saying I don't need an attorney. Det. Garcia, grew very impatient
with me, and smacked me across my face, and told me to stop!
lying to him. When this unknown det. took a step forward, but
stopped when I told Det. Garcia, that I wanted an attorney,

(3)

and I did not want to speak to him.I was slapped again,and told I
do not need a lawyer.Det.Garcia kept pushing me,that he knew I
was just the driver,and that if I knew what was good for me,I
would talk to him.I began to feel pressure in my head and eyes,
the hot flashes and nausea came back again.Iwas afraid of Det.
Garcia,as well as all the officers I encountered.This is the
first time I was ever in this kind of situation,I didn't know a
thing about law.So Ididn't know what they could or could'nt do to
me.I told Det.Garcia that I did not want to talk to him again,and
that I wanted a lawyer and a phonecall.Det.Garcia got angry and
threatened me,that if I didn't tell him what he wanted to hear he
would arrest my cousin and make sure her child was taken away
from her.At this point I did not know how to respond,I was afraid
if I responded wrong that Det.Garcia would smack me again.But I
was afraid that if I didn't say nothing,that Det.Garcia would
arrest my cousin and take her child away.I was afraid for my life
,afraid of the police.But I was also afraid of what might happen
to my cousin and her baby.(See P-258 Lines 11-22;P-264 Lines 2-5)
I gave into the pressure and told Det.Garcia some of what happened
that night,because I felt I didn't have a choice.But Det.Garcia
was not happy with what I told him,he pulled out what he claimed
to be written statements of William Solis and David Neira. Det.
Garcia started stating things and asking questions like,"didn't
this and that happen?" and "wasn't such and such there?" There
were some things I did not remember.Such as the color of the car,
the streets it took place on,and running through lights.There
were also some things I knew were'nt true that I didn't agree on.

(4)

Such as Juan Ocon being present at incident and being a shooter.
Det.Garcia continued to go over certain things that he claims
happened,and that he wanted me to know.Det.Garcia told me that he
can't help me if I don't help him,and then asked me if I was hun-
gry or needed anything.I stated that I needed a cigarette,and
that I Was very hungry.Shortly after that I was uncuffed from
the wall.I never trusted Det.Garcia or anybody else,but I was
under alot of pressure.I didn't know what else to do,cause when I
wouldn't co-operate,Det.Garcia would threaten me and get aggress-
ive.When I would co-operate,he would act like he wanted to help
me.Det.Garcia even said he would talk to the judge on my behalf
should I be charged.But he assured me that I was helping myself by
helping him.I Was confused by all this and continuously felt the
pressure on my head and eyes,the knot in my throat and nausea.It
got so intense that I got up and banged on the door,when they
opened the door I motioned that I had to throw up.I was taken to
the bathroom where I threw up for about 5 mins.,cause I could not
hld my food down.I could not take the pressure that Det.Garcia
was putting on me.Some time later Det.Garcia entered the interro-
gationroom again,this time with assistant states attoney Jack
Blakey(John Robert Blakey).Det.Garcia introduced Jack Blackey to
me,and told me that he was there to help,but that the same rules
applied from when we talked earlier.Assist. states Attorney Jack
Blakey introduced himself,and said that Det.Garcia explained to
him everything that happened earlier.Jack Blakey told me that it
was not up to him on whether or not I get charged with anything,

(5)

but he had a way to show the judge that I helped.Plus he himself
and Det.Garcia,would tell the judge also.Jack Blakey told me
about the video statement,and said it was a good idea. He then
raised what he claimed were the written statements of William
solis and David Neira,and said they got to go home for helping
them and the same could happen to me. Jack Blakey explained to me
everything that was gonna happen on this video,he told me that I
would be asked questions that I had to answer.(See P-222 Line 12-
P-223 Line 1) Also(P-249 Line 13-P-250 Line 20).Jack Blakey then
pulled out some more papers,and said we needed to go over things
until we got it right.We went over and practiced the video state-
ment,over and over and over again.Until Jack Blakey and Det.Garc-
ia were satisfied.Jack Blakey controlled everything,I never had
any say so in it,at all.Jack Blakey and Det.Garcia even coached
me in answers to the questions.(See P-255 Lines 21-24;P-256 Lines
10-12;P-256 Lines 19-20).I became confused because some of the
things that Det.Garcia wanted me to say and in a certain order,
Jack Blakey wanted me to change it up.I didn't trust any of them,
but I was under alot of pressure.Some of the things I was coached
on were as followed:(A) That Juan Ocon was in the van when I ent-
ered it,that he was seated in the front passenger seat and he st-
epped out on running board and flashed gang signs to car.Also
that he shot at car,and I saw him.(Juan Ocon was placed in a line
up the next day after shooting,and viewed by two eye witnesses
that saw person in front passengr of van.Juan Ocon was not ident-
ified as said person,but Onyx Santana was).(B) I had a 9mm hand-
gun that I purchased off of a drug-addict,loaded it,and gave it

(6)

to Juan Ocon when I got into van.(Noone ever witnessed me with a
gun,or give a gun to anyone.Noone ever heard any talk about me
giving a gun to anyone.(SeeP-56 Lines 17-24;P-91 Lines 14-15;P-
100 Lines 2-13;Q-6 Lines 3-9).(C)I saw the car and knew they were
rival gang members,because of the way their hats were turned.(The
people in car were never wearing any hats,states own witness test-
ified he knew people in car were male because of thir shaved head
Nothing about hats.(See P-86 Lines 7-12).(D) I knew if they were
rival gang members,Juan Ocon would open fire,or if they were'nt
he would just scare them.(See P-55 Lines 10-18;P-57Lines 1-6;P-60
Lines 5-9;P-99 Lines 15-P-100 Line 1;P-100 Lines 11-21).(E) I saw
Alvaro Vera on the streets on the night of January 10,2000,and
Alvaro told me to leave town because the police were picking peo-
ple up on a homicide.(Officer Michelle Rubino testified as to the
circumstances of how we met on January 12,2000.Inever ran or gave
any alias,they were given my full co-operation.Clearly not the
actions of someone who was warned to leave town,because the pol-
ice are looking for him for a homicide).(See D-67 Line 9-D-68
Line 14).I was coached by Assist. States Attorney Jack Blakey to
make sounds of how the gun shots sounded and to represent gang
sings,also I was shown pictures of people that I would have to
identify as being involved in incident.All things were practiced
over and over again,until it was satisfactory to Jach Blakey and
Det.Garcia.I was then brought some papers to sign,and told by
Assist. States Attorney Jack Blakey that in order to finalize
our agreement I would need to sign these papers.I was told that
if I broke any part of the deal,by not doing and saying everythig

(7)

we practiced exactly on the video,everything would be off.I would
go to prison,my cousin would go to prison,and her child would be
taken away from her.I had no other choice,I signed what was pres-
ented to me as the consent.I never signed a Miranda Waiver,bec-
ause they were never presented to me in any form.After I signed
the consent,I was asked if I was hungry.I said yes,and I was bro-
ught some more food.Det.Garcia brought the food into the interro-
gationroom alone,and told me I was doing the right thig.At no
time did I ever trust Det.Garcia,Jack Blakey,or any othr officer.
But I felt like I was trapped,I had no choice.I replied to Det.
Garcia,"Yeah right,now I won't be out for thirty yrs".Det.Garcia
replied,"You will only do about 10 yrs.,if that".That just made
me more uneasy.Some time later Assist. States Attorney Jack Blakey
and Det.Garcia came back into interrogationroom,and told me we
were going to do the video very shortly.We practiced the whole
thing again,I was reminded not to forget about the last meal I
had when asked if I was given something to eat.I was reminded
that again if I didn't say and do everything as we practiced,
what would happen to me,my cousin and her child.(See P-191 Lines
14-23).We then went to a room to do the video,but during this I
couldn't stop thinking about Det.Garcia's comment about the 10yrs.
I knew that if I did or said anything different,other than what
we practiced,that I would get in trouble.But I felt that I had to
take that chance,as I didn't trust Det.Garcia or JackBlakey.So I
took the chance and at the end of the video statement,I asked
Jack Blakey if it was okay for me to say somethig,so as I don't
break our deal.When he said yes,I let the judge know that even
though I might go to prison(because I didn't trust Garcia or B..
Blakey),and I was in fear for my life of the police.I co-operated

I wanted to show the judge to know about the deal with Det.Garcia
and Jack Blakey.(**Refer to video statement**).After video statement
I was taken to the lock-up of Area 4 police station,fingerprinted
ETC...Some time later,towards the end of January 2004,Det.Garcia
came to the county jail,Div.10 where I was incarcerated.I was
called out for a visit,and Det.Garcia was waiting in the attorney
visiting area.(Refer to the Div.10 records of visits.Jan.2000).
Det.Garcia said that he was there to ask me some questions about
a double murder,but he didn't know if he would be able to get out
of jail for my help.I told Det.Garcia that I did not know any-
thing about a double murder,and I did not want to talk to talk to
him because himself and Jack Blakey cheated me on our first agree-
ment.It was then that our visit ended,I never saw Det.Garcia
again until trial.
6) My attorney Martha Fitzsimmons came to see me,and spoke to me
when we first met.She advised me that if I was going to take a
plea to let her know then,cause if we fight it will be to the end.
The second time Miss Fitzsimmons came to see me,she showed me the
video statement.She asked me questions about the interrogation,
and also the arrest.At that point I told Miss Fitzsimmons about
how the police took me by force from Vanessa Beltran's home,how
the police treated me during that night,about the threats,my be-
ing coerced and coached by Det.Garcia and Assist. States Attorney
Jack Blakey.Miss Fitzsimmons stated that we will not be challeng-
ing the statement,because the judge will deny our motion ,and the
state will know our game plan for trial.She stated that we will
be challenging the arrest,with a quash arrest motion.Miss fitz-

(9)

simmons never listened to me about my claims of how I was treated
by the police,the way I was threatened,coerced and coached into
making the video statement.Miss Fitzsimmons sent me the trial
transcripts of Mr.Ocon and Mr. Vera,after they both were convict-
ed.When Miss Fitzsimmons came to see me before my trial,she came
with her assistant Miss Schilling.On this visit Miss Fitzsimmons
asked if I read over Mr.Ocon and Mr. Vera's transcripts from
trial,and I replied yes.Miss Fitzsimmons stated,"You see what
happened to them,what do you think is going to happen to you?"
The whole visit Miss Fitzsimmons and Miss Schilling were trying
to get me to plead guilty for the court.There were comments such
as:"20 yrs from now you could be getting out of prison,but your
going to be mad because your still going to have 20 yrs left be-
cause you didn't plead guilty"."There will be no appeal if you go
to trial"."10 out of 10 times your going to get found guilty".
These types of comments were made by both Miss Fitzsimmons and
Miss Schilling repeatedly,trying to pressure me into pleading
guilty.They both gave up eventually,and then questioned me about
whether or not I was going to testify at trial,because I would
need to be preped for trial.I informed them both that I would
be testifying at trial,in which Miss Fitzsimmons and Miss Schill-
ing became even more impatient with me.Miss Fitzsimmons began to
read certain things off of her records,and asking me what was I
going to say.I told her that I was going to tell the truth,Iwould
say what really happened,how it really happened,who was really
involved.I tell how I was treated by the police,how I was coerced

(10)

and coached in to doing and making the video statement. Miss Fitz-
simmons told me that I was crazy, and that if I even tried to take
the stand she would object to it and I would be thrown out of the
courtroom. Miss Schilling kept pressing that I would not get an
appeal if I took the stand, or if I even went to trial. Eventually
Miss Fitzsimmons and Miss Schilling gave up, and left ending our
visit. The next attorney visit I recieved, was Miss Fitzsimmons
alone. The only thing that we ever talked about, was her wanting me
not to go to trial. Her not wanting me to take the stand if I did
go to trial. The next time I saw Miss Fitzsimmons and Miss Schill-
ing, was I believe the day we started to pick a jury. I talked to
Miss Fitzsimmons in the lock-up, and told her about questioning
the state witnesses that were in the car during said shooting.
That being Nicholas Mobley, Delbert Guy, and William Peppers. About
whether or not they were wearing hats on said night of shooting.
About questioning Officer Michelle Rubino about the circumstances
of how we met. Things in video statement that didn't make sense,
and that testimony could refute. I reminded Miss Fitzsimmons again
of my being coerced and coached into saying these things in and
on this video statement, and about my taking the stand to testify
to these things. I had been telling Miss Fitzsimmons these things
for almost two years, yet Miss Fitzsimmons never interviewed any
of these people. My Fitzsimmons never presented any evidence at
all on my behalf, she only asked that certain identification numb-
ers be stricken on things that were going back to the jury. (See
Q-3 Lines 1-10).

(11)



While we were in the judges chambers about to decide on our first juror,Miss Fitzsimmons asked the judge to speak to me for a minute.(See O-50 Lines 2-11).At this point Miss Fitzsimmons and Miss Schilling tried again to get me to plead guilty,and told me once I pick the first juror,there was no turning back.That if I went to trial,I would get found guilty and there would be no appeal.I informed them that I was going to trial,and we continued with the jury selection.On the last day of trial,before we ever went into the courtroom,Miss Schilling went back to the lock-up and asked me if I was going to take the stand.Before I could answer that I was,Miss Schilling told me that the state's Attorney gave the wrong jury instructions.That I would be found not guilty of the First-degree murder charge,and maybe the attempt murder.However I would have to decide not to testify,so that we can go out in front of the judge before the state notices.I was coerced By Miss Schilling,not to testify when she promised that I would get found not guilty if I did not testify.

7) I received notice that the Office of the state Appellate Defender First District,was assigned to represent me in my direct appeal process in December of 2002. I eventually received my trial Transcripts,after my appellate defender,Yasaman Hannah Navai,was appointed to represent me in june of 2003. I went through and studied my transcripts,and wrote my appellate attorney,informing her that I was coerced into making this involuntary video statement. I informed her of some things that did not match this statement,how the state witnesses testimony contradicted eachother in many things.

I sent cases and case law about the states attorney's closing argue-
ments. I sent Ms.Navai about (3) long letters,explaining all thes
things.I spoke with Ms.Navai on the phone many times about these
issues,and she expressed her prejudice and disbelief towards me
in the following statement,"You were a gang member doing a drive-
by shooting,I would hope that you take responsibility". Ms.Navai
asked questions regarding the video statement,that was all.I in-
formed her that I was mistreated,smacked,threatened,coerced,and
coached into making the video statement.She advised me to raise
this issue on a post-conviction petition,make my claims of invol-
untariness and state my reasons why.She informed me that she,how-
ever,would not be able to help me with such petition.Regardless
of my informing Ms.Navai that all these thinga took place,and my
trial counsel refused to investigate and challenge these things.
Ms.Navai told me that there was only one issue that she saw would
be worth raising,regarding gang bias. The issue was raised in two
part,they were denied on the direct appeal process.Also one part
was raised in Leave to Appeal,Ms.Navai told me that it might be
denied because even if they did agree with me,there is enough
evidence that the outcome of the trial would be the same like in
the direct appeal.Leave to Appeal was denied.

_Jose Vidaurri_
_____
                                                    Affiant

I swear that the information contained in this <u>affidavit</u> are true
to the best of my knowledge and personel involvement.If called to
testify to the facts stated herein I am willing to do so.
Sworn to and subscribed to before me this day of ,2005.


_Crystal L. Mason_
_____
     N O T A R Y    P U B L I C

"OFFICIAL SEAL"
Crystal L. Mason
Notary Public, State of Illinois
My Commission Exp. 11/10/2008

(13)

1    THE COURT:  People's 1 is received into evidence.

2    MS. FITZSIMMONS:  Judge, I think we have an

3    interesting situation which is not one that I'm

4    personally familiar with as regards the case law, and

5    I would like an opportunity to brief this to your

6    Honor where one person gives consent and another

7    person clearly does not.  And I'd like to be able to

8    give your Honor some case law on that issue.

9    THE COURT:  I'll give you some time to do that.

10   When did we set the other matter for, Mr. Holmes.

11   MR. HOLMES:  September 5th, Judge.

12   MS. FITZSIMMONS:  That's a bad week for me.

13   THE COURT:  Well, I was suggesting sometime like

14   before that, the week of August 27th.

15   MS. FITZSIMMONS:  Those two weeks, the last week

16   of August and the first week of September are bad

17   weeks for me because of child care issues, Judge.

18   THE COURT:  How about August the 10th?

19   MR. HOLMES:  August 10th would be perfect.

20   MS. FITZSIMMONS:  Judge, that's soon for me

21   because of other matters -- the jury -- not the jury,

22   because of other matters that I have, I'm not going to

23   have time to do it then.  Your Honor is going to be

24   gone from when to when?

```
 1              THE CLERK:  Jose Vidaurri.

 2              MR. HOLMES:  For the record Brian Holmes,

 3      H-O-L-M-E-S, Assistant State's Attorney.

 4              MS. FITZSIMMONS:  I am Martha Fitzsimmons

 5      from the Multiple Defendant Division, your Honor.

 6      As you can tell, I lost my voice.  I am kind of

 7      under the weather.

 8                  My understanding is we had a motion

 9      to suppress to quash arrest and suppress evidence.

10              MR. HOLMES:  It was held over till today,

11      judge, for argument and I think Miss Fitzsimmons

12      wanted to research an issue as to consent.  So we

13      held it over till today for argument and any case

14      law that you wanted to submit to the court.

15              MS. FITZSIMMONS:  I don't have any case

16      law to submit.

17                  Just to briefly remind you, this is

18      the case where a young lady that Mr. Vidaurri was

19      staying at.  At that time he did not have -- he

20      was not a lease holder.  He didn't have a home of

21      his own.  So he stayed with various people.  And

22      the State's evidence was that the father gave

23      consent, but that -- and our evidence was that the

24      girl refused entry.  I believe the police were in
```

1  obtained from the defendant or a third party who

2  possesses common authority over the premises.

3  That's Mr. Beltran in this case clearly.

4  Common authority exists when there

5  are mutual uses for the property by persons

6  generally having joint access or control for most

7  purposes.  Clearly that's here.  The officers had

8  consent from him.

9  Case goes on to state that consent

10  to enter a residence by a person to be arrested or

11  some other person with significant interest

12  validates a warrantless arrest.  ✳

13  That's what we are asking for the

14  court to find today.  That's what the evidence

15  suggested at the motion.  We ask for you to deny

16  the motion.

17  THE COURT:  Based upon the evidence that

18  I heard that Mr. Beltran was able to give a valid

19  consent to the police officers to enter the

20  premises to effect the arrest of Mr. Vidaurri.

21  Based on that, the motion to

22  suppress is denied.

23  MS. FITZSIMMONS:  Judge, co-defendants

24  are up September 5th, but I am not able to be here

1        A     Yes, I did.

2        Q     Do you see him in court today?

3        A     Yes, I do.

4        Q     Would you please point to him and describe

5    something he's wearing?

6        A     The gentleman in the tan DOC outfit

7    (indicating).

8        MR. HOLMES:  For the record, Judge, in-court

9    identification of the defendant.

10       THE COURT:  The record will so indicate.

11   BY MR. HOLMES:

12       Q     After you received this information from your

13   sergeant, did you learn the whereabouts of Jose

14   Vidaurri at approximately 10:00 p.m. or 9:50 p.m. that

15   same evening, January 13th?

16       A     That's correct.

17       Q     And where did you learn that Jose Vidaurri

18   was at that time?

19       A     He was possibly -- he was at his girlfriend's

20   house at the 2100 block of North Lawndale.

21       Q     Would that be 2138 North Lawndale?

22       A     Correct.

23       Q     And could you describe that building or

24   apartment for his Honor?

1     A      It's an apartment building like a house, like

2     a three-level, and we were by the basement.

3     Q      It's a basement apartment?

4     A      Correct.

5     Q      And you arrived there at about 9:50?

6     A      Correct.

7     Q      And when you arrived there, what did you do?

8     A      We knocked on the door.

9     Q      And as you knocked on the door, did any

10    individuals approach you?

11    A      Yes.

12    Q      From outside?

13    A      That's correct.

14    Q      Who approached you at that time?

15    A      A Mr. Beltran.

16    Q      And who is Mr. Beltran in relationship to

17    that apartment?

18    A      He stated that he was the renter or owner of

19    that apartment.

20    Q      And did you tell him what you were there for?

21    A      Yes.

22    Q      What did you tell him?

23    A      We were there to see Jose Vidaurri; we had

24    wanted to bring him in for questioning.

1      Q    And what did he indicate to you at that time?

2      A    He attempted -- he attempted to open up the

3  door with a key to let us in.

4      Q    And was he able to do that?

5      A    No, he was not.

6      Q    What did you do or say at that time?

7      A    We asked him if he would sign a Consent to

8  Search form.

9      Q    And what did he say?

10     A    He said he would.

11     Q    At this time were you having any

12  communication with anyone inside the apartment?

13     A    At that time, no.

14     Q    Okay, show you, Officer Rubino, what I'll

15  mark as People's Exhibit No. 1 for identification; ask

16  you to take a look at that document and tell me if you

17  recognize it?

18     A    Yes, I do.

19     Q    And what do you recognize People's Exhibit

20  No. 1 to be?

21     A    It is the Consent to Search form.

22     Q    And how do you recognize that?

23     A    I recognize it by the signatures of our

24  witnesses who happened to be on patrol, and up in the

EXHIBIT Guy

2.      My opinion is that the human brain is not fully mature before reaching adulthood, and that furthermore, the brain regions that are the most important for regulating impulse control, planning, consideration of consequences, abstract reasoning, and, most probably, moral judgment are the very regions to mature last.

3.      The results have rather profound implications for understanding behavioral development. The cortical regions that are last to mature, particularly those in prefrontal areas, are involved in behavioral facets germane to many aspects of criminal culpability. Perhaps most relevant is the involvement of these brain regions in the control of aggression and other impulses, the process of planning for long-range goals, organization of sequential behavior, and consideration of alternatives and consequences. More recent evidence indicates that the frontal lobes process aspects of morality and moral judgment. If the neural substrates of these behaviors have not reached maturity before adulthood, it is unreasonable to expect the behaviors themselves to reflect mature thought processes.

4.      The evidence now is strong that the brain does not cease to mature until the early 20's in those relevant parts that govern control of impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable. Therefore, a presumption arises that someone under 20 should be considered to have an underdeveloped brain. Additionally, since brain development in the relevant areas goes in

phases that vary in rate, and is usually not complete until the early to ████████████████████████ state with any scientific reliability that an individual 18-year-old ████████████████████████ should be eligible for the most severe punishment).

