**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, ex rel.** | ) | |
| **JOSE VIDAURRI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 08 C 3665** |
| | ) | |
| **Marcus Hardy,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Warden, Stateville Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

After a 2002 trial in the Circuit Court of Cook County, a jury found Jose Vidaurri ("Petitioner") guilty of the first-degree murder of Dauntrez Snowden and the attempted murder of Nicholas Mobley. The trial court sentenced him to consecutive terms of 35 years for the murder and 10 years for the attempted murder. After unsuccessfully challenging his conviction in state court, Petitioner filed this petition for a writ of habeas corpus. He alleges that errors made by trial and appellate counsel deprived him of his Sixth Amendment right to effective assistance of counsel.

Respondent moved to dismiss his petition as untimely under 28 U.S.C. § 2244. Petitioner does not dispute that he filed his habeas petition three months past the one-year deadline, but asserts that the petition is subject to statutory tolling under 28 U.S.C. § 2244(d)(1)(B) or, in the alternative, under the doctrine of equitable tolling. The court appointed counsel for Petitioner on the tolling issue and conducted an evidentiary hearing to explore the merits of the tolling claims. As explained below, the evidence shows that a prison law clerk gave Petitioner misleading and inaccurate information about the time limits for his habeas petition, and that Petitioner's efforts to gain access to the prison library to perform his own research were stymied by repeated prison lockdowns. Whether these circumstances constitute a "state-created" impediment to timely filing present a close question,

but the court finds that Petitioner has indeed established that rare set of facts that compels the tolling of his habeas limitations period. The court has also considered the merits of the petition, however. For the reasons explained here, although Petitioner has won a procedural victory, the court concludes that Petitioner's substantive arguments in support of habeas relief are unexhausted or lack merit. Accordingly, the petition is denied.

## FACTUAL BACKGROUND

### I.      Petitioner's Trial and Subsequent Review of His Conviction[1]

On the evening of January 8, 2000, Dauntrez Snowden went out with friends Nicholas Mobley, William Peppers, and Delvert Guy to celebrate Peppers' departure for college the next day. (Rule 23 Order, *People v. Vidaurri*, No. 1-05-2051 (Ill. App. Ct. 1st Dist. Nov. 6, 2006) (hereinafter "Post-Conviction Order"), Ex. B to Resp't's Mot. to Dismiss, at 2.) Petitioner was also out that night; he was driving a van with passengers Juan "Pelon" Ocon, Alvaro "Porky" Vera, Benjamin "Bam Bam" Pinero, Rocky Salazar, Francisco Rodriguez, William Solis, and David Niera. (Pet. for Leave to Appeal, No. 02-3718 (hereinafter "Direct Review PLA"), Ex. C to Resp't's Mot. to Dismiss, at 6.) Petitioner and his passengers were members of the Satan Disciples street gang, except for Ocon, who belonged to the Latin Jivers gang. (*Id.*) Petitioner also carried a loaded .9 millimeter handgun which, at some point, he gave to Ocon. (Post-Conviction Order at 2, 14.)

Shortly after midnight on January 9, 2000, Petitioner pulled the van up alongside the car Snowden was driving with passengers Mobley, Peppers, and Guy. (*Id.*) Two of Petitioner's friends flashed gang signs; Snowden and company did not respond, but instead sped away out of fear that they might be robbed. (*Id.* at 2-3.) At Ocon's instruction, Petitioner gave chase. (*Id.* at 15.) When

---

[1]     This court adopts the facts set forth in the Illinois appellate court opinion in *People v. Vidaurri*, No. 1-05-2051 (Ill. App. Ct. 1st Dist. Nov. 6, 2006). (Post-Conviction Order, Ex. B to Resp't's Mot. to Dismiss, at 2-7.); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

he pulled even with Snowden's car, Ocon and another van passenger, Alvaro Vera, fired shots inside. (*Id.* at 3.) Mobley suffered two gunshot wounds to his lower extremities, but he recovered; Snowden suffered a fatal shot to the abdomen. (*Id.*)

Chicago police arrested Petitioner for his role in the shooting on January 13, 2000. (*Id.*) After being advised of his *Miranda* rights, Petitioner agreed to speak with the detectives and ultimately agreed to make a videotaped statement in which he described his involvement in the shooting. (*Id.*) The video shows Petitioner calmly sitting at a table, waiving his *Miranda* rights, and answering questions. (*Id.* at 13.) In the recorded statement, Petitioner admitted that he had a loaded .9 millimeter gun on the night of the shooting, that he gave it to Ocon, and that he (Petitioner) abandoned it in the van after the shooting. (*Id.* at 14.) At the end of the interview, Petitioner volunteered an additional statement—that he wanted the judge to know he was willing to cooperate with the investigation. (*Id.*) Trial counsel later moved to quash the arrest and suppress all subsequent evidence, including the confession, by arguing that Petitioner lived at the address where he was arrested, and therefore, the police's warrantless entry and arrest was improper. (*Id.*) The court denied the motion to suppress on the ground that the police had obtained valid third-party consent for the entry from Ivan Beltran, who also lived at the home where the police arrested Petitioner. (Petition for Writ of Habeas Corpus (hereinafter "Habeas Pet.") at 7-8.)

At Petitioner's July 2002 trial, the State introduced a .9 millimeter handgun in evidence during the testimony of the detective assigned to the case, John Climack. (Post-Conviction Order at 4.) Detective Climack explained that an individual named Onyx Santana had learned the details of the shooting from one of the other van passengers, and that either he or his girlfriend told the detective where to recover the gun.[2] (*Id.* at 14.) The State adduced no other evidence connecting

---

[2]    It is unclear who specifically told Detective Climack where to find the gun; the state appellate opinion says only that it was Santana or Santana's girlfriend. (Post-Conviction Order at 14.)

the .9 millimeter gun to the shooting. (*Id.*) Initially, Petitioner's trial counsel made no objection. (*Id.* at 4.) The following day, however, just before the jury instruction conference, counsel stated that "through an oversight," she had failed to object to the gun and that she now challenged its admission as improper and lacking foundation. (*Id.* at 4, 14-15.) The trial court overruled the objection as tardy and concluded that the jury was entitled to decide what weight to give the gun. (*Id.* at 4, 15.) In further support of its case, the State called van passengers Niera and Solis to testify as to Petitioner's role in the shooting, and surviving victims Mobley, Peppers, and Guy to corroborate that testimony. (Post-Conviction Pet., Ex. E to Resp't's Mot. to Dismiss, at 24; Post-Conviction Order at 15-16.) The State also played Petitioner's videotaped statement for the jurors. (Post-Conviction Order at 14.)

The State then rested its case, and the defense declined to call any witnesses. The trial court reminded Petitioner of his right to testify and asked whether he was waiving that right; Petitioner stated that he was. (*Id.* at 4.) The jury found Petitioner guilty of the first-degree murder of Snowden and the attempted first-degree murder of Mobley. (*Id.* at 4-5.) The trial court sentenced Petitioner to consecutive terms of thirty-five and ten years, respectively.[3] (*Id.* at 5.)