5.     This affidavit details my background, identifies the bases for my opinion, and presents my expert opinion.

## Synopsis of Curriculum Vitae

6. My Curriculum Vitae is attached to this declaration. My qualifications for the opinions I state in this declaration include the following:

a. I received a B.A. from the Hebrew University of Jerusalem and an M.A. and a Ph.D. in Clinical Psychology from Michigan State University. I completed Postdoctoral Fellowships at Stanford University and at the University of Pennsylvania. I have been licensed as a psychologist in Pennsylvania since 1976.

b. I am a Diplomate of the American Board of Professional Psychology, with Specialty in Clinical Neuropsychology (ABPP/CN).

c. I am, or have been, a member of the American Psychological Association, Division of Physiological and Comparative Psychology (Fellow status), Division of Neuropsychology (Fellow), the American Psychological Society (Fellow), the American College of Neuropsychopharmacology (Fellow), the American Association for the Advancement of Science, the International Neuropsychological Society, the National Academy of Neuropsychologists, the New York Academy of Science, and the John Morgan Society.

d.     Among other honors, I have received the Erikson Award for Scientific Excellence and the 1990 Stephen V. Logan Award from the National Alliance for the Mentally Ill. I have authored or co-authored refereed publications in peer-reviewed journals, made

national and international presentations in the field of imaging and brain dysfunction. I have served and am serving on Editorial Boards of professional journals, have served on Search Committees for journal Editorship, and have reviewed manuscripts for leading journals in the areas of imaging, brain and behavior, and schizophrenia, have served on Advisory Panels and Study Sections of the National Institutes of Health and currently serve on the NIH Review Group on "Brain Disorders and Clinical Neuroscience" (BDCN). I have contributed chapters to textbooks and other scholarly volumes on the topic of brain imaging and neuropsychology.

e.    I have the academic rank of Professor (with Tenure) on the Standing Faculty of the University of Pennsylvania, with a primary appointment in Psychiatry and secondary appointments in Neurology and in Radiology. I am currently the Chief of the Brain Behavior Laboratory (BBL) and Director of Neuropsychology, Department of Psychiatry at the Hospital of the University of Pennsylvania. I am Principal Investigator of the Neuropsychology Core and the Functional Imaging Core of the Federally funded Schizophrenia Center, Co-PI of the functional MRI project of the Conte Center for Neurosciences, and PI, Co-PI and investigator on several individual NIH grants (RO1s) on brain imaging and psychopathology. I also supervise interns and practicum students in neuropsychology. I am advisor of the Biological Basis of Behavior Undergraduate Major and the University Scholars Program at the University of Pennsylvania. Additionally, I am a supervisor of postdoctoral Fellows and doctoral students in Psychology and Neuroscience and Co-PI of a Federally funded Training Program in the behavioral neurosciences.

f.    I have been recognized as an expert and allowed to testify with respect to my expert opinions in the specialty of Neuroimaging and Neuropsychology in state and Federal courts.

## Literature reviewed

7.    I reviewed the published literature on the topic of brain maturation in humans. The literature spans from 1967 until present, with some new significant studies published after October of 1998 that have yielded findings that have assisted the analysis.

8.    The purpose of the review was to summarize current understanding of the process of maturation in human brains during the juvenile period and up to young adulthood. Below I will describe the methods used in such investigations and outline the main findings regarding the course of brain development. Of course, there is much that we do not know about brain maturation, but there is congruence of evidence indicating that brain maturation is not complete until young adulthood (about age 21). Furthermore, the main index of maturation, which is rate of myelination, points to large variability in the rate of maturation among brain regions. In general, maturation of the association cortex is not complete even by late adolescence, and within this cortex, the prefrontal regions are last to mature. The review will conclude by discussing the behavioral implications of these findings. The role of myelination is to focus and refine the operation of neural networks regulating behavior, and the frontal lobes specifically modulate and inhibit impulses, shaping behavior in accordance with planned action and long-term goals. Therefore, the brain anatomy data indicate that people are not biologically prepared to exercise mature frontal lobe control until they reach adulthood.

9.    The rate at which the human brain matures has been of considerable interest to neuroscientists and knowledge on when different brain regions mature during human development may have profound implications for understanding behavioral development.

Although the brain and its structure become well differentiated during fetal development, there is

overwhelming evidence that much of the brain maturation process occurs after birth. Indeed,

projections from early pioneering work on donated brain tissue have indicated that some brain

regions do not reach maturity in humans until adulthood. These projections have been confirmed

by more recent studies using neuroimaging with advanced methods for soft tissue segmentation

and regional parcellation. Here, I will first describe the initial neuroanatomic methods and

results they produced, which gave rise to hypotheses currently being confirmed and further

refined. I will proceed to explain the novel methods using structural and functional

neuroimaging, and summarize results pertinent to the issue of brain maturation. I will conclude

by an attempt to integrate findings from the diverse methods and explain their implications to

behavior, focusing on issues pertinent to criminal responsibility.

## Initial studies: Post-mortem tissue anatomy

10.     While sophisticated methods for preservation and dissection of post-mortem brain tissue

had been developed in the first decades of the twentieth century, it was not until the 1960's that

enough such tissue was available to examine the question of brain maturation in humans.

a.      Arguably, the largest collection and the most influential work was that of

Professor Paul I. Yakovlev and his colleagues at Harvard University. His methods, findings, and

conclusions have been summarized in a landmark chapter titled "The myelination cycles of

regional maturation of the brain" co-authored with Dr. Andre-Roch Lecours, which was

published in a book on Regional Brain Development in Early Life (edited by Professor

Alexandre Minkowski and published by Blackwell Scientific Publications, Oxford, England,

1967).

b.     The anatomic framework has focused on the process of the creation of the tissue surrounding nerve fibers, which is known as "myelogenesis." Myelogenesis is important for assuring efficient transmission of neuronal signals. The fatty tissue called myelin surrounds the nerve fibers that carry information across large distances very much in the same way that rubber is used for insulating cables designed to conduct electricity across distance. The process can be examined by obtaining slices of brain tissue from a wide age range, treated in a way that enables visualization of myelin, and comparing its abundance. Such treatment of tissue is called "staining," and Yakovlev and his colleagues used a staining method developed in the twenties by Loyez. The method relies on the ability to observe both the density of stained fibers and the intensity of coloration (light to dark gray and blue to black), and these can be used to index degree of myelination.

c.     Yakovlev and his colleagues examined over 200 brains ranging in age from fourth fetal month to one postnatal year, and another large set of brains from the third decade of life on. Unfortunately, they had very few brains from the first and second decades of life, and their extrapolations for that phase of development are accordingly more tentative. Nonetheless, they were able to derive some principles and propose hypotheses that were confirmed with remarkable consistency using current techniques.

d.     The main surprise was the much slower progression of the maturational process in the human brain compared to what had been expected from animal studies. Yakovlev and his colleagues have carefully charted the maturational process for a large set of regions and found some that matured very early while others were far from maturation at one year of age. By extrapolating from the sample of adult brains and the few specimens from the period in between, they have produced "maturation charts" for these brain regions. Based on these charts, they

identified several principles. The brain can be conceptualized architecturally (and phylogenetically) as consisting of three "zones": the median (median thalamus and hypothalamus, septum, hippocampus), the paramedian (limbic), and the superlimbic (mostly cerebral cortex). They noted that maturational rate is fastest for the paramedian zone, where it is complete within the first decade of life, and slowest for the cortical regions, where development seems to extend into adulthood.

      e.     This principle has rather profound implications for behavior, and is consistent with behavioral data on development. The region that is slowest to mature is the part of the brain that basically serves to inhibit and modulates more primitive, drive-related activation of the limbic areas. From a phylogenetic perspective, the brain areas that are latest to mature are those areas that have seen the greatest expansion in humans and are associated with faculties such as language comprehension and expression of emotions, impulse control and planning, and aspects of attention and memory (including working memory). Thus, the anatomic data as interpreted by Yaokvlev and his colleagues indicated that the very functions that make us uniquely human are the latest to become fully integrated into the workings of the developing brain.

      f.     Other contributions of anatomic studies for understanding brain development ranged from gross measurement of brain weight in large samples to more detailed measurements of synaptic processes in small samples. For example, Dekaban and Sadowsky (1978) tabulated body and brain weight in nearly 5000 autopsy reports, ranging in age from weeks to 90 years, and plotted these values against age. The most important result from the perspective of this review is that brain weight did not reach its peak until about age 20, and showed steady decline thereafter. This method, of course, could not distinguish myelin from other tissue and hence, does not directly examine maturation.

g.     Using methods for examining synaptic density, Professor Peter Huttenlocher from the University of Chicago uncovered another neurodevelopmental phenomenon apparently taking place during adolescence: "pruning." Specifically, he observed a decline in the density of synapses between ages 2 and 16 accompanied by a decrease in neuronal density. His conclusion required a considerable leap of imagination, since he only had one specimen between the ages of 8 and 20 years, however it made theoretical sense and was consistent with animal studies. According to the pruning hypothesis, at some point during adolescence, neurons and their connections that have not been consistently used during childhood "shrivel off" and are eliminated, thereby allowing for greater efficiency of the remaining neural systems (Huttenlocher, 1979; Huttenlocher et al., 1982).

**Current anatomic studies: Structural imaging with MRI**

h.     The post-mortem tissue studies such as those conducted by Yakovlev and his colleagues have contributed important insights into understanding brain maturation, but they have serious limitations. Most importantly, tissue availability depends on sources that may bias the age ranges available; the inability to quantify the measures in an automated fashion limits the number of brains and regions that can be examined; there is large variation introduced by fixation and staining methods; and it is impossible to do repeated studies in the same individual to trace developmental changes.

i.     All these difficulties are circumvented by a set of novel techniques developed in the 1970's and fully implemented by the 1990's, and that can be generally referred to as "structural imaging." These methods permit visualization and volumetric measurement of brain structure in living people without risk. The method that has become state of the art for these studies is based on magnetic resonance imaging (MRI) procedures. The head is placed in a

strong magnetic field (current standard is 1.5 tesla), and the image is based on recording
resonance of molecules after perturbations with radiofrequency (RF) signals using special coils.
Recordings are made with antennae, very much like recording of radio waves. What makes MRI
particularly amenable for quantitative analysis is that different echo times can highlight different
soft tissue contrasts, procedures that have similar effects to those of staining in post-mortem
studies. The main potential drawback in MRI is the difficulty in maintaining a homogeneous
field strength throughout the brain image. Inhomogeneity will produce "shading" effects, which
can be sometimes compensated for by the clinician but have to be minimized, or compensated
for by complex statistical operations when trying to implement a computer algorithm to identify
the tissue. Several approaches have been developed in the early 90's, and these have now
become standard and have been shown to produce reliable results both in phantom and in human
studies (e.g., Filipek, Richelme, Kennedy, and Caviness, 1994; Kohn et al., 1991; Yan and Karp,
1994). These methods have provided data on the intracranial composition of the three main
brain compartments related to cytoarchitecture and connectivity: gray matter (GM)- the
somatodendritic tissue of neurons (cortical and deep), white matter (WM)- the axonal
compartment of myelinated connecting fibers, and cerebrospinal fluid (CSF).

      j.     It has taken some time to apply these segmentation methods to a sufficiently large
sample of healthy people across the age range so as to examine maturational processes.
However, several groups have made considerable progress, and the results of their efforts, while
still tentative with regard to precise charting of developmental trajectories for all brain regions
and for all age groups, are nonetheless quite consistent with the post-mortem findings and
converge to support several conclusions.

**Critical studies**

11.    Among manuscripts in the refereed (i.e., peer reviewed) literature, which by now has reached a considerable number, one can identify seven main groups that pursued issues related to neurodevelopment: 1. The Harvard group under the leadership of Kennedy and Cavines; 2. The NIH group under the leadership of Rapoport and Giedd; 3. The Stanford group under the leadership of Pfefferbaum; 4. The Hopkins group led by Denckla; 5. The UCSD group led by Jernigan; 6. The University of Utah group led by Bigler; 7. The Penn group led by Raquel E. Gur and myself. Contributions from other centers such as Duke, McGill, NYU, and Toyama University in Japan have also been instrumental.

    a.    In one of the first studies examining segmented MRI in children and adults, Jernigan and Tallal (1990) have documented the "pruning" process proposed by Huttenlocher's work. They found that children had higher gray matter volumes than adults, indicating loss of GM during adolescence. This group has more recently replicated these results using advanced methods for image analysis (Sowell et al., 1999). Their new study also demonstrated that the pruning is most "aggressive" in prefrontal and temporo-parietal cortical brain regions.

    b.    The NIH group published a landmark paper in 1996, where they have reported results of a brain volumetric MRI study on 104 healthy children ranging in age from 4-18. While they did not segment the MRI data into compartments, they observed developmental changes that clearly indicated prolonged maturation beyond 17. In a later report on this sample, where segmentation algorithms have been applied, they were able to pinpoint the greatest delay in myelination, defined as WM volume, for fronto-temporal pathways (Paus et al., 1999). Note that this finding is very consistent with Yakovlev's projections. The NIH group went on to exploit the ability of MRI to obtain repeated measures on the same individuals. Using such longitudinal

data, they were able to better pinpoint the timing of pre-adolescent increase in GM that precipitated the pruning process of adolescence. Of importance to the question of maturation as defined by myelogenesis, the results indicated that the volume of WM continued to show increase up to age 22 years (Giedd et al., 1999).

     c.     The Harvard group developed a sophisticated procedure for MRI analysis (Filipek et al., 1994), which they applied to a sample of children with the age range 7-11 years and compared to adults (Cavines et al., 1996). They found sex differences suggesting earlier maturation of females, and generally supported the role of WM as a n index of maturation. Their results also indicated that WM shows delay in reaching its peak volume until early adulthood.

     d.     Another landmark study was published by the Stanford group, which examined segmented MRI on a "retrospective" sample of 88 participants ranging in age from 3 months to 30 years and a "prospective" sample of 73 healthy men aged 21 to 70 years (Pfefferbaum et al., 1994). The retrospective sample used scans available from the clinical caseload, although images were carefully selected to include only those with a negative clinical reading, while the prospective sample was recruited specifically for research and medically screened to be healthy. The results demonstrated a clear neurodevelopmental course for GM and WM, the former showing a steady decline during adolescence while the latter shows increased volume until about age 20-22 years.

     e.     The Hopkins group used a similar approach in a sample of 85 healthy children and adolescents ranging in age from 5 to 17 years (Reiss et al., 1996). Consistent with the post-mortem and the other volumetric MRI studies, they reported steady increase in WM volume with age that did not seem to peak by age 17. Unfortunately, they did not have data on older individuals. Their results are consistent with those of Blatter et al. (1995) from Utah, although

the extensive Utah database combines 16-25 and therefore does not permit evaluation of changes

during late adolescence and early adulthood.

f.    In the only study to date which has examined segmented MRI volumes from a

prospective sample of 28 healthy children aged 1 moth to 10 years, as well as a small adult

sample, Matsuzawa et al. (2001) have applied the segmentation procedures developed by the

Penn group. They have demonstrated increased volume of both GM and WM in the first

postnatal months, but whereas GM volume peaked at about 2 years of age, the volume of WM,

which indicated brain maturation, continued to increase into adulthood. Furthermore, consistent

with the post-mortem and other MRI studies that have examined this issue, the frontal lobe

showed the greatest maturational lag and its myelination is unlikely completed before young

adulthood.

**Other Relevant Studies**

12.    While not directly examining adolescence, several studies of aging may also help shed

light on development. The reason is a rather ubiquitous neurodevelopmental principle: whatever

"comes on board" last is also the first to deteriorate with older age. In this regard, several studies

have suggested that frontal and temporal cortex shows the most pronounced age-associated

decline, and that this happens earlier for men than for women (e.g., Coffee, et al., 1998; Cowell

et al., 1994; Gur et al., 1991, 2002; Raz et al., 1997). The possibility of further maturation

occurring beyond age 17 is supported in a recent study examining age effects for a prospective

sample of 116 healthy adults (57 men and 59 women, age range 18-49). The volume of WM

showed a positive slope for that age range (Gur et al., 2002). To examine in more detail any

effects in young adulthood, defined as between the ages of 18 to 25 (and on which there is

probably the least amount of published data), we have selected all individuals from this age

range in this study. There is clear evidence that the maturation process, reflected in WM

volume, continues into the early 20's, especially for men.

13.    Physiologic studies: Functional imaging. Information on the maturational process can

come not only from anatomic studies of brain structure, the focus of this review, but also from

studies of brain activity or "function." Few studies have been done to examine brain maturation.

Probably the main reason for the paucity of studies is that many of these methods necessitate

exposure to ionizing radiation, and therefore are forbidden as research tools in healthy children.

Another reason is that these studies are expensive and are usually done in very small samples.

Nonetheless, several investigators have examined indices of brain maturation using functional

imaging (e.g., Chugani et al., 1987; Chiron et al., 1992). These studies concur with the anatomic

data. Thus, Chugani et al. show that adult values are not reached by age 15 and are delayed in

association cortex, while Chiron et al. suggest that adult values are reached by about age 20.

### Summary and conclusions

14.    The review of neuroanatomic approaches across methods, and the few neurophysiologic

studies in humans, indicates considerable convergence of findings with respect to brain

maturation during childhood, adolescence, and early adulthood. The overwhelming weight of

the evidence supports the early post-mortem studies indicating that the main index of maturation,

which is called "myelination," is not complete until some time in the beginning of the third

decade of life (probably around 20-22). Other maturational processes, such as the increase and

subsequent elimination ("pruning") in cell number and connectivity, may be completed by late

adolescence, perhaps by age 15-17. More data are needed to pinpoint the age at which these

latter maturational processes are complete.

15.     The results have rather profound implications for understanding behavioral development. The cortical regions that are last to mature, particularly those in frontal areas, are involved in behavioral facets germane to many aspects of criminal culpability. Perhaps most relevant is the involvement of these brain regions in the control of aggression and other impulses, the process of planning for long-range goals, organization of sequential behavior, consideration of alternatives and consequences, the process of abstraction and mental flexibility, and aspects of memory including "working memory." More recent evidence indicates the frontal lobes process aspects of morality and moral judgment. If the neural substrates of these behaviors have not reached maturity before adulthood, it is unreasonable to expect the behaviors themselves to reflect mature thought processes.

16.     The brain scan techniques have demonstrated conclusively that the phenomena observed by mental health professionals in persons under 18 that would render them less morally blameworthy for offenses have a scientific grounding in neural substrates. The evidence now is strong that the brain does not cease to mature until the early 20's in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable. Therefore, a presumption arises that someone under 20 should be considered to have an underdeveloped brain. Additionally, since brain development in the relevant areas goes in phases that vary in rate and is usually not complete until the early to mid-20's, there is no way to state with any scientific reliability that an individual 18-year-old has a fully matured brain (and should be eligible for the most severe punishment), no matter how many otherwise accurate tests and measures might be applied at the time of his trial. This is similar to other physical characteristics such as height. While we know

in detail the age at which the average adults reach their maximum height the individuals are not easy to make.

17.    It is my understanding that, at the time of the offense, Anthony Clark was only 18 years old, making it probable that his brain had not reached full maturation. We can never know for sure the developmental state of Mr. Clark's brain at the time of the offense, since his attorney failed to have him tested, but the research suggests the probability that it was not fully developed. The main effects of this underdevelopment are impairment of impulse control, consideration of consequences, abstract reasoning, and moral judgment.


Dr. Ruben Gur


SUBSCRIBED & SWORN to before me.


NOTARY PUBLIC                          DATE


NOTARIAL SEAL
GERALDINE PETTEY, Notary Public
City of Philadelphia, Phila. County
My Commission Expires Nov. 29, 2004

References

Kohn MI, Tanna NK, Herman GT, Resnick SM, Mozley PD, Gur RE, Alavi A, Zimmerman RA, Gur RC. Analysis of brain and CSF volumes from magnetic resonance imaging: methodology, reliability and validation. Radiology, 1991, 178, 115-122.

Raz N, Gunning FM, Head D, Dupuis JH, McQuain J, McQuain J, Briggs SD, Loken WJ, Thornton AE, Acker JD (1997) Selective aging of the human cerebral cortex observed in vivo: Differential vulnerability of the prefrontal gray matter. Cereb Cortex 7:268-282.

Gur RC, Gunning-Dixon FM, Turetsky BI, Bilker WB, Gur RE. Brain Region and sex differences in age association with brain volume: A quantitative MRI study of healthy young adults. Am J Geriatric Psychiatry, 2002; 10:72-80.

Tsuneishi S, Casaer P. Stepwise decrease in VEP latencies and the process of myelination in the human visual pathway. Brain Dev. 1997 Dec;19(8):547-51.

Rajapakse JC, Giedd JN, Rumsey JM, Vaituzis AC, Hamburger SD, Rapoport JL. Regional MRI measurements of the corpus callosum: a methodological and developmental study. Brain Dev. 1996 Sep-Oct;18(5):379-88.

Sgouros S, Goldin JH, Hockley AD, Wake MJ, Natarajan K. Intracranial volume change in childhood. J Neurosurg. 1999 Oct;91(4):610-6.

Blatter DD, Bigler ED, Gale SD, Johnson SC, Anderson CV, Burnett BM, Parker N, Kurth S, Horn SD. Quantitative volumetric analysis of brain MR: normative database spanning 5 decades of life. AJNR Am J Neuroradiol. 1995 Feb;16(2):241-51.

Caviness VS Jr, Kennedy DN, Richelme C, Rademacher J, Filipek PA (1996) The human brain age 7-11 years: a volumetric analysis based on magnetic resonance images. Cereb Cortex 6:726-736.

Chiron C, Raynaud C, Maziere B (1992) Changes in regional cerebral blood flow during maturation in children and adolescents. J Nucl Med 33:696-703.

Chugani HT, Phelps ME, Mazziotta JC (1987) Positron emission tomography study of human brain functional development. Ann Neurol 22:487-497.

Dekaban A, Sadowsky D (1978) Changes in brain weights during the span of human life: relation of brain weights to body heights and body weights. Ann Neurol 4:345-356.

Dobbing J, Sand J (1973) Quantitative growth and development of human brain. Arch Dis in Child 48:757-767.

Ferrie JC, Barantin L, Saliba E, Akoka S, Tranquart F, Sirinelli D, Pourcelot L (1999) MR assessment of the brain maturation during the perinatal period: quantitative T2 MR study in premature newborns. Magn Reson Imaging 17:1275-1288.

Filipek PA, Richelme C, Kennedy DN, Caviness VS Jr (1994) The young adult human brain: an MRI-based morphometric analysis. Cereb Cortex 4:334-360.

Giedd JN, Snell JW, Lange N, Rajapakse JC, Casey BJ, Kozuch PL, Vaituzis AC, Vauss YC, Hamburger SD, Kaysen D, Rapoport JL (1996) Quantitative magnetic resonance imaging of human brain development: ages 4-18. Cereb Cortex 6:551-560.

Giedd JN, Blumenthal J, Jeffries NO, Castellanos FX, Liu H, Zijdenbos A, Paus T, Evans AC, Rapoport JL (1999) Brain development during childhood and adolescence: a longitudinal MRI study. Nature Neurosci 2:861-863.

Hayakawa K, Konishi Y, Kuriyama M, Konishi K, Matsuda T (1990) Normal brain maturation in MRI. Eur J Radiol 12:208-215.

Ho KC, Roessmann U, Straumfjord JV, Monroe G (1980) Analysis of brain weight. 1. Adult brain weight in relation to sex, race, and age. Arch Pathol Lab Med 104: 635-639.

Huppi PS, Warfield S, Kikinis R, Barnes PD, Ziente GP, Jolesz FA, Tsuji MK, Volpe JJ (1998) Quantitative magnetic resonance imaging of brain development in premature and mature newborns. Ann Neurol 43:224-235.

Huttenlocher PR (1979) Synaptic density in human frontal cortex: developmental changes and effects of aging. Brain Res 163:195-205.

Huttenlocher PR, de Courten C, Garey LJ, Van Der Loos H (1982) Synaptogenesis in human visual cortex: evidence for synapse elimination during normal development. Neurosci Lett 33:247-252.

Huttenlocher PR (1984) Synaptic elimination and plasticity in developing human cerebral cortex. Am J Men Def 88:488-496.

Jack CR Jr, Twomey CK, Zinsmeister AR, Sharbrough FW, Petersen RC, Cascino GD (1989) Anterior temporal lobes and hippocampal formations: normative volmetric measurements from MR imaging in young adults. Radiology 172:549-554.

Jernigan TL, Tallal P (1990) Late childhood changes in brain morphology observable with MRI. Dev Med Child Neurol 32:379-385.

Lange N, Giedd JN, Castellanos FX, Vaituzis AC, Rapaport JL (1997) Variability of human brain structure size: aged 4-20 years. Psychiat Res 74:1-12.

Mann MD (1984) The growth of the brain and skull in children. Dev Brain Res 13: 169-178.

Paus T, Zijdenbos A, Worsley K, Collins DL, Blumenthal J, Giedd JN, Rapoport JL, Evans AC (1999) Structural maturation of neural pathway in children and adolescents: In vivo study. Science 283:1908-1911

Pfefferbaum A, Mathalon DH, Sullivan EV, Rawles JM, _____ quantitaylve magnetic resonance imaging study of changes in _____ late adulthood. Arch Neurol 51:874-887.