On direct appeal, Petitioner argued only that the trial court erred in failing to ask potential jurors whether they harbored bias against gangs or gang members, and that trial counsel was ineffective for failing to do the same. (Rule 23 Order, *People v. Vidaurri*, No. 1-02-3718 (Ill. App. Ct. 1st Dist. Apr. 26, 2004) (hereinafter "Direct Review Order"), Ex. A to Resp't's Mot. to Dismiss, at 1.) The appellate court declined to find that a trial court has a duty to question potential jurors, *sua sponte*, about gang bias. (*Id.* at 5.) The court found, further, that trial counsel's failure to make the

---

[3]     Juan Ocon and Alvaro Vera were also tried and convicted for their involvement in the shooting. Ocon was convicted of first degree murder and attempted murder. (*See* Direct Review Order at 3 n.1 (citing unpublished appellate order affirming Ocon's conviction).) Vera was convicted of attempted murder. (*See id.* at 3 n.2 (citing unpublished appellate order affirming Vera's conviction).)

same inquiry was a matter of trial strategy that "fell within the broad range of defense tactics that will not support a claim of ineffective assistance of counsel." (*Id.* at 8.) Even if it did not, reasoned the court, Petitioner could not show he suffered prejudice, given the substantial evidence of his guilt. (*Id.*) Petitioner filed a petition for leave to appeal ("PLA") with the Illinois Supreme Court, but it was denied. *People v. Vidaurri*, 211 Ill. 2d 611, 823 N.E.2d 977 (2004).

On March 3, 2005, Petitioner filed a *pro se* post-conviction petition asserting ineffective assistance of trial and appellate counsel ,and arguing that advances in developmental science evidence compelled a reduction in his sentence.[4] (Pet. for Post-Conviction Relief, Ex. E to Resp't's Mot. to Dismiss.) He claimed ineffective assistance of his trial counsel on the basis that she failed to (1) challenge the video statement he claims was coerced; (2) investigate the third-party consent to search that led to his arrest; (3) challenge his probable cause hearing; (4) timely object to the admission of the .9 millimeter gun; (5) interview other witnesses in advance of trial; (6) allow him to testify in his own defense; and (7) object to testimony he alleges was perjured and to alleged misstatements of fact in the State's closing. (*Id.* at 2-28.) Petitioner also claimed that his appellate counsel provided ineffective assistance because she (1) did not make all the aforementioned arguments for trial counsel's ineffectiveness; (2) failed to challenge the sufficiency of the evidence; and (3) exhibited personal bias against Petitioner by suggesting he take responsibility for his actions. (*Id.* at 28-32.) Specifically, Petitioner recounted a phone conversation with appellate counsel in which she rejected Petitioner's suggested claims of trial counsel's ineffectiveness and

---

[4] Petitioner cited to and attached a sworn affidavit by University of Pennsylvania psychology professor Dr. Ruben Gur that was prepared on behalf of an unrelated criminal defendant named Anthony Clark and dated March 27, 2003. (Gur Aff., Ex. to Post-Conviction Pet.) In the affidavit, Dr. Gur describes his research on the maturation of the brain and contends that the human brain does not fully develop until an individual reaches twenty years of age, at the earliest. (*Id.*) Petitioner argued that, since he was only eighteen at the time of the shooting, his brain was underdeveloped and his potential for rehabilitation was substantial; thus, his sentence should be reduced accordingly. (Post-Conviction Pet. at 36-38.)

told Petitioner, "'You were a gang[ ]member doing a drive[-]by shooting. I would hope you [would] take your responsibility.'" (*Id.* at 29.)

The trial court summarily dismissed the post-conviction petition as "frivolous and patently without merit." (Post-Conviction Order at 5.) On appellate review, the court addressed only three of Petitioner's arguments: that trial counsel was ineffective for (1) inducing Petitioner's waiver of his right to testify; (2) failing to move to suppress the video statement; and (3) failing to timely object to the admission of the .9 millimeter gun. (*Id.* at 1-2.) As to the inducement of waiver argument, the state court did not find credible Petitioner's assertion that trial counsel told him he was "crazy" for wanting to testify, that she would have him "thrown out" of the courtroom if he tried to do so, and that she promised he would be acquitted of at least one charge if he proceeded without testifying. (Habeas Pet. at 11; Post-Conviction Order at 7-8.) The court also rejected the notion that the trial judge was obliged to ask him whether any threats or promises induced his decision to waive his right to testify and, instead, found that the record demonstrated he voluntarily waived the right. (*Id.* at 8.)

The court found, further, that trial counsel's decision to challenge Petitioner's arrest and the subsequent evidence, as opposed to simply moving to suppress the video statement, was acceptable defense strategy and did not support a claim for ineffective assistance of counsel.[5] (*Id.* at 12-13.) Nor did Petitioner's video statement exhibit any signs that he was coerced, added the court. (*Id.* at 13.) Finally, the court rejected the argument that trial counsel was ineffective in untimely objecting to admission of the gun and noted that, given the overwhelming evidence against

---

[5]     Although the Illinois appellate court notes that Petitioner claimed ineffective assistance of appellate counsel based on the failure to argue that trial counsel was ineffective in failing to move to suppress the video statement (Post-Conviction Order at 1-2, 9-10), the appellate court does not directly dispose of this claim. This court presumes that, because the appellate court rejected Petitioner's ineffective assistance of trial counsel argument, it would also decline to find appellate counsel ineffective for failing to raise that same argument.

him, Petitioner could not show resulting prejudice.[6] (Id. at 15-16.)  Petitioner filed another PLA with the Illinois Supreme Court, but it too was denied on May 31, 2007.  *People v. Vidaurri*, 224 Ill. 2d 591, 871 N.E.2d 61 (2007).

## II.    Petitioner's Habeas Filing Date and Access to the Prison Law Library

As noted, this action under 28 U.S.C. § 2254, filed on June 19, 2008 (Resp't's Mot. to Dismiss at 3 n.1), is untimely on its face.  Petitioner argues, however, that a prison law clerk's miscalculation of the filing deadline for his habeas petition, combined with Petitioner's subsequent inability to access the prison law library, compels either statutory or equitable tolling of the one-year limitations period for habeas petitions.  Petitioner first sought the assistance of law clerk and fellow inmate Albert Kirkman when, in early June 2007, he received a letter from the Illinois Supreme Court informing him that his post-conviction PLA had been denied.  (Evid. Hr'g Tr. 176-77, Apr. 1-2, 2010.)  Petitioner spoke with Kirkman in Cell House B and showed him the letter, which had two dates on it; at the top, the letter was dated May 31, 2007, but at the bottom it listed July 6, 2007, as the date when "[t]he mandate of [the Illinois Supreme Court] will issue to the Appellate Court." (*Id.*; May 31, 2007 Letter, Ex. 3 to Pet'r's Proposed Ex. List.)  Petitioner understood the letter to communicate that state court review of his conviction had ended and that a federal habeas petition was the only remaining means to challenge his imprisonment.  (Hr'g Tr. at 173.)  But Petitioner did not know how much time he had to file his habeas petition; for this, he sought the assistance of Kirkman.  (*Id.* at 174.)

The parties dispute the exact nature of Kirkman's prison employment.  Petitioner contends that Kirkman is an inmate law clerk whose advice may be attributed to prison officials.  (Pet'r's Br. at 3; Hr'g Tr. at 176.)  Respondent, by contrast, insists that Kirkman is nothing more than a "legal

---

[6]       Here too, the state appellate court acknowledged Petitioner's ineffective assistance of appellate counsel claim based on the failure to argue trial counsel was ineffective when she untimely objected to admission of the gun.  Again, the court did not directly address this claim; this court makes the same presumption it did in footnote 5, *supra*.

box man" whose sole duty is to retrieve from storage the boxes in which prisoners store their legal

materials. (Resp't's Proposed Findings of Fact and Conclusions of Law (hereinafter "Resp't's Br.")

¶ 31.) Kirkman himself testified that his title was "legal box man." (Hr'g Tr. at 239.)

Yet Kirkman's own testimony also belies the notion that he did nothing more than ferry

boxes back and forth. He stated that often, while in the library, he would stand behind a counter

with the other law clerks. (*Id.* at 248.) There, he would distribute habeas packets to inmates who

requested them. (*Id.* at 249.) He acknowledged that other inmates knew he worked in the library

and that he had extensive knowledge about post-conviction appeals, so other inmates "would

approach [him] all the time" to seek his legal advice—even in the cafeteria and the shower.