Reiss AL, Abrams MT, Singer HS, Ross JL, Denckla MB (1996) Brain development, gender and IQ in children: a volumetric imaging study. Brain 119:1763-1774.

Sowell ER, Thompson PM, Holmes CJ, Jernigen TL, Toga AW (1999) In vivo evidence for post-adolescent brain maturation in frontal and striatal regions. Nature Neurosci 2:859-861

Thornton JS, Amess PN, Penrice J, Chong WK, Wyatt JS, Ordidge RJ (1999) Cerebral tissue water spin-spin relaxation times in human neonates at 2.4 tesla: methodology and the effects of maturation. Magn Reson Imaging 17:1289-1295.

Utsunomiya H, Takano K, Okazaki M, Mitsudome A (1999) Development of the temporal lobe in infants and children: analysis by MR-based volumetry. Am J Neuroradiol 20:717-723.

Yakovlev PL, Lecours AR (1967) The myelogenetic cycles of regional maturation of the brain. In: Resional development of the brain in early life (Minkowski A, eds), pp 3-70. Oxford: Blackwell.

1    going to testify in the case in his own behalf.  Is he

2    going to testify?

3        MS. FITZSIMMONS:  He is not, your Honor.

4        THE COURT:  Mr. Vidaurri, I just want to advise

5    you that your attorney, I'm sure, told you the same

6    thing, that you have a right to testify, you also have

7    a right not to testify, but that's your decision.  Do

8    you understand that?

9        A.    Yes, sir.

10       THE COURT:  Is it your decision that you don't

11   want to testify today?

12       A.    Yes, sir.

13       THE COURT:  Okay.

14       MS. FITZSIMMONS:  Your Honor, in reviewing the

15   evidence yesterday it occurred to me that Mr. Vidaurri

16   should really seek to strike the gun and the clip.  I

17   think the numbers are --

18            The evidence before you regarding the gun is

19   this:  The gun is People's 16A and the clip is

20   People's 16B.  Detective Climack, C-l-i-m-a-c-k,

21   testified that he spoke to a string of people.  There

22   is a motion pending regarding that -- some of that

23   testimony.  The last one in the string I believe is

24   Onyx, O-n-y-x, Santana and that the next thing that he

1    did was he said we, although he did not identify who

2    that was, we went to 1727 West Erie where we recovered

3    a .9 millimeter handgun which he then identified as

4    People's Number 16A Exhibit and the clip, People's

5    Exhibit Number 16B, sometime on January 12.  It might

6    have been after 5:00 o'clock in the evening.  That gun

7    was not identified by Mr. Vidaurri as the gun he used,

8    nor was it identified by the gun, nor was it

9    identified as even similar to the gun that was used by

10    the surviving victims, Mr. Peppers, Mr. Guy, and Mr.

11    Mobley.

12            There is no competent material evidence which

13    links that gun to this incident other than the fact

14    that it was recovered in the course of this

15    investigation.  And for that reason I would ask that

16    the Court not allow that to be admitted into evidence,

17    although I did not object to it yesterday through an

18    oversight, and that the Court additionally prohibited

19    the State from arguing to the jury that that is, in

20    fact, the gun that was used.

21        THE COURT:  Did you want to say anything?

22        MR. HOLMES:  It sounds to me, Judge, that she's

23    arguing the weight that should be given the

24    evidentiary value of the gun, the admissibility of the

1    gun. It's clear the detective identified that's the

2    gun, "I recovered it such and such a place."

3         The Court's aware the State's position is

4    this was not a shooter, he never had a gun, no one

5    ever identified him with a gun. It's not going to

6    come out in argument. It was just one of the items

7    that the detective recovred in the course of his

8    investigation which I think is certainly proper for

9    the jury.

10        MS. FITZSIMMONS: For the record, Judge, I'm not

11   arguing the weight of it. I'm arguing the actual

12   admissibility of it because there is nothing to link

13   it to this case other than the fact that this

14   particular detective recovered it on this particular

15   day.

16        THE COURT: Objection is overruled. There was no

17   objection during the course of the trial. It's for

18   the jury to determine whether or not any weight to be

19   given to to the testimony that they've heard.

20        With regard to the other issue that was --

21   the Court said I would take under advisement, the

22   issue with regard to a statement that was told to the

23   defendant during the course of the investigation but

24   also during the course of this questioning by the

Q-6

1          Q     You watched the entire videotaped statement.

2          Correct?

3          A     That is correct.

4          Q     The videotaped statement you watched upstairs

5    today, does it accurately depict what happened during

6    the actual videotaped statement of the defendant?

7          A     That is correct.

8          Q     I'd tender the witness.

9          THE COURT:  You may inquire.

10         MS. FITZSIMMONS:  Judge, before I begin examining

11   this witness, may I be heard at the side-bar with the

12   Court Reporter?

13         THE COURT:  We'll go into chambers.

14               Ladies and Gentlemen, while we're there,

15   please don't discuss the case while we're gone.

16               We'll be right back.

17                         (Whereupon the following

18                          proceedings were had in the

19                          court's chambers out of the

20                          presence and hearing of the jury)

21         THE COURT:  What?

22         MS. FITZSIMMONS:  Off the record, Judge.

23

24

1

2          (Whereupon, there was colloquy

3          had between the Court and Counsel

4          with no official record being

5          made, after which the following

6          proceedings were had)

7     MS. FITZSIMMONS:   Judge, on the record.

8          You know, I objected a lot to what the State

9     did which was go through each individual person Ocon,

10    Neira, Santana, etc. to establish this chain of

11    custody that they talked to all of these people and as

12    a result of all of their conversations they got

13    information about Jose.

14         At the time that Mr. Di Benedetto asked the

15    detective what I thought was a rather innocuous

16    question and the response that he gave, I did not

17    respond to at the time.

18         The response was I told Mr. Vidaurri that six

19    people put him in the van which is a short cut way of

20    doing what I had been objecting to and I didn't

21    respond to it immediately.

22         It's improperly before this jury that six

23    people said that he was in the van.

24         There's a motion for a severance.  I'd ask

1   that that be stricken from the record and that the

2   State not be allowed to argue it.

3       THE COURT:  Why didn't you make an objection at

4   that time?

5       MS. FITZSIMMONS:  Because it slipped right past

6   me, Judge.  That's what I'm telling you.

7           I'm not asking your Honor to go back over it

8   and tell the jury to ignore it.  I'm asking your Honor

9   to strike it from the record and prohibit the State

10  from arguing it.

11      THE COURT:  Well, that, your request is taken

12  under advisement and I'll rule prior to closing

13  argument.

14      MS. FITZSIMMONS:  Okay.  Okay.

15          That's what I asked to come back here for.

16      THE COURT:  Okay.

17                      (Whereupon, the following

18                       proceedings were had in open

19                       Court)

20                  CROSS EXAMINATION

21                       BY

22              MS. FITZSIMMONS

23      Q   People's 18, this is about roughly 15 minutes

24  long.

P196

1   was the time element.  Mr. DiBenedetto said think

2   about that brief segment.  Well, think about it.

3   Think about it honestly and fairly.

4         Mr. DiBenedetto been attaches significance to

5   the fact that Mr. Vidaurri drove away from the

6   shooting.  Where did he drive?  According to

7   everybody, he drove within spitting distance of the

8   shooting and he bailed out of the van.

9         Mr. DiBendedtto tells you, and I'm sure Mr.

10  Holmes will also tell you, you have to infer Mr.

11  Vidaurri's intentions from his actions.  Why did he

12  have a gun?  Well, he told you on the tape why he had

13  a gun.  He had a gun for his ownself protection.  He

14  handed the gun to Mr. Ocon.  He never asked Mr. Ocon

15  to kill anyone, he never asked Mr. Vera to kill

16  anyone, he didn't open the door so Mr. Vera could get

17  out and shoot someone the way that Benjamin Pienero

18  did.

19        Apparently driving the van to get the

20  shooters to where they were going to shoot is

21  accountability but opening the door, get out and shoot

22  as Bam Bam did, that's not accountability.  Exactly

23  the same action.  Driving the car for under three

24  minutes, opening the door.  Something that took a

1    second or two.  But Bam Bam is not accountable.  Mr.

2    Vidaurri is accountable.  He's accountable because he

3    drove the van.

4         Mr. DiBenedetto said to you several times,

5    well, what is it when one person kills another person?

6    We call that murder.  And what is it when three people

7    kill someone?  We call that murder.  Well, maybe that

8    is what Mr. DiBenedetto calls it and that's what he

9    want you to call it, but that's not what Mr. Blakey

10   calls it.

11        When Mr. Blakey spent his hour and a half

12   with Mr. Vidaurri, he doesn't talk to Mr. Vidaurri

13   about a murder that he committed, that Mr. Vidaurri

14   committed.  Why?  Because he wants to script what Mr.

15   Vidaurri is saying to you.  And you are going to have

16   Vidaurri 2, 3, 4, and 5 to take back with you into the

17   jury room.  He absolutely controlled the questions

18   that he asked and the subjects that they were going to

19   cover.

20        Now, what difference does that make, Miss

21   Fitzsimmons, Mr. Vidaurri in his own words said what

22   happened?  Well, I submit to you, ladies and

23   gentlemen, that what really happened here is you have

24   some facts that can be interpreted in more than one

1     Q.   So they were going faster than the red car?

2     A.   Right, right.

3     Q.   And it continued moving at a faster rate of

4  speed, and you see Juan put his hand out the window?

5     A.   When we got up to them, yes.

6     Q.   Then what happens?

7     A.   Then when he stuck his hand out the window,

8  at the same time Bam-Bam was reaching to open the door,

9  Pelon was already shooting, and Porky came up, cocked

10  his gun back and then he went, I traded places with

11  Bam-Bam and started shooting.

12     Q.   Who opened the door?

13     A.   Bam-Bam.

14     Q.   Do you remember giving your handwritten

15  statement in this case?

16     A.   When we went to the police station, yes.

17     Q.   Do you remember that?

18     A.   Yes.

19     Q.   Have you read it lately?

20     A.   Yes.

21     Q.   When was the last time you read it?

22     A.   Not too long ago.

23     Q.   How long is not too long ago?

24     A.   A little while ago.

```
 1      Q.    How long is that?

 2      A.    Two or three hours.

 3      Q.    Do you remember in your written statement you

 4   said that Porky pulled the door open?

 5      A.    I seen Bam-Bam, I know.

 6      Q.    Sir, the question is do you remember reading

 7   in your handwritten statement that you said Porky pulled

 8   the door open?

 9      A.    I'm not really sure, sir.  I know I read it,

10   but I haven't really got down to --

11      Q.    Take a look what we're going to consider

12   People's -- excuse me, Defendant Vera's No. 2 for

13   Identification.

14            If you would be kind enough, turn to the first

15   page.  I want to make sure that is your statement.

16      A.    Yes.

17      Q.    Okay.

18            Would you be kind enough to go to the page, I

19   think it would be Page 3, and I'll point to you the

20   appropriate location.

21      A.    I see right here.

22      Q.    Did you in your statement say David states

23   Porky pulled open the sliding door on the right and

24   stuck his right hand out with a gun?  Did you say that?
```

1      A.    They wrote it down.

2      Q.    Did you write that?

3      A.    I didn't actually write it, but they wrote it
4  and I signed it.

5      Q.    Someone wrote it for you?

6      A.    Yes, the State's Attorney.

7      Q.    So which one was it?  Was it Bam-Bam opened
8  the door or was it Porky opened the door?

9      A.    Well, it was like when the first couple of
10 shots came, I like, I didn't know what to do.  I kind
11 of, I got scared.

12           And then at the same time they were getting
13 up, and I figured Bam-Bam had got up because he moved
14 out of his place, and he got up, and Porky went to the
15 door, and by that time the door was already opened, I
16 figured Bam-Bam had did it.

17           So --

18     Q.    So you hear the gunshots, right?

19     A.    Yes.

20     Q.    You were frightened, right?

21     A.    Yes, very frightened.

22     Q.    You started ducking?

23     A.    Not ducking, but I was just waiting to see
24 what was going to happen.  I was like --

```
 1        Q    You say the van bumped.  What did the van
 2   bump?
 3        A    The car.
 4        Q    What side of the car was the van on when it
 5   drove down Jackson?
 6        A    The van was on, we were on their driver's
 7   side and they were on our passenger side.
 8        Q    Is your passenger side to their driver's
 9   side?
10        A    Right.
11        Q    And at some point while driving down Jackson,
12   both those vehicles collided?
13        A    Hit, yeah.
14        Q    Okay.  What happened as the van caught up to
15   the car?
16        A    I seen Juan Ocon with a handgun.  He was
17   pointing it out the window and then at the same time
18   Porky opened the van door and they start shooting.
19        Q    Porky opened the door.  That's Alvaro Vera?
20        A    Yes.  And he changed seats with Bam Bam and
21   they both started shooting.
22        Q    When you say they both started shooting, who
23   are you talking about specifically?
24        A    Juan Ocon and Porky.
```

P45

1  lights and they were going around traffic.

2      Q    Let me stop you there.

3           When you say taking the lights, what do you

4  mean by taking the lights?

5      A    Like instead of stopping at the red light,

6  go, keep going past the red light.

7      Q    Was the red car doing that also?

8      A    Yes.

9      Q    And your van Jose Vidaurri was driving was he

10  doing that also?

11      A    Yes.

12      Q    Were, from where you were seated in the van

13  could you hear any words exchanged between Jose

14  Vidaurri and Juan Ocon?

15      A    Yes.

16      Q    What did you hear those two individuals say?

17      A    I heard Juan Ocon telling Jose Vidaurri go

18  get 'em, get 'em, you know, keep going after them.

19      Q    Where was the van when Juan Ocon said that to

20  Jose Vidaurri?

21      A    Where was the van?

22      Q    Um hum.  What street?

23      A    We were, I don't know.  We were kind of

24  already going down Ashland kind of far.  I don't know

P43

1    A.    Through the street gang.

2    Q.    How long had you known him?

3    A.    Couple of weeks.

4    Q.    Now, you got in that van around ten o'clock?

5    A.    Yes.

6    Q.    Directing your attention to about 12:15 a.m.

7  Erie and Wood, this would be now on the 9th of January,

8  do you recall being in that area?

9    A.    Yes.

10    Q.    Tell the Ladies and Gentlemen of the jury

11  what happened?

12    A.    We were driving -- we were driving down Erie,

13  seen a dark colored car.  They pulled up next to him,

14  started representing to them, throwing gang signs up,

15  just trying to see who they were, see if they were from

16  the neighborhood or not.

17    Q.    When you say "they started representing," who

18  are you talking about?

19    A.    Jose Vidaurri and Pelon.

20    Q.    Juan Ocon?

21    A.    Yes.

22    Q.    Those were people in the van you were in?

23    A.    Yes.

24    Q.    When they started representing, what were

D - 223

1   going at it with everybody.

2        Q.    Okay.

3              And those two individuals did that to the car?

4        A.    Yes.

5        Q.    Did anyone in the car signal anything back

6   that you could see?

7        A.    Not that I can recall.

8        Q.    Could you hear them yell anything?

9        A.    No.

10       Q.    After those signs were made to the car, did

11   the car take off?

12       A.    Yes.

13       Q.    What happened next?

14       A.    I don't know.  The car took off going east on

15   Erie, and that's when Jose Vidaurri started chasing it

16   down Erie towards Ashland.

17       Q.    What was Juan Ocon doing during this first

18   part of the chase?

19       A.    Just sitting on the front seat, like, just

20   sitting there, just -- I don't know.  I guess just

21   sitting.

22       Q.    Was he saying anything to Jose Vidaurri?

23       A.    Not at the time.

24       Q.    At any time did he say anything to him?

```
 1       A.    Yes.

 2       Q.    When was that?

 3       A.    Probably like during the middle of the chase

 4   or so.

 5       Q.    Okay.  We're not there yet then?

 6       A.    No.

 7       Q.    I believe you stated you were on Erie?

 8       A.    Yes.

 9       Q.    And on Erie, did you go to another busy

10   street?

11       A.    Yes.

12       Q.    What street would that have been?

13       A.    Ashland.

14       Q.    And you're still chasing the car?

15       A.    Yes.

16       Q.    What was going on in the van?  Were you

17   saying anything?  Was anyone saying anything in the van

18   at that time?

19       A.    Not at the time.

20       Q.    Did your -- did the van that you were in make

21   it to Ashland?

22       A.    Yes.

23       Q.    When you made it to Ashland, which way did

24   the car go?
```

1      A.    It made a right going southbound on Ashland.

2      Q.    Where did the van go?

3      A.    Same direction.

4      Q.    Did the van chase the car then down Ashland?

5      A.    Yes.

6      Q.    Safe to say you were going at a high rate of

7  speed?

8      A.    Yes.

9      Q.    How long did the chase down Ashland take?

10     A.    Say probably like ten, ten minutes or so.

11     Q.    During that time, is that when Juan Ocon was

12  saying something to Jose Vidaurri?

13     A.    Yes.

14     Q.    What was Juan Ocon saying?

15     A.    Kind of like, I don't know, encouraging him

16  to keep up with the van.

17     Q.    Where was the defendant Alvaro Vera at this

18  time?

19     A.    In the back row seat.

20     Q.    Still next to you in the back?

21     A.    Yes.

22     Q.    After you chased the car down Ashland, did

23  you reach another street and turn?

24     A.    Yes, we did.

1   Q What happened at 12:15 near Erie and Wood?

2   A We were driving and then we started going

3 down Erie toward Ashland going east and then we seen a

4 car.

5   MS. FITZSIMMONS:  Objection.  I ask that that be

6 stricken.

7   THE COURT:  Just tell us what you saw.

8   A I saw a car driving and where the van was

9 following them and the car stopped and pulled up next

10 to them.

11    I seen Juan Ocon and Jose Vidaurri

12 representing to them.  The car took off down Ashland

13 going south and they started chasing them telling

14 them --

15   MR. HOLMES:  Q  Let's slow down.  Let's back up a

16 little bit.

17    You said you saw a car?

18   A Yes.

19   Q Do you recall what color the car was?

20   A It was a dark colored car.  I don't really

21 know the color.

22   Q Were you able to see the people that were in

23 that car?

24   A No.

P39

1    Q    You said that the van started to follow the

2  car?

3    A    Yes.

4    Q    Was anything said between Jose Vidaurri and

5  Juan Ocon while the van started to follow the car?

6    A    Juan Ocon was like encouraging him like to

7  chase 'em.  So he's like go get 'em.  Go get 'em.  So

8  he kept going after that.

9    Q    At some point the van stopped next to the

10  car?

11    A    Yes.

12    Q    You said someone started representing?

13    A    Right.

14    Q    First of all, what do you mean by

15  representing?

16    A    Like showing what gang you're in and then

17  disrespecting to them seeing what they're going to say

18  to you or throwing hand signals at them.

19    Q    Is representing doing something with your

20  hands?

21    A    Yes.

22    Q    Okay.  And someone in the van or some people

23  in the van did that towards the car?

24    A    Yes.

P40

1    Q    Who did that towards the car?

2    A    I seen Juan Ocon and Jose Vidaurri.

3    Q    As to Jose Vidaurri, show the ladies and

4    gentlemen of the jury what exactly Jose Vidaurri did

5    with his hands?

6    A    They were, he was like that and he was going

7    like that, disrespecting 'em.  That's about it, seeing

8    who they were.

9    Q    When you say he was disrespecting them, who

10   was he disrespecting?

11   MS. FITZSIMMONS:  May the record reflect the

12   gesture?

13   THE COURT:  It can if you want to say something

14   about it.

15        Go ahead.

16   MR. HOLMES:  Q    What does it mean to disrespect

17   someone?

18   A    To like just to see what they were going to

19   do back to you.

20        Like say they're in a gang and you disrespect

21   their gang, you throw it down.  That's just to see

22   what they would say.

23   Q    So if you showed those hand gestures that you

24   just made, if you do those pointing down, that's a

P41

1    sign of disrespect?

2         A    Yes.

3         Q    What do you do if they're pointing up?

4         A    That's showing love to their gang.

5         Q    Jose Vidaurri showed those gang signs down?

6         A    Yes.

7         Q    Could you tell who he was showing those gang

8    signs down to?

9         A    To the car.

10        Q    Were you able to see what the occupants in

11   that red car did upon seeing the hand signs?

12        A    After that they just took off.

13        Q    Did they say or do anything back towards the

14   van?

15        A    No.

16        Q    When they took off did they take off slowly

17   or did they take off at a high rate of speed?

18        A    They took off fast.

19        Q    What did the van do?

20        A    Started chasing 'em.

21        Q    When you say chasing them, describe how fast

22   you were going?

23        A    We were, I don't know exactly how fast, but

24   we were going pretty fast where we were taking the

```
 1        A.      Yes, I do.

 2        Q.      Do you recall what that car looked like?

 3        A.      I know it was a dark, like a dark-colored

 4   car.

 5        Q.      Do you recall if you could see the people in

 6   that dark-colored car?

 7        A.      Yes.

 8        Q.      Were they male or female?

 9        A.      By the way of the back of the heads, probably

10   male.

11        Q.      Were they black, white or Hispanic, if you

12   can tell?

13        A.      I have no idea.

14        Q.      What happened when the van first came in

15   contact with the car there at Erie and Paulina?

16        A.      I knew the Jose Vidaurri pulled up next to

17   him.

18        Q.      That's the driver?

19        A.      Yes.  Pulled up next to him, and then Pelon

20   started rolling down the window, started representing to

21   him, you know.

22        Q.      Stop there.

23                Pelon, that is Juan?

24        A.      Yes.
```

1     Q.     And he started representing?

2     A.     Yes.

3     Q.     What does it mean to represent?

4     A.     Like when you throw up a gang sign, throwing

5  up what you be about, showing respect.  And it's like

6  you throw it down means you are dissing them.

7     Q.     When you throw it up it means that you are

8  the gang you're with?

9     A.     Yes.

10    Q.     And throwing down is showing disrespect?

11    A.     Yes.

12    Q.     Who was doing this?

13    A.     I believe Jose -- or not Jose.  Juan and

14 Bam-Bam.

15    Q.     Juan and Bam-Bam.

16           What were they doing?  Show the Ladies and

17 Gentlemen of the jury the signs they were making?

18    A.      The Jiver, the fork, throwing down Kings --

19           MR. WALSH:  Just a moment, your Honor.  I

20 can't see.

21           MR. HOLMES:  Why don't you stand up so they

22 can see over here.

23           THE WITNESS:  Throwing up the Jiver, SD,

24 throwing down the Kings, Cobras.  At the time they were

1      A    Machin.

2      Q    And in back of Juan Ocon sat who?

3      A    That was Bam Bam.

4      Q    In the back seat were the rest of you,

5  Alvaro, yourself and Dave?

6      A    Yes.

7      Q    Directing your attention then to January 9th

8  right after midnight about 12:15 a.m. in the vicinity

9  of Erie and Paulina, were you still in that van?

10     A    Yes.

11     Q    Were those individuals we just discussed,

12  Jose, Juan, Bam Bam, Machin, Alvaro and yourself and

13  David still in the van?

14     A    Yes.

15     Q    Who was driving the van at 12:15?

16     A    Jose.

17     Q    They were still in the same spots we just

18  talked about?

19     A    Yes.

20     Q    What occurred near Erie and Paulina at that

21  time?

22     A    We pulled up to a car.

23     Q    Do you recall the color of that car?

24     A    No.

1  Q    Do you recall whether it was a light color or

2  a dark color?

3  A    I know it was a dark color.

4  Q    Were you able to see the occupants of that

5  car?

6  A    Not completely.

7  Q    When you say not completely, were you able to

8  make out if they were white or black?

9  A    Not really.

10  Q    Male or female?

11  A    Probably like male, because the way their

12  head, like the back of their heads were shaved. No hats

13  Q    What took place then?

14  A    We pulled up next to the car and then Juan

15  rolled down the windows and then him --

16  Q    What window did Juan roll down?

17  A    Passenger, right side.

18  Q    Front seat passenger?

19  A    And he started representing to 'em.

20  Q    When you use the term representing, what do

21  you mean?