(*Id.* at 259.) Moreover, the law library associate, Phyllis Baker, identified Kirkman as a law clerk

and noted that, at some point, he received a paralegal certificate. (Baker Dep., Ex. 11 to Resp't's

Proposed Exs., at 48:17-49:3.) Karen Rabideau, Petitioner's correctional counselor, also referred

to Kirkman as a law clerk. (Hr'g Tr. at 59.) Rabideau, who previously served as a prison placement

officer and hired inmates for the law library, testified that inmates working in the library either serve

as law clerks or janitors and that, sometimes, the law clerks retrieve boxes for other inmates. (*Id.*

at 60.) Paralegal assistant Crystal Mason described Kirkman as a "box clerk," but she added that

she did not know his "actual title." (Mason Dep., Ex. 12 to Resp't's Proposed Exs., at 31:19-21.)

Mason and Baker worked together in the law library, supervising the inmate employees; in the

court's view, if they cannot agree on Kirkman's title and duties, surely the inmates themselves were

susceptible to the same confusion. Considered collectively, the evidence supports a conclusion

that, even if Kirkman was a "legal box man" by title, the law library staff delegated at least some law

clerk responsibilities to him.

Petitioner testified that when he first approached Kirkman to discuss his habeas deadline

in early June 2007 in Cell House B, Kirkman told him he had one year from July 6, 2007, to file his

habeas petition. (Hr'g Tr. at 177.) Kirkman's recollection of the interaction was more muddled. He

had no memory of discussing a habeas petition with Petitioner, though he later admitted to having many legal discussions with Petitioner and to reviewing Petitioner's PLA denial letter. (*Id.* at 240, 242, 266.) Kirkman gave conflicting accounts of how he handles inmates' legal questions; at first, he maintained that he would not answer an inmate's question pertaining to the calculation of a deadline. (*Id.* at 272.) But later he stated that, in reviewing such a letter, he "usually" tells inmates to calculate the one-year deadline by the earlier of the two dates.[7] (*Id.* at 242.) Kirkman testified, further, that in the summer of 2007, had an inmate shown him a PLA denial letter like Petitioner's, he would have told the inmate he had one year from the date of the letter to file a habeas petition. (*Id.* at 273, 274-75.) At that time, Kirkman did not understand that the days between the end of a prisoner's direct appeal and the start of his post-conviction review are to be counted against the one-year habeas limitations period. (*Id.* at 274); *see also Morales v. Boatwright*, 580 F.3d 653, 656 (7th Cir. 2009) (explaining that the one-year habeas limitations period begins to run when a prisoner's conviction is final, but excludes days during which petitions for state court relief are pending) (citing 28 U.S.C. § 2244(d)(2)).

Petitioner also discussed his habeas deadline with Kirkman in the prison law library on June 12, 2007. (Hr'g Tr. at 222.) Petitioner testified that on that date, he approached Kirkman, who was sitting behind the library counter, and again showed him the PLA denial letter and inquired about his habeas deadline. (*Id.* at 179.) Kirkman "reassured" Petitioner that he had one year to file and gave him a federal habeas packet for filing in the Northern District of Illinois. (*Id.* at 179-81.) The packet contained a blank petition and general instructions regarding the habeas process. (Blank Habeas Pet. and Instructions for Filing in the U.S. District Court for the Northern District of Illinois (hereinafter "Northern Dist. Packet"), Ex. 1 to Resp't's Proposed Exs.) The prison also

---

[7]     Even if Kirkman had advised Petitioner that he had one year from the earlier of the two dates—May 31, 2007—the resulting deadline (May 31, 2008) still would have been almost two months late. (*See* Petitioner's Filing Timeline, Ex. 16 to Pet'r's Proposed Ex. List, at 1 (worksheet compiled by Petitioner's counsel calculating his actual habeas filing date as April 3, 2008).)

maintained packets for the Central and Southern Districts of Illinois. (Blank Habeas Pet. and Instructions for Filing in the U.S. District Court for the Central District of Illinois (hereinafter "Central Dist. Packet"), Ex. 2 to Resp't's Proposed Exs.; Blank Habeas Pet. and Instructions for Filing in the U.S. District Court for the Southern District of Illinois (hereinafter "Southern Dist. Packet"), Ex. 3 to Resp't's Proposed Exs.)

The record does not reveal who prepares the habeas packets, but each district's packet contains different instructions.[8] The packets for the Central and Southern Districts include essentially the full text of 28 U.S.C. § 2244(d)—the provision explaining calculation of habeas filing deadlines—as well as a citation to the statute, but the packet for the Northern District makes no reference to § 2244 or to a statute of limitations at all. (Central Dist. Packet at 1; Southern Dist. Packet at 2.) The Northern District packet advises prisoners that they "need [not] cite cases or statutes," but also cautions them to "prepare [their] petition[s] with care" because "[o]nce the court has ruled on [their] habeas claims, [they] may not file another habeas petition attacking the same conviction or sentence without prior permission from the U.S. Court of Appeals." (Northern Dist. Packet at 1.) Similarly, the Central District packet warned petitioners that a second habeas may only be filed in "rare circumstances" (Central Dist. Packet at 5), and the Southern District packet cautioned that successive petitions are uncommon once a petitioner has had "one bite at the apple." (Southern Dist. Packet at 2.) When Petitioner received his Northern District packet on June 12, 2007, he reviewed it and spent the remainder of his library time that day researching substantive legal issues relevant to his petition. (Hr'g Tr. at 182.)

Petitioner's June 12, 2007 library visit was his last before he filed his petition more than a year later. Stateville Correctional Center, where Petitioner was incarcerated at the time, has strict

---

[8]     The record does not reveal the source(s) of the information in the packets, which Butler-Winters' observed is "not always accurate." (Hr'g Tr. at 112.) Baker testified that"[m]ost of [the library's] forms come from the school district and senior paralegals." (Baker Dep. 55:4-5.)

procedures regulating inmate access to the law library that become even stricter when the prison is on "lockdown." (Mason Aff., Ex. 11 to Pet'r's Proposed Ex. List, ¶¶ 3, 5.) When the prison is not on lockdown, inmates may request a library visit by filling out a "call pass." (Hr'g Tr. 80-81; Library Call Pass Req., Ex. 1 to Pet'r's Proposed Ex. List, at 1.) Because the form states that "priority will be given to those offenders with the closest filing deadline" (Library Call Pass Req., at 1), inmates typically write their court filing deadlines on the form, although this is not required. (Hr'g Tr. at 94, 189.) Inmates can obtain call passes from the library, from civilian paralegals, or from their correctional counselors. (*Id.* at 186-87.) An inmate may also request a library visit by submitting a written request on a blank piece of paper, known as a "kite." (*Id.* at 29-30, 52-53.) Passes and "kites" are submitted to the library via the institutional mail system, a correctional counselor, or directly to library staff. (Mason Aff. ¶ 3; Hr'g Tr. at 30, 91.) One paralegal estimated that the library receives 60 to 70 call passes per day (Mason Dep. at 14:2), while another estimated there were 50 to 100 per day. (Hr'g Tr. at 84.)