22  A    Flashing gang signs.

23  Q    With his hands, his arms?

24  A    Yeah, with his hands.

1        Q    When you represent and flash gang signs

2  upward, what does that mean?

3        A    That means you're showing, you're showing

4  them what you are.

5        Q    The gang you're aligned with?

6        A    Yes.

7        Q    When you represent or flash gang signs down,

8  what does that mean?

9        A    That means you're dissing them.

10       Q    Disrespecting them?

11       A    Yes.

12       Q    What did Juan Ocon do at this time?

13       A    He was throwing up the gang signs to the car

14  next to us and then Bam Bam was throwing up gang signs

15  to the car next to us also.

16       Q    What gang signs was Juan Ocon throwing up?

17       A    Jivers.

18       Q    Can you show the Ladies and Gentlemen what he

19  was doing?

20           For the record the witness has his right arm

21  extended with his index and thumb fingers out somewhat

22  like a gun or an "L."

23           And Bam Bam was also representing also to the

24  car?

P87

1     A    Yes.

2     Q    Was Jose Vidaurri doing anything that you

3  could tell at that time?

4     A    I could tell he was leaning over looking at

5  the car.

6     Q    Did the people in the car do anything at that

7  time that you could tell?

8     A    Not that I noticed.

9     Q    Could you hear anyone talking between the van

10  and the car?

11     A    No.  I just heard, you know, yelling toward

12  the car.

13     Q    Who was yelling toward the car?

14     A    Pelon.

15     Q    Juan Ocon?

16     A    Yeah.

17     Q    What happened then?

18     A    All of a sudden I noticed that the car just

19  took off.

20     Q    And did your van stay there or what did the

21  van do?

22     A    The van followed.

23     Q    Did it follow slowly or at a high rate of

24  speed?

## SS. AFFIDAVIT OF ALVARO VERA

Alvaro Vera, being first duly Sworn, does dispose and says:

1) I was present in the Van on the late night hours of January 8, 2000, and the early morning hours of January 9, 2000.

2) Jose Vidaurri never had a gun.

3) Jose Vidaurri never gave anybody a gun.

4) Jose Vidaurri never knew that any guns were in the Van.

5) Jose Vidaurri never represented any gang signs to anyone.

6) There was never any talk by anyone in the Van, about committing acts of violence against anyone.

7) The words "go get 'em, go get 'em" were never said to anybody, by anybody in the Van.

8) I never stopped Jose Vidaurri on the street, and told Jose Vidaurri to leave town, because the police are; picking up people on a homicide.

_Alvaro Vera_
Affiant

I swear that the information contained in this <u>affidavit</u> is true, to the best of my knowledge and personel involvement. If called to testify to the facts stated herein I am willing to do so. Sworn to and Subscribed to before me, this _9th_ day of _December_, 2004.

_Sharon L. McCabe_
N O T A R Y        P U B L I C

1    Gangster network, a nation, do hereby give my gun to

2    Juan Ocon to kill someone.

3        MS. FITZSIMMONS:  Objection.

4        THE COURT:  Overruled.

5    BY MR. HOLMES:

6        You don't need that.  The best indication of

7    knowledge and intent of someone is their actions,

8    either before, during, or after the crime.

9        The last statement on the video when he tells

10   you people, he tells the Judge, the last statement.

11   Remember?  Jack Blakey is not controlling him.  He

12   says hey, hey, can I say something else.  Jack Blakey,

13   sure, go ahead, it's your statement.  Even though I

14   know I'm going to jail, even though I know I'm going

15   to jail, he knows, he knows he's guilty, even though I

16   know I'm going to jail, I'm doing this to cooperate,

17   to show the Judge I'm cooperating.  These are the

18   little truth detectors.

19       Look at his actions afterwards.  He takes the

20   guns from the shooter, hides them in the van, parks

21   the van and leaves.

22       Alvaro Vera, the 16-year-old --

23       MS. FITZSIMMONS:  Objection to the 16-year-old,

24   your Honor.

Q-54

1          MR. WALSH: Objection as to the form of that
2   question.

3          THE COURT: Overruled.

4          MR. HOLMES: You can answer.

5          THE WITNESS: From both of them.

6     Q.   After Juan Ocon and Alvaro Vera fired their
7   guns, what happened?

8     A.   All of a sudden I felt the car hit the van,
9   and I guess it veered off the side of the road, and we
10  kept on heading down Jackson.

11    Q.   How far did that van go down Jackson?

12    A.   Approximately two blocks maybe.

13    Q.   What happened next?

14    A.   We made a right in the alley and parked in
15  the other alley and parked the van in a parking lot.

16    Q.   Did you see what Alvaro Vera did with his
17  gun?

18    A.   I seen -- I believe he put the gun in the
19  back seat of the van.

20    Q.   We're talking about Alvaro Vera, so we're
21  clear?

22    A.   Yes.

23    Q.   Did you see what Juan Ocon did with his gun?

24    A.   I believe he gave it to Porky.

1    Q.    Did you see what Porky did with that second
2    gun?

3    A.    Placed it in the same spot as the first one.

4    Q.    Prior to the shooting, did you see anyone in
5    the van with a gun?

6    A.    No, I did not.

7    Q.    Did anyone in the van indicate that they had
8    a gun?

9    A.    Nope.

10   Q.    After the van parked, did you get out of the
11   van?

12   A.    Yes, we did.

13   Q.    When you say "we," who are you talking about?

14   A.    Individuals in the van.

15   Q.    Did you go somewhere?

16   A.    Yes, I did.

17   Q.    Where did you go?

18   A.    I went walking through UIC campus.

19   Q.    Who were you with?

20   A.    I was with David Neira, and then about maybe
21   a couple of seconds later Porky caught up with us.

22   Q.    And where did you guys go?

23   A:    Try to catch a train on the, by the train
24   station, but I guess it was closed at the time, so we



# OFFICE OF THE STATE APPELLATE DEFENDER
## FIRST JUDICIAL DISTRICT

203 NORTH LASALLE STREET
24TH FLOOR
CHICAGO, ILLINOIS 60601
TELEPHONE: 312/814-5472
FAX: 312/814-1447

**MICHAEL J. PELLETIER**
DEPUTY DEFENDER

June 5, 2003

**YASAMAN HANNAH NAVAI**
ASSISTANT APPELLATE DEFENDER

Mr. Jose Vidaurri
Register No. R-15606
Stateville Correctional Center
P.O. Box 112
Joliet, IL 60434

RE: *People v. Jose Vidaurri*
Indictment No.:00 CR 8905 (03)

Dear Mr. Vidaurri:

I am the attorney who has been assigned to your appeal. I am sending you this letter in order to answer, in advance, some of the questions you may have and to explain to you the procedure I will follow in handling your case. In fairness to the clients we are appointed to represent, with the exception of State appeals and appeals from remands, we do cases in order of the final judgment date. In other words, we do the oldest cases first. For example, we would work on the appeal of a defendant who was sentenced in April 2000 before we would do the appeal of someone sentenced in December of 2000.

We also have an office policy that if another assistant is able to work on your case sooner, then your case is reassigned to him or her. So, I may not be the attorney who works on your case. Until your case is ready to be briefed by me or another attorney, my role is to answer any questions you may have about the appellate process, to file motions to extend the time to file your brief and to essentially monitor your case. In the event that your case is reassigned you will be notified.

Although you have already received an information sheet from this office regarding the appellate process, I would like to give you some additional facts about what to expect from your appeal. An appeal is a review by three appellate court judges of the trial court proceedings to insure that your conviction was not obtained in violation of existing law. The review by the appellate court is based entirely upon written records of the appellate court and it accepts no new evidence. Therefore, even if there is important information not in the record, we cannot use it on appeal.

On appeal, the attorneys present most of their arguments in writing and the

STATEVILLE
OUTGOING LEGAL MAIL CARD

B423

VIDAURRI, JOSE
R15606

| ORGANIZATION | OUTGOING | INCOMING |
|---|---|---|
| BLUHM LEGAL CLINIC<br>357 E. CHICAGO AVE.<br>CHGO. IL. 60611 | | 1/11/2005-<br>11/29/04P- |
| CIR CLK<br>28 N CLARK<br>CHGO IL | 8/13/04- | |
| CHGO POLICE DEPT<br>3510 S MICHIGAN AVE<br>CHGO IL | 3/5/04- | |
| GOV<br>207 STATE HOUSE<br>SPR IL | 6/7/03- | |
| BENJAMIN AND SHAPIRO LTD.<br>180 N LASALLE ST STE 2600<br>CHGO, IL | | 7/23/04-7/31/04P-<br>9/1/04- |
| CIR CLK<br>RICHARD DALEY CNTR<br>50 W WASHINGTON ST<br>CHGO IL | 7/29/04- | |
| CIR CLK<br>2650 S CAL<br>CHGO IL | 5/22/03-5/14/03-<br>1/29/04-2/7/04P-<br>7/29/04- | |
| STATE APPEL<br>203 N LA SALLE<br>CHGO IL | 4/26/03-5/22/03-<br>6/13/03-6/18/03P-<br>7/26/03P-8/15/03-<br>8/15/03(P)-2/7/04P-<br>8/4/04- | 9-22-04-10-18-04P- |
| CIR CLK<br>RICHARD DALEY CENTER<br>CHGO IL | 4/26/03- | |

END OF CARD

individuals in Mr. Snowden's vehicle might be members of a gang, so Mr. Ocon flashed gang symbols at them. (People's Ex. 18). The absence of any response by the individuals in the Mercury was perceived to be a sign of disrespect. (People's Ex. 18, R. III. P41-2). Therefore Mr. Vidaurri followed the Mercury until it turned right onto Ashland from Ohio. (People's Ex. 18; R. III. P89, P42). The Mercury proceeded at a high speed southbound on Ashland Avenue to escape the van, running several red lights in the process. (People's Ex. 18; R. III. P109, P151). When the Mercury turned left onto Jackson, that vehicle slowed as Mr. Snowden asked William Peppers to locate a cellular phone from underneath his seat. (R. III. P110, P152). At this point, Mr. Vidaurri caught up to the Mercury and drove the van alongside the Mercury's driver side, eventually hitting the Mercury with the van. (People's Ex. 18; R. III. P44). Juan Ocon began shooting from his window. (People's Ex. 18; R. III. P45). Mr. Vidaurri did not order anyone to shoot at the Mercury. (People's Ex. 18; R. III. P45). At the same time, Benjamin Pinero opened the sliding doors of the van and Mr. Vera began shooting from the back of the van. (R. III. P45, P91). Dauntrez Snowden was shot once in his upper left abdomen while Nicholas Mobley was shot twice, once in the left leg and another time in the right foot. (R III. P68-9, P114). Dauntrez Snowden died as a result of the gunshot wound. (R. III. P74). The medical examiner ruled his death to be a homicide. (R. III. P68, P76).

In his videotaped statement Mr. Vidaurri admitted that he chased the Mercury so that Juan Ocon could determine if the individuals were members of a rival gang. Mr. Vidaurri believed that, if they were not rival gang members, Mr. Ocon would only scare them. If the Mercury was driven by rival gang members, however, Mr. Vidaurri expected that Mr. Ocon would "open fire." (People's Ex. 18).

## POINTS AND AUTHORITIES

Page

**Mr. Vidaurri Was Deprived Of A Fair Trial When The Trial Court Failed To
Empanel A Fair And Impartial Jury By Not Asking The Jury Any Questions
Regarding Gang Bias. Also, Trial Counsel Was Ineffective For Failing To Ensure
That The Panel Of Jurors Consisted Of Impartial Jurors By Not Insisting that Trial
Judge Ask Or By Herself Asking Whether They Had Any Bias Towards Members
Of Gangs As Required By Illinois Supreme Court Rule 431(b) And *People v. Strain*.**

.................................................................... 9

*People v. Williams*, 164 Ill. 2d 1, 645 N.E.2d 844 (1994) ......................... 9

*People v. Taylor*, 101 Ill. 2d 377, 462 N.E.2d 478 (1984)........................  9

*People v. Strain*, 194 Ill. 2d 467, 742 N.E.2d 315 (2000) ....................... 10

*People v. Nielsen*, 187 Ill. 2d 271, 718 N.E.2d 131 (1999) ...................... 10

*People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988) ...................... 10

*People v. Metcalfe*, 202 Ill. 2d 544, 782 N.E.2d 263 (2002) ..................... 10

*People ex. rel. Daley v. Joyce*, 126 Ill. 2d 209, 533 N.E.2d 873 (1988) ............ 11

*People v. Peeples*, 155 Ill. 2d 422, 616 N.E.2d 294 (1993) ...................... 11

*People v. Carroll*, 260 Ill. App. 3d 319, 631 N.E.2d 1155 (1st Dist. 1992) ......... 11

*People v. Strain*, 306 Ill. App. 3d 328, 714 N.E.2d 74 (1st Dist. 1999) .......... 11,13

*People v. Gregg*, 315 Ill. App. 3d 59, 732 N.E.2d 1152 (1st Dist. 2000) ...... 11,12,13

*People v. Moore*, 243 Ill. App. 3d 1045, 614 N.E.2d 152 (1st Dist. 1993) .......... 12

*People v. Williams*, 164 Ill. 2d 1, 645 N.E.2d 844 (1994) ....................... 12

*People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984) ....................... 12

*People v. Gardner*, 331 Ill. App. 3d 358, 771 N.E.2d 26 (1st Dist. 2002) .......... 14

The text of this decision: 08-cv-036
changed or corrected prior to the
time for filing of a Petition for
Rehearing or the disposition of
the same. /

FIRST DIVISION
April 26, 2004

No. 1-02-3718

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS,) | | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 8905 |
| | ) | |
| JOSE VIDAURRI, | ) | Honorable |
| | ) | Joseph G. Kazmierski, Jr., |
| Defendant-Appellant. ) | | Judge Presiding. |

## O R D E R

Following a jury trial, defendant Jose Vidaurri was
convicted of first degree murder and attempted first degree
murder, then sentenced to consecutive, respective terms of 35 and
10 years' imprisonment. Defendant does not challenge the
sufficiency of the evidence to sustain his conviction, but
contends that the trial court committed reversible error in
failing to sua sponte question the venire as to whether
defendant's gang affiliation would affect their ability to be
fair. He also contends that he was denied his right to the
effective assistance of trial counsel, who failed to question the
venire as to any bias against gangs.

Defendant's convictions arose from his involvement in the
fatal shooting of Dauntrez Snowden and the attempted murder of
Nicholas Mobley. The incident took place shortly after midnight

1-02-3718

Delbert Guy, and Nicholas Mobley were celebrating Peppers'
impending departure for college the next day. Snowden was
driving his maroon Mercury Mystique that night and Peppers was in
the front passenger seat. Guy and Mobley were in the back seat.

That same night, defendant, Francisco Rodriguez, David
Niera, Juan Ocon,[1] Benjamin Pienero, William Solis, and Alvaro
Vera[2] were joyriding in Rodriguez's van. The occupants of this
van were members of the Satan Disciples street gang, save for
Ocon who was a member of the Latin Jivers street gang.

About 12:15 a.m., defendant pulled up beside Snowden's car
near Erie and Paulina. Ocon and Pienero flashed gang signs
toward the car, but, purportedly, no one responded. During the
high speed chase that ensued, defendant drove alongside Snowden's
car while Ocon and Vera fired multiple shots. Mobley was shot in
the left leg and right foot. Snowden was fatally shot in the
stomach.

Subsequently, defendant gave a videotaped statement
regarding his involvement in the shootings. The State rested its
case and defendant did not present any evidence. A jury found

---

[1]Ocon was also convicted of first degree murder and
attempted murder. That judgment was affirmed in a separate
appeal. People v. Ocon, No. 1-02-1567 (2003)(unpublished order
under Supreme Court Rule 23).

[2]Vera was convicted of attempted murder for his involvement
in the shootings. That judgment was affirmed in a separate
appeal. People v. Vera, No. 1-02-2046 (2004)(unpublished order
under Supreme Court Rule 23).

1-02-3718

about gang bias. <u>Strain</u>, 194 Ill. 2d at 477. Defendant
acknowledges that <u>Strain</u> did not directly address whether the
trial court had a duty to make inquiries <u>sua sponte</u> on gang bias;
nonetheless, he asks this court to hold that such a duty exists
under <u>Strain</u>. We decline to do so.

We initially agree with the State that defendant has waived
this issue by failing to ask the trial court to question the
venire regarding potential gang bias and by failing to raise a
contemporaneous objection during the questioning of the
prospective jurors. <u>People v. Enoch</u>, 127 Ill. 2d 176, 190
(1988); <u>People v. Thomas</u>, 186 Ill. App. 3d 782, 799-800 (1989).
We also find for the following reasons that the purported error
does not fall within the plain error exception to the waiver
rule. 134 Ill. 2d R. 615(a).

In <u>People v. Williams</u>, 295 Ill. App. 3d 456, 466 (1998),
this court explicitly held that, where, as here, neither party
tendered supplemental <u>voir dire</u> questions to the trial court
regarding this issue, and defendant failed to object during <u>voir
dire</u> or raise the issue in a posttrial motion, the trial court
had no duty to make inquires <u>sua sponte</u> regarding gang bias.
<u>Williams</u>, 295 Ill. App. 3d at 466. In reaching that conclusion,
this court noted that the trial court had advised the parties of
its procedures for conducting <u>voir dire</u> and then posed general
questions to the venire regarding fundamental principles of law,

- 5 -

1-02-3718

People v. Wiley, 165 Ill. 2d 259, 285 (1995). In reviewing trial
counsel's performance, the entire record must be taken into
consideration and counsel's actions reviewed from the
circumstances confronting counsel at the time the questioned
conduct occurred. Wiley, 165 Ill. 2d at 285. A claim of
ineffectiveness arising from a matter of defense strategy will
not support a claim of ineffectiveness. Williams, 295 Ill. App.
3d at 469.

Defendant asserts that an attorney's failure to tender
supplemental voir dire questions can support a claim of
ineffectiveness. However, our supreme court, in People v. Lear,
175 Ill. 2d 262, 270 (1997), held that this issue is a matter of
trial strategy and virtually unchallengeable. Under the
circumstances revealed in this record, we cannot say that
counsel's conduct was not tactical or a matter of jury selection
strategy. See People v. Metcalfe, 202 Ill. 2d 544, 562 (2002).

The record shows that during voir dire, defense counsel
excused five prospective jurors, and also objected to seating the
juror who lived six miles from the crime scene. See Metcalfe,
202 Ill. 2d at 562. The record also shows that the gang evidence
introduced at trial was limited to explaining motive and no
litany of witnesses discussing gang rivalry or gang territory was
presented. It was thus plausible for counsel to reasonably
conclude that probing into gang bias would have served to unduly

# EXHIBIT School #1

## CONSUELLA B. YORK ALTERNATIVE HIGH SCHOOL PROGRESS REPORT

Name _JOSE VIDAURRI_

Division # _10_    Grade _11_

Entry Date _1/9/00_

BOE # _283 45984_

Division Teacher _BULGER_

Exit Date ____

|  | Instructor | 1st Qtr | 2nd Qtr | 3rd Qtr | 4th Qtr | Sum Qtr |
|---|---|---|---|---|---|---|
| Language Arts | WEED | B | B | | | |
| Mathematics | BEECHER | B+ | A | | | |
| Social Studies | BULGER | A | A | | | |
| Science | SCHMIDT | A | A | | | |
| Vocational Education | BROWN | B | B | | | |
| Physical Education | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Total Days Membership | 43 | 44 | | | |
| Total Days Attendance | 46 | 41 | | | |
| Total Days Absence | 2 | 3 | | | |

# EVENING HIGH SCHOOL GRADE REPORT

(PLEASE PRINT FIRMLY SO ALL COPIES ARE LEGIBLE.)

YORK     Evening High School

Student's Name Vidaurri    Jose     MI
Last      First

Student I/D No. 2 8 3 4 5 9 8 4

Date of Birth 8 / 13 / 80
Month   Day   Year

Guardian's Name Jenny Vidaurri

Address 1811 W. Superior

Home Phone ( ) 486-4058   Emergency Phone ( )

Unit # 1730
Room 0187    Session Time _____ P.M.

Circle day(s) session meets   M (T) W (Th) F S

Home H. S. YORK     Unit No. 1730

Course Title: Algebra      Semester (1) or 2    Course # 41800

_Circle_

| Days absent ____ Date, if dropped _____ | Days absent ____ Date, if dropped _____ |
| **Semester Mid-Term Grade** | **Quarter or Semester Final Grade** F |

_____
Evening School Teacher / Mid-Term

_____
Evening School Teacher / Final

_____
Evening School Principal / Mid-Term

_____
Evening School Principal / Final

_____ 200__
Date

_____ 200_
Date

**DISPOSITION OF COPIES**
WHITE - Evening High School Permanent Record
GREEN - Student / Mid-Term Semester Grade Report
CANARY - Home High School / Mid-Term Semester Grade Report
PINK - Student / Final Grade Report
BLUE - Home High School / Final Grade Report

---

Check if student is enrolled in more than one class. ☒ **EXHIBIT School # 3**    CHICAGO PUBLIC SCHOOLS

# EVENING HIGH SCHOOL GRADE REPORT

(PLEASE PRINT FIRMLY SO ALL COPIES ARE LEGIBLE.)

YORK     Evening High School

Student's Name Vidaurri    Jose     MI
Last      First

Student I/D No. 2 8 3 4 5 9 8 4

Date of Birth 8 / 13 / 80
Month   Day   Year

Guardian's Name Jenny Vidaurri

Address 4321 West Parker

Home Phone (773) 486-4058   Emergency Phone ( )

Unit # 1730
Room 9     Session Time 4-7 P.M.

Circle day(s) session meets   M T (W) Th (F) S

Home H. S. YORK     Unit No. 1730

Course Title: English 2      Semester 1 or 2    Course # 11520

_Circle_

| Days absent ____ Date, if dropped _____ | Days absent ____ Date, if dropped _____ |
| **Semester Mid-Term Grade** | **Quarter or Semester Final Grade** F |

_____
Evening School Teacher / Mid-Term

_____
Evening School Teacher / Final

_____
Evening School Principal / Mid-Term

_____
Evening School Principal / Final

_____ 200__
Date

_____ 200_
Date

**DISPOSITION OF COPIES**
WHITE - Evening High School Permanent Record
GREEN - Student / Mid-Term Semester Grade Report
CANARY - Home High School / Mid-Term Semester Grade Report
PINK - Student / Final Grade Report
BLUE - Home High School / Final Grade Report

EXHIBIT GED #1

# ILLINOIS STATE BOARD OF EDUCATION
# High School Equivalency Certificate



THIS IS TO CERTIFY THAT

*JOSE R. VIDAURRI*

has successfully completed the requirements of the High School Level Tests of
General Educational Development and other State requirements, promulgated
by the Illinois State Board of Education, as authorized by the statutes of the State of Illinois.