Civilian paralegals collect the call passes and determine which inmates will be granted access on a given day by creating a list called a "library call line." (Hr'g Tr. at 282, 132; Library Call Line, Ex. 9 to Pet'r's Proposed Ex. List.) To create the library call line, paralegals first order the requests by the date they were received and then prioritize the requests of inmates with the nearest verified court deadlines. (Hr'g Tr. at 86, 91-92.) Stateville policy allows several methods for court deadline verification. An inmate can (1) show his court notice to library staff or a law clerk while in the library; (2) show his court notice to unit housing staff; (3) send his court notice to the library via institutional mail; (4) show the notice to a law clerk housed in their unit so the clerk can confirm the notice and convey the deadline to the library staff; or (5) "[a]s a last resort," submit a court notice to his correctional counselor so the counselor can contact the library. (Hr'g Tr. at 289-99; Mar. 3, 2006 Ill. Dept. of Corrections Memorandum (hereinafter "IDOC Memo"), Ex. 17 to Pet'r's Proposed Ex. List, at 1.) Tyneer Butler-Winters, a corrections officer temporarily assigned to serve as a

paralegal assistant from January 2008 to September 2008, explained that she used a "cheat sheet" to verify inmates' deadline dates. (Hr'g Tr. at 101-04; Court Deadline Table, Ex. 4 to Pet'r's Proposed Ex. List, at 1.) She testified that since her first day in the library, the "cheat sheet" was taped to the pull-out writing board in her desk, and to her knowledge, it was not available elsewhere in the library. (*Id.* at 107-08.) Butler-Winters' "cheat sheet" lists the deadline for a habeas petition as "1 year after end of state appeal" and cites 28 U.S.C. § 2254, but not § 2244.[9] (Court Deadline Table at 1.)

There was, however, another "cheat sheet" that, according to Butler-Winters, was maintained in the "catalogue area" with the habeas packets. (Hr'g Tr. at 156-57.) Unlike the "cheat sheet" Butler-Winters used to verify court deadline dates, this second "cheat sheet" did include a citation to 28 U.S.C. § 2244. (Court Deadlines, Ex. 4 to Resp't's Proposed Exs., at 2.) It also stated that habeas petitions "[g]enerally must be filed within one year of the end of the appeal process (but the time during which post-conviction was pending does not count towards that year)." (*Id.*) Paralegal assistant Mason testified that she uses this second "cheat sheet" to compute court deadlines, but also stated that she has never had to check an inmate's stated deadline date against the "cheat sheet" to see if the date was accurate. (Mason Dep. at 19:10-20:3, 24:22-24.) Because this second "cheat sheet" was behind the counter, only law clerks had direct access to it, although inmates could obtain it upon request. (Hr'g Tr. at 156-57.) If an inmate asked the clerks about how to calculate a deadline, the clerks would not necessarily give the inmate the second "cheat sheet"; sometimes they simply communicated the deadline calculation verbally. (Baker Dep. at 55:21-23.) Petitioner testified that he never saw the second "cheat sheet" while at Stateville. (Hr'g Tr. at 216-17.)

---

[9]     While 28 U.S.C. § 2254 explains the general mechanics of habeas relief, it makes no mention of the corresponding one-year statute of limitations detailed in § 2244.

Prison paralegals compile a list of all the inmates with verified court deadlines in order to facilitate creation of the library call lists. (Mason Dep. at 12:14-18.) A library call list will include roughly thirty inmates and, during non-lockdown periods, inmates from each cell house visit the library twice a week. (Mason Aff. ¶ 4; Mason Dep. at 47:5.) The library can accommodate a thirty-person visit in the morning and another in the afternoon. (Hr'g Tr. at 85.) Butler-Winters estimated that eighty percent of inmates visiting the law library had court deadlines (*id.* at 148), while Mason gauged the percentage at roughly half. (*Id.* at 283.)

Access to the law library is limited, however, when a cell house or the entire prison is on a lockdown. There are four categories of lockdown at Stateville, but Level 1 and Level 4 lockdowns occur most often. (Hr'g Tr. at 153.) During a Level 1 lockdown, inmates are not permitted to visit the library for any reason. (Mason Aff. ¶ 5.) During a Level 4 lockdown, inmates who receive special permission from the warden may visit the library to access their legal boxes but not to conduct research. (Hr'g Tr. at 153.)

Even during lockdown periods, however, inmates have at least some access to legal materials. Inmates with a good understanding of the materials they need may request copies of certain documents from the library during a lockdown. (Hr'g Tr. at 89.) To do so, an inmate must write a list of the materials he needs on either a blank piece of paper or a preprinted work order request form and send the request to the library via institutional mail. (*Id.* at 141.) Once the library receives the request, a paralegal will make copies of the requested materials and deliver them to the inmate either via the mail system or by hand. (*Id.* at 144.)

Also during lockdown, a civilian paralegal will visit each cell house twice a week, in lieu of the twice weekly library visits, and go from cell to cell to discuss legal matters with the inmates and gather requests for library materials. (Hr'g Tr. at 117-18.) The paralegals give inmates having verified court deadlines priority during the lockdown rounds. (Mason Aff. ¶ 5.) They also keep "at-cell service logs" to record requests inmates make during these personal visits. (*Id.* at 120-21; Law

13

Library Cell Service Request Sheet, Ex. 12 to Pet'r's Proposed Ex. List.) Once back in the library, the paralegals make copies of any requested materials and send them to the inmates. (Hr'g Tr. at 122.)

Between May 31, 2007 (the date of the letter Petitioner received informing him of the denial of his post-conviction PLA) and mid-June 2008 (when Petitioner filed his habeas petition), lockdowns affecting Stateville as a whole or Petitioner's cell house (B) took place on the following dates:

- June 30, 2007 – July 6, 2007 (Level 1)
- July 6, 2007 – July 10, 2007 (Level 4)
- July 11, 2007 – August 10, 2007 (Level 1)
- August 10, 2007 – August 31, 2007 (Level 4)
- August 31, 2007 – September 7, 2007 (Level 1)
- September 7, 2007 – September 24, 2007 (Level 4)
- November 25, 2007 – November 28, 2007 (Level 1)
- November 28, 2007 – December 7, 2007 (Level 4)
- December 31, 2007 – January 2, 2008 (Level 1)
- January 13, 2008 – January 15, 2008 (Level 1)
- January 15, 2008 – January 23, 2008 (Level 4)
- January 23, 2008 – January 28, 2008 (Level 1)
- January 28, 2008 – February 1, 2008 (Level 4)
- February 1, 2008 – February 2, 2008 (Level 1)
- February 2, 2008 – February 3, 2008 (Level 4)
- February 3, 2008 – February 7, 2008 (Level 1)
- February 7, 2008 – February 9, 2008 (Level 4)
- February 15, 2008 – February 25, 2008 (Level 4)
- February 28, 2008 – February 29, 2008 (Level 1)
- March 25, 2008 – March 28, 2008 (Level 1)
- March 28, 2008 – April 18, 2008 (Level 4)
- April 24, 2008 – April 25, 2008 (Level 1)
- May 15, 2008 (Level 1)
- May 15, 2008 – May 17, 2008 (Level 4)
- June 15, 2008 – June 16, 2008 (Level 4)
- June 16, 2008 – June 19, 2008 (Level 1)

(Lockdown Periods of May 1, 2007 to June 30, 2008, Ex. 6 to Pet'r's Proposed Ex. List.)  By the court's calculation, Petitioner was on lockdown for 178 days in the year following his June 12, 2007 library visit or in other words, half the year.  Although inmates were unable to access the library for legal research purposes during any of the aforementioned lockdown periods, many continued to

submit library call passes in the hopes of visiting the library once lockdown was lifted. (Hr'g Tr. at 88, 97.) Accordingly, there was often a backlog of such requests after a lockdown period ended. (*Id.* at 88.)