In recognition of such achievement and as evidence of such entitlement,
within the County of Cook, I hereunto set my hand

this 27th day of March 20 01

Roz Petrilli
*State Administrator*
*GED Testing Program*

Glenn W. McGee
*State Superintendent of Education,*
*Illinois State Board of Education*

# *** C O N G R A T U L A T I O N S ***

 SCORE REPORT FOR THE

## GENERAL EDUCATIONAL DEVELOPMENT TESTS

administered by the Cook County GED Testing Program

### Student Information

Name:    JOSE R. VIDAURRI
Address: 4912 SOUTH LAMON
         CHICAGO, IL  60638

Date of Birth:   08/13/1980
Social Security #: 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

(If any of your personal information listed above is incorrect please contact our office)

| TEST NO. | NAME OF TEST SECTION | FORM TAKEN THIS DATE | TEST DATE | Scored on this date | High Score to date |
|----------|---------------------|----------------------|-----------|---------------------|--------------------|
| TEST 1 | WRITING SKILLS | AO | 03/14/2001 | 47 | 47 |
| TEST 2 | SOCIAL STUDIES | AO | 03/14/2001 | 54 | 54 |
| TEST 3 | SCIENCE | AO | 03/14/2001 | 56 | 56 |
| TEST 4 | LITERATURE & ARTS | AO | 03/14/2001 | 53 | 53 |
| TEST 5 | MATHEMATICS | AO | 03/14/2001 | 51 | 51 |

TOTAL STANDARD SCORE . . . . . . . . . . . . . . . . . . . . 261
PASSED ILLINOIS CONSTITUTION TEST . . . . . . . Yes
**ELIGIBLE FOR GED CERTIFICATE** . . . . . . . . . **YES**

Based on your highest GED scores to date you  <DO QUALIFY>  for a GED/Illinois High School Equivalency Certificate.

> In Illinois, you must meet all (3) requirements listed below before you can obtain your GED/High School Equivalency Certificate:
> - A minimum Standard Score on each test of 40
> - A minimum Total Standard Score of 225
> - Passing of the Illinois/ U.S. Constitution Test

If you have previously taken the GED Test and you scored higher this time, the higher scores replaced the lower scores in the section(s) you scored higher in. You are entitled to one free transcript which will reflect your highest scores and which will show that you have passed the test. You may want to have this sent to an employer or school. If you have any questions you can contact our office at 1-847-328-9795.

EXHIBIT LL #1

# Outreach
# Christian School

## CERTIFICATE OF EDUCATION

Educational Ministry of Chicagoland Prison Outreach

*Presented To* Jose Vidaurri

*In Recognition of Having Met The Requirements*

*To Pass* Math 1

Additional Information Is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

_____
Dennis Raatjes, Director of Education

_____
Dan Swets, Executive Director

Max. 2536




Illinois Coalition of Nonpublic Schools
Christian Schools International

Chicagoland Prison Outreach

EXHIBIT LL #2



# Outreach
# Christian School

Educational Ministry of Chicagoland Prison Outreach

## CERTIFICATE OF EDUCATION

*Presented To Jose Vidaurri*

*In Recognition of Having Met The Requirements*

*To Pass Math 2*

Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473

Additional Information Is Available By Contacting

Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

*Dennis Raatjes*
Dennis Raatjes, Director of Education

*Dan Swets*
Dan Swets, Executive Director


Christian Schools International


Illinois Coalition of Nonpublic Schools


Chicagoland Prison Outreach

Hun. 2536

EXHIBIT LL #3

# Outreach Christian School

## CERTIFICATE OF EDUCATION

Educational Ministry of Chicagoland Prison Outreach

*Presented To Jose Vidaurri*

*In Recognition of Having Met The Requirements*

*To Pass Math 3*

Additional Information Is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

Dennis Raatjes, Director of Education

Dan Swets, Executive Director



Christian Schools International

Illinois Coalition of Nonpublic Schools





Chicagoland Prison Outreach

EXHIBIT LL # 4



# Outreach
# Christian School

### CERTIFICATE OF EDUCATION

Educational Ministry of Chicagoland Prison Outreach

*Presented To Jose Viduarri*

*In Recognition of Having Met The Requirements*

*To Pass Reading 1*

Additional Information Is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

Dennis Raatjes, Director of Education

Dan Swets, Executive Director



Illinois Coalition of Nonpublic Schools

**Christian Schools International**



Chicagoland Prison Outreach

Max. 1536

EXHIBIT LL #5

# Outreach Christian School

## CERTIFICATE OF EDUCATION

Educational Ministry of Chicagoland Prison Outreach

*Presented To Jose Vidaurri*

*In Recognition of Having Met The Requirements*

*To Pass Reading 2*

Additional Information Is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

Dennis Raatjes, Director of Education

Dan Swets, Executive Director







Illinois Coalition of Nonpublic Schools

Christian Schools International

EXHIBIT LL # 6



# Outreach
# Christian School

Educational Ministry of Chicagoland Prison Outreach

## CERTIFICATE OF EDUCATION

*Presented To* **Jose Vidaurri**

*In Recognition of Having Met The Requirements*

*To Pass Bible Level 3*



Additional Information is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

Dennis Raatjes, Director of Education

Dan Swets, Executive Director



Illinois Coalition of Nonpublic Schools

Christian Schools International

Chicagoland Prison Outreach

EXHIBIT 77 #7

# Outreach Christian School

## CERTIFICATE OF EDUCATION

Educational Ministry of Chicagoland Prison Outreach

*Presented To Jose Vidaurri*

*In Recognition of Having Met The Requirements*

*To Pass Bible Ia*

Additional Information Is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools



Dennis Raatjes, Director of Education

Dan Swets, Executive Director



Christian Schools International

Illinois Coalition of Nonpublic Schools

Chicagoland Prison Outreach

EXHIBIT LL # 8

# Outreach
# Christian School

## CERTIFICATE OF EDUCATION

Educational Ministry of Chicagoland Prison Outreach

*Presented To Jose Viduarri*

*In Recognition of Having Met The Requirements*

*To Pass Bible 4b*

Additional Information Is Available By Contacting
Chicagoland Prison Outreach at P.O. Box 63, South Holland, IL 60473
Outreach Christian School Is A Member Of Christian Schools International and Illinois Coalition of Nonpublic Schools

Dennis Raaijes, Director of Education

Dan Swets, Executive Director


Christian Schools International

Illinois Coalition of Nonpublic Schools


Chicagoland Prison Outreach

Matt. 25:36

EXHIBIT LL #9



# DIVISION X, COOK COUNTY JAIL
## LIFE LEARNING DORM PROGRAM
### CERTIFICATE OF GRADUATION

## CLASS OF 2001 - 02

Presented to _____ Jose Vidaurri _____

*In Recognition of Completing The Requirements of*
*Division X Life Learning Dorm Program*



L.V. COLLIER, SUPERINTENDENT, DIV. X

MAY 29, 2002

DR. SUK HUN LEE, CHAPLAIN, DIV. X

MATTHEW 28:18-20

1    A    He mentioned to me -- I got them confused

2    which girlfriend he was talking about.

3    Q    In other words, you knew going into the

4    videotape that he had two girlfriends?

5    A    Yes.

6    Q    But for some reason it was important to you

7    to state on the videotape that he had two girlfriends.

8         Is that correct?

9    MR. DI BENEDETTO:  Objection, Judge.

10   THE COURT:  Sustained.

11   MS. FITZSIMMONS:  Q    Now in that one and a half

12   hour conversation before you ever got to this stage,

13   Mr. Vidaurri told you that he was afraid, didn't he?

14   A    That he was afraid of the police, yes.

15   Q    Well, he told you that he was afraid of more

16   than the police, didn't he?

17   A    He told me that he was afraid of the police

18   and that's why he made up an alibi.

19   Q    Didn't he tell you that he was afraid of what

20   would happen to him if he told you the truth about

21   what happened that night?

22   A    Yes.  And he said that in the video.

23   Q    In his explanation of what happened in the

24   van on January 8th and 9th he told you and I'm talking

P258

1    statement and wanted to cooperate.

2         Q    Well, the topic, the very last thing he

3    wanted to talk about was the fear that he had of his

4    own life?

5         A    That's correct.

6         Q    Nothing further.

7         MR. DI BENEDETTO:  One question, Judge.

8                   RE-DIRECT EXAMINATION

9                            BY

10                    MR. DI BENEDETTO

11        Q    Counsel asked you about the oral interview at

12   approximately 5:30 not being videotaped.

13             Why wasn't the first interview videotaped,

14   sir?

15        A    In order to videotape you have to fill out

16   the paperwork.  You have to execute the consent form

17   and you have to order someone or make, put in a

18   request to have a videotape person come out there.

19             Obviously you can't do that without talking

20   to him first.

21             First, I talked to him and we did the oral

22   and did the video afterwards.

23        Q    Nothing else, Judge.

24

1       THE COURT:  Sustained.

2       MS. FITZSIMMONS:  Q    Now Mr. DiBenedetto asked

3   you if the state's attorney gave you a quick summary.

4           Right?

5       A    That's correct.

6       Q    You were present during the conversations

7   that led up to People's 18.

8           Correct?

9       MR. DI BENEDETTO:  Objection, your Honor.

10          Asked and answered.

11      THE COURT:  Sustained.

12      MS. FITZSIMMONS:  Q   It was explained to Mr.

13  Vidaurri what was going to be happening during the

14  videotaping.

15          Correct?

16      MR. DI BENEDETTO:  Objection, your Honor.

17      THE COURT:  Overruled.

18      A    Yes.  That's correct.

19      MS. FITZSIMMONS:  Q   And Mr. Vidaurri's responses

20  were responsive to whatever information you and Mr.

21  Blakey were giving him.

22          Correct?

23      A    Well, he was told that he would be asked

24  questions and that he would have to respond to those

 1  questions during the video.

 2       Q    And either you or Mr. Blakey or both of you

 3  explained to him the subject matter of People's 18.

 4       Right?

 5       MR. DI BENEDETTO:  Objection.

 6       A    No.

 7       MR. DI BENEDETTO:  Objection.

 8       Beyond the scope.

 9       THE COURT:  Overruled.

10       A    No, Ma'am.  The state's attorney, Blakey,

11  explained to Mr. Vidaurri that everything that he had

12  told us in our interview prior to the video he wanted

13  him to repeat during the video.

14       MS. FITZSIMMONS:  Q    Was there any question in

15  your mind as you all started out to tape this that Mr.

16  Vidaurri didn't get what it was that you were going to

17  be talking about?

18       A    He, to the best of my recollection he always

19  understood everything that we explained to him or that

20  he told us.

21       Q    Nothing further.

22       MR. DI BENEDETTO:  Nothing based on that.

23       THE COURT:  You're excused, Detective Garcia.

24       Ladies and Gentlemen, we're going to take a

1      Q    And it was going to take some time?

2      A    Yes.

3      Q    In fact, it did take some little time?

4      A    That's right.

5      Q    You explained to Mr. Vidaurri you were going

6 to go into a different room for the videotaping?

7      A    That's correct.

8      Q    You told him the room was going to be over

9 there in Area 4?

10     A    It is.  Yes.

11     Q    That's what you told Mr. Vidaurri?

12     A    Yes.

13     Q    You told Mr. Vidaurri that you were going to

14 be explaining things and asking questions of him and

15 that he in turn could explain things to you.

16           Correct?

17     A    I didn't say that I was explaining things.  I

18 told him just like during our oral interview during

19 the videotape I would ask him questions and he would

20 answer in any way he wanted.

21     Q    So you didn't tell Mr. Vidaurri that you were

22 going to review some of the facts as he had told them

23 to you?

24           You didn't tell him that?

1      A    No.  I said we were going to go over the

2    statement just like we had in the oral statement.

3      Q    You didn't tell him that you were going to be

4    explaining to him that he had already told you that on

5    January 9, 2000 at around, you didn't explain that you

6    were going to be doing that?

7      A    I explained to him what would happen in the

8    videotaped statement which would be I would go over

9    the consent that we had.  I would talk about the oral

10   that we had and then we would have the question and

11   answer period just like we did in the oral statement.

12      Q    So you told him that you were going to review

13   the facts as you did on the video?

14      A   As to the summary of the oral statement?

15           Is that what you're referring to?

16      Q   Yes.

17           You told him you were going to do that?

18      A    Yes.

19      Q    In fact you did do that?

20      A    Yes.

21      Q    You didn't do that because you thought he

22   didn't understand what the subject matter of the

23   videotape was, did you?

24      A   Are you asking me why I summarized it?

1

2          My question to you is you didn't say all that

3     to him in the video tape because you thought going

4     into it that Jose Vidaurri did not know what you were

5     going to be talking about, did you, sir?

6          A    I don't understand the question.

7               You're asking me why I summarized?  It's

8     oral.

9          Q    My question to you, sir, is did you think

10    Jose Vidaurri knew what it was you all were talking

11    about?

12         A    Yes.  He knew what we were talking about.

13         Q    You believe he understood that going into the

14    videotape?

15         A    Yes.  He understood what it was and that's

16    what he told me.

17         Q    Yet you felt it necessary to play in essence

18    the facts that he was about to tell you.

19              Correct?

20         A    I summarized the oral.  Yes.

21         Q    Now you determined what questions got asked.

22              Correct?

23         A    I framed the questions.

24              Yes.

1      Q    And you determined what questions did not get

2    asked?

3      A    No.  I determined the questions based on the

4    statement that he told me, which is why I write notes

5    in the first place.

6           Unlike the defendant, I wasn't there that

7    night.  So in order to remember what happened I had to

8    write notes to myself to make sure he told me

9    everything he told me.

10      Q    You wanted to go in a certain order, didn't

11    you, sir?

12      A    I wrote in a chronological order.

13      Q    You picked the order that you asked the

14    questions?

15      A    That's the same order the defendant chose

16    when he explained it to me.

17           He explained it to me chronologically.

18    Therefore, that's the way I asked the questions.

19      Q    You chose how to ask the questions?

20      A    Yes.

21    MR. DI BENEDETTO:  Objection.

22    THE COURT:  The answer will stand.

23    MS. FITZSIMMONS:  Q  You asked questions about

24    other than the events surrounding the death of

```
 1        Q     Juan told Jose and Jose Vidaurri followed
 2   Juan's instructions?
 3        A     Yeah.  I guess.
 4        Q     He received those instructions numerous
 5   times.
 6              Correct?
 7        A     I don't know a lot, but I know he was telling
 8   him.
 9        Q     How many times was he told, the defendant
10   told to keep driving, keep following the car?
11        A     A couple times.  I know that, I'm not saying
12   20, 30 times, but he was telling him.
13        Q     Did he also tell Mr. Vidaurri to drive
14   faster?
15        A     He was like go get 'em, catch up to them.  So
16   I'm figuring yes.
17        Q     You never saw Jose with a gun that night?
18        A     No.
19        Q     You never saw Jose give Juan a gun that
20   night?
21        A     No.
22        Q     You never saw Jose give Vera a gun that
23   night?
24        A     No.
```

X    P56

```
 1    already, Pelon already had his out.

 2         MS. FITZSIMMONS:  Objection to what he guesses.

 3         THE COURT:  Overruled.

 4         A    And shot a couple times.

 5         MR. HOLMES:  Q  Who shot a couple times first?

 6         A    I can't tell who shot first, but I know Pelon

 7    and Porky.

 8         Q    Juan Ocon and Pelon shot?

 9         A    Yes.

10         Q    And Porky shot?

11         A    Yes.

12         Q    Jose Vidaurri didn't shoot?

13         A    No.

14         Q    You didn't see him with any gun, did you?

15         A    No.

16         Q    Were you saying anything to Jose Vidaurri

17    while the whole chase was going on?

18         A    Just, I was just yelling to the front, you

19    know, just forget about it since the car was kind of

20    further away from us.

21         Q    You were telling him to stop?

22         A    Yes.

23         Q    How many times?  If you know, how many times

24    did Juan Ocon fire his gun?
```

Never said it to grand jury and it's not in his statement

P91.

1       A    No.

2       Q    You never saw a gun in Jose Vidaurri's hand,

3  did you?

4       A    No.

5       Q    You never saw Jose Vidaurri give Ocon a gun,

6  did you?

7       A    No.

8       Q    You never heard him say he gave Ocon a gun

9  that night, did you?

10      A    No.

11      Q    You never heard Jose Vidaurri say he knew Mr.

12  Vera had a gun that night, did you?

13      A    No.

14      Q    You never heard Jose Vidaurri tell Juan Ocon

15  to shoot at that car, did you?

16      A    No.

17      Q    Did you ever hear Jose Vidaurri tell Mr. Vera

18  to shoot at that car?

19      A    No response.

20      Q    Did you?

21      A    No, I did not.

22      Q    You testified here today that you told Mr.

23  Vidaurri to stop chasing the car.

24          Is that your testimony?

1       Q     You were a gang member yourself?

2       A     Yes.

3       Q     You as a gang member have disrespected other

4  gangs in the past?

5       MR. HOLMES:  Objection, Judge.

6       THE COURT:  Sustained.

7       MS. SCHILLING:  Q  And you indicated this chase

8  took place down Erie to Ashland to Jackson?

9       A     Correct.

10      Q     And you remained in the rear passenger side

11  of the van the whole time?

12      A     Yes.

13      Q     And you heard voices inside the van.

14  Correct?

15      A     Yes.

16      Q     You never once heard Jose tell Juan to shoot

17  that gun, did you?

18      A     I didn't hear him say nothing, no.

19      Q     You only heard Jose tell Juan to keep

20  driving?

21      A     I heard Juan tell Jose.

22      Q     I'm sorry.  You heard Jose told Juan to keep

23  driving?

24      A     Juan told Jose.

```
1        Q    You never heard Jose tell Vera to shoot the
2   car, at the car?
3        A    No.
4        Q    You never heard Jose tell Juan to shoot at
5   that car?
6        A    No.
7        Q    You indicated that a few days after the
8   shooting you went down to Area 4?
9        A    They came and got me, yes.
10       Q    So they came and picked you up?
11       A    Right.
12       Q    What time of the morning did they pick you
13  up?
14       A    About three o'clock, four o'clock in the
15  morning.
16       Q    Did anybody accompany you to the police
17  station?
18       A    Yes.
19       Q    Who went with you?
20       A    The detectives came and got me.  But I went
21  by myself.
22       Q    After the shooting on January 9th you didn't
23  tell anybody about the shooting, did you?
24       A    The next day I did.              D-28
```

P57

1    Isn't that true?

2    A    As far as?

3    Q    This case?

4    A    No.

5    Q    When you were in the vehicle, the van I

6    should say, on January 8th leading into January 9th

7    there was no conversation amongst you in the van about

8    going out and shooting anybody that night?

9    A    No.

10    Q    You were there to drink and smoke pot?

11    A    Just to party.

12    Q    Just to party.  And that included drinking

13    and smoking pot?

14    A    Right.

15    Q    I have nothing further, your Honor.

16    MS. FITZSIMMONS:  Just a minute.

17    MS. SCHILLING:  Nothing further, your Honor.

18    MR. HOLMES:  Just one question, Judge.

19                    RE-DIRECT EXAMINATION

20                            BY

21                       MR. HOLMES

22    Q    Who did you tell the next day about the

23    shooting?

24    A    Onyx Santana.

1      A      Yep.

2      Q      Is that a yes?

3      A      Yes.

4      Q      Were you smoking your pot in a pipe or by a

5  joint?

6      A      By a joint.

7      Q      How many joints did you have before you got

8  into the van?

9      A      Probably one, maybe two.

10     Q      When you got into the van did you begin

11  smoking more pot?

12     A      No.

13     Q      Did you begin to drink in that van?

14     A      Yes.

15     Q      When you got into the van at 10:30 you got

16  into the van to smoke pot and party with your friends.

17         Correct?

18     A      Yes.

19     Q      When you got into the van at 10:30 you didn't

20  hear Juan Ocon say they were hunting for rival gang

21  members, did you?

22     A      No.

23     Q      You didn't hear Jose Vidaurri say he was

24  hunting for rival gang members, did you?

1        THE COURT:  Overruled.  Did you?

2        THE WITNESS:  Oh, I'm sorry.

3        THE COURT:  Answer the question.

4    BY MS. FITZSIMMONS:

5        Q    Did you use any -- did you use the person you

6    were looking for's nickname when you were talking to

7    the cousin?

8        A    No, ma'am.  I do not know him by nickname.

9        Q    Now, you say you had met Mr. Vidaurri the day

10   before?

11       A    Correct.

12       Q    How -- what were the circumstances in which

13   you met Mr. Vidaurri?

14       A    Mr. Vidaurri was on one of two streets,

15   either Throop or Elizabeth; I'm not too sure exactly

16   of the address.  He was -- there was a party for this

17   woman named Vanessa, not Vanessa his girlfriend, but

18   it was Vanessa's birthday.  And we had stopped seeing

19   somebody else who was wanted on a warrant, and he was

20   standing out in front.  We saw him out in front of

21   this building in which there was a party.

22       Q    And you told the judge you met him?

23       A    That's correct.

24       Q    Well, how did it happen that you met him?

1      A    Well, we were -- when we approached, there

2    was a smell of narcotics; and so we were taking down

3    people's names.

4      Q    When you say taking down their names, you

5    mean putting them on contact cards or something?

6      A    Right, just contact cards.

7      Q    And so then when you heard that a detective

8    was looking for someone named Jose Vidaurri, you

9    remembered the incident from the day before, is that

10   right?

11     A    That's right.

12     Q    And you went to look at the contact cards, is

13   that correct?

14     A    Correct.

15     Q    Do you still have that contact card?

16     A    No, ma'am.  I turned them in.  I think they

17   are saved for six months.

18     MS. FITZSIMMONS:  Nothing further.

19     MR. HOLMES:  No further questions, your Honor.

20     THE COURT:  You're excused, Officer Rubino.

21     MR. HOLMES:  Judge, I'd ask that People's No. 1,

22   the Consent, be admitted into evidence.  And with that

23   I would rest.

24     THE COURT:  People's 1.

1          Q      When Erica was brought back to Area 4 did you

2     have a chance to be present with her at Area 4?

3          A      Yes, I was.

4          Q      And briefly at approximately 8 o'clock in the

5     evening was anything prepared with respect to Erica?

6          A      Yes.

7          MS. FITZSIMMONS:  Objection, your Honor.

8          THE COURT:  Sustained.

9          MR. DI BENEDETTO:  Q.    You were present for a

10    meeting with Erica at approximately 8 o'clock that

11    evening.

12               Correct?

13         A      Yes, I was.

14         Q      Moving your attention a little bit forward

15    now to approximately 9:30 in the evening on January

16    14th of 2000, were you still at Area 4?

17         A      Yes, I was.

18         Q      Did you have a chance to meet with the

19    defendant again?

20         A      Yes, I did.

21         Q      Where did this meeting occur, sir?

22         A      We then had a meeting first in the interview

23    room and then into the video room.

24         Q      When you say you went to the video room, was

1    THE COURT: Bring out Mr. Vidaurri.

2          With regard to the matter on trial, the

3    defendant is present with his attorneys and the

4    state's attorneys are also present.

5          Miss Fitzsimmons, is the Defense going to be

6    presenting any evidence today, this morning?

7    MS. FITZSIMMONS: Your Honor, I'm going to ask the

8    Court to strike the identification numbers on Vidaurri

9    2, 3, 4, and 5 and move those into evidence and that

10   will be it.

11   THE COURT: What are those exhibits again? May I

12   see those?

13   MS. FITZSIMMONS: Our number 1 was a transcript of

14   the video taped statement. I'm not offering that into

15   evidence.

16   THE COURT: Do you want to say anything, Mr.

17   Holmes?

18   MR. HOLMES: No, Judge.

19   THE COURT: Okay. They are received.

20   MS. FITZSIMMONS: And at the close of the evidence

21   Mr. Vidaurri will be asking the Court again to grant

22   him a directed finding of not guilty on all 3 counts.

23   THE COURT: When we broke yesterday you said you

24   wanted to determine whether or not Mr. Vidaurri is

Q-3

1    shortly.

2                              (The following proceedings

3                              were had in chambers:)

4        MS. FITZSIMMONS:  Judge, I have a for cause.

5        THE COURT:  Wait until he closes the door.

6            They get them first, then you can give me

7    your causes and peremptories after that.  Next time

8    you'll get them first.

9        MS. FITZSIMMONS:  Okay.  I thought you would do

10   the causes first.  Can we talk to Mr. Vidaurri for a

11   minute?

12       THE COURT:  Sure.

13       MR. HOLMES:  Judge, I would make a motion for

14   cause as to Frank Vigilante.

15       MS. FITZSIMMONS:  I'll join in that, Judge.

16       THE COURT:  He's excused for cause based upon his

17   answers to the Court.