After his June 12, 2007 library visit, Petitioner assumed that he would be able to return to the library "[p]lenty of times" before filing his habeas petition. (Hr'g Tr. at 183.) To the contrary, the record reveals that, despite his best efforts, Petitioner was denied law library access for more than a year. (*See* Mason Aff. ¶ 9 (showing Petitioner's next visit was September 9, 2008).) Petitioner stated that his general policy was to submit weekly library call passes in non-lockdown periods and, if there was a lockdown, he would wait about a week after it ended to see if he would be called, based on previously submitted call passes, before submitting a new call pass. (*Id.* at 191-92.) Petitioner stated that he did not submit library call passes during lockdown because he knew they could not be granted. (*Id.* at 191.) When he did submit a library call pass, Petitioner wrote that his court deadline date was July 6, 2008, and sent it to the library via either institutional mail or his correctional counselor, Rabideau. (*Id.* at 190.)

Rabideau served as Petitioner's counselor until he was transferred to a new facility in 2009, and she confirmed that Petitioner frequently complained about his inability to access the law library. (Hr'g Tr. at 17, 44.) Rabideau testified, and her notes from her cell house rounds confirm, that Petitioner's difficulty visiting the library was a "repeated" and "constant" issue for him. (*Id.* at 32, 33.) While Rabideau did not have any independent recollection of her conversations with Petitioner, her notes reflect that Petitioner spoke with her about accessing the library or obtaining library call passes no fewer than eleven times in the year before he filed his habeas petition. (Rabideau's Notes from Cell House Rounds, Ex. 2 to Pet'r's Proposed Ex. List, 1-11.) Petitioner made at least five more library-related requests of Rabideau after filing his habeas petition but before he was granted access. (*Id.* at 12-16.) Furthermore, Rabideau's notes show that she e-mailed Baker to ask about Petitioner's filing deadline and to help Petitioner gain access to the

library on at least three separate occasions (and Rabideau testified that she e-mailed Baker even more than that). (Hr'g Tr. at 34.) Sometime shortly after May 27, 2008, Rabideau spoke with Baker personally about Petitioner's inability to access the law library and also e-mailed paralegal Butler-Winters on Petitioner's behalf. (*Id.* at 38.) These efforts proved unsuccessful; as noted, Petitioner was unable to visit the library until September 2008.

Petitioner's direct requests for assistance from Butler-Winters, who made the twice-weekly rounds on Cell House B during lockdown periods starting in February 2008, also went unaddressed.[10] When Butler-Winters made her rounds, Petitioner routinely informed her that he was filing a federal habeas petition, that he had a deadline, and that he needed access to the library. (Hr'g Tr. at 202.) During at least one lockdown, Petitioner asked Butler-Winters to bring him materials related to federal habeas filing, but she replied that he needed to request specific materials. (*Id.* at 203-04.) Petitioner testified that he could not be more specific because he did not know what to request; consequently, he received no materials. (*Id.* at 204.) Butler-Winters testified that she remembered Petitioner telling her about his filing deadline during rounds (*id.* at 127), and that Petitioner requested federal habeas materials. (*Id.* at 131-32.)

Petitioner began preparing his habeas petition in April or May 2008; he did not do so earlier because he was hoping to conduct legal research on the substantive claims underlying his petition. (Hr'g Tr. at 205.) He believed that filing in federal court was serious and complicated, and he wanted "to do as much research as possible." (*Id.*) But when it appeared unlikely that he would be able to do that research, he began compiling his petition using only the personal legal records he kept in his cell (others were kept in the library) and a typewriter. (*Id.* at 185-86, 212.) Petitioner filed his habeas petition on June 19, 2008. (Resp't's Mot. to Dismiss at 3 n.1.)

---

[10] The record does not reveal the identity of the Cell House B paralegal prior to February 2008. Mason stated that she could not recall which cell house(s) she covered at that time period, nor could she recall whether a temporary paralegal named Mark McCoy covered Cell House B during that time. (Mason Dep. at 15:4-14.)

It was not until he received Respondent's motion to dismiss in August 2008 that Petitioner learned that he may have missed his habeas filing deadline. (Hr'g Tr. at 206.) In light of his new deadline for responding to the State's motion, Petitioner was granted access to the library on September 9, 2008. (Hr'g Tr. at 206; Mason Aff. ¶ 9.) Throughout Petitioner's stay at Stateville, the library maintained a copy of 28 U.S.C. § 2244 governing the statute of limitations on writs of habeas corpus (Mason Aff. ¶ 10); during Petitioner's September 9, 2008 visit to the library, he was finally able to read § 2244 and ascertain that he had filed his petition according to a deadline that erroneously failed to account for the days between the end of his direct review and the initiation of his post-conviction review. (Hr'g Tr. at 209.)

## DISCUSSION

I.     **Tolling the One-Year Statute of Limitations Period**

Petitioner does not contest that his habeas petition was filed late; rather, he asserts that the statute of limitations should be either equitably or statutorily tolled and his petition deemed timely. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), prisoners generally have one year to file a habeas petition from the conclusion of direct review of their conviction, not counting the days during which state court post-conviction proceedings are pending. 28 U.S.C § 2244(d). The one-year period is statutorily tolled, however, where the state creates an impediment to filing that violates the Constitution or federal law and "prevents" the applicant from filing. 28 U.S.C. § 2244(d)(1)(B). Petitioner alleges Kirkman's miscalculation of his habeas filing date, coupled with his subsequent inability to access the law library for the following year, amounted to just such a state-created impediment. (Pet'r's Resp. to Resp't's Mot. to Dismiss ¶ 12.) Petitioner also argues, in the alternative, that the court should apply the doctrine of equitable tolling because, despite his reasonable diligence, extraordinary circumstances prevented Petitioner from timely filing his habeas petition. (*Id.* at ¶ 16.)

17

A petitioner must overcome significant hurdles before a court will toll a habeas statute of limitations period. This court has been unable to find a case in which the Seventh Circuit has tolled a habeas limitations period, either under the doctrine of equitable tolling or under the statutory tolling provision in § 2244(d)(1)(B). Notably, the Supreme Court itself did not definitively hold the doctrine of equitable tolling applicable to habeas petitions until quite recently. *See Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010) (holding that AEDPA's statutory limitations period may be subject to equitable tolling in appropriate cases). But even tolling under AEDPA's own provisions is a relatively infrequent occurrence. *See, e.g.*, *Powell v. Davis*, 415 F.3d 722, 727 (7th Cir. 2005) (finding no state-created impediment to habeas filing where the public defender's "first-in, first-out" prioritization of cases caused the petitioner's limitations period to lapse); *Lloyd v. Van Natta*, 296 F.3d 630, 633 (7th Cir. 2002) (state's failure to deliver a trial transcript to petitioner did not "prevent" him from timely filing his habeas petition); *United States ex rel. Hughes v. Pierce*, No. 09 C 6247, 2011 WL 1485269, at *4-6 (N.D. Ill. Apr. 19, 2011) (no state-created impediment existed where petitioner failed to prove that correctional employees prevented him from accessing the law library); *United States ex rel. Andujar v. Pierce*, No. 10 C 4168, 2010 WL 4628765, at *3 (N.D. Ill. Nov. 8, 2010) (no state-created impediment where state did not timely notify petitioner of dismissal of his post-conviction petition or where petitioner's mental illness prevented him from understanding his legal rights); *but see Coker v. Jones*, No. 07 C 5988, 2008 WL 4372395, at *2 (N.D. Ill. Sept. 24, 2008) (finding a state-created impediment and tolling a habeas limitations period where the petitioner was transferred to a new prison but his personal legal papers were not sent to him until four to six months later). Indeed, many district court judges have noted that the Seventh Circuit has yet to define "state-created impediment" under § 2244(d)(1)(B). *See, e.g.*, *Hughes*, 2011 WL 1485269, at *3 (St. Eve, J.); *Andujar*, 2010 WL 4628765, at *3 (Lindberg, J.); *United States ex rel. Strong v. Gaetz*, No. 07 C 435, 2009 WL 3060267, at *9 (N.D. Ill. Sept. 21, 2009) (Kennelly, J.).