18       MR. HOLMES:  We would excuse Miss Foreman and Miss

19   Antonopoulos.  Do you want me to pull those cards out,

20   Judge?

21       THE COURT:  Yes, please.

22       MS. SCHILLING:  Spell the first name of

23   Antonopoulos.

24       MR. HOLMES:  V-a-s-i-l-i-k-i.

File Date: _____8-26-2008_____

Case No: _____08 cv 3665_____

ATTACHMENT # _____

EXHIBIT ____F to G_____

TAB (DESCRIPTION)
_____

ORIGINAL

## 1 0 4 1 9 8

NO. _____

### IN THE

### SUPREME COURT OF ILLINOIS

| | | |
|---|---|---|
| People State of Illinois, | ) | Appellate Court, |
| | ) | First District |
| Respondent | ) | No.    1-05-2051 |
| | ) | |
| v. | ) | Circuit Court, |
| | ) | Cook County |
| Jose Vidaurri, | ) | No.    00 CR 8905 |
| | ) | |
| Petitioner | ) | Hon. Joseph G. Kazmierski, |
| | ) | Judge Presiding. |

### PETITION FOR LEAVE TO APPEAL

FILED

FEB 2 2 2007

**SUPREME COURT
CLERK**

Jose Vidaurri
Reg. No. R-15606
Stateville Correctional Center
P. O. Box 112
Joliet, Illinois  60434

R-115606
RH ......... 610737

EXHIBIT F

No.

IN THE

SUPREME COURT OF THE STATE OF ILLINOIS

| PEOPLE OF THE STATE OF ILLINOIS, )  Plaintiff-Appellee,    )  )  vs.    )  )  Jose Vidaurri,    )  Defendant-Appellant-Petitioner. )  )  ) | Petition for Leave to Appeal from the Appellate Court of Illinois, First Judicial District, No. 1-05-2051  There heard on Appeal from the Circuit Court of Cook County, Illinois, No. 00 CR 8905(03).  HONORABLE Joseph G. Kazmierski, Judge Presiding. |
|---|---|

## PETITION FOR LEAVE TO APPEAL

TO THE HONORABLE JUSTICES OF THE SUPREME COURT OF THE STATE OF ILLINOIS:

May It Please The Court:

## PRAYER FOR LEAVE TO APPEAL

Your Petitioner, Jose Vidaurri, pro se, hereby respectfully petitions this Honorable Court for leave to appeal, pursuant to Supreme Court Rules 315 and 612, from the judgment of the Appellate Court of Illinois, First Judicial District, affirming his conviction for first degree murder and attempt first degree murder and his sentence of consecutive terms of 35 years and 10 years imprisonment.

## OPINION AND PROCEEDINGS BELOW

On July 10, 2002, Petitioner was found guilty of first-degree murder and attempt first-degree murder. Petitioner was subsequently sentenced to 35 years and 10 years to be served consecutively. He appealed this conviction to the Illinois Appellate Court, First District. On April 26, 2004 the court delivered its opinion in said appeal, affirming the judgement of conviction and sentence. No Petition for Rehearing was filed. On April 27, 2004, an affidavit of Intent to File Petition for Leave to Appeal was filed. Leave to appeal was filed and denied.

Petitioner filed a pro se Post-Conviction Petition on March 10, 2005, and was denied by the Circuit Court of Cook County on May 11, 2005. Petitioner filed a timely notice of Appeal on June 3, 2005. Petitioner appealed the summary dismissal of his post-conviction petition to the Illinois Appellate Court, First District. On November 6, 2006 the court delivered its opinion in said appeal, affirming the judgement and dismissal. Petition for Rehearing was filed, and denied on January 9, 2007.

## POINT RELIED UPON FOR REVERSAL

"Traditionally, courts have not reviewed an attorney's
choices when made on the basis strategic considerations. However,
these strategic decisions may be made only after there has been
a "thorough investigation of all matters relevant to plausible
options." Strickland,466 U.S. at 690;and People v. Whittaker,557
N.E.2d 468 (1990).

The 6th Amendment of the United States Constitution
guarantees the right of effective assistance of counsel in
criminal prosecutions. It is therefore axiomatic, that under both
the U.S. Const. and Ill. Const., a defendant in a criminal case
has a right to the effective assistance of counsel. Please see,
Strickland v. Washington,466 U.S. 668 (1984); Mc Mann v. Richards
397 U.S. 759 at 771 (1970) (holding, 6th amendment right to
counsel is right to effective assistance of counsel."). See,
People v. Garza,535 N.E.2d 968 (1989); and People v. Albanese,
473 N.E.2d 1246 (1984). The "benchmark" in determining whether
there has been ineffective assistance of counsel is "Whether
counsel's conduct so undermined the proper functioning of the
adversarial process that the trial cannot be relied on as having
produced a just result." Strickland,466 U.S. at 686.

The Illinois Constitution requires that every sentence
take into account the objective of Rehabilitating the offender
to useful citizenship. Ill. Const., art.I, sec.11; Steffens,131
Ill.App.3d at 151.

## STATEMENT OF FACTS

Jose Vidaurri was convicted by a jury of the first degree murder of Dauntrez Snowden and the attempt murder of Nicholas Mobley, for driving a van that was involved in a shooting. Mr. Vidaurri was sentenced to thirty-five years' incarceration for the murder and ten years' consecutive incarceration for the attempt murder.(TR S18).

The Appellate Court of Illinois, First District, affirmed Mr.Vidaurri's convictions on direct appeal. **People v, Vidaurri, No. 1-02-3718 (Rule 23 order, April 26,2004).** The Appellate Court of Illinois, First District, also affirmed the Circuit Court's summary dismissal of Mr.Vidaurri's first pro se petition for Post-Conviction relief. **People v. Vidaurri, No. 1-05-2051 (Rule 23 order, November 6,2006).** The present Leave to Appeal relates to the Circuit Court's summary dismissal of Mr.Vidaurri's first pro se Post-Conviction petition in it's entirety as frivolous and without merit, and the Appellate Court of Illinois' affirming the dismissal.

## THE TRIAL

The evidence at trial indicated that for several hours during the night of January 8,2000 and early morning hours of January 9,2000; Jose Vidaurri, drove a van belonging to Fransico Rodriguez.(TR P35,P37,P81). Inside the van were Mr.Vidaurri, Rodriguez, Juan Ocon, Benjamin Pienero, Alvaro Vera, David Niera and William Solis.(TR P34). The people in the van were drinking and smoking marijuana, just parting.(TR P38,P51-52,P60,P99). All of the van riders were members of a street gang.(TR P34-35). Ocon and Vera were charged as the shooters in this crime, and the remaining passengers were not charged with any crime relating to this incident. Van passengers Niera and Solis testified as eye-witnesses for the state, as did the three survivijng passengers in the car that was shot at.

By all accounts, at about 12:15 a.m., the van pulled up next to a car, and atleast one van rider "represented", or Flashed gang signs to the people in the car, showing what gang he was in and showing disrepect for rival gangs. (TR P39-41,P86-87, P108,P137). According to Niera, Mr.Vidaurri represented from the driver's seat and Ocon represented from the front passenger seat of the van. (TR P35-36,P39-41). However Mr.Niera was seated in the far back bench on the passenger's side on the end. (TR P36-37). Mr.Solis had a far better view right up the middle of the van to the front of the van, as he was sitting in the middle of the far back bench. (TR P36). According to Solis, Ocon represented from the front passenger seat, and Pienero, who was sitting in a captain's chair behind Ocon, represented with Ocon, while Mr.Vidaurri, who was driving, leaned forward to look into the car, not representing any gang signs. (TR P35-36,P87-88). The surviving car passengers all testified that when the van pulled up, they only saw one person step out onto the van's passenger side running board to flash hand signals. (TR P108,P117,P137,P150). None of the car passengers ever saw Mr.Vidaurri. (TR P117,P140,P155). According to Niera and Solis, before the gang signals were flashed, there was no discussion about shooting anyone or hunting for rival gang members. (TR P60,P99). Niera and Solis did not see Mr.Vidaurri with a gun that night, never saw Mr.Vidaurri give anyone a gun that night, never heard any discussion indicating that Mr.Vidaurri knew that Ocon or Vera had a gun. (TR P46,P56,P91,P100). Snowden was fatally shot in the abdomen, and Mobley was shot in the leg and the foot. (TR P68,P114).

The car was occupied by Dauntrez Snowden, William Peppers, Delbert Guy, and Nicholas Mobley. (TR P104,P135,P148). After the four individuals saw someone on the van's running board flash hand disgnals at them, they drove away quickly in an attempt to get away from the van. The car made a right on Ashland, the van followed them, and they fled, running a red light. The car then

made aleft on Jackson.(TR P109-110,P138-139,P151-152). According
to van occupants Niera and Solis, during this chase, Ocon was
urging Mr.Vidaurri to follow the car and Mr.Vidaurri never said
anything.(TR P40,P43,P55-56,P89). According to Niera and Solis,
during this chase they did not see anyone with a gun.(TR P45,
P89,P90-91).

       Snowden slowed the car briefly on Jackson, a one way street
going east, to try to help Peppers find a cellular phone so they
could call the police.(TR P110,P131,P139). When the car slowed,
then the van approached the car on it's driver side.(TR P111,P139,
140,P153). Jackson is a one way street going east with (3) lanes,
the car was all the way in the right lane and the van was behind
the car. In order for the van to pass the car, the van had to get
into the middle lane.(TR P152). When the pulled into the middle
lane, Ocon began shooting out of the passenger side front window,
while Vera shot from an open door on the passenger of the van.
(TR P45,P90-91). According to Niera and Solis, they never once
heard Mr.Vidaurri tell Ocon or Vera to shoot any guns at any car.
(TR P57,P100). According to van occupants Niera and Solis, Mr.
Vidaurri parked the van a block or two away in an open parking
lot on Jackson and went his seperate way.(TR P47). Snowden was
fatally shot in the abdomen, and Mobley was shot in the leg and
the foot.(TR P86,P114).

       After the shooting, Mobley and Guy went to the police station
and assisted in creating a composite sketch of the van and one of
the shooters.(TR P115-116,P142-143). Detective Climack testified
that the following day, he learned the van had been located.
Mobley and Guy both identified the van.(TR P116,P143,P161-162).
They also tentatively misidentified a person who had not been in
the van as one of the shooters, and they were unable to identify
Vera and Ocon as the shooters.(TR P117,P143-144,P162-163).

       As part of his investigation, Detective Climack interviewed
Rodriguez (the van owner), Ocon, Vera and Niera.(TR P161). He
also interviewed a young man named Onyx Santana several times.

shooting, when he got into Francisco Rodriguez' van, he gave Juan
Ocon a loaded nine millimeter handgun. Mr.Vidaurri admitted that
he knew Alvaro Vera also had a gun with him that night. According
to Niera and Solis, they did not see Mr.Vidaurri with a gun that
night, they did not see Mr.Vidaurri give anybody a gun that night
they did not hear any discussion indicating that Mr.Vidaurri knew
that Ocon or Vera had a gun.(TR P46,P56,P91,P100). In describing
what happened, Mr.Vidaurri admitted that during the chase, he in-
tentionally pulled along side of the car so that Ocon could see
if the passengers were rival gang members and either scare them
or open fire. According to Niera and Solis, they never heard Mr.
Vidaurri tell Ocon or Vera shoot any guns at the car.(TR P57,P100).

## ARGUMENT

### Introduction

The Post Conviction Hearing Act ("the Act") provides for a three stage process to determine if post-conviction relief is warranted. At the first stage of the process, the trial court reviews the petition to determine if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2)(West 2003). If frivolous or without merit, the court must dismiss the petition in a written order, specifying the findings of fact and conclusions of law it made in reaching its decision. 725 ILCS 5/122-2(a)(2)(West 2003). If the petition is not dismissed at this stage, the matter is docketed and the state must answer or move to dismiss. 725 ILCS 5/122-2.1(b)(West 2003);725 ILCS 5/122-5(West 2003). If the petition survives this second stage, the matter proceeds to an evidentiary hearing 725 ILCS 5/122-6(West 2003).

At the first stage of proceedings, the post-conviction petition must "set forth the respects in which the petitioner's constitutional rights were violated." 725 ILCS 5/122-2(West 2003). To establish a violation, a petitioner is required to present only the gist of a claim that his or her constitutional rights were violated. People v. Edwards,197 Ill.2d 239,244(2001);People v. Gaultney,174 Ill.2d 410,418(1996),citing People v. Porter,122 Ill.2d 64(1988). Both this Court and the Appellate Court of Illinois have explicitly noted that the standard at stage one is quite low. People v. Jones,168 Ill.App3d 925,937(1st Dist.1988)(the standard at the first stage of the post-conviction process is a low one);Edwards,197 Ill.2d at 245(the "gist" standard is, by definition, "something less than a completely pled or fully stated claim"). A pro se post-conviction petition does not need set forth the claim in its entirety, nor does it need to include sufficient facts and legal arguments. Edwards,197 Ill.2d at 244,

A petitioner's claim should be taken as true and liberally construed in his favor. Edwards,197 Ill.2d at 244.

Because there are no factual issues to be resolved at the summary dismissal stage of the proceedings, the questions to be considered are of a legal nature and the reviewing court must make its own independent assessment of the allegations. People v. Coleman,183 Ill.2d 366,388-389(1998). Accordingly, on appeal, a trial court's summary dismissal of a post-conviction petition is reviewed de novo. Coleman,183 Ill.2d at 389;People V. Brown, 336 Ill.App.3d 711 (1st Dist.2002).

### 1) JOSE VIDAURRI'S POST-CONVICTION PETITION STATES THE GIST OF MERITORIOUS CLAIMS THAT HE WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HIS TRIAL COUNSEL'S FAILURE TO FILE A MOTION TO SUPPRESS THE VIDEOTAPED STATEMENT.

In Crane v. Kentucky,106 S.Ct. 2142, The United States Supreme Court states the following: 'It is by now well established that "certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of Justice that they must be condemned under the Due Process Clause of the 14th Amendment." Miller v. Fenton,474 U.S. 104,109,106 S.Ct 445,449,88 L.Ed.2d 405 (1985). To assure that the fruits of such techniques are never used to secure a conviction, due process also requires "that jury [not] hear a confession unless and until the trial judge [or some *688 other independent decision maker] has determined that it was freely and voluntarily given." Sims v. Georgia,389 U.S. 539,543-544,87 S.Ct. 639,643,171 L.Ed.2d 593(1967). See generally Jackson v. Denno,378 U.S. 368,84 S.Ct. 1774,12 L.Ed.2d 908(1964).

The importance of a confession in a court of law has been reported in numerous British and American studies as the single most important piece of evidence against the accused. In the U.S. jurors are more likely to convict based upon the weight of a

confession than on any other form of evidence. In a study by Kass &
Sukel (1997), it was demonstrated that even when a confession
was recognized by mock jurors as coerced, and stricken from the
record, the confession still increased the conviction rate.

In the United States, it is axiomatic that law enforcement
may not secure a confession through the application of brute force.
In Brown v. Mississippi, the United States Supreme Court recognized
that confessions obtained through violence are inherently un-
reliable. 297 U.S. 278,286 (1936). Law enforcement has long accepted
that convictions elicited by brute force, prolonged isolation, de-
privation of food or sleep, and threats of harm or punishment
simply cannot be trusted. See,e.g.,Saul Cassin, The Psychology of
Confession Evidence, American Psychologist (March 1997( at 221.
as a result, there is today an almost universal intolerance of
police brutality as a tool for eliciting confessions. In Illinois
however, and especially in Chicago, there is a disturbingly high
incidence of confessions alleged to have been secured through
police beatings or other coercive techniques.

Threats and physical and emotional abuse, conditions that
cause anxiety, including the lack of freedom to move about, obtain
refreshments or use the bathroom, and conditions that produce
social isolation, including sensory deprivation, fatigue, hunger,
and lack of sleep, are all designed to overcome a suspect's will.
Unfortunatelt, however, they also increase the likelihood that
an innocent person may confess to a crime he did not commit. Id
at 26,31. Many times, people laboring under these stresses be-
lieve that the short-term relief that they will obtain from con-
fessing outweighs the potential long-term consequences. This
especially true when a suspect gives a false confession, as he
believes that once he gets out of police custody, or when he
confronts a more reasonable police officer, he will be able to
explain "what really happened."

The risk of a false confession is exacerbated in this case since Mr.Vidaurri had little to no prior experience with the criminal justice system. While prior offenders may develope a greater resistance to "interpersonal pressure applied during interrogation", people who have little to no prior experience with the police are naturally more likely to have a heightened sensitivity to the environment, thereby rendering the environment more coercive. **Id at 162.** Because coercive environments lead people to falsely confess, Mr.Vidaurri's confession is highly suspect.

There are requirements that the court make a pre-trial voluntariness determination. Determining the voluntariness of a defendant's custodial statement, court must consider the "Totality of the Circumstances"; including factors such as defendant's age, intelligence, background, experience, mental capacity, education and physical condition at the time of questioning. As well as the legality and duration of the actual questioning of the defendant. Additionally, the court must consider any physical or mental abuse of defendant, including possible threats or promises. People v. Nicholas, Case No.1-02-0828 (July 9,2004) 1st Dist. Appellate Court.

For the proposition that no single factor is dispositive and the test of voluntariness is whether the defendant made the statement freely, voluntarily and without compulsion or inducement of any sort, or whether the [defendant's] will was overcome at the time he or she sonfessed. People v. Gilliam,172 Ill.2d 484, 500 (1996).

Further more, trial counsel's refusing to file a motion to suppress statement, challenging the voluntariness of the video confession, denied Mr.Vidaurri and the Trial Courts's review of the "Totality of the Circumstances" in which statement was made. Therefore it was impossible for the court to make a fair and complete pre-trial voluntariness determination.

In determining whether to grant an evidentiary hearing, all well-plead facts in the post-conviction petition and accompanying affidavits are to be taken as true. People v. Peeples,205 Ill.2d 480,511,793 N.E.2d 641 (2002);People v. Towns,182 Ill.2d 491,503,696 N.E.2d 1128 (1998). Mr.Vidaurri makes specific allegations in his post-conviction accompanied by his affidavit, making the claim of involuntariness. Accepting Mr.Vidaurri's allegations as true, the allegations support his claim. Mr.Vidaurri is entitled to the full panoply of the relevant protections which due process guarantees in State Criminal proceedings. He must be afforded all those safeguards which are fundamental rights and essential to a fair trial, including the right to due process as measured by the requirements of the 14th Amendment to provide the defendant with an opportunity to be heard; that he be present with counsel; that he be confronted with witnesses against him; that he have the right to cross examine and be able to offer evidence of his own.

Trial counsel's failure to present evidence affecting the weight and credibility of Mr.Vidaurri's confession fell below a reasonable standard. The due process clause of the 14th Amendment and the confrontation and compulsory process clauses of the 6th Amendment guarantee the defendant a meaningful opportunity to present a defense. An accused is denied this opportunity where evidence bearing on the credibility of defendant's confession, which is central to his claim of innocence, is excluded. Crane v. Kentucky,476 U.S. 683,690 (1986). Evidence surrounding a confession bears on its credibility as well as its voluntariness. Mr.Vidaurri provided a signed and sworn affidavit of co-defendant Alvaro Vera, his testimony would have refuted several key points in the video statement in his post-conviction petition. Because questions of credibility, whether of a witness or of a confession

are for the jury, "the requirements that the court make a pre-
trial voluntariness determination does not undercut the defendant's
traditional perogative to challenge the confession's reliability
during the course of the trial. Crane,476 U.S. at 688, citing
Jackson v. Denno,378 U.S. 368 (164). Regardless of whether the
same evidence was unsuccessful in a motion to suppress the state-
ment, a defendant's case may stand or fall on his ability to con-
vince the jury that the manner in which the confession was obtained,
casts doubt on its reliability. Id. Trial counsel did not challenge
the petitioner's claim of involuntariness during pre-trial or at
trial, in fact refused to allow Mr.Vidaurri to take the stand at
trial to testify to his claims of police misconduct.

The Appellate Court cites, Defense counsel is not required
to make losing motions or objections in order to provide effective
legal assistance. People v. Kelley,304 Ill.App.3d 628,636 (1999).
However that is exactly what trial counsel did, she filed a losing
motion. Trial attorney filed a motion to quash arrest and suppress
evidence, challenging third party consent. Trial counsel sought
to prove that Mr.Vidaurri's arrest was illegal, and therefore as
a result warranted suppression of Mr.Vidaurri's video statement.
In New York v. Harris,495 U.S. 14,18-21,109 L.Ed.2d 13,21-22,110
S.Ct. 1640,1643-45 (1990)(holding that even an arrest made during
a warrantless nonconsensual entry of a home does not invalidate
a defendant's subsequent voluntary statement outside the home,
so long as the authorities had probable cause to arrest the suspect.
See also People v. Segoviano,189 Ill.2d 228,244 (2000). These
cases hold that even if it would have been found that the police's
entry into the home where Mr.Vidaurri was arrested was illegal,
that is not a basis for suppression of the statement. In fact
trial counsel waited all the way until the end of the pre-trial
proceeding, to inform the judge that she was unfamiliar with the
case law regarding this motion and its circumstances. **(TR. D69).**

It was clearly not trial strategy to waive Mr.Vidaurri's right
to due process and ignore the requirements that the court make
a pre-trial voluntariness determination, and the due process
that requires that a jury [not] hear a confession unless and
until the trial judge or some other independent decision maker
has determined that it was freely and voluntarily given. Sims
v. Georgia,338 U.S. 538,543-544,87 S.Ct. 639,643,171 L.Ed.2d
593(1967). But instead filed a losing motion that would have no
bearing on Mr.Vidaurri's statement, and a motion that trial
counsel knew no case law about.

The Appellate Court further states that the videotaped
statement does not support petitioner's allegations of coercion,
and in fact, it shows petitioner to be cooperative, calm and
forthcoming with his answers. The Appellate court gets way far
afield from first-stage post-conviction consideration when it
argues what videotaped statement shows. This analysis presumes
the State's version of the facts and rejects Mr.Vidaurri's well-
plead allegations, which is wholly improper. Edwards,197 Ill.2d
at 244. For instance the Appellate court notes that in the
videotape, Mr.Vidaurri says that he was Mirandized, and making
a voluntary statement. But presuming Mr.Vidaurri's factual
allegations as true, Mr.Vidaurri only said those things because
he was induced to do so by torture and a violation of his rights.
For example the state claims that Mr.Vidaurri was Mirandized,
however Det.Garcia testified that Mr.Vidaurri was told that he
would have to answer those questions, even though A.S.A Jack
Blakey denies this.(TR.P222-P223;P262-P263). Apart of being
Mirandized is having the right to remain silent, hence the con-
tradiction. Assuming that is the case, ofcourse the video state-
ment would have to be suppressed even though he was tortured in-
to stating that his rights were not violated. A "Totality of the

Circumstances" evaluation may be proper at the evidentiary hearing on these allegations, but it has no place in a simple evaluation of whether petitioner has stated the gist of a claim.

The Appellate Court further states that during the videotaped interview, petitioner sits at a table with his hands crossed and calmly answers questions. He does not hesitate or give any indication that he was speaking against his will. It should be noted that Mr.Vidaurri states in his affidavit, that ASA Blakey informed Mr.Vidaurri that he himself was not in charge of deciding whether or not Mr.Vidaurri would be charged. But that ASA Blakey promised to speak to the Judge on Mr.Vidaurri's behalf, but Mr.Vidaurri would have to do and say everything he told him to and how he told him to. It also states, that should Mr.Vidaurri no cooperate the deal would be off. Therefore Mr.Vidaurri's allegations taken as true and liberally construed in his favor, show that his actions would determine whether or not he was going to be charged. Therefore Mr.Vidaurri felt that his life was all determined, by the videotaped statement.

Mr.Vidaurri's affidavit taken as true, the allegations support his claims.