Petitioner here has made a compelling argument for tolling: he contends that a prison law clerk's miscalculation of his deadline date, coupled with his subsequent inability to access the law library for a year, constituted a state-created impediment, or in the alternative, extraordinary circumstances that prevented him from timely filing his petition despite his best efforts. Indeed, one district court has already declared that facts essentially identical to those Petitioner presents here would be sufficient to invoke some form of tolling. *See Strong*, 2009 WL 3060267, at *9 ("Were a prison law clerk or prison staff member to give an inmate . . . incorrect information about his filing deadline that caused the inmate to file his federal habeas corpus petition late, that advice, particularly if combined with the resulting prioritization of law library access, would amount to a state-created impediment entitling the inmate to a later start date for the one-year limitation period, or at least a basis for equitable tolling of the limitation period."). Furthermore, the Seventh Circuit has suggested that inadequate access to the prison law library could serve as a basis for tolling a habeas petition. *See Moore v. Battaglia*, 476 F.3d 504, 508 (7th Cir. 2007) (remanding for further fact-finding regarding the petitioner's claim that lack of access to the prison law library constitutes a state-created impediment to filing).[11]

The facts Petitioner has presented generate concern about the obstacles to timely habeas filing that many prisoners, including Petitioner, have faced. To begin, Kirkman, a prison law clerk, misinformed Petitioner concerning his habeas filing date on two separate occasions. Although Kirkman was a fellow inmate, he was employed by the prison as a law clerk in the library, and he routinely answered inmates' legal questions and advised them on their filing deadlines. Law library staff were well aware of Kirkman's interactions with the other inmates. Indeed, it was official prison policy that an inmate law clerk could verify the court deadline dates of fellow inmates residing in his

---

[11]     On remand, the district court again dismissed the petition but did so on adequate and independent state procedural grounds. *Moore v. McCann*, No. 03-1055, slip op. at 13 (Ill. App. Ct. Aug. 27, 2007) (unpublished order).

same cell house.  (*See, e.g.*, Hr'g Tr. at 296-98; IDOC Memo at 1) (explaining that inmates can verify their court deadlines by showing a law clerk their notice either in the library or in their cell house units).)  And law library associate, Phyllis Baker, acknowledged that inmates routinely ask the law clerks for legal assistance, including regarding the computation of filing deadlines.  (Baker Dep. 44:5-18.)  Baker testified, further, that when an inmate did ask for assistance calculating a deadline, it was not uncommon for law clerks to simply tell the inmate what they thought the deadline was, rather than giving the inmate the court deadline "cheat sheet" that included a reference to § 2244.  (Baker Dep. 55:18-23.)

The library maintained copies of that "cheat sheet," but prison policy does not require them to distribute the sheet whenever an inmate asks about a habeas deadline.  Indeed, no clerk or library staff ever gave the sheet to Petitioner, and he cannot reasonably be expected to specifically request that which he does not know exists.  Petitioner did ask, however, for any materials related to federal habeas petitions and Kirkman gave him the federal habeas packet for the Northern District of Illinois.  Curiously, this packet makes no reference to any statute of limitations period or to § 2244, though the packets for the Central and Southern Districts of Illinois both explained the operation of the limitations period and cited to § 2244; it is not clear why the different districts should have different instructions for matters governed by federal law.

Perhaps most worrisome is that, despite Stateville's policy of verifying all court deadlines to determine priority library access, no one ever noticed that Petitioner's date had been miscalculated.  Either prison officials violated their own policy by failing to verify the date, or whoever did verify the date did not understand the operation of § 2244 either.  The fact that library access, already limited by frequent lockdowns, is determined according to impending court deadlines exacerbated Petitioner's predicament.  His correctional counselor's notes corroborated his assertion that he had repeatedly sought, and was repeatedly denied, access to the law library during non-lockdown periods.  In fact, he was not admitted to the law library for more than a year

after first receiving his federal habeas packet.  Under these circumstances, Petitioner never had an opportunity to discover the error in his deadline despite his best efforts to diligently prepare and timely file his habeas petition.  Petitioner ultimately filed his habeas petition several weeks before what he thought was his deadline; the court has no reason to believe that, had he known his actual deadline, he would not have timely filed his petition.

The court concludes that these circumstances present the rare case that compels tolling of Petitioner's habeas limitations period under 28 U.S.C. § 2244(d)(1)(B).  Kirkman assured Petitioner that his filing deadline was in July 2008 and, because the prison repeatedly denied Petitioner access to the law library for over a year, Petitioner was unable to learn that his actual filing date was in early April 2008.  Thus, the prison effectively prevented him from timely filing his habeas petition, and in doing so, substantially hindered his efforts to pursue his nonfrivolous habeas claims.

As an aside, the court notes that the miscalculated habeas deadline is all too familiar, that it burdens the justice system directly and taxpayers indirectly, and that it could readily be avoided if correctional staff provided uniform written materials that include simple and clear explanations of the relevant AEDPA provisions, including § 2244.  A notice such as the behind-the-scenes "cheat sheet" could be posted and circulated.  A simple, one-hour training on habeas deadline calculation for library staff could spare many hours of litigation.  Such steps would not, of course, guarantee timely filing, but they could eliminate the kind of dispute that has prolonged this litigation.

## II.    The Merits of Petitioner's Habeas Claims

Having concluded that the petition before the court may be deemed timely, the court turns to consideration of its merits. Respondent has not yet filed an answer to the habeas petition, but the rules make clear that the court need not order such a response, and instead must summarily dismiss the petition, where "'it plainly appears from the petition . . . that the petitioner is not entitled to relief.'"  *Mayle v. Felix*, 545 U.S. 644, 656 (2005) (quoting Rules Governing § 2254 Cases in the

United States District Courts, Rule 4). The court concludes from the face of the petition at issue here that Petitioner's claims of ineffective assistance of trial and appellate counsel do not entitle him to relief and therefore, his petition must be dismissed.

### A.     Standards for Review of Habeas Petition

Under the now familiar provisions of AEDPA, the court will grant habeas relief only where the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir. 2011). A federal court may grant a writ of habeas corpus under the "contrary to" clause only where the state court applied a rule that "contradicts" Supreme Court precedent or where it "reached a different outcome based on facts 'materially indistinguishable' from those previously before the Supreme Court." *Morgan*, 662 F.3d at 797 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Under the "unreasonable application" clause, Petitioner must show that the state court unreasonably refused to apply Supreme Court precedent where it should have been applied, or that it unreasonably applied the precedent where it should not have been applied. *Id.* (citing *Virsnieks v. Smith*, 521 F.3d 707, 713 (7th Cir. 2008)). Even if a reviewing court finds the application to be "substantively incorrect," it is reasonable as long as it is acceptable. *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005) (citing *Williams*, 529 U.S. at 411-12).

Before the court can consider Petitioner's claims, he must "exhaust[ ] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In other words, he must "fairly presen[t] federal claims to the state court in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Johnson v. Pollard*, 559 F.3d 746, 751 (7th Cir. 2009) (alteration in original) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). To do so, Petitioner is required to "fairly present" his claims through "'one complete round'" of state court

review; if he fails to do so, the claim is deemed procedurally defaulted. *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Procedural default "bars federal review unless the petitioner demonstrates cause for the default and actual prejudice as a result of the failure [to fairly present a claim] or demonstrates that the failure to consider the claim will result in a fundamental miscarriage of justice." *Dellinger v. Brown*, 301 F.3d 758, 764 (7th Cir. 2002) (citing *Rodriguez v. Scillia*, 193 F.3d 913, 917 (7th Cir. 1999)).