Here, Mr.Vidaurri' strongest defense was to seek suppression of the video statement, as the statement provided the only evidence that Mr.Vidaurri: (1) knew any of the people in the van were armed; Appellate Court ignores that state witnesses Niera and Solis did not see Mr.Vidaurri with a gun that night or hear any discussion indicating that Mr.Vidaurri knew anybody had a gun.(TR P56,P100). This court also ignores the sworn affidavit of Alvaro Vera which states, Mr.Vera never once saw Mr.Vidaurri with a gun, never once saw Mr.Vidaurri give anyone a gun, or even knew that any guns were in the van. (2) supplied Ocon with the gun used for the shooting; Again Appellate Court ignores the testimony of Niera and Solis, as well as the sworn affidavit

of Mr.Vera. (3) pulled the van alongside the car with the under-
standing that Ocon would likely fire on the car. Thus without
the statement, Mr.Vidaurri could contest his accountability for
the shooting, because the State's evidence left open the possibility
that Mr.Vidaurri did not know of or intend anybody in any shooting
as he did not know of any weapons in said van. See People v.
Calvillo,170 Ill.App.3d 1070,1076 (1st Dist.1998)("To convict a
defendant under the theory of legal accountability for the con-
duct of another, the state must prove beyond a reasonable doubt
that he:(1) solicited,aided,abetted,agreed or attempted to aid,
another person in the planning or commission of the offense; and
(3) did so with the concurrent,specific intent to promote or
facilitate the commission of the offense"); People v. Dennis,181
Ill.2d 87,108(1998)(to be legally accountable, a driver must not
just drive the getaway car, he must also have knowledge of the
crime committed). Thus in order to contest Mr.Vidaurri's account-
ability, it was absolutely essential for the defense to seek
suppression of the video statement.

    In that context, there was no reasonable strategic basis
for failing to file a motion to suppress the involuntary video
statement, that for the purpose of first-stage post-conviction
proceeding, was patently meritorious. Accepting Mr.Vidaurri's
allegations as true, his claims that his statement was attained
through threats, coercion and torture support suppression.(C.13-
14,16-17); See People v. Patterson,192 Ill.2d 93 (2000)(remanding
for an evidentiary hearing on petitioner's post-conviction claim
that his statement should have been suppressed because it was in-
duced by coercion and torture). Likewise, his claim that his
statement taken in absence of Miranda warnings and despite his
invocation of his right to counsel, if accepted as true, necess-
itates suppression.(C.16-18). People v. Winsett,153 Ill.2d 335,
353 (1992)("The Supreme Court has consistently held that state-
ments obtained in violation of the principles established in

Miranda may not be used in the prosecution's case in chief");
Winsett,153 Ill.2d at 361, citing Edwards v. Arizona,451 U.S. 477,
484 (1981)("any statement obtained after a defendant has invoked
his right to counsel may not be admitted as substantive evidence
in the prosecution's case in chief, unless the defendant initiated
the subsequent contact and made a knowing and intelligent waiver
of his Miranda rights"). Accordingly, Mr.Vidaurri's allegations
support patently meritorious bases for suppressing his video
statement, so there could be no reasonable strategic basis for
failing to file such a motion.

In sum, Mr.Vidaurri's allegations must be accepted as true
for first-stage post-conviction analysis. Edwards,197 Ill.2d at
244. Mr.Vidaurri has properly alleged that his trial counsel was
ineffective for failing to seek suppression of his video statement
among other things, but applied cumulatively.

## 2) THE PETITION ALLEGES THE GIST OF A MERITORIOUS CLAIM THAT TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PREPARE LAW & EVIDENCE FOR PRE-TRIAL MOTION CONSTITUTED INEFFECTIVE ASSISTANCE.

On January 13,2000, Officer Michelle Rubino of the 13th
District, assigned to the tactical unit#136-Charlie, entered a
home at the 2100 block of North Lawndale (2138 N. Lawndale),
basement apartment at approximately 9:50 or 10:00 p.mm Before
entering the aforementioned house, this detective claims to have
encountered Mr.Ivan Beltran, who allegedly stated to this police
officer, that he was the renter of the apartment in question.
This Officer testified at the Motion to Quash Arrest and Suppress
Evidence, that she informed Mr.Ivan Beltran that she was there
to bring this petitioner in for questioning. (TR D59 through D61).

Subsequently this police officer allegedly obtained a third party
consent to search the apartment by Mr.Ivan Beltran. Although the
detectives tried to gain entry to the home, Mr.Beltran's daughter
Vanessa Beltran denied these detectives entry unless they had a
warrant. The door to the home was broken, and Mr.Vidaurri was
arrested. Trial counsel challenged the third party consent, by
placing Ms.Vanessa Beltran on the stand at the pre-trial motion.

     Had trial counsel did and investigation and prepared any
law or evidence, trial counsel would have known that this was a
losing motion. As the state presented, People v. Simpson, Illinois
Supreme Court, March 21,1996. Cited 172 Ill. 2nd,117, 665 N.E.2d,
1228. Consent to enter may be obtained from the defendant or a
third party who possesses common authority over the premises.
This is the law  throughout the State of Illinois. Trial counsel
did not know this, and it is clear from the record.

        <u>Trial Counsel</u>: Judge, I think we have an interesting
        situation which is not one that I'm personally familiar
        with as regards to the case law, and I would like an
        opportunity to brief your honor where one person
        gives consent and another does not. And I'd like to be
        able to give your Honor some case law on that issue.
        (TR D69)

     Trial counsel was not aware of the law throughout the
State of Illinois, so a continuance was set for August 21,2001.
The Simpson case goes on to state, that consent to enter a re-
sidence by a person to be arrested or some other person with
significant interest validates a warrantless arrest. Upon
continuance on August 21,2001, trial counsel had no case law to
present.

        <u>Trial Counsel</u>: I don't have any case law to submit.(TR E3)

The State also stated to the Judge, that the officers did gain entry to the home with consent voluntarily given to them from Mr.Beltran and they effectuated the arrest. Trial Counsel did no investigation into the aunthentiscity of Mr.Beltran's alleged signature, or the voluntariness of the consent. It was the signature of Mr.Beltran that validated the warrantless arrest of Mr.Vidaurri, yet counsel never subpeonaed Mr.Ivan Beltran. Counsel only presented Ms.Vanessa Beltran, who was irrelevant to the issue at hand. It was because of the alleged signature of Mr. Beltran, that said motion was denied.

> Trial Court: Based upon the evidence that I heard that Mr.Beltran was able to give a valid consent to the police officers to enter the premises to effect the arrest of Mr.Vidaurri. Based on that, the motion to suppress is denied. (TR E6).

House v. Balkcom,725 F.2d 608 (11th Cir.1984), A pretrial investigation in a criminal case provides the basic foundation, on which most defense rests and is a critical stage of the lawyer performance. Trial counsel's failure to investigate and call Mr.Ivan Beltran constituted ineffective assistance of counsel. Berryman v. Morton,100 F.3d 1089 (3rd Cir. 1996), Failure to investigate and call defense witnesses constituted ineffective assistance of counsel.

Trial Counsel knew no case law until after the witnesses were presented in the motion, and even had to ask for a continuance to be able to present case law. Based on counsel's actions and failures, the motion was denied. A Court deciding an actual ineffective claim, must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. Stricklnand Supra, at 104 S.Ct. 2066. There is no reasonable explanation for trial counsel not knowing any case law prior to filing pretrial motion, or failure to do any investigation.

3) THE PETITION ALLEGES THE GIST OF A MERITORIOUS CLAIM THAT TRIAL
COUNSEL FAILED TO TIMELY OBJECT TO THE PREJUDICIAL ADMISSION
OF IMPROPER REMARKS MADE BY STATE WITNESS DET.GARCIA,AND
FAILURE TO TIMELY OBJECT TO THE PREJUDICIAL ADMISSION OF A GUN
AND AMMUNITION THAT WERE NOT CONNECTED TO THIS CRIME.

A. TRIAL COUNSEL FAILED TO TIMELY OBJECT TO THE PREJUDICIAL
ADMISSION OF IMPROPER REMARKS MADE BY STATE WITNESS DET.GARCIA
AT TRIAL.

During the direct examination by the Assiatnat State's
Attorney of Detective Adrian Garcia, Det.Garcia made a comment
that he advised Mr.Vidaurri that there were approximately six
witnesses that had placed him in the van the night of the homicide
(TR P183). This resulting that it was improperly before the jury
that six people said  that Mr.Vidaurri was in the van, as there
was a motion for a severance. The State's Attorney only presented
two witnesses at trial, that testified Mr.Vidaurri was in said
van the night of the homicide.

Following a lengthy direct examination by the state, it
was not until trial counsel was to cross examine Det.Garcia that
counsel chose to object to Det.Garcia's prejuducial remark. (TR
P195). Trial counsel did not object to these remarks in front of
the jury, but asked for a side-bar.(TR P194). It was then that
counsel informed the Judge about it being improperly before the
jury that six people  said that Mr.Vidaurri was in the van the
night of the homicide, and counsel asked that it be stricken from
the record and that the State not be allowed to argue it.(TR P195
P196).

The Judge realizing counsel's error why an objection was
not made at the time:

Trial Judge: "Why did'nt you make an objection at that
time."

Trial Counsel: "Because it slipped right past me, Judge.
That's what I'm telling you."

Trial counsel was suppose to object in front of the jury, so that the jury would know that such remarks were wrong and improperly before them and should be ignored because there were not six witnesses at trial stating that Mr.Vidaurri was in the van the night of the homicide. Trial counsel's failure to do so, resulted in it improperly being before this jury.

Upon counsel's untimely objection to such prejudicial remarks, counsel stated the following:

> Trial Counsel: "I'm not asking your Honor to go back over it and tell the jury to ignore it. I'm asking your Honor to strike it from the record and prohibit the State from arguing it." (TR P196).

On top of counsel's excuse that her failure to make an untimely objection was because it slipped right past her head, counsel does'nt ask the Judge to do what is suppose to done. Counsel should have rectified her mistake by, asking the Judge to go back over it and tell the jury to ignore such improper remarks. However, counsel does not do so. Therefore this highly prejudicial remark was before the jury, without any clarification at all. Trial Counsel's excuse that "it slipped right past her", after the Judge acknowledged there was error clealry shows that counsel was in error. Therefore, counsel was ineffective again. Although it was ruled that there was no evidence that identification was made, and the state was not going to argue it. It was still before the jury improperly and highly prejudicial, that there were in fact six witnesses that identified Mr.Vidaurri.

## B. TRIAL COUNSEL FAILED TO TIMELY OBJECT TO THE PREJUDICIAL ADMISSION OF A GUN AND AMMUNITION THAT WERE NOT CONNECTED TO THIS CRIME.

Detective Climack testified that he repeatedly inter-interviewed Onyx Santana, who was not alleged to be present during

the shooting. (TR P167,P35-P37). Climack testified that after inter-
viewing Santana and Santana's girlfriend, he went to a certain
address on January 12,2000 (about three days after the shooting)
and recovered a nine millimeter handgun and magazine clip. (TR P-
167-P168). No evidence whatsoever was adduced at trial connecting
the gun to the crime at issue. Nevertheless, the gun and clip were
admitted into evidence and displayed to the jury. (TR P167-P168,
Q5). The day after Detective Climack testified, defense counsel
belatedly moved to deny admission of the gun and clip into evidence
on the basis that there was no evidence connecting the gun to the
crime. (TR Q5). The trial court overruled the objection as un-
timely, noting,"There was no object during the course of the trial.
(TR Q6). The gun and magazine clip were inflammatory, prejudicial
evidence that had no relevance to this trial. As Mr.Vidaurri's
petition alleges, defense counsel was ineffective for failing to
timely object to their admission, and appellate counsel was in-
effective for failing to raise this issue on direct appeal. (C.26
39-43).

        Claims of ineffective assistance of counsel in a post-
conviction petition are ordinarily measured by the standard set
forth in Strickland v. Washington,466 U.S. 668(1984). People v.
king,316 Ill.App.3d 901,912(1st Dist.2000). A defendant must show
that counsel's representation fell below an objective standard
of reasonableness, and that counsel's actions resulted in prejudice
to the defendant. Strickland,466 U.S at 687-88.

        Here, Mr.Vidaurri properly alleged that trial counsel was
ineffective for failing to object to the irrelevant and prejudicial
admission of the gun and magazine clip.(C.36-27,39-42). To be
admissible, the general rule is that a gun must be "connected to
both the defendant and the crime." People v. Babiarz,271 Ill.App.
3d 153,159 (1st Dist.1995)(admission of a gun was error where the
prosecution only established a negligible connection between the
gun and the defendant). In order to establish a connection be-
tween the defendant, the crime, and the gun there must be:"(1)

sufficient testimony to establish that a weapon was used,(2) sub-
stantial evidence the defendant participated in the crime, and
(3) testimony that the weapon admitted was similar to the one use
during the crime." People v. Tucker,317 Ill.App.3d 233,241( 5th
Dist.2000).

    Here, however, the prosecution did not establish any conn-
ection between the gun admitted at trial and displayed before the
jury and the gun used in the shooting. No one testified that the
gun found had been used during the shooting or even that it re-
sembled one of the guns used. Thus, a timely relevance objection
should have resulted in the court denying the gun and clip's ad-
mission into evidence.

    Nevertheless, the court properly denied defense counsel's
belated objection to the gun because it was not timely made.(TR Q5).
People v. Reed,243 Ill.App.3d 598,603 (1st Dist.1993)(where defense
counsel objected to chain of custody at the close of the State's
case rather than during the witness' testimony, untimely objection
constituted waiver). Thus counsel's unreasonable representation,
in failing to make a timely objection to the gun and clip, per-
mitted the evidence's admission. Moreover, counsel's delay in
objecting to the evidence was clearly not trial strategy, as he
admitted on record as in Argument 3(A) that his failure to make
a timely objection was "an oversight" rather than intentional
strategy. (TR Q5).

> <u>Trial Counsel</u>: "And for that reason I would ask that
>                    the Court not allow that to be admitted
>                    into evidence, although I did not
>                    object to it yesterday through an over-
>                    sight.....     (TR Q5).

    This error resulted in prejudice to Mr.Vidaurri. To demon-
strate prejudice, a defendant need not demonstrate that counsel's
conduct more likely than not altered the outcome in the case.
People v. Patterson,192 Ill.2d 93,122 (2000). Instead, a reasonable

probability that the outcome of the trial would have been different
'" is a probability sufficient to undermine confidence in the out
come.'" Id.,quoting Strickland,466 U.S. at 694. Here, the inflammatory
nature of the irrelevant nine millimeter handgun and magazine clip
was highly prejudicial and undermines confidence in the verdict.
See, e.g., Tucker,317 Ill.App.3d at 242(noting that admission of
guns, despite prosecutor's failure to connect the guns to the crime
was "intrinsically prejudicial").

In People v. Kliner,185 Ill.2d 81,126 (1998), the trial
court barred evidence of the murder defendant's purchase of two
guns because the State could not establish a sufficient connect-
ion between the prior gun purchase and the crime, so evidence of
the defendant's ownership of these guns would be unduly prejudicial.
When the State nevertheless reffered to the gun purchases in
argument, the Illinois Supreme Court found deliberate prosecutorial
misconduct. Id at 127. Here, there was even less of a connection
between the gun and Mr.Vidaurri. The gun was not found in his
person or his home- it was found at 1727 West Erie Street, an
address whose occupants the prosecution failed to identify. **(TR
P167)**.

Moreover, the evidence in this case was very closely
balanced. Absent the videotaped statement, which Mr.Vidaurri
argues should have been suppressed (See argument 1), there was
no direct evidence of his accountability for the shooting. State
witnesses David Niera and William Solis testified that in the van
before the shooting, no one displayed a gun or discussed shooting
anyone. **(TR P56-P57,P60,P99-P100)**. They testified that they did
not see Mr.Vidaurri with a gun, never saw Mr.Vidaurri give anyone
a gun, and never heard any discussion indicating that Mr.Vidaurri
knew that anybody had any guns. **(TR P46,P56,P91,P100)**. They also
testified, they never once heard Mr.Vidaurri tell anyone to shoot
at the car. **(TR P57,P100)**. Thus, a jury could reasonably have in-
ferred that Mr.Vidaurri did not have the knowledge or intent to
promote or facilitate the crime. See People v. Calvillo,170 Ill.
App.3d 1070,1076 (1st Dist.1988)("To convict a defendant under

the theory of legal accountability for the conduct of another,
the State must prove beyond a reasonable doubt that he: (1)
solicited,aided,abetted,agreed or attempted to aid, another
person in the planning or commission of the offense;(2) did so
either before or during the commission of the offense; and (3)
did so with the concurrent, specific intent to promote or
facilitate the commission of the offense"); People v. Dennis,181
Ill.2d 87,108 (1998)(to be legally accountable, a driver must
knowingly drive the getaway car). Given the absence of direct
evidence indicating accountability, the gun's admission was
highly prejudicial. Counsel's failure to object to its admission
certainly undermines confidence in the trial's outcome.

In sum to argument 3(A) & (B), counsel's delay in objecting
to the evidence was clearly not trial strategy, as he admitted
on the record that his failure to make a timely objection was
(A) "Because it slipped right past me", and (B) "through an over-
sight" rather than intentional strategy. Mr.Vidaurri has properly
alleged that his trial counsel was ineffective for failing to
make timely objections which was highly prejudicial to Mr.Vidaurri
among other things, but applied cumulatively.

**4. JOSE VIDAURRI'S POST-CONVICTION PETITION STATES THE GIST OF A
MERITORIOUS CLAIM THAT HE WAS DENIED HIS RIGHT TO TESTIFY
WHERE HIS AFFIDAVIT AVERS THAT DEFENSE COUNSEL REFUSED TO
ALLOW HIM TO TESTIFY,THREATENED HIM,AND MADE HIM PROMISES TO
INDUCE HIM TO WAIVE HIS RIGHT.**

The Fifth, Sixth, and Fourteenth amendments of the United
States Constitution guarantee a criminal defendant the right to
testify on his or her own behalf. Rock v. Arkansas,483 U.S. 44,
51-53 (1987); U.S. Const. amends. V,VI,XIV. A defendant's pre-
rogative to testify at trial is a fundamental constitutional
right. People v. Madej,177 Ill.2d 116,145 (1997), overruled on
other grounds by People v. Coleman,183 Ill.2d 366 (1998); Rock,
483 U.S. at 53 n. 10. The decision whether to exercise that
right is not a matter of strategy left to trial counsel. People

v. Hernandez,351 Ill.App.3d 28, 36 (1st Dist.2004). Instead, only
the defendant may waive his or her right to testify. Medej,177
Ill.2d at 146.

Where the record is devoid of information contrary to a
petitioner's claim that he was precluded from exercising his con-
stitutional right to testify, that claim is cognizable under the
Post-Conviction Act. 725 ILCS 5/122-2.1 etseq;People v. Von Perbandt,
221 Ill.App.3d 951,955 (1st Dist.1991)(simple statement that
defendant's trial counsel had deprived defendant of his right to
testify was sufficient to survive the first stage of the Post-
Conviction process, and thus, summary dismissal of post-conviction
petition was improper);People v. Brown,336 Ill.App.3d 711,720
(1st Dist.2002)(where petitioner's allegation that he informed
his attorney he wanted to testify but was never allowed to do so
was uncontradicted by trial record, first-stage dismissal of the
post-conviction petition was erroneous);People v. Dredge,148 Ill.
App.3d 911,913 (4th Dist.1986)(where defendant's verified allega-
tion that she was deprived of her right to testify at her trial
was uncontradicted by anything appearing in the trial record, it
was sufficient to require appointment of counsel and further
post-conviction consideration).

Here, Mr.Vidaurri states the gist of a constitutional
violation of his fundamental right to testify. The petition states
the claim clearly: "Petitioner's trial counsel refused to allow
him to take the stand, during attorney visit. Petitioner expressed
his desire to take the stand, trial counsel ignored this position
by petitioner." (C.30). Moreover, Mr.Vidaurri's affidavit clearly
states that an additional, contemporaneous attempt to testify was
made on the last day of the trial, before the defense rested. (C.
67). Mr.Vidaurri's affidavit recounts that when he told his
attorneys that he intended to testify, counsel told him he was
"crazy" and that she would have him "thrown out of the court room

if he tried to testify. (C.65-66). According to the affidavit, counsel told Mr.Vidaurri that he would forgo his appeal rights if he testified. (C.66). Mr.Vidaurri also alleges that he waived his rights because counsel promised him that, due to an instructional error, he would be acquitted of one or both charges if he proceeded without testifying. (C.67). In determining whether to grant an evidentiary hearing, all wellplead facts in the post-conviction petition and accompanying affidavits are to be taken as true. People v. Peeples,205 Ill.2d 480,511,793 N.E.2d 641(2002); People v. Towns,182 Ill.2d 491,503,696 N.E.2d 1128(1998).

Significantly, the record does not rebut Mr.Vidaurri's claims. Although the court did indeed ask Mr.Vidaurri if he was foregoing his right to testify, the court never questioned whether any threats or promises induced the decision. (TR Q4). Thus the record does not contradict Mr.Vidaurri's well-pled allegations. Mr.Vidaurri's petition and affidavit state the gist of a constitutional claim that he was prevented from testifying by his attorney's threats that if he testified, he would lose his appeal rights and "be thrown out of the court room," and his attorney's promises that if he forfeited his right to testify, he would be acquitted on a technicality. (C.30,65-67). At this stage, Mr.Vidaurri's allegations must be accepted as true and liberally construed in his favor. People v. Edwards,197 Ill.2d 239,244(2001).

The allegations supporting a deprivation of rights of Mr.Vidaurri are even more egregious here than those in Von Perbandt, Brown, and Dredge. In those cases, the petitioner merely alleged that he told his attorney he wanted to testify, but was not allow to do so. Von Perbandt,221 Ill.App.3d at 955;Dredge,148 Ill.App.3d at 913;Brown,336 Ill.App.3d at 720. Here, however, Mr.Vidaurri vastly expands on that allegation, enumerating not only a request to testify, but also threats and promises used to induce him to forgo his rights. (C.65-67). Mr.Vidaurri's allegations that he made a timely request to testify, but was prevented from doing so sufficiently states a claim. Von Perbandt at 955;Dredge at 913; Brown at 720.

Moreover, Mr.Vidaurri's specific allegations about how his
waiver of his right to testify was induced through threats and
promises bolster that claim. Where false threats and promises are
used to induce a waiver of a right, that waiver is not legally
valid. To be binding, a waiver of rights must be knowing and vol-
untary. People v. Bracey,213 Ill.2d 265(2004). A waiver is not
knowing and voluntary when it is coerced or induced by a mis-
apprehension of the legal significance of the waiver. See, e.g.,
People v. O'Leary,45 Ill.2d 122(1970)(waiver of Miranda rights
invalid where use of tear gas and imprisonment in "the hole" in-
duced the confession);People v. Hall,217 Ill.2d 324(2005)(de-
fendant made a substantial showing that his guilty plea was in-
voluntary where he relied on misapprehension based on defense
counsel's legally erroneous advice in waiving his right to trial).

In Hall, the defendant maintained that he was induced to
waive his right to trial by his attorney's erroneous advice that
lack of knowledge was not a defense to the charge of aggravated
kidnapping. 217 Ill.2d at 336. Because his guilty plea was based
on a misapprehension of the law, the defendant made a substantial
showing that his waiver of rights was not knowing and voluntary.
Id. at 341. See also People v. Pugh,157 Ill.2d 1,13-14(1993)
(court should permit withdrawal of the guilty plea when it appeared
that the plea relied on a misapprehension of the facts or of the
law). Likewise, here, Mr.Vidaurri's allegations show that he
relied on several misapprehensions in waiving his rights, in-
cluding his beliefs that waiver was necessary to preserve his
right to appeal, that his lawyer could have him "thrown out of
the courtroom" if he tried to testify, and that if he relinquished
his right to testify, he would be acquitted on a technicality.
Accepting Mr.Vidaurri's allegations as true, the allegations
support his claim that he did not knowingly and voluntarily
waive his right to testify.