### B.      Ineffective Assistance of Trial Counsel

Petitioner alleges that his trial counsel's performance was ineffective in a variety of ways. To prove such a claim, Petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In examining the first prong, the court asks "[w]hether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo v. Moore*, 131 S. Ct. 733, 740 (Jan. 19, 2011) (quoting *Strickland*, 466 U.S. at 690). Prejudice occurs, under the second prong, where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A habeas court reviewing a state court's application of *Strickland* asks only whether that application was contrary to, or unreasonable in light of, Supreme Court precedent, not whether counsel's performance was deficient. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). So while "[s]urmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010), challenging a state court's application of *Strickland* is even harder. *Harrington*, 131 S. Ct. at 788; *see also Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997) ("*Strickland* builds in an element of deference to counsel's choices in conducting litigation [and] § 2254(d)(1) adds a layer of respect for the state court's application of the legal standard.").

One of Petitioner's factual bases for alleging ineffective assistance of counsel is procedurally defaulted, however. "Adequate presentation of a claim to the state courts requires the petitioner to present both *the operative facts* and the legal principles that control each claim." *Pole v. Randolph*, 570 F.3d 922, 934-35 (7th Cir. 2009) (emphasis added) (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). In his habeas petition, Petitioner alleges that his trial counsel was ineffective, in part, because she failed to timely object to Detective Garcia's statement on the stand that six people witnessed Petitioner's presence in the van on the night of the shooting; the state presented only two such witnesses. (Habeas Pet. at 8.) But prior to his habeas petition, Petitioner claimed ineffective assistance based on this failure to object only in his post-conviction PLA (not in the original post-conviction petition itself and not on direct appeal). Because he did not submit these "operative facts" for his ineffective assistance claim in one complete round of state court review, he is barred from raising them here.

Petitioner did, however, identify other alleged errors that he did present through one complete round of state court review.[12] This court will examine his trial counsel's performance "as a whole" because "'it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief.'" *Pole*, 570 F.3d at 934 (quoting *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)). Specifically, Petitioner asserts that his trial counsel provided him ineffective assistance of counsel by (1) failing to challenge the videotaped statement he claims was coerced; (2) failing to investigate the law and facts concerning the third-party consent that led to Petitioner's warrantless arrest; (3) failing to object to the admission of the .9 millimeter gun, the alleged knowing use of perjured testimony by the state, and supposed misstatements of fact in the

---

[12] The record includes Petitioner's original petition for post-conviction relief and his petition for leave to appeal to the Illinois Supreme Court; it does not include the appellate brief he filed upon dismissal of his petition at the trial court level. Petitioner raises all the same arguments in his original petition and in his PLA and the court presumes he did so upon appeal as well.

State's closing; (4) preventing Petitioner from testifying; and (5) conceding his guilt in closing argument. (Habeas Pet. at 5-16.)

In reviewing Petitioner's first claim—that trial counsel was ineffective in failing to file a motion to suppress the videotape of his statement to police—the Illinois appellate court first noted that the decision to move to suppress evidence is traditionally a matter of trial strategy and such a decision typically cannot support an ineffective assistance claim. (Post-Conviction Order at 12.) Petitioner's trial counsel opted, instead, to challenge his warrantless arrest and all evidence obtained therefrom, including the video statement. (*Id.* at 13.) The appellate court found that the decision to challenge the arrest, thereby indirectly challenging the statement, demonstrated trial counsel's professional judgment that such a motion had a greater potential for success than a motion to suppress the allegedly coerced statement directly. (*Id.*) And, the court added, counsel is not required to make losing motions in order to provide effective assistance. (*Id.* at 12.)

Indeed, a motion to suppress Petitioner's statement on the basis that it was the result of police coercion appears to have had no chance of success. As the appellate court observed, the video of the statement shows Petitioner sitting calmly at a table, assenting to the waiver of his *Miranda* rights, and calmly answering questions. (*Id.* at 13.) Of particular import, at the conclusion of the statement and without any prompting from police, Petitioner volunteered the statement that "he wanted the judge to know that he was willing to cooperate with the investigation." (*Id.*) Given the complete dearth of evidence of coercion and Petitioner's apparent strategic desire to cooperate, the appellate court concluded that trial counsel's decision not to move to suppress the statement on that basis cannot be said to fall below an objective standard of reasonableness. This court cannot say that the state court's assessment here was contrary to, or an unreasonable application of, the *Strickland* standard.[13]

---

[13]     Petitioner also bases his ineffective assistance claim on trial counsel's challenge of
(continued...)

Petitioner also attacks his trial counsel's failure to make various objections throughout the course of the trial. (Habeas Pet. at 8-10, 12-15.) First, he cites trial counsel's untimely objection to the admission, for lack of foundation, of a .9 millimeter handgun during the testimony of Detective Climack. (*Id.* at 9-10.) In examining this claim, the Illinois appellate court first noted that even failure to object to inadmissible evidence does not necessarily constitute ineffective assistance. (Post-Conviction Order at 15.) The court then explained that counsel did indeed object to the evidence the following day and found that the delay in objecting was insufficient to show ineffective assistance. (*Id.*)

The state court also added that, even if counsel's untimely objection was unreasonable, Petitioner had not satisfied *Strickland*'s prejudice prong. (Post-Conviction Order at 15.) Assuming that the State did not properly lay the foundation for and establish the relevance of the gun, Petitioner cannot show ineffective assistance here without also proving that there is a reasonable probability that, but for counsel's failure to timely object, he would not have been found guilty. Here, given the substantial evidence against Petitioner, there is no such probability. As the state court observed, "[c]ontrary to [P]etitioner's assertion, the evidence at trial was not closely balanced." (*Id.*) The State presented two witnesses who testified that they were in the van on the night of the shooting, that Petitioner was driving the van, that Petitioner chased after Snowden's car at Ocon's instruction, and that Petitioner pulled the van up alongside Snowden's car while Ocon and Vera shot at the victims. (*Id.* at 15.) Not only did the three surviving witnesses corroborate that testimony, but so did Petitioner; in his statement to police, Petitioner admitted to driving the van and

---

[13](...continued)
his warrantless arrest, arguing that her decision to file what was plainly "a losing motion," demonstrates her ineffectiveness, in and of itself. (Habeas Pet. at 7.) Although the Illinois appellate court did not directly address this claim in its opinion, trial counsel's attempt to challenge Petitioner's arrest, even if ultimately fruitless, does not fall below *Strickland*'s objective standard of reasonableness. Just as the provision of effective legal assistance does not require counsel to file losing motions, it obviously does not confine counsel to filing only those motions certain to be granted.

following Snowden's car. (*Id.* at 15-16.) He even admitted to giving Ocon a loaded gun earlier that night. (*Id.* at 16.) Any error in failing to timely object to the admission of the gun did not cause the jury to find Petitioner guilty; the verdict was a result of the overwhelming evidence against him.

Petitioner's other claims of failure to object compel the same conclusion. He argues that his trial counsel was ineffective in failing to object to the State's alleged knowing use of perjured testimony and purposeful misstatement of fact during closing arguments. Neither of these factual bases for Petitioner's ineffective assistance claim were directly addressed by the Illinois appellate court but they, too, are meritless. The so-called "perjured" testimony is based on one witness's inconsistent testimony concerning which van passenger opened the sliding door before the shooting began. (Habeas Pet. at 11-13.) The alleged misstatement of fact in the State's closing occurred when the prosecutor stated that Petitioner hid the guns in the van even though, Petitioner claims, the prosecutor knew from his co-defendants' trials that someone else hid the guns. (*Id.* at 14,15.) Even if a failure to object to either the testimony or the closing constituted an unreasonable error by trial counsel, as explained above, Petitioner cannot show resulting prejudice. The evidence showed that Petitioner, as the driver of the van, chased after the victims so that his friends could fire shots into their car; the identity of the person who opened the sliding door does not alter these facts. The same can be said of the prosecutor's statement that Petitioner hid the guns. Even if those statements were inaccurate and stricken from the record upon trial counsel's objection, the State had still presented sufficient evidence establishing Petitioner's guilt based on his role as the supplier of one of the guns used in the shooting and as the driver of the van.