In ruling that this post-conviction claim was frivolous
and patently without merit, the trial court based its holding on
its erroneous conclusion that the post-conviction petition did
not allege a contemporanrous assertion of the right to testify.
(C.175).  The court relied on People v. Thompkins,161 Ill.2d 148,
177-78(1994), which ruled that a defendant who remains silent and
acquiesces in the decision not to have himtestify may not later
assert that his right to testify was violated. Thompkins addressed
the defendant who acquiesces to a trial strategy that omits his
testimony and holds that such a defendant essentially waives his
right to later complain of the strategy decision. Id. Here, how-
ever, the issue is not acquiescence. Rather, here, Mr.Vidaurri
alleges that he was induced by false promises and threats to re-
linquish his right. Mr.Vidaurri does allege a timely discussion
of his right to testify, on the last day of trial, before the
defense rested. (C.67). But he also alleges that he was induced
to waive his rights based on false threats that he could be
thrown from the court room or lose his right to appeal and the
false promise that he would be acquitted on a technicality. Given
the threats and promises inducing his waiver, the timing of his
request is not determinative of his claim.

In ruling that this post-conviction claim was frivolous
and patently without merit, the Appellate Court based its holding
also on People v. Thompkins,161 Ill.2d 148,177-78, and quotes
People v. Brown,54 Ill.2d 21,24(1973). The Appellate Court mis-
takenly applied this case to Mr.Vidaurri's case, for the following
reasons:

(1) In Brown the court stated,"that neither in the post-
conviction petition in that case, with its reference
to conversations which took place between the defendant
and his attorney well in advance of the beginning of
of the trial, nor in the suppporting affidavit, is
there any statement that the defendant, when the
time came for him to testify, told his lawyer that he
wanted to do so despite the contrary. In absence of a
contemporaneous assertion by the defendant of his right
to testify, the trial judge properly denied an evident
iary hearing.

(2) Rather here in Vidaurri in the <u>post-conviction petition</u>
in this case, with its reference to conversations which took
place between Mr. Vidaurri and his attorneys <u>in advance</u> of the
beginning of the trial and <u>on the last day of trial</u>, <u>before the
defense rested</u>, and in the <u>supporting affidavit</u>, Mr.Vidaurri
stated when the time came for him to testify, told his lawyer
that he wanted to do despite the contrary.

The Appellate court further states that petitioner's
allegations are contradicted by the record because Mr.Vidaurri
was admonished by the trial court:

"THE COURT:Mr.Vidaurri, I just want to advise you that
your attorney,I'm sure,told you the same thing,that you
have a right to testify,you also have a right not to
testify, but that's your decision. Do you understand that?
PETITIONER:Yes,sir.
THE COURT:is it your decision that you don't want to
testify today?
PETITIONER:Yes,sir."

Although the court did indeed ask Mr.Vidaurri if he was
foregoing his right to testify, the court never questioned
whether any threats or promises induced the decision.**(TR Q4).**
Mr.Vidaurri's allegations arised from conversations he had before
trial and at the last day of trial, before the defense rested
with his attorneys, in which noone else was present but him and
his attorneys.

The Appellate Court's contention is also burdensome because
apparently it would impose a burden on petitioner to attach an
affidavit from trial counsel confessing to their ineffective
assistance, and even specifying it's exact nature. No authority
can be cited for such a burden, orcourse, because there is none.
As the Supreme Court stated in People v. Williams,47 Ill.2d 1,4,
264 N.E.2d 697(1970), where the defendant alleged that his guilty

plea was based on a misrepresentation by his trial counsel, "the
only affidavit that petitioner could possibly have furnished,
other than his own sworn statement, would have been that of his
attorney who allegedly made the misrepresentation to him. The
difficulty or impossibility of obtaining such an affidavit is
self-apparent."

Mr.Vidaurri has properly alleged that his trial counsel
was ineffective, and that his Post-Conviction states the gist of
a meritorious claim that he was denied his right to testify
where his affidavit avers that defense counsel refused to allow
him to testify, threatened him, and made him promises to induce
him to waive his right. Further applied cumulatively to arguments
1, 2, & 3, counsel was ineffective.

**5. JOSE VIDAURRI'S POST-CONVICTION PETITION STATES THE GIST OF A
MERITORIOUS CLAIM THAT TRIAL COUNSEL'S FAILURE TO OBJECT TO
PROSECUTORIAL MISCONDUCT IN THEIR USE OF PERJURED TESTIMONY
BY STATE WITNESS DAVID NIERA,AND ASSISTANT STATE'S ATTORNEY
BRIAN HOLMES.**

In Napue v. Illinois,360 U.S. 26,79 S.Ct. 1173,3 L.Ed.2d
1217(1959), "the principle witness for the prosecution falsely
testified that he had been promised no consideration for his
testimony. The court held that knowing use of false testimony to
obtain a conviction, violates due process regardless of whether
the prosecutor solicited the false testimony or merely allowed
it to go uncorrected when it appeared, the court explained that
the principle that a state may not knowingly use false testimony
to obtain a conviction – even false testimony that goes only to
the credibility of the – is implicit in any concept of ordered
liberty. Finally the court held that it was not bound by the
state court's determination that the false testimony could not
in any reasonable likelihood have affected the judgement of the
jury. The court conducted it's own independent examination of the

record and concluded that the false testimony, may have had an
effect on the outcome of the trial. Accordingly, the court re-
versed the judgement of the conviction."

In this case at bar, petitioner avers, that the A.S.A.
Mark Gerhardt, wrote things in the statement of State witness
David Niera, that David Niera never told A.S.A. Gerhardt. At
petitioner's co-defendant's (Alvaro Vera) trial, Mr.Niera was
questioned about his written statement contradicting his testimony
at Mr.Vera's trial.

Q:Then what happens?
A:Then when he stuck his hand out the window at the
same time Bam-Bam was reaching to open the door.....
Q:Who opened the door?
A:Bam-Bam.
**(Alvaro Vera's TR D250).**

It is established by Mr.Niera that Bam-Bam opened the van
door right before the shooting, it is then that Mr.Niera is asked
if he remembered his written statement.

Q:Do you remember in your written statement you said
that Porky pulled the door open?
A:I seen Bam-Bam, I know.
**(Alvaro Vera's TR D251).**

Mr.Niera is then showed his written statement, and he him-
self realizes that his written statement states that Porky open
the sliding door before the shooting began. When asked if he said
what was on his written statement, he says that the State's
Attorney wrote it.

Q:Did you in your statement say David states Porky Pulled
open the sliding door on the right and stuck his right hand
out with a gun? Did you say that?

A:They wrote it down.

Q:Did you write that?

A:I did'nt actually write it, but they wrote it and I signed it.

Q:Someone wrote it for you?

A:Yes, the State's Attorney.

**(Alvaro Vera's TR D251-D252).**

It is well established here that after Mr.Niera testified with conviction when challenged about who opened the van door, that it was Bam-Bam that he saw with his own eyes. It is also well established that the written statement was written by the State's attorney and the written statement contradicted his tesimony, and therefore was not at all trust-worthy.

Several months later state witness David Niera knowingly and willingly changed his testimony to match that of the untrust-worthy written statement,written by A.S.A. Mark Gerhardt, even after he testified with conviction about what he saw. On July 9,2002, David Niera testified at Mr.Vidaurri's trial.

Q:Okay. What happened as the van caught up to the car?

A:I seen Juan Oconn with a handgun. He was pointing it out the window and then at the same time <u>Porky</u> opened the van door and they started shooting.

**(TR. P45).**

State witness David Niera's willingness to change his testimony from what he saw and defended with conviction at Alvaro Vera's trial, to match that of the written statement written by A.S.A. Mark Gerhardt, which he claims he did not even write shows that Mr.Niera knowingly committed perjury. Mr.Niera's Supposed written statement is untrustworthy, and his willingness to change to match an untrustworthy statement makes him untrustworthy.

Mr.Vidaurri avers that A.S.A. Brian Holmes and Romano Di
Benedetto tried the same case two times prior to petitioner's trial,
Mr.Niera is the state's own witness. Both of the assistant state'
attorneys were present at the trial of Mr Alvaro Vera, and knew
of the contradiction between David Niera's convictions and the
written statement that contradicted Mr.Niera's testimony in which
he defended with conviction. However, they both allowed this
testimony to go unchecked at petitioner's trial. In Mooney v.
Holohan,294 U.S. 103,55 S.Ct. 34,79 L.Ed 791(1935), "the court
established the rule that the knowing use by a state prosecutor
of perjured testimony to obtain a conviction and the deliberate
suppression of evidence that would have impeached and refuted the
testimony constitutes a denial of due process. The court reasoned
that a deliberate deception of court and jury by the presentation
of testimony known to be perjured, is inconsistent with the rudi-
mentary demands of justice."

**B. TRIAL COUNSEL FAILED TO OBJECT TO PROSECUTORIAL MISCONDUCT IN
THEIR USE OF PERJURY BY A.S.A.BRIAN HOLMES IN CLOSING ARGUMENT**

During the closing arguments, the A.S.A. Brian Holmes
committed perjury, when he himself knowingly and willingly mis-
informed the jury about certain facts of the case.

BH:Look at his actions afterwards. He takes the guns from
the shooters, hides them in the van, parks the van and leaves.

(TR Q54).

Prosecuting attorneys, Brian Holmes and Romano Di Benedetto
again, both tried the same case twice prior to Mr.Vidaurri's.
They both had knowledge of this case in detail, including their
state witnesses' statements and testimonies. During the trial of
co-defendant Alvaro Vera, State witness witness William Solis
was questioned by one of Brian Holmes or Romano Di Benedetto

about what happened to the weapons after the shooting.

Q:What happened next?

A:We made a right in the alley and parked in the other
alley and parked the van in a parking lot.

Q:Did you see what Alvaro did with his gun?

A:I believe he put the gun in the back seat of the van.

Q:We're talking about Alvaro Vera, so we're clear?

A:Yes.

Q:Did you see what Juan Ocon did with his gun?

A:I believe he gave it to Porky.

Q:Did you see what Porky did with that second gun?

A:Placed it in the same spot as the first one.

**(Alvaro Vera's TR D178-D179).**

As shown through the trial transcript of co-defendant
Alvaro Vera, either Mr.Holmes or Mr.Benedetto questioned Mr.Solis
about where the weapons ended up and emphasis was added to the
name of Alvaro Vera. The prosecution knew who it was that took
those weapons and where they placed them. Yet Mr.Holmes still
chose to knowingly and willingly mislead the jury of Mr.Vidaurri's
trial.

Trial Counsel was ineffective in that she did not object
to this prosecutorial misconduct, and correct the wrong that severely
prejudiced the petitioner. Mr.Vidaurri has properly alleged that
his trial counsel was ineffective, and that his Post-Conviction
states the gist of a meritorious claim. Further applied cumulat-
ively to arguments 1, 2, 3, & 4, counsel was ineffective.

**6) THE PETITION ALLEGES THE GIST OF A MERITORIOUS CLAIM THAT TRIAL COUNSEL'S REMARKS DURING CLOSING ARGUMENT CONCEEDED GUILT AND RESULTED IN A <u>CHANDLER</u> VIOLATION.**

In People v. Chandler,129 Ill.2d 233,135 Ill.Dec 543,543 N.E.2d 1290(1987), Chandler's trial counsel's performance fell below an objective standard of reasonableness. Chandler was charged with murder, residential burglary, and arson. After his arrest he made a statement, introduced at trial, which he admitted to breaking into victim's home, but stated that it was his co-defendant who stabbed the victim. Chandler's trial counsel presented no witnesses on his behalf, and Chandler himself did not testify. During closing arguments, defense counsel conceeded that Chandler had entered the victim's house, but argued that he did not stab the victim. Our Supreme Court of Illinois held, that defense counsel's performance in Chandler amounted to ineffective assistance of counsel. Our Supreme Court of Illinois, reasoned that, even if counsel had succeeded in persuading the jury that defendant did not kill the victim, the jury was still instructed to find the defendant guilty of murder on accountability, and had no choice but to find the defendant guilty of murder, residential burglary, and arson."

The circumstances surrounding the Chandler case, are very much similar to the circumstances surrounding the case or the petitioner, Mr.Vidaurri. After Mr.Vidaurri's arrest he made a statement, which was introduced at trial. Trial counsel presented no witnesses on Mr.Vidaurri's behalf, and Mr.Vidaurri himself did not testify. During closing arguments, defense counsel con-ceeded that Mr.Vidaurri drove the van to get the shooters to where they were going to shoot. Trial counsel then said that Bam-Bam opening the door, getting out and shooting, is exactly the same action as Mr.Vidaurri's actions.

TC:Apparently driving the van to get the shooters
to where they were going to shoot is accountability,
but opening the door, get out and shoot as Bam-Bam
did, that's not accounatability. <u>Exactly the same
action</u>....                    (TR Q41).

    It is clear from the context of the trial transcript,
that counsel was being sarcastic in a way. However, the com-
parison that Mr.Vidaurri's actions were the same of a man who
opened the door and shot conceeded guilt. Trial Counsel's
argument was that Mr.Vidaurri was accountable, but so was
Bam-Bam but he is not on trial. Even if counsel would have
convinced the jury that Bam-Bam was guilty and should be on
trial, by the statement that Mr.Vidaurri's actions and Bam-
Bam's actions were the same, the jury was still instructed
to find the defendant guilty of murder on accountability, and
had no choice but to find the defendant guilty of murder and
attempted-murder.

    Our Supreme Court of Illinois held in, People v. Shatner,
174 Ill.2d 133,673 N.E.2d 258,220 Ill.Dec. 346, at footnote [5],
"The Court's finding of ineffective assistance did not rest
exclusively on Chandler's counsel alleged failure to develope
a theory of innocence. Rather the Chandler court further observed
that the defense counsel's performance was deficient because
he failed to cross-examine others in an extremely conclusive
manner, and called no witnesses to testify, including defendant."

    Mr.Vidaurri has properly alleged that trial counsel was
ineffective in that remarks made by counsel during closing
argument, conceeded guilt resulting in a Chandler violation.
Further applied cumulatively to arguments 1, 2, 3, 4, & 5,
counsel was ineffective.

**7) PETITIONER RESTATES ARGUMENTS 1 THROUGH 6 AND ASSERTS
INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL
WHERE SAID ISSUES ARE APPLIED, AND DIRECT APPEAL COUNSEL
EXPRESSED BIASNESS TOWARD PETITIONER.**

Claims of ineffective assistance of counsel in a post-
conviction petition are ordinarily measured by the standard set
forth in Strickland v. Washington, 466 U.S. 668(1984). People v.
King, 316 Ill.App.3d 901(1st Dist.2000). A defendant must show
that counsel's representation fell below an objective standard
of reasonableness, and that counsel's actions resulted in pre-
judice to the defendant. Strickland, 466 U.S. at 687-88. Like-
wise, ineffective assistance of appellate counsel claims are
evaluated under the same two-pronged standard set forth in
Strickland. People v. Harris, 206 Ill.2d 1,34(2002). Thus, a
defendant who alleges that appellate counsel rendered ineffective
assistance by failing to argue an issue must show that the
failure to raise that issue was objectively unreasonable and
that the decision prejudiced the defendant. Id. If the defendant
adequately alleges both an underlying ineffective assistance
of trial counsel claim that merited review on direct appeal and
appellate counsel's failure to raise the claim, that is suffic-
ient to warrant further consideration under the Post-Conviction
Hearing Act. People v. Makiel, 358 Ill.App.3d 102,105(1st Dist.
2005)(noting that "The Illinois Supreme Court has repeatedly
recognized that waiver or procedural default may not preclude
an ineffective assistance claim for what trial or appellate
counsel allegedly ought to have done in representing a criminal
defendant.").

When petitioner spoke with his appellate counsel, Yasaman
Hannah Navai, about challenging the evidence used to convict
Mr.Vidaurri, appellate counsel expressed biasness toward the
petitioner. "You were a gangmember, doing a driveby shooting. I

would hope you take your responsibility." Appellate counsel
also used the most damaging testimony at trial, in her statement
of facts which showed petitioner in a very prejudicial light.
Appellate counsel stated in "Brief and argument", and "Leave to
Appeal" statement of facts, " at this point, Mr.Vidaurri caught
up to the Mercury and drove the van along side the Mercury's
driver side, <u>eventually hitting the Mercury with the van.</u>"
Appellate counsel used **(TR P44)**, the testimony of David Niera
to prove this, but ignored the overwhelming testimony of
William Solis **(TR P92)**;Nicholas Mobley **(TR P111-P112)**;Delbert
Guy **(P140)**; and William Peppers **(TR P153)**. All state witnesses.
These four testimonies all refuted the testimony of David Niera
**(TR P44)**, which appellate defender used to prove her statement
of facts.

    Appellate counsel raised the issue of ineffective assistant
of counsel in the direct appeal: **"JOSE VIDAURRI WAS DEPRIVED OF
A FAIR TRIAL WHEN THE TRIAL COURT FAILED TO EMPANEL A FAIR AND
IMPARTIAL JURY BY NOT ASKING THE JURY ANY QUESTIONS REGARDING
GANG BIAS. ALSO, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO
ENSURE THAT THE PANEL OF JURORS CONSISTED OF IMPARTIAL JURORS BY
NOT INSISTING THAT TRIAl JUDGE ASK OR BY HERSELF ASKING WHETHER
THEY HAD ANY BIAS TOWARDS MEMBERS OF GANGS AS REQUIRED BY
ILLINOIS SUPREME COURT RULE 431(b) AND PEOPLE V. STRAIN."**
However Appellate counsel knowing the case law, was well aware
that raising an ineffective claim would have to meet the two-
prong test in Strickland v. Washington. The record shows that
trial counsel was ineffective for failing to ensure that panel
of jurors consisted of impartial jurors, therefore meeting prong
(1) of the Strickland test. However failure to challenge the
evidence used to convict petitioner, would render claim frivolous
in that it would not meet the second prong of the Strickland
test. Appellate counsel ignored the request of petitoner to

challenge the evidence used to convict him. Petitioner's direct
appeal was denied, and it stated in the beginning: "Following a
jury trial, defendant Jose Vidaurri, was convicted of First degree
murder and attempted first degree murder, then sentenced to
consecutive, respective terms of 35 and 10 years' imprisonment.
Defendant does not challenge the sufficiency of the evidence to
sustain his conviction...."

Appellate counsel was ineffective in the direct appeal
process, in that she was biased against petitioner and failed to
challenge the ineffectiveness of trial counsel. Petitioner was
denied fair and complete review of the issues raised on direct
appeal, as well as the issues appellate counsel did not raise
in regards to arguments 1, 2, 3, 5, & 6.

8) EVIDENCE NOT AVAILABLE TO PETITIONER OR TRIAL COURT DURING
SENTENCING THAT WOULD HAVE SUPPORTED PETITIONER'S REHABILI-
TATIVE POTENTIAL.

The Illinois Constitution requires that every sentence
take into account the objective of Rehabilitating the offender
to useful citizenship. **Ill. Const., art.I, sec.11; Steffens,131
Ill.App.3d at 151.**

In 2000 this petitioner was incarcerated at the Cook
County Dept. of Corr., awaiting trial on said offense. During this
time of incarceration, petitioner took every opportunity that
was available to him to better and rehabilitate himself. This
petitioner attended the Consuella B. York Alternative High School
for two Qtrs., and received A's & B's. **(EX. School #1 of Post).**
While petitioner was attending CBY Alternative H.S. during the
day, this petitioner was also attending the CBY evening H.S. at
night. **(EX. School #2 & #3 of Post).** In this evening school,
petitioner also received A's & B's. While petitioner was attending

these classes, he was advised that he would not be able to re-
ceive enough credits on time to earn his High School diploma.
Petitioner then started attending GED classes in which he success-
fully completed, and earned his GED. This was presented at
sentencing, but proof of it was not available. **(EX. GED #1 & #2
of Post)**. In 2001 after petitioner earned his GED, he then
signed up for a life learning dorm program in Division 10 of
the CCDOC. In this program petitioner was a student of the
OUTREACH CHRISTIAN SCHOOL, and earned many certificates of
education in academics and religion. **(EX. LL #1 through #8 of
Post)**. Petitioner graduated from the Div.10 LLD program on May
29,2002. **(EX. LL #9 of Post)**.

These exhibits were not available to the trial court or
petitioner at sentencing. Petitioner was sentenced to 35 yrs.
at 100% of the time to be served, and 10 yrs. at 85% of the
time to be served, to be served consecutively. Which means with
Petitioner's time served right now, he will have to wait at-
least $17\frac{1}{2}$ years to be eligible for a medium security prison.
With the time petitioner has been sentenced to, he is only
eligible for a maximum security prison. In these maximum
security prisons, petitioner is not in a rehabilitative environ-
ment in that he spends 21 hrs. a day on average in a cell.
Petitioner is not afforded opportunity to gain employment, and
the only educational programs available are GED classes and
barber college. Petitioner can not attend GED classes in that he
has his GED already, and is about to graduate from barber college.
Therefore there are no more programs or tools available for
petitioner to further rehabilitate himself. Medium security
prisons have ample opportunity to gain employment, as well as
earn college degrees and trades. However in order to be eligible
for such medium security prison, offender's sentence must have

20 yrs. or less left to serve. Petitioner avers that all of the
exhibits  presented now, as well as presented at sentencing show
that petitioner has very excellent rehabilitative potential.
It is also very important to consider that petitioner was con-
victed on an accountability theory, and did not he himself kill
or attempt to kill anyone. For these reasons petitioner asked
that his sentence be reduced to reflect his rehabilitative
potential that he may be eligible for a medium security prison,
and be placed in a rehabilitative environment to further re-
habilitate himself.

The trial court in denying petitioner's post-conviction
petition, stated that "While admirable, these accomplishments
would also not have altered petitioner's sentence..."

Petitioner states that should trial court abide by the
Illinois Constitutional requirments that every sentence take into
account the objective of Rehabilitating the offender to useful
citizenship, and sentenced petitioner to 35 yrs. and 10 yrs to
be served consecutively without these exhibits presented at
sentencing. Then now that they are presented, and further show
petitioner's rehabilitative potential his sentence should reflect
this potential. Plus showing this potential to further be re-
habilitated, petitioner should be placed in a rehabilitative
environment.

## CONCLUSION

Mr.Vidaurri has sufficiently alleged the gist of a claim that trial counsel was ineffective at every stage of legal proceedings as shown in his post-conviction, and appellate counsel was therefore ineffective for failing to raise trial counsel's lapses. That these failures were objectively unreasonable, and these decisions prejudiced him. That cumulatively applied as one body, trial counsel's actions denied Mr.Vidaurri a fair trial. Also that evidence as to Mr.Vidaurri's rehabilitative potential not available to him or the court during sentencing, should warrant a lesser sentence that would allow Mr.Vidaurri access to a rehabilitative environment. Accordingly, further consideration of these claims are warranted. Harris,206 Ill.2d at 34. Jose Vidaurri respectfully asks this Court to reinstate his post-conviction petition and remand this matter for further proceedings.

Wherefore, your Petitioner respectfully requests this Honorable court to grant his petition for leave to appeal and reverse his conviction.

Respectfully Submitted,

Jose Vidaurri

Jose Vidaurri.

104198

**SUPREME COURT OF ILLINOIS**
**CLERK OF THE COURT**
SUPREME COURT BUILDING
SPRINGFIELD, ILLINOIS 62701
(217) 782-2035

May 31, 2007

Hon. Lisa Madigan
Attorney General, Criminal Appeals Div.
100 West Randolph St., 12th Floor
Chicago, IL 60601

No. 104198 - People State of Illinois, respondent, v. Jose
            Vidaurri, petitioner.  Leave to appeal, Appellate
            Court, First District.

The Supreme Court today DENIED the petition for leave to appeal in the above entitled cause.

The mandate of this Court will issue to the Appellate Court on July 6, 2007.

EXHIBIT G