Trial counsel also failed to provide effective assistance, argues Petitioner, when she purportedly refused to allow him to testify. Petitioner states that, when he told trial counsel he wanted to testify on his own behalf, she told him he was "crazy" and that she would have him "thrown out" of the courtroom if he even tried. (Habeas Pet. at 11.) Petition alleges, further, that counsel promised him that, because of an erroneous jury instruction, he would be acquitted of at

least one charge if he proceeded without testifying. (*Id.*)  But the Illinois appellate court found that

Petitioner voluntarily waived his right to testify based on the following in-court exchange:

> The Court:    Mr. Vidaurri, I just want to advise you that your attorney, I'm sure,
> told you the same thing, that you have a right to testify, you also
> have a right not to testify, but that's your decision.  Do you
> understand that?
>
> Petitioner:   Yes, sir.
>
> The Court:    Is it your decision that you don't want to testify today?
>
> Petitioner:   Yes, sir.

(Post-Conviction Order at 8.)  Unless there is some indication that a defendant has actually been

prevented from testifying, the Constitution does not require trial courts to question defendants about

whether they have knowingly and voluntarily waived their right to testify.

*United States v. Manjarrez*, 258 F.3d 618, 623-24 (7th Cir. 2001).  Nevertheless, the trial court here

admonished Petitioner about his right to testify (and his right not to testify) and did indeed ask

whether his decision not to testify was his own, thereby giving Petitioner ample opportunity to

address the threats and promises he alleges his attorney made.  In response, Petitioner simply

stated that it was *his* decision not to testify.  Therefore, this court agrees that the transcript evinces

Petitioner's knowing and voluntary waiver of his right to testify and does not support Petitioner's

claim that trial counsel made threats to induce that waiver.  The appellate court also rejected

Petitioner's assertion that the court should have asked him whether any threats or promises had

induced his decision not to testify as not rooted in the law.  (*Id.*)  Because the record does not

support the claim that Petitioner's trial counsel prevented him from testifying, trial counsel's conduct

cannot fall below an objective standard of reasonableness on that basis.

Even if Petitioner's trial counsel prevented him from testifying, Petitioner has not established

how he was prejudiced by his counsel's deficient performance.  "[D]efendants who allege they

waived their right to testify still must show that this waiver was prejudicial, i.e., that the failure to

testify affected the outcome of the trial." *Barrow v. Uchtman*, 498 F.3d 597, 608 n.12 (7th Cir. 2005) (citing *Rodriguez v. United States*, 286 F.3d 972, 983-84 (7th Cir. 2002)).  Petitioner does not explain what testimony he would have given on his own behalf, and in light of the statements he made at his videotaped confession, there is no likelihood that any testimony would have changed the outcome of the trial.

Petitioner's final basis for asserting trial counsel's ineffectiveness—that she conceded his guilt during closing arguments—is equally unavailing.  During closing arguments, trial counsel made the following, somewhat confusing, statement:

> Apparently driving the van to get the shooters to where they were going to shoot is accountability but opening the door, get out and shoot as Bam Bam did, that's not accountability.  Exactly the same action.  Driving the car for under three minutes, opening the door.  Something that took a second or two.  But Bam Bam is not accountable.  Mr. Vidaurri is accountable.  He's accountable because he drove the van.

(Trial R., Ex. to Post-Conviction Pet., at Q41-42.)  Petitioner states that trial counsel was making a sarcastic but ultimately prejudicial comparison between him and someone who actually fired a gun at Snowden's car.  (Habeas Pet. at 15-16.)  Without having the full record before it, this court interprets trial counsel as comparing Petitioner's conduct to that of the person who opened the van door but did nothing more; counsel appears to be making the implicit suggestion that Petitioner's role in the incident must be viewed as far less blameworthy.  In the court's view, the quoted language reflects inarticulateness, at worst; there is no basis for concluding that this single isolated comment constitutes incompetence under prevailing professional norms.  Here too, the Illinois appellate court did not directly address this argument on post-conviction review, but this court finds that counsel's perhaps clumsy closing argument did not fall below an objective standard of reasonableness and certainly did not prejudice Petitioner, given the weight of the evidence against him.

### C.    Ineffective Assistance of Appellate Counsel

29

Petitioner's claim of ineffective assistance of appellate counsel fares no better. Construing his *pro se* petition liberally, *Munson v. Gaetz*, ___ F.3d ___, No. 11-1532, 2012 WL 752372, at *2 (7th Cir. Mar. 9, 2012), Petitioner claims his appellate counsel erred in failing to make a sufficiency of the evidence argument, despite his urging, and in failing to raise all the arguments for ineffective assistance of trial counsel that he raises here. (Habeas Pet. at 16-17.) Again, the Illinois appellate court alluded to, but did not directly dispose of, Petitioner's claim of ineffective assistance of appellate counsel, perhaps because that claim appears entirely frivolous. On appeal, counsel argued that the trial court erred in failing to question potential jurors about gang bias and that trial counsel was ineffective for the same reason. (Direct Review Order at 1.) While ultimately unsuccessful, appellate counsel made a strategic decision to advance the gang bias issue, as opposed to the arguments Petitioner advances here, and her decision to do so did not fall below prevailing professional norms. Appellate counsel did not err in failing to raise the unsuccessful claims of trial counsel's alleged ineffectiveness that this court has just dismissed as meritless. Nor was it unreasonable for appellate counsel to decline to raise a sufficiency of the evidence argument, given the abundance of evidence bolstering the guilty verdicts. Equally futile is Petitioner's insistence that his appellate counsel was prejudiced against him because she allegedly suggested he take responsibility for his actions.[14]

As the Supreme Court has recently emphasized, both the *Strickland* standard and the habeas review standard under § 2254(d) are "'highly deferential[,]' . . . and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (citations omitted). Petitioner cannot

---

[14]     Petitioner states that during a phone conversation, appellate counsel rejected his suggested claims of trial counsel's ineffectiveness and told Petitioner, "'You were a gang[ ]member doing a drive[-]by shooting. I would hope you [would] take your responsibility.'" (Habeas Pet. at 29.) Petitioner does not explain how this conversation, conducted during the course of privileged communication between an attorney and her client, affects the constitutionality of his conviction. Nor does he attach to his petition a sworn affidavit in which he describes this conversation, thereby leaving the court with no factual basis for finding that it occurred in the first place.

satisfy this "doubly" deferential standard. Even considering collectively all the separate factual bases for ineffective assistance that Petitioner alleges against both his trial and appellate counsel, the state court's finding that Petitioner did not receive ineffective assistance is not contrary to, nor an unreasonable application of, the *Strickland* standard. Petitioner's ineffective assistance claims are dismissed.

## CONCLUSION

For the reasons explained herein, the court dismisses as meritless the petition for a writ of habeas corpus. The court declines to issue Petitioner a certificate of appealability, because he has failed to make "'a substantial showing of the denial of a constitutional right.'" *Gonzalez v. Thayer*, ___ U.S. ___, 132 S. Ct. 641, 648 (Jan. 10, 2012) (quoting 28 U.S.C. § 2253(c)(2)); *see also Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011) (noting the Supreme Court's statement that the required "substantial showing" exists only where "reasonable jurists" could debate the disposition of the petition) (citing *Slack v. McDaniel*, 529 U.S. 476, 484 (2000)).


ENTER:


Dated: March 29, 2012

_____
REBECCA R. PALLMEYER
United States District Judge